LAW OFFICES OF

WALKUP, MELODIA, KELLY & SCHOENBERGER
A PROFESSIONAL CORPORATION

650 CALIFORNIA STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94108-2615
T: (415) 981-7210 · F: (415) 391-6965

MICHAEL A. KELLY (State Bar #71460)
mkelly@walkuplawoffice.com
RICHARD H. SCHOENBERGER (State Bar #122190)
rschoenberger@walkuplawoffice.com
MATTHEW D. DAVIS (State Bar #141986)
mdavis@walkuplawoffice.com
ASHCON MINOIEFAR (State Bar #347583)
aminoiefar@walkuplawoffice.com

SHANIN SPECTER (Pennsylvania State Bar No. 40928)
(Admitted Pro Hac Vice)
shanin.specter@klinespecter.com
ALEX VAN DYKE (CA State Bar No. 340379)
alex.vandyke@klinespecter.com
KLINE & SPECTER, P.C.
1525 Locust Street
Philadelphia, PA  19102
Telephone:  (215) 772-1000
Facsimile:  (215) 772-1359

**ATTORNEYS FOR ALL PLAINTIFFS**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO/OAKLAND
DIVISION

| | |
|---|---|
| JANE ROE, an individual; MARY ROE, an individual; SUSAN ROE, an individual; JOHN ROE, an individual; BARBARA ROE, an individual; PHOENIX HOTEL SF, LLC, a California limited liability company; FUNKY FUN, LLC, a California limited liability company; and 2930 EL CAMINO, LLC, a California limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, a California public entity, <br><br> Defendants. | Case No. 4:24-cv-01562-JST <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** <br><br> **ASSIGNED FOR ALL PURPOSES TO THE HONORABLE DISTRICT JUDGE JON S. TIGAR, COURTROOM 6** <br><br> Action Filed:  03/14/2024 <br> Trial Date:     Unassigned |

1

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

2

3    I.     INTRODUCTION ..................................................................................... 1

4    II.    STANDARD OF REVIEW ...................................................................... 2

5    III.   PLAINTIFFS' ALLEGATIONS .............................................................. 2

6           A.    The City actively herds addicts to the Tenderloin and actively
                  supports them when they live on that neighborhood's streets. ............... 2

7
8           B.    The City treats plaintiffs unequally by *not* enforcing laws in the
                  Tenderloin that it enforces in other neighborhoods. ............................. 4

9           C.    The City's affirmative conduct puts plaintiffs in danger and
                  exposes them to nuisances. .................................................................. 5

10
11          D.    The disabled plaintiffs are unable to use the sidewalks, public
                  spaces and programs around their homes. ............................................ 7

12   IV.    ARGUMENT ........................................................................................... 8

13          A.    Plaintiffs Mary and Susan Roe have standing to bring their
                  properly alleged disability claims. ....................................................... 8

14
15          B.    Plaintiffs adequately allege nuisance claims .......................................13

16          C.    Discussion of the federal constitutional claims. ..................................16

17                1.    Plaintiffs have Article III standing. ...........................................17

18                2.    Plaintiffs have stated a substantive due process claim
                        based on the danger-creation doctrine. ......................................17

19                3.    Plaintiffs have stated an equal protection claim. .......................20

20                4.    Plaintiffs' allegations satisfy *Monell*. .....................................21

21          D.    Plaintiffs' negligence claim can proceed because they seek
                  equitable relief only. .........................................................................22

22
23          E.    Plaintiffs' claims for violation of the California Constitution are
                  based on the affirmative acts of the City. ...........................................22

24          F.    Response to the City's other immunity arguments. ..............................22

25          G.    Plaintiffs' claims do not implicate prosecutorial discretion and the
                  separation of powers doctrine does not automatically bar requests
26                for injunctive relief against a public entity. .........................................23

27          H.    Plaintiffs seek injunctive relief based on emergency conditions,
                  and discovery should not be delayed....................................................23

28

i

V.      CONCLUSION ................................................................................................24

1

# TABLE OF AUTHORITIES

2

**Page**

3

## CASES

4

*Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) ....................................................2

5

*Barden v. City of Sacramento*, 292 F.3d 1073, 1077 (9th Cir. 2002).......................9, 11

6

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ...................................................2

7

*Bragdon v. Abbott*, 524 U.S. 624, 631-32 (1998) ..........................................................8

8

*Chapman v. Pier 1 Imports (U.S.) Inc.* 631 F.3d 939 (9th Cir. 2011)....................10, 11

9

*City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610,
     674 (N.D. Cal. 2020) ..........................................................14

10

*DeShaney v. Winnebago County Dep't of Soc. Serv.*, 489 U.S. 189, 195 (1989) ...........17

11

*Gananian v. Wagstaffe*, 199 Cal. App. 4th 1532 (2011) .................................................23

12

*Hason v. Med. Bd.*, 279 F.3d 1167, 1172 (9th Cir. 2002) ..............................................9

13

*Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir. 2018) ..........................17

14

*Hood v. City of Sacramento*, 2023 WL 6541870 (E.D. Cal. 2023)..............11, 12, 13, 23

15

*Hunters Capital LLC v. City of Seattle*, 499 F.Supp.3d 888 (W.D. Wash. 2020)..17, 18,
     19

16

17

*K.H. Through Murphy v. Morgan*, 914 F.2d 846, 854 (7th Cir. 1990) ........................20

18

*Koll-Irvine Center Property Owners Assn. v. County of Orange* (1994) 24
     Cal.App.4th 1036..........................................................14

19

*Lacey v. Maricopa Cty.*, 693 F.3d 896, 922 (9th Cir.2012)...........................................20

20

*LaShawn A. v. Dixon*, 762 F. Supp. 959, 996 (D.D.C. 1991) ......................................19

21

*Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) .................................................2

22

*Lew v. Superior Court of Alameda County*, 20 Cal.App.4th 866.................................15

23

*Moore v. Kelly*, 990 F.2d 1319 (D.C. Cir. 1993) ...........................................................19

24

*People v. ConAgra Grocery Prod. Co.*, 17 Cal. App. 5th 51, 122 (2017) ...............14, 16

25

*Railroad 1900, LLC v. City of Sacramento*, 604 F.Supp.3d 968, 974 (2022) ...19, 20, 21

26

*Rosenbaum v. City & Cnty. of San Francisco*, 484 F.3d 1142, 1152 (9th Cir.
     2007)..........................................................20

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - CASE NO. 4:24-cv-01562-
JST

1   *United States v. Safehouse*, 985 F.3d 225, 243 (3rd Cir. 2021) ...................................14

2   *Vedder v. Cnty. of Imperial*, 36 Cal. App. 3d 654, 661 (1974) ......................................13

3   *Whitaker v. Tesla Motors, Inc.* 985 F.3d 1173 (9th Cir. 2021)...............................10, 11

4

5   **<u>STATUTES</u>**

6   28 C.F.R. § 35.149 ...................................................................................................8, 9

7   Americans with Disabilities Act of 1990 § 201-04, 42 U.S.C. § 12131-34 (2006) ..........8

8   Cal. Health & Safety Code § 11364.5 ..............................................................................3

9   Cal. Health & Safety Code §§ 11365, 11366; 21 U.S.C. § 856 .....................................14

10   California Constitution, Article I § 1...............................................................................22

11   Cil Code § 3481 .......................................................................................................13, 14

12   Civil Code §3480.............................................................................................................13

13   Fed. R. Civ. P. 12(b)(6) ...................................................................................................2

14   Fed. R. Civ. P. 8(a)(2) .....................................................................................................2

15   Federal Rules of Evidence 201(b)(2) ...............................................................................3

16   Federal Rules of Evidence 801(d)(2)................................................................................3

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

Plaintiffs filed this action because defendant City and County of San Francisco (the "City") puts them in danger by treating their neighborhood as a containment zone for illegal narcotics activity. Today, the City actively herds fentanyl addicts to the Tenderloin, encourages them to stay on that neighborhood's sidewalks and streets, and actively supports them when they do. The City also treats plaintiffs and other people who live and commerce in the Tenderloin unequally. In an attempt to confine social ills to a neighborhood with a large population of minority and low income people, the City does not enforce the laws against drug dealing and usage, public intoxication, illegal vending, blocked sidewalks, and loitering in the Tenderloin. However, the City does enforce those laws in more affluent, less diverse parts of San Francisco.

The City's motion to dismiss does not challenge the plaintiffs' allegations that the current street conditions in the Tenderloin are dangerously horrific and much worse compared to other parts of San Francisco. The City instead contends that plaintiffs have no remedy under state or federal law. In doing so the City misstates plaintiffs' allegations and the law.

For example, the City does not cite an unfavorable decision from the Eastern District that is nearly perfectly on point and supportive with respect to the disability claims made by two of the plaintiffs in this case.

Similarly, the City argues that all plaintiffs lack standing to bring their federal constitutional claims because they are solely premised on the City's failure to enforce laws and perform affirmative acts, which is patently inaccurate. The complaint makes specific allegations about the affirmative steps that the City has taken and continues to take that have caused or contributed to endangering plaintiffs' safety, health and lives.

Similarly, the City argues that some of plaintiffs' claims may be time-barred because the complaint does not tie specific dates to each allegation. The City also

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - CASE NO. 4:24-cv-01562-JST

1   asserts that *expired* emergency declarations *may* immunize it from tort liability.

2   These arguments ignore plaintiffs' explicit statement that they do not seek to recover

3   money damages, but instead limit their remedy to injunctive and equitable relief to

4   redress the *current conditions* around their homes and businesses.

5   ## II.   STANDARD OF REVIEW

6          A party may move to dismiss for "failure to state a claim upon which relief can

7   be granted." Fed. R. Civ. P. 12(b)(6). In response, the court begins by assuming the

8   complaint's factual allegations are true, but not its legal conclusions. *Ashcroft v.*

9   *Iqbal*, 556 U.S. 662, 678–79 (2009) citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

10  555 (2007). The court then determines whether those factual allegations, assumed

11  true, "plausibly give rise to an entitlement to relief" under Rule 8. *Id.* at 679. The

12  complaint need contain only a "short and plain statement of the claim showing that

13  the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed factual

14  allegations," *Bell Atl. Corp.*, 550 U.S. at 555. This evaluation of plausibility is a

15  context-specific task drawing on "judicial experience and common sense." *Id.* These

16  general rules apply to a defendant's argument that the court lacks jurisdiction to

17  hear a case. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (holding courts

18  should resolve facial attacks on jurisdiction just as they would resolve motions to

19  dismiss under Rule 12(b)(6)).

20  ## III.   PLAINTIFFS' ALLEGATIONS

21  ### A.   The City herds addicts to the Tenderloin and actively supports them when they live on that neighborhood's streets.

22
23         Plaintiffs allege that for years "the *de facto* policy of the City has been to corral

24  and confine illegal drug dealing and usage, and the associated injurious behaviors, to

25  the Tenderloin. The City tries to keep such crimes and nuisances out of other San

26  Francisco neighborhoods by 'containing' them in the Tenderloin." ECF no. 1 at ¶6.

27         Most recently, the City herds and directs fentanyl addicts to the Tenderloin,

28  where they can openly buy and use that drug and remain under its influence while

1   on that neighborhood's sidewalks and public spaces. *Id*. at ¶8.

2       Once in the Tenderloin, addicts quickly learn that the City and others will

3   provide "support" if they stay in the neighborhood. For example, drug kits will be

4   delivered to their sidewalk encampments. *Id*. at ¶10. These allegations are

5   corroborated by the declarations that the City recently filed in the related case,

6   *College of the Law, San Francisco, et al. v. CCSF*, Case No. 4:20-cv-03033-JST. The

7   "Street Medicine team" provides "street-based" services to the homeless "who are

8   currently rejecting shelter." ECF no. 137-9 at ¶¶6-12. The "Best Neighborhood

9   Program" offers "street-based care" and distributes thousands of kits, outreach

10  supplies, and Narcan doses in the Tenderloin. ECF no. 137-10 at ¶¶4-8. The "Night

11  Navigator" program provides "on the spot" services and resources to the homeless,

12  and this includes kits, supplies and Narcan doses. ECF no. 137-6 at ¶¶4-9. The "Joint

13  Field Operations" supports individuals "experiencing homelessness or struggling

14  with substance use disorders." ECF no. 137-8 at ¶8.[1]

15      An organization in the Tenderloin regularly hands out fentanyl smoking kits.

16  Crowds gather for these handouts and chaos ensues; addicts become intoxicated and

17  act erratically. When citizens try to discourage people from using narcotics on the

18  sidewalk, the organization intercedes, proclaiming the addicts have the right to use

19  drugs in public spaces. The City knows this organization and other groups hand out

20  fentanyl kits and encourage illegal drug use in the Tenderloin.[2] ECF no. 1 at ¶45.

21      The City opened a "wellness hub" in the Tenderloin that, in fact, operated as a

22  narcotics consumption site, in violation of state and federal criminal laws. *Id*. at ¶79.[3]

23

24  ---

   [1] Plaintiffs request judicial notice of these declarations. *See* FRE 201(b)(2) and 801(d)(2).

25  [2] Plaintiffs can add specific allegations that the City directly and indirectly distributes drug
   paraphernalia to addicts living on the Tenderloin's streets, a crime under state law. *See* Cal.
   Health & Safety Code § 11364.5

26  [3] Plaintiffs can add allegations that SFPD dropped addicts off at the "Tenderloin Linkage

27  Center," and that the center's operations, that the operation of other City-supported "service
   centers" in the Tenderloin, and that other City policies draws numerous addicts and dealers

28  from outside of San Francisco to the Tenderloin. *See*
   https://www.sfchronicle.com/crime/article/san-francisco-cash-aid-drug-users-18695571.php

Similarly, last summer, "activists" set up tents on a Tenderloin street and invited addicts to come there to collect drug paraphernalia and ingest fentanyl, also in violation of criminal laws. A member of the City's board of supervisors praised those who ran the site. An employee of a nonprofit that receives many millions in City funding appears to have been involved in its operation. *Id*. at ¶¶75-79.[4]

**B.    The City treats plaintiffs unequally by *not* enforcing laws in the Tenderloin that it enforces in other neighborhoods.**

Plaintiffs allege that pursuant to the containment zone policy City, the treats them and other residents and businesses in the Tenderloin unequally. ECF no. 1 at ¶17. For example, the City recently decided to enforce the laws that prohibit illegal street vending in the Mission District. The City has not done the same in the Tenderloin. Foreseeably, illegal street vending increased in the "containment zone," also known as the Tenderloin, after the City's crackdown in the Mission. *Id*. at ¶34.

The City knows that groups hand out fentanyl kits and encourage illegal drug use in the Tenderloin. "The City would not tolerate such arrogant and reckless conduct in other neighborhoods, but because the City has decided to treat the Tenderloin as a containment zone, it does nothing to discourage such activity despite the harm it causes to Tenderloin residents and stakeholders." *Id*. at ¶45.

The City knows crowds gather in front of small markets in the Tenderloin, completely blocking the sidewalks while selling, buying and using drugs, and hawking stolen items. The City would not tolerate such nuisances around markets elsewhere, but because the City treats the Tenderloin as a containment zone, the

---

[4] Plaintiffs can allege more detail as to how the City actively encourages addicts to come to and stay in the Tenderloin, and how it treats the neighborhood unequally. For example, in recent years the City and City-funded organizations, with no advance publicity or local input, have opened numerous "wellness," "service" and "support" centers in the neighborhood under the guise of compassion for substance abusers. These centers foreseeably attract more addicts (and the drug dealers who follow them) to the Tenderloin, and add to the already dangerous environment. By contrast, earlier this year the City *publicly* announced a plan to open a "sober housing" project near Chinatown, but quickly scrapped that plan in the face of stiff public opposition. *See* https://www.sfchronicle.com/bayarea/article/sf-breed-drug-crisis-chinatown-sober-living-18678670.php .

4

City does little to nothing in response. *Id*. at ¶¶16, 46, 56-57.

### C.   The City's affirmative conduct puts plaintiffs in danger and exposes them to nuisances.

The complaint alleges how the City's affirmative conduct of steering addicts to the Tenderloin and encouraging them to live on its streets, and the City's selective nonenforcement of the drug and other criminal laws in that neighborhood, puts plaintiffs' in danger and exposes them to nuisances.

Addicts living on the Tenderloin's streets foreseeably support their habit by stealing and hawking stolen merchandise on the sidewalks. As their addiction worsens, they act erratically, ignore serious medical problems, rummage through trash and discard it on the sidewalk, go partially clothed, and defecate in public. Fentanyl dealers belong to competing gangs, and use intimidation, threats and violence to protect their markets. Throngs gather on the sidewalks to sell, buy, and use illegal narcotics, fight, commit thefts, and hawk stolen goods. There have been drug-related murders, stabbings and gun battles. ECF no. 1 at ¶¶11-13, 16, 18, 19.

Plaintiff Jane Roe lives with her husband and their two young daughters in an apartment in the center of the Tenderloin. Open-air drug deals occur on the sidewalk in front of their building. When she and her family enter or leave their home, they encounter drug dealers, users who openly inject or smoke narcotics, and people who appear unconscious or dead. On one occasion, a person in front of her building threatened to cut her throat. On other occasions, people threatened her with knives and hammers. People start smokey bonfires in front of the building that endanger the health of her asthmatic daughter. Encampments block the sidewalks around her apartment. Unleashed dogs associated with encampments bark and growl when she and her family pass. Displays of stolen goods for sale also block the sidewalk. Trash and biohazards, such as used syringes and feces, litter the area. She and her family must step into the busy street to bypass these hazards, dangers and obstacles. ECF no. 1 at ¶¶25-36; *see also* ECF no. 19-2 (Jane Roe Declaration).

Large crowds block the sidewalks around plaintiff Susan Roe's home. People in these crowds openly smoke and inject drugs, scream and act erratically. She must be on the lookout for and navigate around excrement, used syringes, vomit and garbage. These obstacles make it impossible for her to use the sidewalk. She instead walks in the busy street. ECF no. 1 at ¶¶37-40; *see also* ECF no. 19-4 (Susan Roe Declaration).

Drug dealers and users block the sidewalks around plaintiff Mary Roe's apartment building. She must avoid people who scream and act erratically, or who are naked. The sidewalks around her home are littered with garbage, human waste, and used drug paraphernalia. She has no choice but to jaywalk in a busy street. ECF no. 1 at ¶¶41-44; *see also* ECF no. 19-3 (Mary Roe Declaration).

Plaintiff John Roe and his husband own a home in the Tenderloin. Drug deals happen around his residence at all hours. The dealers belong to intimidating gangs. People inject drugs and light fires in front of his home. He hears people screaming in the throes of psychotic episodes. He hears gunshots. Encampments and displays of stolen goods for sale make the sidewalks impassable. He must step into the street to bypass these dangers and obstacles. ECF no. 1 at ¶¶47-52; *see also* ECF no. 19-5 (John Roe Declaration).

Plaintiff Barbara Roe and her husband own a Tenderloin condominium. Large crowds gather in front of and around her building every night, and its members openly sell and use drugs, and hawk stolen items. She finds it "difficult and scary" to navigate through the crowds around her residence. They light bonfires that trigger the building's smoke alarm. People under the influence block the door to her building and she fears that they will attack her when she tries to pass. Recently, her neighbor was attacked and injured at the building's entrance and received stitches. She must step into the busy street to bypass the sidewalk obstacles near her home. ECF no. 1 at ¶¶53-57; *see also* ECF no. 19-6 (Barbara Roe Declaration).

Gang members now openly sell fentanyl and other potent drugs around the Phoenix Hotel. People freely inject and smoke and ingest drugs on the sidewalks

6

1   around the property. The conditions around the hotel scare away prospective guests

2   and restaurant patrons. A trespasser recently hit a hotel employee in the head with

3   an object. ECF no. 1 at ¶¶58-70.

4       Narcotic transactions happen around the Best Western hotel at all hours.

5   Addicts live in unsanitary sidewalk encampments next to the property. The

6   conditions around the hotel mortify and scare away guests. ECF no. 1 at ¶¶71-74.

7       **D.   The disabled plaintiffs are unable to use the sidewalks, public**
        **spaces and programs around their homes.**

8

9       Susan Roe is elderly and depends on a walker to ambulate. As described above,

10  the sidewalks and public spaces around her home are impassable and inaccessible to

11  her because they are obstructed by crowds, encampments and items. She attends

12  community events and receives services at a nearby senior center. These events and

13  services are important to her, but she dreads going to the center because

14  intimidating crowds block a corner where she must cross the street. These obstacles

15  force her to walk in the busy street. *Id.* at ¶¶38-40.

16      Mary Roe is a senior citizen whose spinal and lung infirmities make it difficult

17  for her to walk. As described above, drug dealers and users, encampments, illegal

18  street vendors and similar obstructions block the sidewalks around her residence.

19  When she ventures outside, she has no choice but to jaywalk. Around the corner from

20  her apartment crowds of drug dealers and users block the sidewalks in front of small

21  markets. *Id.* at ¶¶42, 43, 46.

22      The Phoenix Hotel and Best Western plaintiffs are not parties to the disability

23  claims made in the complaint. However, the ADA and other laws that mandate that

24  their facilities be open and accessible to those with disabilities, *e.g.*, patrons who use

25  a wheelchair. People selling and using narcotics block passage of the sidewalks

26  abutting these businesses. Encampments, garbage and biological hazards make it

27  difficult or impossible for even able-bodied guests and patrons to navigate on the

28  public walkways around the businesses. The sidewalks around the hotels are

1  inaccessible to their disabled guests and patrons. *Id*. at ¶¶67, 73.

2  **IV.    ARGUMENT**

3          **A.    Plaintiffs Mary and Susan Roe have standing to bring their
                   properly alleged disability claims.**

4          The first three claims are brought by plaintiffs Mary Roe and Susan Roe only.

5  The first cause of action alleges violations of the Americans with Disabilities Act

6  ("ADA"), the second alleges violations of Section 504, and the third alleges violations

7  of the California Disabled Persons Act ("DPA"). ECF no. 1 at ¶¶81-96.

8          The City claims that the allegations are vague and as such, the plaintiffs have

9  failed to adequately allege Article III standing as to the first two causes of action.

10 The City also argues the allegations are "insufficient" to state claims under all three

11 causes of action. ECF no. 35 at pp. 14-16, 18. But a review of fundamental principles

12 related to these access laws and court decisions springing from those principles

13 proves otherwise.

14         As a threshold matter, Title II, the "public services" provision of the ADA,

15 prohibits discrimination by public entities. *See* Americans with Disabilities Act of

16 1990 § 201-04, 42 U.S.C. § 12131-34 (2006). Moreover, Section 504 provides

17 equivalent coverage. *See Bragdon v. Abbott*, 524 U.S. 624, 631-32 (1998) (stating that

18 § 12201(a) "requires [the Court] to construe the ADA to grant at least as much

19 protection as provided by the regulations implementing the Rehabilitation Act").

20         To comply with the ADA, public entities must operate such that each program,

21 service, or activity, when viewed in its entirety, is accessible to individuals with

22 disabilities. The federal regulations state that "[e]xcept as otherwise provided ... no

23 qualified individual with a disability shall, because a public entity's facilities are

24 inaccessible to or unusable by individuals with disabilities, be excluded from

25 participation in, or be denied the benefits of the services, programs, or activities of a

26 public entity ...." 28 C.F.R. § 35.149. A "facility" is defined as "all or any portion of

27 buildings, structures, sites, complexes, equipment, rolling stock or other conveyances,

28

8

1    *roads, walks, passageways, parking* lots, or other real or personal property, including

2    the site where the building, property, structure, or equipment is located." 28 C.F.R. §

3    35.104 (emphasis added).

4          Although new construction is subject to different compliance standards than

5    "existing facilities," the "program access" standard associated with existing facilities

6    was not intended to serve as a sword and a shield that allows public entities to avoid

7    making facilities accessible and also attack challenges designed to do the same. *See*

8    https://www.ada.gov/law-and-regs/design-standards/ ("State and local governments

9    are required by Title II to provide program access. The program access requirement

10   makes sure that individuals with disabilities are not excluded from any program,

11   service, or activity provided by the state or local government because existing

12   buildings and facilities are inaccessible. State and local governments must look at

13   their programs, services and activities in their entirety or as a whole to ensure that

14   they are accessible to individuals with disabilities.").

15         The Ninth Circuit has concluded that the ADA's "fundamental purpose" of

16   eliminating disability discrimination is best served by including public sidewalks

17   within the phrase "services, programs, or activities." *Barden v. City of Sacramento*,

18   292 F.3d 1073, 1077 (9th Cir. 2002) (citing *Hason v. Med. Bd.*, 279 F.3d 1167, 1172

19   (9th Cir. 2002)). *Barden* involved a group of individuals with mobility and vision

20   impairments who brought a class action against Sacramento, alleging that the city

21   had violated Title II and Section 504 by failing to maintain existing public sidewalks

22   and to make them accessible to persons with disabilities. *See id.* at 1075.

23         In *Barden*, the Ninth Circuit reasoned that the proper question was not

24   whether a public function could technically be considered a service, program, or

25   activity, but rather concluded that maintaining a system of public sidewalks is

26   "without a doubt something that the [city] 'does,' " and therefore falls under the

27   purview of Title II. *Id.* at 1076-1077 (quoting *Hason*, 279 F.3d at 1173).

28         That federal courts, in entirely different circumstances, have generally

1    approved San Francisco's program access approach to sidewalks in no way insulates

2    the City from its refusal to maintain its facilities nor justifies its blatant and ongoing

3    violations of the ADA in plaintiffs' neighborhood.

4         It is within this context that the City's reliance on *Whitaker v. Tesla Motors,*

5    *Inc.* 985 F.3d 1173 (9th Cir. 2021) must be viewed. There, Whitaker, a

6    wheelchair-bound quadriplegic, visited a Tesla dealership in Sherman Oaks and

7    allegedly encountered inaccessible service counters that denied him full and equal

8    access to the dealership and "created difficulty and discomfort." *Id.* at 1175. He

9    further alleged that Tesla's continued failure to provide accessible service counters

10   deterred him from returning to the dealership. *Id.* He alleged "on information and

11   belief, that there are other violations and barriers on the site that relate to his

12   disability." *Id.* The court considered those allegations to be vague and uncertain and

13   invited him to amend. *Id.* The court did not describe an onerous or technical pleading

14   standard; it observed that the necessary detail could have been shown through

15   allegations that "the counter was too high" or "not in a place that had wheelchair

16   access." *Id.* For unknown reasons, he failed to do so.

17        That is a far cry from the detailed allegations in this case, where Susan and

18   Mary Roe list specific streets they cannot access, describe in graphic detail the

19   obstacles they encounter and the specific impact the barriers to movement have on

20   them in simply venturing out of their residences. ECF no. 1 at ¶¶32, 37-40, 42-46.

21   The complaint is also replete with images of Tenderloin sidewalk conditions.

22   Moreover, Mary and Susan Roe, unlike Whitaker, are not serial complainants suing

23   for money damages against private entities. These plaintiffs want no money, but

24   rather freedom to move with dignity on the sidewalks near their homes so as to gain

25   access to San Francisco services.

26        The City also relies on *Chapman v. Pier 1 Imports (U.S.) Inc.* 631 F.3d 939 (9th

27   Cir. 2011) (en banc) for the proposition that plaintiffs' allegations are constitutionally

28   infirm. In *Chapman*, the complainant required the use of a motorized wheelchair

10

1    when traveling in public. In July 2004, he sued a Pier 1 Imports alleging that some of

2    the chain's Vacaville store's architectural features denied him full and equal

3    enjoyment of the premises in violation of the ADA. *Id*. Chapman requested, among

4    other things, monetary damages. *Id*. During discovery, Chapman testified that he

5    was not deterred by the alleged ADA violations; rather, Chapman acknowledged that

6    he intended to return to the store, which was located near his home and offers

7    products he finds desirable. *Id*. Again, that factual scenario bears no resemblance to

8    the present case, where plaintiffs cannot even access stores and public services, much

9    less freely return to them. ECF no. 1 ¶¶39, 40, 43-44, 82, 87-88, 92.

10          More importantly, *Chapman*, like *Whitaker*, involved Title III of the ADA

11   related to public accommodations in private facilities. *See Chapman*, 631 F.3d at 944-

12   945; *see also Whitaker*, 985 F.3d at 1174-1175. As set forth above, Congress created a

13   whole separate section, Title II of the ADA, because of the larger, more critical

14   obligation a local government has to provide safe access. *Barden*, 292 F.3d at 1077.

15   Again, a picture is worth a thousand words here, as no such access exists for these

16   plaintiffs.

17          Plaintiffs Mary and Susan Roe's disability claims are akin to those made in

18   *Hood v. City of Sacramento*, 2023 WL 6541870 (E.D. Cal. 2023), which is nearly

19   perfectly on point, and which the City conspicuously fails to cite, let alone discuss.

20          In *Hood*, five disabled plaintiffs brought a putative class action pursuant to the

21   ADA and Section 504 to enjoin Sacramento City and Sacramento County based on

22   their alleged failure to maintain their sidewalks clear of debris and tent

23   encampments. Both the city and the county moved to dismiss, arguing, as does the

24   City here, that plaintiffs lacked Article III standing and had failed to state claims. *Id*.

25   at *1.

26          As to standing, the *Hood* court found that two of the plaintiffs had properly

27

28

1  alleged an injury based on the encampments and barriers on the sidewalks.[5] *Id*. at

2  *3. As to causation, the court held "plaintiffs allege unhoused individuals make

3  decisions to set up and remain housed in sidewalk encampments only because the

4  city permits them to do so…. It is these encampments that cause plaintiffs' alleged

5  injuries. As alleged, the court finds a causal chain between defendants' actions and

6  plaintiffs' injuries." *Id*. The court also found that the plaintiffs' claims were

7  redressable because the injunction requested need not violate the rights of the

8  unhoused, and the court could adopt an injunction that was not unduly burdensome.

9  "If plaintiffs prevail, the court need not issue their requested injunction and can

10 instead fashion an injunction with language taking account of defendant's concerns."

11 *Id*. at *4.

12      The *Hood* defendants argued plaintiffs' claims failed because 1) they did not

13 allege they were denied access to defendants' sidewalk systems in their entirety, and

14 2) plaintiffs could not establish they were denied access to sidewalks solely by reason

15 of their disabilities. *Id*. The court rejected both arguments. As to "systems," the court

16 held:

17          Construing the factual allegations in the light most
            favorable to them, all plaintiffs but Barstow have plausibly
18          alleged defendants' sidewalks are systematically
            unavailable to them because they cannot access specific
19          destinations within the City and/or County. Although Hood
            alleges she has had difficulty navigating City sidewalks,
20          she has not alleged the sidewalks are unavailable to her.
            …. The court grants the City's motion to dismiss and
21          dismisses Hood's and Barstow's claims against it with
            leave to amend.
22

23 *Id*. at *6.

24      With respect to the exclusion-based-on-disability requirement, the defendants

25 argued "the encampments and debris at issue 'affect[ ] the entire community at large'

26 so plaintiffs cannot allege any exclusion was by reason of their disabilities." *Id*. But

27

28 _____
   [5] The court dismissed the claims of the other three plaintiffs with leave to amend.

1   the court found that plaintiffs had properly alleged a disparate impact claim.

2   "[P]laintiffs have alleged just that: The government's policy of allowing encampments

3   and debris on sidewalks has the effect of denying plaintiffs access to those sidewalks,

4   even though the policy applies to all individuals." *Id.*

5          For the same reasons as discussed in *Hood*, Mary and Susan Roe have

6   properly alleged both standing and ADA and Section 504 claims. As the City

7   acknowledges, the DPA not only "substantially overlaps with the ADA" but also

8   "provides additional protections beyond the ADA." ECF no. 35 at p. 18. Thus, their

9   DPA claim is also properly pleaded.

10         In sum, the disability claims' allegations are plainly sufficient. As alleged in

11  the complaint and supported by above-referenced case law, the City is not performing

12  its basic duty to make a sidewalk accessible, a transgression that limits Mary and

13  Susan Roe from accessing any public or private businesses or services.

14         **B.      Plaintiffs adequately allege nuisance claims.**

15         All plaintiffs bring the fourth and fifth causes of action, which allege public

16  and private nuisance. ECF no. 1 at ¶¶97-107. These claims are adequately pled.

17         Nuisance actions can be brought against public entities "to the extent that

18  such actions are founded on Civil Code sections 3479, 3480 and 3481, which define

19  public and private nuisances." *Vedder v. Cnty. of Imperial*, 36 Cal. App. 3d 654, 661

20  (1974). Plaintiffs' allegations about how they are affected and harmed by conditions

21  adjacent to their homes and businesses, are all recognized by Civil Code § 3479,

22  which provides the general definition of what is a nuisances. That statute says:

23                 Anything which is injurious to health, including, but not
                   limited to, the illegal sale of controlled substances, or is
24                 indecent or offensive to the senses, or an obstruction to the
                   free use of property, so as to interfere with the comfortable
25                 enjoyment of life or property, or unlawfully obstructs the
                   free passage or use, in the customary manner, of … any
26                 public park, square, street, or highway, is a nuisance.

27         Civil Code §3480 defines which nuisances are a "public nuisance" and

28  comports with plaintiffs' allegations about how the City's conduct affects their entire

1  neighborhood. It says, "A public nuisance is one which affects at the same time an

2  entire community or neighborhood, or any considerable number of persons, although

3  the extent of the annoyance or damage inflicted upon individuals may be unequal."

4  While Civil Code §3481 defines a private nuisance as being every type of a nuisance

5  that is not a public nuisance.

6  " 'A nuisance may be both public and private, but to proceed on a private

7  nuisance theory the plaintiff must prove an injury specifically referable to the use

8  and enjoyment of his or her land. The injury, however, need not be different in kind

9  from that suffered by the general public.' " *People v. ConAgra Grocery Prod. Co.*, 17

10  Cal. App. 5th 51, 122 (2017) quoting *Koll-Irvine Center Property Owners Assn. v.*

11  *County of Orange* (1994) 24 Cal.App.4th 1036, 1041.

12  A public nuisance cause of action is premised on affirmative conduct that

13  assisted in the creation of a hazardous condition. Affirmative conduct encompasses

14  any action that assists in creating a system that causes hazardous conditions. *City &*

15  *Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 674 (N.D. Cal.

16  2020) (San Francisco sufficiently pleaded that pharmaceutical companies and drug-

17  store chain engaged in affirmative conduct that enabled the opioid epidemic in the

18  city, as was relevant to determining if the city stated a public-nuisance claim under

19  California law as to their distribution of opioids).

20  For example, plaintiffs allege the City operated a narcotics consumption site in

21  the Tenderloin, a federal and state crime.[6] Likewise, they allege the City condoned

22  another illegal drug consumption site, countenances the distribution of drug

23  paraphernalia in the Tenderloin, and provides support to addicts who opt to live on

24  the Tenderloin's streets. ECF no. 1 ¶¶ 75-79. By doing so, the City sends the clear

25  message that addicts should come to Tenderloin (and the gang-member dealers

26

27  [6] Cal. Health & Safety Code §§ 11365, 11366; 21 U.S.C. § 856. "The statute forbids opening
and maintaining any place for visitors to come to use drugs." *United States v. Safehouse*, 985

28  F.3d 225, 243 (3rd Cir. 2021) (a nonprofit that intentionally opens its facility to visitors it
knows will use drugs there violates § 856).

14

1   predictably follow their customers). Plaintiffs are the ones who pay the price for these

2   City actions.

3          With respect to these allegations, *Lew v. Superior Court of Alameda County*,

4   20 Cal.App.4th 866, is both analogous and instructive. There, plaintiffs lived near a

5   multi-unit HUD insured apartment complex owned by defendants. Plaintiffs alleged

6   defendants allowed illegal drug activity to occur at the complex. Plaintiffs made

7   allegations similar to those made in this case. For example, "[n]umerous times I have

8   been confronted by dealers or buyers and I am now afraid to walk near this property

9   and down my street." *Id*. at 869. The trial court found that the complex was "being

10  used as a center for sale and distribution of drugs" and awarded the plaintiffs

11  damages. *Id*. at 870. Defendant brought a writ seeking to set aside the judgment,

12  arguing that they could not be held liable for the criminal acts of third parties. The

13  court of appeals denied the petition, holding:

14          The Legislature has resolved any doubt as to the question
            of whether a so-called "drug house" is a nuisance through
15          the enactment of section 11570 of the Health and Safety
            Code. That section, enacted in 1972, provides as follows:
16          "Every building or place used for the purpose of unlawfully
            selling, serving, storing, keeping, manufacturing, or giving
17          away any controlled substance, precursor, or analog
            specified in this division, and every building or place
18          wherein or upon which those acts take place, is a nuisance
            which shall be enjoined, abated, and prevented, and for
19          which damages may be recovered, whether it is a public or
            private nuisance."
20
            .... The fact that the immediate and specific injury
21          plaintiffs suffered from this nuisance was due to the acts of
            third parties, rather than, for example, being due to
22          noxious gases, is not relevant to the issue of whether the
            property qualifies as a nuisance under section 11570. That
23          section does not require that the unlawful activity which
            makes the building a nuisance be conducted by the owner
24          of the building, a tenant of the building, or a person
            entering with permission.
25
    *Id*. at 871 [footnote omitted].
26
           Whether the City continues to operate an illegal consumption site in the
27
    Tenderloin is immaterial to the viability of the nuisance claim because plaintiffs
28

                                            15
─────────────────────────────────────────────

allege that the aftereffects continue to harm them. It is not necessary for plaintiffs to show the City continues to assist in the creation of the public nuisance if its conduct was a substantial factor in causing the ongoing public nuisance. *People v. ConAgra Grocery Prod. Co.*, 17 Cal. App. 5th 51, 97 (2017) (lead paint manufacturer's advertising in the 1930-40's was evidence of assisting in creating the public nuisance of lead paint in residential homes built after 1950 even if it stopped producing lead paint in 1948).

The City's argument that plaintiffs fail to allege an injury that is "different in kind" from the general public lacks merit. There is no requirement that plaintiffs suffer damage different in kind when the nuisance is both private and public. Moreover, each plaintiff satisfies the special injury requirement if needed. Each makes specific allegations about how the harms that the City fostered in the Tenderloin affects them and their property.

The City's argument that the nuisance claims may be barred by the three-year limitations period because they have not alleged specific acts on specific dates is nonsensical. Plaintiffs disclaim an award of monetary compensation. Plaintiffs plainly allege that they seek injunctive relief only because the nuisances are continuous and ongoing. ECF No. 1 ¶¶ 36, 39-40, 44-46, 49, 55, 68-70, 72, 100-102, 105-106.

In sum, the City's motion to dismiss should be denied as to the fourth and fifth causes of action.

## C.   Discussion of the federal constitutional claims.

All plaintiffs bring the sixth, seventh and eighth causes of action, which allege violations of their federal constitutional rights. The sixth and eighth causes of action both reference violations of their due process rights, with the eighth cause of action expressly alleging that the City "affirmatively created or increased the risk that

1  plaintiffs would be exposed to dangerous conditions."[7]  The seventh claim alleges

2  equal protection violations. ECF no. 1 at ¶¶108-118.

### 1.      Plaintiffs have Article III standing.

4          The City contends that plaintiffs' three federal constitutional claims are

5  "predicated on the City's failure to enforce laws in the Tenderloin" and then argues

6  that individuals lack standing to sue the government for failure to enforce the laws.

7  ECF no. 35 at pp. 5-6. This is strawman argument. Plaintiffs' claims are based not

8  solely on the City's non-enforcement of laws in the Tenderloin, but also the City's

9  substantial and affirmative conduct in making the conditions there more harmful

10 and dangerous to the plaintiffs.

### 2.      Plaintiffs have stated a substantive due process claim based on the danger-creation doctrine.

12         In *DeShaney v. Winnebago County Dep't of Soc. Serv.*, 489 U.S. 189, 195 (1989)

13 the Supreme Court held that a government is not obligated under the due process

14 clause to "protect the life, liberty, and property of its citizens against invasion by

15 private actors." An exception to the rule exists, however, where the state actor

16 affirmatively places the plaintiff in a dangerous situation. The affirmative act must

17 create an actual, particularized danger, and the ultimate injury to the plaintiffs must

18 be foreseeable. *Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir. 2018)

19 (attendees of political rally alleged police officers violated their due process rights

20 under state-created danger theory by shepherding them into crowd of violent

21 protesters).

22         Here, plaintiffs allege that the City's affirmative actions with respect to the

23 containment zone policy exposes them to actual dangers and harms. Their allegations

24 resemble those made in *Hunters Capital LLC v. City of Seattle*, 499 F.Supp.3d 888

25 (W.D. Wash. 2020) where business owners in protest-occupied area of city known as

26

27

28 _____

[7] The 6th and 7th causes of action cite both the 5th and the 14th Amendments. Plaintiffs agree they can only proceed against the City based on the 14th Amendment.

17

"CHOP" brought a putative class action against the City of Seattle, asserting claims for substantive due process and other constitutional violations. Similar to this case, the *Hunters Capital* plaintiffs alleged that CHOP participants set up tents on the streets and sidewalks, and that Seattle provided them "with medical equipment, washing/sanitation facilities, portable toilets, nighttime lighting, and other material support," that the CHOP participants were violent, created excessive noise at all hours, and that "trash, feces, and other refuse built up." *Id*. at 894. Plaintiffs alleged that Seattle officials allowed the CHOP participants to continue occupying and controlling access to the public areas and provided them concrete barriers to do so. Plaintiffs alleged that as a result, "local residents could not use public streets, sidewalks, or other rights-of-way to enter their homes or businesses, they could not receive deliveries, and their clients were unable to visit their businesses." *Id*. at 895. They also alleged that Seattle stopped providing most police services to the CHOP area. *Id*. Seattle police cleared the area. Plaintiffs then filed suit seeking money damages, alleging that their property and premises had been destroyed, stolen or vandalized, that their revenues and rents had declined, that their clients had been threatened, harassed and terrorized and had stopped patronizing their businesses, and that the police did not respond to their emergency calls for assistance. *Id*. at 897-898. Seattle moved to dismiss. With respect to the plaintiff's substantive due process claim, the district court observed:

> [T]he Ninth Circuit has held that a local government may violate substantive due process if it " 'affirmatively places [a plaintiff] ... in danger by acting with 'deliberate indifference' to a 'known or obvious danger.' " *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019) (quoting *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971–72 (9th Cir. 2011)). To prevail on such a theory, known as the "state-created danger doctrine," a plaintiff must show that (1) "the officers' affirmative actions created or exposed her to an actual, particularized danger that she would not otherwise have faced," (2) "the injury ... suffered was foreseeable," and (3) "the officers were deliberately indifferent to the known danger." *Id*.

*Hunters Capital*, *supra*, 499 F.Supp.3d at 901–902.

18

1  The court held the plaintiffs' due process claim could go forward because the
2  complaint plausibly alleged that "the City's actions foreseeably placed Plaintiffs in a
3  worse position than they would have been in absent any City intervention
4  whatsoever. Their allegations are also sufficient to show that the City acted with
5  deliberate indifference to that danger." *Id.* at 902 (footnote omitted). As a case on
6  which the City and County of San Francisco relies heavily noted, "the plaintiffs'
7  claims in *Hunters Capital* were based not only on the city's alleged non-enforcement
8  of the laws, but also on the city's substantial, affirmative provision of material
9  support to the occupying protestors." *Railroad 1900, LLC v. City of Sacramento*, 604
10  F.Supp.3d 968, 974 (2022).

11  Here, plaintiffs likewise allege that the City's actions in the Tenderloin—e.g.,
12  operating drug consumption sites, distributing drug paraphernalia, providing
13  services to addicts who live on streets, ceasing to enforce laws—foreseeably places
14  them in a worse position. The allegations are more than sufficient to show that the
15  City acted, and continues to act, with deliberate indifference to these dangers.

16  Plaintiffs here do differ from those in *Hunters Capital* in two meaningful ways.
17  First, five of them are individuals, not businesses. Thus, the dangers and harms they
18  face in the Tenderloin are corporeal; threats to their life and limb.

19  Second, plaintiffs seek injunctive relief only, thus a lower threshold should
20  govern. In *LaShawn A. v. Dixon*, 762 F. Supp. 959, 996 (D.D.C. 1991), (aff'd and
21  remanded sub nom *LaShawn A. by Moore v. Kelly*, 990 F.2d 1319 (D.C. Cir. 1993), a
22  §1983 class action brought on behalf of foster children alleged that the government
23  agency managing the foster program violated numerous laws. Plaintiffs sought
24  injunctive relief only. Following a bench trial, the court issued an opinion stating
25  that it was judging the defendants' liability based on whether they exercised
26  competent professional judgment in the administration of the child welfare system.
27  In a footnote, the court explained why:

28  The Court is also persuaded to reach this conclusion based

19

1

2

3

4

5

> on the nature of this case. This is not a case . . . in which
> the plaintiff seeks money damages. In such cases, a
> deliberate indifference standard may be warranted due to
> the chilling effect that an unfavorable judgment may have
> on municipal policymakers. Plaintiffs in this case seek
> injunctive relief only. In seeking such specific relief, it is
> particularly appropriate to consider whether the treatment
> plaintiffs are currently receiving is the result of competent,
> professional decisionmaking.

6   *Id.* at 996 fn. 29; *see also K.H. Through Murphy v. Morgan*, 914 F.2d 846, 854 (7th

7   Cir. 1990) (Judge Richard Posner in *dicta* noting there might be broader liability in

8   an injunctive suit against government officials).

9               **3.     Plaintiffs have stated an equal protection claim.**

10              The City argues that equal protection claims "may *only* proceed where a

11  plaintiff establishes a law was enforced against the plaintiff, but not against other

12  similarly situated individuals...." ECF no. 35 at p. 8 (citing *Lacey v. Maricopa Cty.*,

13  693 F.3d 896, 922 (9th Cir.2012); *Rosenbaum v. City & Cnty. of San Francisco*, 484

14  F.3d 1142, 1152 (9th Cir. 2007) (emphasis added)). The case law does not support this

15  assertion.

16              It may be true that courts have held that "[t]o prevail on an equal protection

17  claim under the "Fourteenth Amendment, a plaintiff must demonstrate that

18  enforcement had a discriminatory effect and the police were motivated by a

19  discriminatory purpose." *Lacey*, 693 F.3d at 920 (citations omitted). However, this

20  statement attends actions involving claims of selective enforcement. It does not

21  follow that selective non-enforcement can never establish an equal protection claim.

22  The selective non-enforcement argument was raised and rejected in *R.R. 1900, LLC*

23  *v. City of Sacramento*, 604 F. Supp. 3d 968, 978 (E.D. Cal. 2022), in which the court

24  relying on the *Lacey* line of precedent, commented as follows:

25

26

27

28

> Nor has plaintiff identified any authority establishing that
> cities are required, as a matter of equal protection law, to
> treat all areas of the city alike. While it may be unfair for a
> city to afford businesses and residents in certain areas the
> benefit of enforcing local laws while denying that benefit to
> those in other areas, as plaintiff argues, it does not amount
> to a violation of equal protection. The court is aware of, and

20

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - CASE NO. 4:24-cv-01562-JST

1
2
3

> plaintiff has identified, no precedent demonstrating that it does, and to hold otherwise would expand the scope of the Equal Protection Clause in ways this court lacks the authority to extend it. Accordingly, plaintiff's equal protection claim must also be dismissed.

4  However, this is *ipse dixit*. While direct authority might not exist that

5  supported the plaintiffs' claims in that case, the court cited no contrary authority

6  either.

7  Moreover, several key factors distinguish this case from the *R.R. 1900, LLC*

8  decision. As discussed above, the situation in the Tenderloin is a function of systemic

9  and affirmative decisions by the City. This is relevant not only in a due process

10  analysis, but also in the context of equal protection. Specifically, a key component of

11  the selective enforcement caselaw is the need for affirmative action on the part of

12  defendants. The Constitution is almost exclusively a negative on state power and

13  does not ordinarily provide for affirmative rights. However, when the conditions

14  complained of are a product of systematic decisions by state actors, which are then

15  left unremedied by selective nonenforcement, this state action requirement should be

16  satisfied.

17  **4.   Plaintiffs' allegations satisfy *Monell*.**

18  Plaintiffs allege that they have been harmed by the execution of City policies.

19  As part of the containment zone policy, the City itself operated the drug consumption

20  site that brought even more addicts and dealers to the Tenderloin. As the City

21  declarations submitted in the related case show, the City actively provides support

22  and services to addicts who live on the streets and refuse offers of shelter. Plaintiffs

23  describe the harms that befall them because of the numerous drug fentanyl addicts

24  on the streets and sidewalks around their homes and businesses. Plaintiffs can

25  amend their complaint to add other acts of the City that show it treats the

26  Tenderloin as a containment zone, to the injury of the plaintiffs, such as its direct

27  and indirect involvement in distributing drug paraphernalia.

28  Accordingly, the Court should deny the City's motion to dismiss the federal

21

1  constitutional claims.

2     **D.    Plaintiffs' negligence claim can proceed because they seek
            equitable relief only.**

3

4     The City argues that it is immune from plaintiffs' ninth cause of action for

5  negligence (ECF no. 1 at ¶¶119-123), and cite to Government Code §815 *et seq*.

6  However, the City ignores a preceding statute, part of the same act, that says:

7  "Nothing in this part affects liability based on contract or the right to obtain relief

8  other than money or damages against a public entity or public employee." Govt Code

9  §814. Here, plaintiffs seek equitable relief only. Thus, the immunity does not apply to

10  bar the negligence claim.

11     **E.    Plaintiffs' claims for violation of the California Constitution are
            based on the affirmative acts of the City.**

12     Plaintiffs' tenth cause of action alleges the City has burdened their rights

13  guaranteed under California Constitution, Article I § 1 to enjoy and defend their life

14  and liberty; to acquire, possess, and protect their property; and to pursue and obtain

15  safety, happiness, and privacy. ECF no. 1 at ¶¶124-127. The City argues that this

16  "claim can only be premised on affirmative acts that the City has committed that

17  interfered with their rights to pursue and obtain safety, happiness, and privacy."

18  ECF no. 35 at pp. 17-18. Plaintiffs agree, and have made such allegations. Plaintiffs,

19  however, do acknowledge that this claim can only be pursued by the five individual

20  plaintiffs, and the three corporate plaintiffs should be dismissed from this claim.

21     **F.    Response to the City's other immunity arguments.**

22     The City argues that emergency declarations, all of which expired last year or

23  before, *may* immunize it from tort liability.[8] These arguments ignore plaintiffs'

24  explicit statement that they do not seek to recover money damages from the City, but

25  instead limit their remedy to injunctive and equitable relief to redress the *current*

26

27  ────────────────
    [8] A presumed typo in the City's brief says that one of the Mayor's proclamations about the
28  Tenderloin expires on June 30, 2024. That is incorrect. The proclamation expired on June 30,
    2022. ECF no. 36 at Exhibit J.

1    *conditions* around their homes and businesses. ECF no. 1 at ¶7. Proclamations that

2    have been expired for a year or more provide no shield against any of plaintiffs' state

3    claims.

4         The City argues that it is generally immune from its failure to enact or enforce

5    laws. But as has been discussed at length already, plaintiffs allege much more than a

6    mere failure to enforce the law.

7         **G.   Plaintiffs' claims do not implicate prosecutorial discretion and**
          **the separation of powers doctrine does not automatically bar**
8         **injunctive relief against a public entity.**

9         The City cites a case where a plaintiff asked the court to require a district

10   attorney to investigate and prosecute alleged violations of the law. *Gananian v.*

11   *Wagstaffe*, 199 Cal. App. 4th 1532 (2011). The court of appeal affirmed the trial

12   court's dismissal, noting that prosecutorial discretion is founded on the constitutional

13   principles of separation of power and due process. *Id*. at 1543.

14        In a jarring pivot, the City stretches that unremarkably holding beyond its

15   breaking point, to argue that plaintiffs' case is "premised on the City's inaction (that

16   is, failure to enforce laws) or the City's policy and fiscal choices…. Under the

17   separation of powers doctrine, this Court cannot compel the City to enforce any law

18   or enact any legislative or policy initiatives." ECF no. 35 at p. 25. But as has been

19   shown above, this is a gross mischaracterization of plaintiffs' allegations. Moreover,

20   this argument is also premature. If and when the time comes to consider the

21   imposition of specific forms of injunctive relief, this court can then consider the City's

22   any objections based on the separation of powers doctrine. As noted in the *Hood*

23   decision, this Court has the power to tailor the relief to both redress the harms to

24   plaintiff while also accommodating the public entity's legitimate concerns and

25   interests. 2023 WL 654187 at *4.

26        **H.   Plaintiffs seek injunctive relief based on emergency conditions,**
          **and discovery should not be delayed.**
27

28        The City finally contends that "far ranging" discovery should be stayed as

23

1   Plaintiffs' allegations fall "well short of the necessary pleading standard". ECF no. 35

2   at p. 25. Plaintiffs do not accept the premise that its pleadings are insufficient, as

3   evidenced by this opposition. More importantly, they have no intention to engage in

4   "far ranging" fishing expeditions, but rather seek targeted discovery geared toward

5   efficient, economical and pointed eliciting of testimony and documents that will lead

6   inexorably to, plaintiffs hope, an expeditious solution to the tragic conditions of their

7   neighborhood.

8        Plaintiffs claims for emergency discovery are not hyperbolic. Even the City has

9   sought emergency relief in the Tenderloin on three separate occasions in recent

10  years. *See* ECF no. 36 at Exhibits F, G, and H.

11       Plaintiffs believe it is imperative that discovery begin immediately.

12  **V.    CONCLUSION**

13       For the foregoing reasons, the City's motion should be denied and discovery

14  should begin.

15  Dated:  May 24, 2024              WALKUP, MELODIA, KELLY & SCHOENBERGER

16

17                          By: _____

18                              MICHAEL A. KELLY
                                RICHARD H. SCHOENBERGER
19                              MATTHEW D. DAVIS
                                ASHCON MINOIEFAR
20                              Attorneys for ALL PLAINTIFFS

21

22

23

24

25

26

27

28

1

<u>**PROOF OF SERVICE**</u>

2

**Jane Roe, et al. v. City and County of San Francisco, et al.**
**USDC-Northern California Case No. 4:24-cv-01562-JST**

3

4          At the time of service, I was over 18 years of age and not a party to this action.
I am employed in the county where the mailing took place,  My business address is
650 California Street, 26th Floor, City and County of San Francisco, CA 94108-2615.

5

6          On the date set forth below, I caused to be served true copies of the following
document(s) described as

7

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

8

          to:

9   Shanin Specter, Esq.                          **Co-Counsel for Plaintiffs**
    (Admitted Pro Hac Vice)

10  Alex Van Dyke, Esq.                           Telephone: (215) 772-1000
    KLINE & SPECTER, P.C.                         shanin.specter@klinespecter.com

11  1525 Locust Street                            alex.vandyke@klinespecter.com
    Philadelphia, PA 19102                        escalanteyleana@uclawsf.edu

12

13  David Chiu, Esq., City Attorney               **Counsel for City and County of San**
    Yvonne R. Meré, Esq., Chief Deputy            **Francisco**

14  City Attorney
    Wayne Snodgrass, Esq., Deputy City            Steeley Direct: (415) 554-4655

15  Attorney                                      Lakritz Direct: (145) 554-4628
    Tara M. Steeley, Esq., Deputy City            George Direct:  (415) 554-4223

16  Attorney                                      Murphy Direct:  (415) 554-6762
    Thomas S. Lakritz, Esq., Deputy City          Facsimile: (415) 554-4699

17  Attorney                                      Mere Direct:  (415) 554-4700
    John H. George, Esq., Deputy City             Mere Facsimile:  (415) 554-4757

18  Attorney                                      Yvonne.Mere@sfcityatty.org
    Kaitlyn M. Murphy, Esq., Deputy               tara.steeley@sfcityatty.org

19  City Attorney                                 tom.lakritz@sfcityatty.org
    Deputy City Attorneys                         john.george@sfcityatty.org

20  City Hall, Room 234                           kaitlyn.murphy@sfcityatty.org
    1 Dr. Carlton B. Goodlett Place               anita.murdock@sfcityatty.org

21  San Francisco, CA  94102-4682                 celena.sepulveda@sfcityatty.org
                                                  sophia.garcia@sfcityatty.org

22                                                winnie.fong@sfcityatty.org

23

24  John K. Dipaolo, Esq.                         **Counsel for Plaintiff College of the**
    General Counsel                               **Law, San Francisco**

25  Secretary to the Board of Directors           (related case USDC-Northern California
    College of the Law, San Francisco             case #4:20-cv-03033-JST)

26  200 McAllister Street
    San Francisco, CA 94102                       Telephone: (415) 565-4787

27                                                Facsimile: (415) 565-4825
                                                  dipaolojohn@uchastings.edu

28

1

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - CASE NO. 4:24-cv-01562-
JST

1  Lauren Hansen, Esq.                    **Counsel for Proposed Intervenors**
   Melissa A. Morris, Esq.                **Hospitality House; Coalition on**
2  Public Interest Law Project            **Homelessness; and Faithful Fools**
   449 15th Street, Suite 301             (related case USDC-Northern California
3  Oakland, CA 94612-06001                case #4:20-cv-03033-JST)

4                                         Office: (510) 891-9794
                                          Fax: (510) 891-9727
5                                         lhansen@pilpca.org
                                          mmorris@pilpca.org
6

7  Lili V. Graham, Esq.                   **Counsel for Proposed Intervenors**
   Tiffany L. Nocon, Esq.                 **Hospitality House; Coalition on**
8  Disability Rights California           **Homelessness; and Faithful Fools**
   350 S. Bixel Street Suite 290          (related case USDC-Northern California
9  Los Angeles, CA 90017-1418             case #4:20-cv-03033-JST)

10                                        Office: (213) 213-8000
                                          Fax: (213) 213-8001
11                                        lili.graham@disabilityrightsca.org
                                          tiffany.nocon@disabilityrightsca.org
12

13 Michael David Key, Esq.                **Counsel for Proposed Intervenors**
   Jessica Berger, Esq.                   **Hospitality House; Coalition on**
14 Bay Area Legal Aid                     **Homelessness; and Faithful Fools**
   1454 43rd Avenue                       (related case USDC-Northern California
15 San Francisco, CA 94122                case #4:20-cv-03033-JST)

16                                        Office: (415) 982-1300
                                          Fax: (415) 982-4243
17                                        mkeys@baylegal.org
                                          jberger@baylegal.org
18

19 William S. Freeman, Esq.               **Counsel for Amicus Curiae**
   John Thomas H. Do, Esq.                **(ACLU Foundation of Northern**
20 ACLU Foundation of Northern            **California)**
   California                             (related case USDC-Northern California
21 39 Drumm Street                        case #4:20-cv-03033-JST)
   San Francisco, CA 94111
22                                        Office: (415) 621-2943
                                          wfreeman@aclunc.org
23                                        jdo@aclunc.org

24

25

26    **BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the
document(s) with the Clerk of the Court by using the CM/ECF system.  Participants
27 in the case who are registered CM/ECF users will be served by the CM/ECF system.
Participants in the case who are not registered CM/ECF users will be served by mail
28 or by other means permitted by the court rules.

1         I declare under penalty of perjury under the laws of the United States of

2    America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

3         Executed on May 24, 2024, at San Francisco, California.

4

5    _____

     Kirsten Benzien

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - CASE NO. 4:24-cv-01562-JST