1

LAW OFFICES OF
**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION

2

650 CALIFORNIA STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94108-2615
T: (415) 981-7210 · F: (415) 391-6965

3

4

MICHAEL A. KELLY (State Bar #71460)
mkelly@walkuplawoffice.com
RICHARD H. SCHOENBERGER (State Bar #122190)
rschoenberger@walkuplawoffice.com
MATTHEW D. DAVIS (State Bar #141986)
mdavis@walkuplawoffice.com
ASHCON MINOIEFAR (State Bar #347583)
aminoiefar@walkuplawoffice.com

5

6

7

8

9

SHANIN SPECTER (Pennsylvania State Bar No. 40928)
(Admitted Pro Hac Vice)
shanin.specter@klinespecter.com
ALEX VAN DYKE (CA State Bar No. 340379)
alex.vandyke@klinespecter.com
KLINE & SPECTER, P.C.
1525 Locust Street
Philadelphia, PA 19102
Telephone: (215) 772-1000
Facsimile: (215) 772-1359

10

11

12

13

14

**ATTORNEYS FOR ALL PLAINTIFFS**

15

16

UNITED STATES DISTRICT COURT

17

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO/OAKLAND DIVISION

18

19 | JANE ROE, an individual; MARY ROE, an individual; SUSAN ROE, an individual; JOHN ROE, an individual; BARBARA ROE, an individual; PHOENIX HOTEL SF, LLC, a California limited liability company; FUNKY FUN, LLC, a California limited liability company; and 2930 EL CAMINO, LLC, a California limited liability company,

Case No. 4:24-cv-01562-JST

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS" MOTION FOR PRELIMINARY INJUNCTION**

**TESTIMONY AND ORAL ARGUMENT REQUESTED**

**Date: October 27, 2025**
**Time: 8:30 am**

Plaintiffs,

v.

CITY AND COUNTY OF SAN FRANCISCO, a California public entity,

Defendants.

**ASSIGNED FOR ALL PURPOSES TO THE HONORABLE DISTRICT JUDGE JON S. TIGAR, COURTROOM 6**

Action Filed:   03/14/2024
Trial Date:     Unassigned

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2    I.    INTRODUCTION .................................................................................. 1

3    II.   STATEMENT OF FACTS ..................................................................... 2

4          A.   The Plaintiffs................................................................................ 2

5          B.   The City Has Facilitated and Ratified the Distribution of Drug
                 Paraphernalia to Addicts in the Tenderloin.......................................... 3
6
                 1.   Declaration of Omar Ward .................................................... 3
7
                 2.   Testimony of Acting SFPD Captain Daniel Manning (Ret.)................... 3
8
                 3.   Testimony City Department of Emergency Management,
9                    Tenderloin Street Operations Manager Mark Mazza. ........................ 4

10               4.   Testimony of DPH Community Affairs Manager. ............................. 7

11               5.   Testimony of Director of Behavioral Health Services and
                     Mental Health SF. ............................................................. 8
12
                 6.   Testimony Director of Director of Strategic Initiatives in the
13                   Behavioral Health Section of DPH. ......................................... 9

14               7.   Testimony of City Employee Emily Cohen. ................................ 11

15               8.   Declaration of Randy Shaw. ............................................... 11

16         C.   Plaintiffs Are Being Harmed by the Distribution of Drug Paraphernalia
                 to Addicts in the Tenderloin. ...................................................... 12
17
                 1.   Plaintiff Jane Roe ......................................................... 12
18
                 2.   Plaintiff Mary Roe ........................................................ 13
19
                 3.   Plaintiff Susan Rose ...................................................... 14
20
                 4.   Plaintiff John Roe ......................................................... 14
21
                 5.   Plaintiff Barbara Roe...................................................... 15
22
                 6.   Plaintiffs Phoenix Hotel  and Funky Fun, LLC ............................ 15
23
                 7.   Plaintiff 2930 El Camino, LLC............................................. 16
24
     III.  LEGAL ARGUMENT ...................................................................... 17
25
           A.   The City's Conduct Has Given Rise to a Private Nuisance in the
26              Tenderloin.................................................................................. 17

27               1.   The City Has Interfered with Plaintiffs' Use and Enjoyment of
                     Their Property............................................................ 17
28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - CASE NO. 4:24-cv-01562-JST

2.    The Interference with Plaintiffs' Use and Enjoyment of Their Property Has Been Substantial. ..............................................18

3.    The Interference with Plaintiffs' Use and Enjoyment Is Unreasonable and Outweighs any Benefits. ............................19

B.    The City's Conduct Has Given Rise to a Public Nuisance in the Tenderloin Because It Assisted in the Creation of a Nuisance. ...................20

1.    The City Caused a Nuisance by Its Affirmative Conduct. ......................20

2.    The City Has Had Actual Knowledge of the Harms Caused by Distributing Paraphernalia to Drug Addicts. ...........................21

3.    The City's Conduct Was Unreasonable. ...................................21

C.    The Court Has Authority to Issue an Injunction Under These Facts and Should Do So to Prevent Further Harm to Plaintiffs. ...........................22

1.    Plaintiffs' Action Is Likely to Succeed on the Merits. ............................22

2.    Plaintiffs Are Likely to Suffer Irreparable Harm Absent Preliminary Relief. ..............................................22

3.    The Balance of the Equities Favors Plaintiffs. .......................................23

4.    An Injunction to Prevent Distribution of Drug Pipes in the Tenderloin Is in the Public Interest. ............................................24

D.    The City Is Not Immune from Injunctive Relief Under Civ. Code § 3482 Because the Statute Under Which It Has Acted Does Not Expressly Sanction Its Conduct. ..................................................24

IV.    CONCLUSION. ..................................................................25

iii.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - CASE NO. 4:24-cv-01562-JST

1

# TABLE OF AUTHORITIES

2

**Federal Cases**                                                                                      Page(s)

3

*City & Cnty. of San Francisco v. Purdue Pharma L.P.*
4    620 F. Supp. 3d 936 (N.D. Cal. 2022) ................................................    20, 21, 22

5
*Leiva-Perez v. Holder* (9th Cir. 2011) 640 F. 3d 962 ...........................    22

6
*Matsumoto v. Labrador* (9th Cir., 2024) 122 F. 4th 787 ......................    22

7

8    **Federal Statutes and Rules**

9    Federal Rule of Civil Procedure 65 ................................................    22

10

11   **State Cases**

12   *Adams v. MHC Colony Park, L.P.* (2014) 224 Cal. App. 4th 601 ...........    17

13
*City of Norwalk v. City of Cerritos* (2024) 99 Cal.App. 5th 977 ..............    24

14
*Kempton v. City of Los Angeles* (2008) 165 Cal. App. 4th 1344 ...............    18

15

16   *Koll-Irvine Center Property Owners Assn. v. County of Orange* (1994)
24 Cal. App. 4th 1036 ................................................................    17

17
*People v. ConAgra Grocery Prod.* Co. (2017) 17 Cal. App. 5th 51...........    17, 20, 21, 22

18
*Today's IV, Inc. v. Los Angeles County Metropolitan Transportation*
19   *Authority* (2022) 83 Cal. App. 5th 1137 ................................................    17

20

21   **State Statutes**

22   Civil Code § 3479 ................................................................    17, 20

23   Civil Code § 3480 ................................................................    20

24
Civil Code § 3482 ................................................................    24

25
Health & Safety Code § 11364 ................................................    19

26
Health & Safety Code § 11364.7 ................................................    19, 20

27

28

Health & Safety Code § 121349.1 ………………………………………..     24

v.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - CASE NO. 4:24-cv-01562-JST

# I.     INTRODUCTION

Plaintiffs seek a preliminary injunction enjoining Defendant City and County of San Francisco ("the City") from directly or indirectly supplying fentanyl or methamphetamine-related drug paraphernalia to any individuals, groups, organizations, or entities within the Tenderloin neighborhood, and further enjoining the City from allowing City-funded contractors to furnish such paraphernalia to any individuals, groups, organizations, or entities in the Tenderloin.

City-funded contractors continue to hand out fentanyl pipes and related drug paraphernalia in the Tenderloin. The stills below are from a video taken just last week inside a storefront on Turk Street. The left image shows fentanyl pipes that were being handed out. The right image shows what happens as one steps outside.[1]

 

The City has sponsored and facilitated the distribution of paraphernalia in the Tenderloin. The City recently formalized this distribution with a policy promulgated to all organizations that furnish paraphernalia that are, or wish to be, in contract with the City. The City's affirmative conduct attracts hardcore fentanyl and methamphetamine drug addicts to the Tenderloin, where the City and its vendors

---

[1] See accompanying declaration of Omar Ward, attached to the Declaration of Ashcon Minoiefar at ¶ 4 and **Ex. A**

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - CASE NO. 4:24-cv-01562-JST

then provide them with "harm reduction" services and "housing first" shelter options.

Foreseeably, drug addicts swarmed the Tenderloin in response to the City's offers of drug paraphernalia, drug consumption sites, and shelter spaces that impose little to no rules with respect to behavior. Equally foreseeable, violent, gang-affiliated drug dealers also converged on the neighborhood. As a result of the City's recent change to its policies with its contractors distributing drug paraphernalia, the City's has designated approved sites for its contractors to continue to furnish drug paraphernalia to the addicts who now habituate the Tenderloin's sidewalks, or otherwise frequent the neighborhood.

Tenderloin residents and businesses, including Plaintiffs, have borne the brunt of this influx of addicts and dealers. As set forth in Plaintiffs' supporting declarations, their use and enjoyment of their property has been significantly harmed by addicts and dealers who block the public sidewalks and building entrances, biohazardous waste, noise, smoke, dangerous activity, and offensive smells. Although City employees acknowledge the existence of these nuisance conditions and admit that drug use, especially the smoking of fentanyl, as contributing to those conditions, the City facilitated City-funded vendors to handout fentanyl pipes in the Tenderloin. Under these circumstances, the Court can and should grant Plaintiffs' motion and enjoin the City from directly, or indirectly through its contractors, distributing or allowing the distribution of drug paraphernalia in the Tenderloin.

## II.    STATEMENT OF FACTS

### A.    The Plaintiffs.

There are five (5) individual plaintiffs and three (3) entity plaintiffs, all of whom are moving parties herein. Each individual plaintiff resides in the Tenderloin neighborhood, and each entity plaintiff operates a business there. In support of their motion, they each submit declarations describing the conditions of the sidewalks adjacent to their respective residences and businesses and also describing how those conditions substantially interfere with the use and enjoyment of their property.

2.

**B.      The City Has Facilitated and Ratified the Distribution of Drug Paraphernalia to Addicts in the Tenderloin.**

### 1.      Declaration of Omar Ward

Omar Ward regularly visits the Tenderloin and publishes online content about drug use in San Francisco. (Declaration of Omar Ward ("Ward Dec.") at ¶ 2.) On August 19, 2025, he was in an the alleyway near Duboce Park, where he saw people who he understood to be with SF AIDS Foundation handing out paraphernalia at a table. (*Id*. at ¶ 3.) Ward saw one person receive a bag with foil in it. (*Id*.) He also saw an individual wearing a Department of Public Health ("DPH") jacket sitting at a table observing the "mobile distribution station." (*Id*.)

On August 20, 2025, Ward entered 172 Turk Street and stood in line with others. (*Id*. at ¶ 4.) An individual who he understood to be working for SF AIDS passed out glass pipes and related paraphernalia to each person in the line, including Ward. (*Id*.) No one offered counseling or provided counseling materials. (*Id*.) He took a video of the interaction and conduct, including of two people who appeared to be addicts under the influence just outside the door. (Ward Dec. at ¶ 4 and **Ex. A**.)

On August 21, 2025, Ward entered the parking lot of the Glide Memorial Church at 322-330 Ellis Street and received a "smoking kit" from persons he understood to be Glide employees. (*Id*. at ¶ 5.) The kit contained aluminum foil, straws and Brillo. (*Ib*.) He did not receive a pipe because, he was told, "those are handed out on Tuesday and Fridays." (*Id*.) He took video of the interaction and conduct. (Ward Dec. at ¶ 5 and **Ex. B**.)

Ward frequently sees people loitering outside 685 Ellis Street a City-owned shelter, some of whom he knows to be residents, that are intoxicated and sitting or lying on the sidewalk. (*Id*. at ¶ 6.)

### 2.      Testimony of Acting SFPD Captain Daniel Manning (Ret.)

Daniel Manning, now retired, last served as Acting Captain of the SFPD's Tenderloin Station. (Deposition of Daniel Manning ("Manning Depo.") at 8:7-15,

3.

1  attached as **Ex. A** to Minoiefar Dec.) He regularly worked in the Tenderloin and

2  responded to complaints from residents and merchants about street conditions. (*Id.*

3  at 11:22-24.) The complaints included large groups of people blocking sidewalks, open

4  drug use and sales, and garbage. (*Id.* at 19:20-25.)

5       Manning was aware that City-funded vendors handed out fentanyl pipes and

6  he was told "that we [the SFPD] shouldn't be citing people for things that are being

7  given to them by nonprofits." (*Id.* at 22:18-21.) He felt that furnishing pipes to drug

8  addicts worsened the problems in the Tenderloin. (*Id.* at 22:18-23:01.) He stated, "I

9  remember hearing words like 'safe injections' and things like that. And smoking

10 something out of a pipe has nothing to do with safely injecting yourself with

11 narcotics." (*Id.* at 23:6-9.)

12      He understood the City-operated Tenderloin Linkage Center ("TLC") to be "a

13 place where people were ingesting drugs in a safe environment." (*Id.* at 32:2-9.) That

14 people were allowed to smoke fentanyl there was a "source of frustration" for him.

15 (*Id.* at 35:25-36:6.) He was told that his officers were not permitted to go into the

16 TLC. (*Id.* at 61:9-12.) The TLC "caused a lot of issues in UN Plaza for sure," including

17 assaults, loitering, and "quality of life type crimes." (*Id.* at 32:20-22.)

18      Manning is troubled by "the convenience" afforded to illicit drug users in the

19 Tenderloin. (*Id.* at 28:2-6.) It increases the problem of drug use in the neighborhood.

20 (*Id.* at 28:7-9.)

21        **3.**   **Testimony City Department of Emergency Management, Tenderloin Street Operations Manager Mark Mazza.**

22      Mark Mazza works for the City's Department of Emergency Management as

23 Tenderloin Street Operations Manager. (Deposition of Mark Mazza ("Mazza Depo.")

24 attached as **Ex. B** to Minoiefar Dec., at 9:5-11.) He is also a licensed clinical social

25 worker. (*Id.* at 9:23-25.) He is intimately familiar with the Tenderloin, having lived

26 and worked there since 2006. (*Id.* At 13:23-14:05.) He spends the majority of his work

27 time on the Tenderloin's streets. (*Id.* at 16:18-21.)

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - CASE NO. 4:24-cv-01562-JST

Mazza testified about a flyer, entitled "**Keep Our Streets Healthy and Safe**," that the City, ironically, distributed when it opened the TLC. (Mazza Depo. at 17:01-14 and Ex. 1 thereto, which is attached as **Ex. C** to the Minoiefar Dec.) The flyer list "activities" that "are harmful to the whole community" and also identifies "unhealthy and unsafe street conditions."



Mazza affirmed that the "harmful" activities and conditions described in the flyer all occur in the Tenderloin as a result of illicit drug activity. He witnesses the selling and storing of illegal drugs and "rampant" illegal drug use. (*Id.* at 23:7-10; 25:2-11.) He sees people who continue to camp on the Tenderloin's streets even after being offered shelter. (*Id.* at 27:11-17.) Many of them do so because of drug addiction. (*Id.* at 31:2-9.) He agreed that selling and storing illegal drugs contributes to unhealthy and unsafe conditions in the Tenderloin (*Id.* at 20:10-24), as does "setting up structures and belongings that block sidewalk, entrances or access to public spaces" (*Id.* at 21:22-

5.

22:03) and operating grills, heaters, and open flames near buildings and vehicles. (*Id.* at 22:14-21.)

Mazza has seen people handing out drug paraphernalia in the Tenderloin. (*Id.* at 32:1-2.) He confirmed a growing and troubling trend: the distribution of smoking materials by City-funded organizations, including Glide. (*Id.* at 35:13-20; 42:3-11.) He testified that employees of the City's Department of Public Health ("DPH") are also "involved" in the distribution of drug paraphernalia. (*Id.* at 36:8-21.) He identified another employee, the DPH Community Affairs Manager, as being in a "leadership role focused on harm reduction"[2] and as being the person at DPH who knew the most about the distribution of drug paraphernalia in the Tenderloin. (*Id.* at 37:9-12, 55:7-11.)

Mazza often finds discarded drug paraphernalia on the streets. (*Id.* at 35:6-9.) He testified that in the past, the paraphernalia was primarily syringes. "More lately, glass pipes, straws, aluminum foil." (*Id.* at 35:9-12.)

Mazza testified about the City's operation of the TLC. (*Id.* at 56:6-10.) He observed people openly using narcotics in front of the staff who worked there. (*Id.* at 61:17-62:01.) He recalls the TLC being called a "safe consumption site." (*Id.* at 62:6-9.) The TLC staff made no effort to stop the drug use there. (*Id.* at 62:17-21.)

Mazza has misgivings about handing out drug supplies in the Tenderloin. (*Id.* at 39:15-17.) He feels it "maintains," "facilitates," and "condones" illegal drug use in the there. (*Id.* at 41:13-42:01; 52:8-12.) He viewed video of a "Harm Reduction Day" event held at Glide's parking lot. (*Id.* at 48:4-18.) He identified Grant Colfax, the former head of the DPH, as an attendee seen in the video. (*Id.* at 49:5-10.) He also identified the DPH Director of Strategic Initiatives as an attendee. (*Id.* at 49:8-10.) A speaker at that event urged addicts to "Always go to the same dealer!" (*Id.* at 50:7-13.)

---

[2] "Harm reduction" is a term used by City employees and in City-sponsored programs to describe activities that include the distribution of smoking pipes to people who are addicted to fentanyl and/or methamphetamine.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - CASE NO. 4:24-cv-01562-JST

1  Mazza testified that he is "confused by people who are in a professional capacity

2  encouraging drug dealing and drug use." (*Id.* at 50:24-51:05.)

### 4.    Testimony of DPH Community Affairs Manager.

4    The current DPH Community Affairs Manager ("DPH Manager")[3] was formerly

5  the director of DPH's Overdose Prevention Program. (DPH Manager Depo., attached

6  as **Ex. D** to Minoiefar Dec. at 6:12-19 and 8:4-6.) She has worked for DPH for 27 years.

7  (*Id.* at 7:6-11.) She is the person that Mazza identified as most knowledgeable about

8  paraphernalia distribution in the Tenderloin. (Mazza Depo, *supra*, at 36:8-11.)

9    As the director of Overdose Prevention Program, she oversaw the contracts for

10  syringe distribution programs by Glide and SF AIDS. (*Id.* at 19:25-20:17.) She denied

11  knowing that "vendors who receive city funds distribute foil, smoking pipes and other

12  non-syringe drug paraphernalia in the Tenderloin." (*Id.* at 21:8-22:2.) But she also

13  admitted that she was aware "from community meetings, from the news, [and] from

14  residents" that these vendors were handing out smoking supplies such as foil, straws,

15  and pipes on the Tenderloin's sidewalks and streets. (*Id.* at 22:3-18.)

16    The DPH Manager initially denied any involvement in the operation of the TLC,

17  but then admitted that she was on many email communications about it. (*Id.* at 23:6-

18  15.) She claimed she could not recall the names of any DPH employees who worked at

19  the TLC. (*Id.* at 23:22-24:14.) She admitted that she saw employees of HealthRight

20  360, another City vendor, hand out drug paraphernalia from a table inside the TLC,

21  but repeatedly claimed, "I don't know" when asked what was being distributed. (*Id.* at

22  25:1-18.) She admitted that people were allowed to use drugs at the TLC, but claimed

23  not to know whether DPH supervised that site. (*Id.* at 25:19-26:03.) She saw people

24  using drugs in an outdoor area that the City had fenced in, but said she had "no idea"

25  who supervised that site. (*Id.* at 26:4-27:12.) She said, "I don't remember" when asked

26  if she saw people smoking or injecting drugs at the TLC. (*Id.* at 28:13-29:05.)

27

28  [3] Per agreement of the parties, the names of certain City employees are not being
referred to here for confidentiality reasons.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - CASE NO. 4:24-cv-01562-JST

The DPH Manager acknowledged that street conditions in the Tenderloin, including human waste and disposed drug paraphernalia, give rise to unhealthy and unsafe conditions for the children who live there. (*Id*. at 18:10-17.) She also testified that the Tenderloin has more children than just about any other neighborhood in the city. (*Id*. at 14:11-15.) She acknowledged that DPH's mission is to serve all San Franciscans. (*Id*. at 13:21-23.) Yet, she also testified that she was unaware of DPH ever examining whether handing out drug supplies in the Tenderloin had any harmful effects of children who live there. (*Id*. at 75:15-21.)

**5.    Testimony of Director of Behavioral Health Services and Mental Health SF.**

The current DPH Director of Behavioral Health Services and Mental Health SF ("BH Director") has held that position since 2021. (BH Director Depo., attached as **Ex. E** to Minoiefar Dec., at 10:4-6, 20:3-9.) When the she gave her deposition on April 21, 2025, she was asked whether "Under the auspices of the City and County of San Francisco, either directly or indirectly through contracted groups, have fentanyl pipes been distributed in the Tenderloin" since she began her job. Rather than answer, she invoked her Fifth Amendment right to remain silent. (*Id*. at 68:5-16.)

The BH Director testified that a new City policy, effective April 30, 2025, would require that the furnishing of "safer smoking supplies," including foil, pipes, and straws, only occur in non-public or DPH-approved spaces, including the Glide parking lot. (*Id*. at 71:11-73:01.) She further testified that the City will not restrict vendors from handing out pipes to anyone who asks for them. For example:

> Q. A 14 year old who comes into Glide in June 2025 and wants drug paraphernalia, so long as he or she is counseled, will receive it, true?
>
> A. I want to acknowledge the complexity here and say yes.

(*Id*. at 121:14-19.)

The BH Director testified that the so-called use of "safe consumption" sites is a "subset of harm reduction." (*Id*. at 24:6-8.) She asserted her Fifth Amendment right

8.

1  when asked whether she had advocated for such sites in the City. (*Id*. at 24:9-15.)

2  She sometimes visited the TLC. (*Id*. at 28:11-22.) When asked whether drug use was

3  permitted there, whether it was intended to be a safe consumption site, and whether

4  she knew that people would use fentanyl and heroin at the TLC, she asserted her

5  right to remain silent. (*Id*. at 28:24-29:05, 55:1-23.) She likewise asserted the Fifth

6  Amendment when asked whether drug paraphernalia had been handed out at the

7  TLC. (*Id*. at 57:8-21.)[4]

8      The BH Director testified that under the new City policy, drug users will not

9  be allowed to use drugs within the controlled spaces where paraphernalia is

10 distributed. (*Id*. at 79:4-7.) She initially denied that a person receiving a fentanyl

11 pipe would be likely to use it outside of the approved distribution site, "People could

12 be living somewhere, for example." (*Id*. at 79:8-16.) But, when pressed, she

13 acknowledged the obvious: people leaving  the distribution sites are going to use the

14 drug and that can result in crime occurring around the parking lot at GLIDE. (*Id*.

15 79:18-80:18.)

16              **6.    Testimony Director of Director of Strategic Initiatives in
                       the Behavioral Health Section of DPH.**

17      The Director of Strategic Initiatives in the Behavioral Health Services section

18 of DPH ("Director of Strategic Initiatives") was deposed. (Director of Strategic

19 Initiatives Depo., attached as **Ex. F** to Minoiefar Decl., at 11:4-13.) Her department

20 works with vendors, including Glide and SF AIDS, and oversees the contract for SF

21 AIDS. (*Id*. at 16:19-17:04; 18:22-25.)

22      When overseeing contracts for the distribution of "harm reduction" supplies,"

23 her department determines what supplies will be distributed by the contractor. (*Id*. at

24 20:22-21:01.) When asked whether up to April 2025 the DPH was involved in the

25 distribution of pipes or smoking materials in public spaces, she invoked her right to

26

27 _____

28 [4] Plaintiff Barbara Roe lives within a block of the TLC site and avers that its
   operations devastated her neighborhood and that the problems persist. (Barbara Roe
   Decl. at ¶¶2-7.)

1  remain silent. (*Id*. at 22:2-23:4.)

2      The Director of Strategic Initiatives testified that the City has the capability to
3  insert new provisions into contracts, as needed, with immediate effect. (*Id*. at 75:25-
4  76:14; 76:17-77:04.) Further, certain items are already strictly prohibited from
5  distribution by City contractors, for example tents. (*Id*. at 36:10-20.) Where a
6  contractor fails to comply with such prohibitions, the City will order the contractor to
7  "stop immediately" and enforce the provision through the contract if the conduct
8  continues. (*Id*. at 36:21-37:07.)

9      The Director of Strategic Initiatives acknowledged that the City received
10 complaints from the community about a City-funded pop-up paraphernalia
11 distribution site on Willow Street in the Tenderloin. (*Id*. at 47:12-48:08.) She also
12 acknowledged there was a "significant encampment and other drug use" at that
13 location. (*Id*. at 47:23-48:04.) Community members complained that the distribution of
14 supplies enabled drug use and attracted addicts to that area. (*Id*. at 48:22-49:01.) As a
15 result, it was moved. (*Id*. at 49:11-15.)

16     The Director of Strategic Initiatives testified that the City can "make
17 modifications to what supplies, or where supplies can be given out." (*Id*. at 21:16-20.)
18 The City recently instituted a new policy, formally allowing vendors to distribute
19 smoking supplies so long as it occurs in nonpublic spaces. (*Id*. at 72:4-7.) She further
20 testified that specified distribution sites for smoking materials have been identified,
21 including the parking lot of Glide, and her office is overseeing the process of moving
22 outdoor mobile sites to "comply with" the City's new policy. (*Id*. at 52:22-53:04.) There
23 was no effort to move the concentration of these distribution sites out of the Tenderloin.
24 (*Id*. at 53:5-9.)

25     She affirmed that in order to effectuate the new policy to permit the distribution
26 of smoking paraphernalia so long as it is in non-public spaces, DPH is instituting a
27 "policy rollout" that will include a "monitoring" program to ensure contractors comply
28 with the City's policy to distribute smoking paraphernalia in nonpublic spaces. (*Id*. at

72:13-73:21.) She testified that a contract provision prohibiting the distribution of smoking paraphernalia in public spaces "will immediately be added to the contracts." (*Id*. at 76:17-77:04.) She said these provisions will be enforced by the City, including additional site visits and "formal corrective action process, which could then put their funding and contract at risk." (*Id*. at 74:11-75:23.)

### 7.    Testimony of City Employee Emily Cohen.

Emily Cohen works for the City's Department of Homelessness and Supportive Housing ("HSH") in the Tenderloin. (Deposition of Emily Cohen ("Cohen Depo."), attached as **Ex. G** to Minoiefar Dec., at 7:20-25 and 16:14-15.) HSH enters into agreements with venders to run homeless facilities but "doesn't have total control over the agreements because the nonprofits that operate the sites have their own – like, are their own entities." (*Id*. at 33:16-22; 34:4-6.) She is unaware of any mandates imposed by HSH regarding the use of drugs in the facilities. (*Id*. at 34:15-20.) She has received many complaints about drug use in HSH-sponsored facilities spilling out into the public areas around those facilities. (*Id*. at 35:6-12.)

Cohen has seen drug paraphernalia littering the streets of the Tenderloin. (*Id*. at 53:6-8.) She is aware that some "harm reduction" organizations hand out paraphernalia in the Tenderloin, including fentanyl and methamphetamine smoking pipes. (*Id*. at 57:11-16; 57:21-58:07.) She testifies that HSH does not have any "position" about whether furnishing such supplies is a good idea. (*Id*. at 58:25-59:03.)

### 8.    Declaration of Randy Shaw.

Randy Shaw is an authority on the current events and conditions in the Tenderloin. (Declaration of Randy Shaw ("Shaw Dec.") at ¶¶ 2, 3.) Shaw describes how the City purchased a former youth hostel located at 685 Ellis Street in the Tenderloin, ostensibly to provide permanent supportive housing for the homeless population. (*Id*. at ¶ 4.) Instead, the City has been operating it as a homeless shelter that is managed by a contractor. (*Ibid*.) In similar fashion, the City previously took over three (3) former tourist hotels in the Tenderloin – the Adante Hotel, the

11.

Monarch Hotel, and the COVA – and converted them into homeless shelters. (*Id.* at ¶ 5.) The COVA was later closed due to significant pressure from the community, but the Adante and Monarch continue to operate as homeless shelters. (*Id.* at ¶¶ 5 and 15.)

Shaw describes how during the daytime, many shelter residents at 685 Ellis Street and the Monarch congregate outside those property and that the sidewalks become blocked by drug users. (*Id.* at ¶ 6.) He has often witnessed illegal drug activities among the people loitering in front of those shelters and has seen garbage and discarded drug paraphernalia there. (*Id.*) Residents of 685 Ellis Street are free to spend their days outside the shelter, and the operators have not effectively dispersed sidewalk drug users. (*Id.* at ¶ 7.) The people loitering in front of 685 Ellis Street include residents of that shelter. (*Id.*)

The Tenderloin Business Coalition asked the City to assign "ambassadors," to each of these former hotels-now shelters to prevent them from causing nuisance conditions, but the City has failed to provide consistent monitoring. (Id. at ¶ 9.) Shaw has supplied photographs of people using drugs in front of the 685 Ellis Street shelter and the Monarch Hotel. (Shaw Dec. at ¶¶ 10 and 11, and **Ex. A** and **B**.)

Shaw provides a description of the longer-term effects of such nuisance conditions have had in the Tenderloin. The Little Saigon neighborhood has been economically devastated because the nuisance conditions from the nearby shelters (former tourist hotels) have driven away foot traffic. (*Id.* at ¶¶ 12-14.)

C. **Plaintiffs Are Being Harmed by the Distribution of Drug Paraphernalia to Addicts in the Tenderloin.**

1. **Plaintiff Jane Roe**

Jane Roe is a married mother of two school-age daughters and has lived in the Tenderloin for 18 years. (Declaration of Jane Roe at ¶ 2.) She often works 12-13 hour days and returns home at night. (*Id.*) Her home is on the same block as the former COVA Hotel and the current homeless shelter located at 685 Ellis Street. (*Id.* at ¶ 3.)

12.

1  She sees intoxicated people on the sidewalks and frequently sees drug sales. (*Id.* at ¶

2  4.) She also finds a lot of discarded items, including pipes for smoking drugs. (*Id.*)

3  She has frequently found the entrance to her building blocked by people who are

4  lying down. (*Id.*) She frequently smells drugs being smoked near her home. (*Id.*) One

5  daughter has bad asthma. (*Id.*) She has been threatened with bodily harm when

6  asking loitering people to stop smoking near her home or cleaning up after them. (*Id.*

7  at ¶¶ 5-6.)

8       The conditions on her block are currently the same as when the COVA Hotel

9  was open; they persist around 685 Ellis Street. (*Id.* at ¶ 8, 12.) She sometimes has to

10  walk in the street because the sidewalk is blocked by people and other things, like

11  drug paraphernalia and feces. (*Id.* at ¶ 9.) She does not let her daughters walk alone

12  to the bus stop or play outside because of the dangerous conditions. (*Id.* at ¶ 10.)

13       **2.    Plaintiff Mary Roe**

14       Mary Roe is a disabled senior citizen who lives in the Tenderloin. (Declaration

15  of Mary Roe at ¶¶ 2, 3.) Her disability requires that she use supplemental oxygen

16  and that she limit her physical exertion. (*Id.* at ¶ 3.) Her home is located close to

17  several facilities that provide services to the homeless and/or drug addicts. (*Id.* at ¶

18  2.)

19       A City-funded vendor, the Hospitality House, has a storefront on her block.

20  (*Id.*) In the past the staff would hand out drug paraphernalia from a table outside the

21  storefront. (Id. at ¶ 5.) More recently, paraphernalia is handed out inside the

22  Hospitality House's storefront through the doorway. She has witnessed individuals

23  take the paraphernalia, walk a short distance, and begin to smoke drugs, including

24  next to her building. (*Id.* at ¶¶ 5-6.)

25       She finds the blocked sidewalks to be especially problematic. (*Id.* at ¶ 7.) A

26  simple trip to the store is scary because "you don't want to take your time walking

27  through the conditions described in this declaration." (*Id.* at ¶3.) Adding extra steps

28  to walk around blocked sidewalks can cause her COPD to flare up. (*Id.* at ¶¶ 3, 8.) If

13.

1  she stops to rest, she fears that she is making herself a target for criminal activity.

2  (*Id*. at ¶ 3.)

3       The conditions of the sidewalks have worsened recently, with more people

4  congregating there than before. (*Id*. at ¶ 7.) Despite reported changes by the City's

5  policies related to the furnishing of services and supplies to drug addicts, she has not

6  noticed any significant changes. (*Id*. at ¶ 8.) She is always on high alert for her safety

7  when she leaves her building and walks on the sidewalks. (*Id*. at ¶ 8-9)

8           **3.**    **Plaintiff Susan Rose**

9       Plaintiff Susan Roe is a disabled senior citizen who lives in the Tenderloin and

10  needs to use a walker when she leaves her home. (Declaration of Susan Roe at ¶¶ 2,

11  3.) She finds the sidewalks blocked by loitering groups of people, who appear to be

12  homeless drug users, or their tents. (*Id*. at ¶¶ 4 and 5.) She frequently has to walk

13  into the street because the sidewalks are blocked. (*Id*. at ¶ *6*.) She must be alert for

14  human excrement, erratic individuals, and discarded needles and pipes. (*Id*. at ¶ 5-7.)

15  She always checks outside her home in both directions before leaving. At times, she

16  decides not to leave her home due to the conditions outside and otherwise enjoy the

17  use of her property. (*Id*. at ¶ 7-8.)

18           **4.**    **Plaintiff John Roe**

19       Plaintiff John Roe is a behavioral health clinician who lives in the Tenderloin.

20  (Declaration of John Roe at ¶ 2.) The sidewalks on his street are frequently blocked

21  by drug users. (*Id*. at ¶ 3.) He has on many occasions found unconscious people

22  blocking the entrance to his home. (*Id*. at ¶ 6.) One time, he encountered a man who

23  was defecating in the doorway of his home, and the man threatened him. (*Id*. at ¶ 5.)

24  On many occasions, he has smelled smoke from drugs. (*Id*.) He has to exercise

25  caution when exiting his home and using the sidewalks in order to avoid stepping

26  in/on hazardous items and substances. (*Id*. at ¶ 6.) These problems continue, despite

27  reports that the City has changed policies. (*Id*. at ¶ 7.)

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - CASE NO. 4:24-cv-01562-JST

### 5.    Plaintiff Barbara Roe

Plaintiff Barbara Roe lives on the same block as the site of the former TLC. (Declaration of Barbara Roe at ¶ 2.) Before the TLC closed, the sidewalks outside her building were frequently crowded with people using or selling illegal drugs. (*Id*.) Those activities have continued after the TLC closed. (*Id*.) Recently, crowds of apparent addicts and drug dealers have been loitering outside the Proper Hotel across the street from her building. (*Id*. at ¶ 3.) She occasionally sees people with weapons. (*Id*.) She also sees people using drugs and acting extremely intoxicated. (*Id*.) She frequently has to step into the street to avoid loitering people, debris, and drug paraphernalia blocking the sidewalks. (*Ibid*.)

A nearby Whole Foods store closed, which she understands was out of concern for the safety of the employees. (*Id*. at ¶ 4.) Because of biohazardous material at the entrance to her residence and on the sidewalk, she must take extra care for her safety when entering and leaving her home. (*Id*. at ¶¶ 5, 7.) She carries a taser for protection. (*Id*.) The entrance to her building has frequently been blocked by crowds of seemingly intoxicated and dangerous individuals. (*Id*. at ¶ 6.) People have started illegal fires outside the building, triggering the fire alarms. (*Id*.) Her HOA erected a fence around her building in an effort to protect residents, but crowds of people still continue to loiter there. (*Id*.)

### 6.    Plaintiffs Phoenix Hotel  and Funky Fun, LLC

Isabel Manchester has an ownership interest in and manages two business, a hotel and a restaurant, which are both located at 601 Eddy Street, in the Tenderloin. (Declaration of Isabel Manchester at ¶ 2.) Her businesses are close to a shelter located at 685 Ellis Street and to a former shelter, the COVA Hotel. (*Id*. at ¶ 3.) She and her partners have decided to close the businesses because it is "too difficult" to operate in the Tenderloin under the current conditions there. (*Id*. at ¶ 4.) Those conditions include sidewalks that are crowded by people who appear to be buying and using drugs, and people who are under the influence of drugs. (*Id*. at ¶ 5.) She

1  regularly finds discarded drug paraphernalia and human excrement on the sidewalks

2  outside the hotel. (*Id*.) There are offensive smells caused by smoke and human waste.

3  (*Id*.) The conditions disrupt the operation of the hotel. (*Id*.) She has received

4  numerous complaints from guests about the conditions and has had numerous

5  canceled reservations. (*Id*. at ¶ 6.) Lower guest traffic has made it unprofitable to

6  operate a hotel or restaurant in the neighborhood. (*Id*.) Guests book out early

7  because of the conditions. (*Id*. at ¶ 7.) Her employees have been attacked by people

8  who are loitering and who appear to be under the influence of drugs. (*Id*.)  This all

9  continues on the sidewalks in the Tenderloin despite reports of recent policy changes

10 by the City. (*Id*. at ¶ 8.)

### 7.    Plaintiff 2930 El Camino, LLC

12     Sam Patel is a member of 2490 El Camino, LLC, which operates the Best

13 Western Red Coach Inn, at 700 Eddy Street, in the Tenderloin. (Patel Declaration at

14 ¶ 2.) The hotel is located within two (2) blocks of 685 Ellis Street and the COVA

15 Hotel, where the City has operated homeless shelters. (*Id*. at ¶ 3.) The hotel is also

16 less than a block from a former paraphernalia distribution site on Willow Street and

17 a few blocks away from a current distribution site at the Glide parking lot. (*Id*.) The

18 sidewalks in front of the hotel are frequently occupied by people using narcotics. (*Id*.

19 at ¶ 4.) Intoxicated people sit and lie down on the sidewalks. (*Id*.) Some of the people

20 erect makeshift shelters on the sidewalks next to the hotel. (*Id*.) There are a lot of

21 hazardous items around the hotel, such as garbage, syringes, needles, pipes, and

22 aluminum foil. (*Id*.)

23     Hotel staff constantly try to clean up those materials to keep guests safe and to

24 maintain the hotel's reputation. (*Id*.) However, guests report the conditions in

25 reviews, and this appears to drive away potential business (*Id*.) There are loud noises

26 from arguments and offensive smells caused by smoke and human waste. (*Id*.) These

27 conditions disrupt the hotel's operations and the guests' use of the property. (*Id*.)

28 Patel has to be careful for his safety when entering or exiting the premises (*Id*. at ¶

5) The conditions occasionally improve, but they have been largely consistent and have a substantial impact on operations and cost time and money to address. (*Id.*)

### III.    LEGAL ARGUMENT

It is possible for a nuisance to be both public and, "from the perspective of individuals who suffer an interference with their use and enjoyment of land, to be private as well." (*Adams v. MHC Colony Park, L.P.* (2014) 224 Cal. App. 4th 601, 610.) When a nuisance is both public and private the plaintiff must prove an injury specifically referable to the use and enjoyment of his or her land. The injury, however, need not be different in kind from that suffered by the general public.' " (*People v. ConAgra Grocery Prod.* Co. (2017) 17 Cal. App. 5th 51, 122, quoting *Koll-Irvine Center Property Owners Assn. v. County of Orange* (1994) 24 Cal.App.4th 1036, 1041.)

### A.    The City's Conduct Has Given Rise to a Private Nuisance in the Tenderloin.

California Civ. Code § 3479 defines a nuisance as:

> "Anything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway . . .."

The elements of an action for private nuisance are: 1) an interference with the plaintiff's use and enjoyment of the plaintiff's property; (2) that is substantial, and (3) unreasonable. (*Today's IV, Inc. v. Los Angeles County Metropolitan Transportation Authority* (2022) 83 Cal. App. 5th 1137, 1176.)

#### 1.    The City Has Interfered with Plaintiffs' Use and Enjoyment of Their Property.

The City has engaged in a well-documented pattern of affirmative conduct that has attracted noxious and harmful activity to the Tenderloin. Plaintiffs have provided evidence that the City's policy of distributing smoking materials has caused

17.

1    drug addicts and dealers to congregate around their residences and businesses.

2    Plaintiffs have described how the conduct of those drug users and sellers has

3    interfered with and obstructed their use of their property. The resulting crowding,

4    offensive smells, and fear of physical harm that interferes with plaintiffs' use,

5    enjoyment and egress from their property are cognizable nuisances. (*See Kempton v.*

6    *City of Los Angeles* (2008) 165 Cal.App.4th 1344, 1349 (impairment of access to and

7    from a home to abutting public streets through physical barriers and the fear of

8    physical harm stemming from navigating the obstructions constitutes both private

9    and public nuisances.) Thus, Plaintiffs have established the first element of their

10    private nuisance action.

11        The change in policy whereby fentanyl smoking kits are now handed out in

12    nonpublic spaces, like the Glide parking lot or the SF AIDS and Hospitality House's

13    storefront locations, does not diminish the nuisance. People who receive this

14    paraphernalia use drugs in nearby public spaces. This is clear from Ward's video of

15    the storefront outside 172 Turk Street, Mary Roe's eye witness testimony of

16    distribution resulting in consumption right outside her home, and BH Director's

17    reluctant admission people leaving the distribution sites are going to use the drug in

18    public areas.

19              **2.    The Interference with Plaintiffs' Use and Enjoyment of
                     Their Property Has Been Substantial.**

20

21        Plaintiffs have established the second element of private nuisance, substantial

22    interference, by showing the great extent to which the furnishing of drug

23    paraphernalia in the Tenderloin has affected their free use of their property. There

24    are common themes in their stories about the dangers, annoyances, and indignities

25    they have faced: dealing with **blocked sidewalks and building entrances**, trying

26    to avoid physical contact with biohazardous waste in and around building entrances,

27    noise, smoke from open flames, and **aggressive and threatening behavior by**

28    **loitering drug addicts, which has scared them**. The individual Plaintiffs have

18.

1  described the extraordinary measures they have to take to protect themselves from

2  these harms. The commercial plaintiffs have shown that these conditions have driven

3  away customers and have cost them revenue.

4          **3.      The Interference with Plaintiffs' Use and Enjoyment Is
                      Unreasonable and Outweighs any Benefits.**

5

6          The third element of private nuisance – that the defendant's conduct be

7  unreasonable – is also met here. As shown above, City employee Mark Mazza and

8  former SFPD Capt. Manning both expressed strong doubts that there was any

9  benefit in the furnishing of drug paraphernalia to drug addicts or in allowing the

10 open use of illicit drugs in the Tenderloin. The City also recognized the deleterious

11 effects of distributing smoking pipes in its new policy: it regulates how and where

12 they can be distributed. But as discussed above, this half measure does not reduce

13 the nuisance but rather contributes to it.

14         The City's new policy continues the affirmative conduct of distributing drug

15 smoking pipes in the Tenderloin, which, in turn, feeds the nuisance conditions that

16 persist there. Individuals who the City knows to be drug addicts receive the smoking

17 materials at "DPH approved sites," then simply find a spot on a nearby sidewalk to

18 become intoxicated.

19         Health & Safety Code § 11364 states that it is "unlawful to possess and opium

20 pipe or any device, contrivance, instrument of paraphernalia for unlawfully injecting

21 or smoking" a specified controlled substance. California Health and Safety Code

22 section 11364.7(a)(1) states as follows:

23             "Except as authorized by law, a person who delivers,
               furnishes, or transfers, possesses with intent to deliver,
24             furnish, or transfer . . . drug paraphernalia, knowing, or
               under circumstances where one reasonably should know,
25             that it will be used to , . . ingest, inhale, or otherwise
               introduce into the human body a controlled substance . . .
26             except as provided in subdivision (b), in violation of this
               division, is guilty of a misdemeanor."
27
       In other words, the furnishing of fentanyl and methamphetamine smoking
28

                                          19.

paraphernalia is normally a criminal act with confirmed dilatory effects. Section

11364.7(a)(2) provides *limited* criminal immunity for public entities and their agents

who distribute items like "hypodermic needles or syringes," that are "necessary to

prevent the spread of communicable diseases, or to prevent drug overdose, injury, or

disability" to participants in authorized "clean needle exchange programs." The City

has never explained how the furnishing of a fentanyl or methamphetamine smoking

pipe is *necessary* to prevent the spread of communicable diseases, drug overdoses, or

injuries. (Both Mazza and Manning appeared to be highly skeptical of that notion.)

The Legislature included illegal drug sales in the very definition of "nuisance."

(Civ. Code § 3479.) By criminalizing the possession and the furnishing of drug

paraphernalia (apart from limited exceptions), the Legislature has signaled that the

harm of such conduct greatly outweighs any benefits.

### B.    The City's Conduct Has Given Rise to a Public Nuisance in the Tenderloin Because It Assisted in the Creation of a Nuisance.

Civ. Code § 3480 defines a "public nuisance" as "one which affects at the same

time an entire community or neighborhood, or any considerable number of persons,

although the extent of the annoyance or damage inflicted upon individuals may be

unequal." A public nuisance cause of action is established by proof that a defendant

"knowingly created or assisted in the creation of a substantial and unreasonable

interference with a public right." (*ConAgra*, *supra*, 17 Cal.App.5th at 79.) Causation is

an element of a public nuisance action. (*Id*. at 101.)

### 1.    The City Caused a Nuisance by Its Affirmative Conduct.

In *City & Cnty. of San Francisco v. Purdue Pharma L.P.* (N.D. Cal. 2022) 620

F. Supp. 3d 936, 946, the Court found that conduct, for purposes of public nuisance,

encompasses "any action" that assists in creating a system that causes an

interference with a public right." (Id. at 999.) The *ConAgra* court held that a

substantial factor standard applied, noting that:

> "'The substantial factor standard is a relatively broad one,
> requiring only that the contribution of the individual cause

20.

1    be more than negligible or theoretical.' . . . Thus, 'a force
2    which plays only an "infinitesimal" or "theoretical" part in
     bringing about injury, damage, or loss is not a substantial
3    factor' . . ,, but a very minor force that does cause harm is a
     substantial factor. (*Id.* at 101-02.)

4    The City's conduct, in furnishing the pipes that are used by, and later

5    discarded on the streets of the Tenderloin, by homeless drug addicts, meets the low

6    threshold of the substantial factor test. Specifically, the City *implemented a policy*, in

7    that directs "the furnishing of safer smoking supplies," including foil, pipes, and

8    straws to be distributed *in locations it approves.* (BH Director Depo. at 71:11-73:01.)

9    The City is also *monitoring compliance* with the policy. (Director of Strategic

10   Initiatives Depo. at 72:4-15.)

11                **2.    The City Has Had Actual Knowledge of the Harms Caused
                         by Distributing Paraphernalia to Drug Addicts.**
12

13   Plaintiffs have submitted testimony of City employees who admit they were

14   aware of complaints from the Tenderloin community about the various nuisance

15   conditions arising from the City's "harm reduction" activities. As discussed above, the

16   City published a flyer, "Keep Our Streets Healthy and Safe," to be distributed at

17   "harm reduction" locations. In that flyer, the City demonstrated its awareness of the

18   "unhealthy," "unsafe," and "harmful" conditions that were likely to arise. Also, the

19   record shows that on prior occasions, the City closed facilities (such as the TLC and

20   the COVA Hotel) after similar nuisance conditions arose there.

21   The City knows that the paraphernalia handed to drug addicts, eventually

22   ends up on public streets and sidewalks, *regardless of whether furnished outside or*

23   *inside.* This is evident from the numerous complaints by residents, traditional and

24   social media news reports, and observations by its own employees.

25                **3.    The City's Conduct Was Unreasonable**

26   In *Purdue Pharma*, the Court wrote that conduct "is unreasonable" if it either

27   violates a statute, ordinance or administrative regulation (620 F.Supp.3d at 999) or,

28   alternatively, if "the gravity of the harm outweighs the social utility of the

21.

1  defendant's conduct." (*Ibid*.) It remains untested whether the City's conduct violated

2  criminal statutes. But the harm shown by Plaintiffs in this action clearly outweighs

3  any social utility.

4       **C.    The Court Has Authority to Issue an Injunction Under These**
              **Facts and Should Do So to Prevent Further Harm to Plaintiffs.**

5

6            Pursuant to Federal Rule of Civil Procedure 65(a), a court can issue a

7  preliminary injunction following notice to the adverse party. A plaintiff seeking a

8  preliminary injunction must establish (1) that it is likely to succeed on the merits, (2)

9  that it is likely to suffer irreparable harm absent preliminary relief, (3) that the

10 balance of the equities tips in its favor, and (4) that an injunction is in the public

11 interest. (*Matsumoto v. Labrador* (9th Cir., 2024) 122 F.4th 787, 804.) Although a

12 plaintiff must meet all four elements, the court may apply a balancing test to them,

13 so long as a certain threshold showing is made on each factor." (*Leiva-Perez v. Holder*

14 (9th Cir. 2011) 640 F. 3d 962, 966.)

15           **1.    Plaintiffs' Action Is Likely to Succeed on the Merits.**

16           Although the underlying conduct in this case differs from the conduct that was

17 found to be a nuisance in the *Purdue Pharma* case, the harms complained of as

18 private and public nuisances are the same. Whether the City's conduct was a

19 contributing cause of those harms is analyzed under the "relatively broad"

20 substantial factor test, "requiring only that the contribution of the individual cause

21 be more than negligible or theoretical." (*ConAgra*, *supra*, 17 Cal.App.5th, at 101-02.)

22 The elements of public and private nuisance have been met. Thus, this factor weighs

23 strongly in favor of an injunction.

24           **2.    Plaintiffs Are Likely to Suffer Irreparable Harm Absent**
                   **Preliminary Relief.**

25

26           Plaintiffs have thus far managed to avoid significant physical injuries by

27 exercising extraordinary personal vigilance while entering and exiting their homes

28 and businesses and while trying to use the sidewalks in the Tenderloin. They are

1 constantly subjected to threatening words and conduct and unreasonable risks of

2 harm when leaving their buildings or using public sidewalks. They are forced to

3 inhale toxic fumes and smell highly offensive odors inside or right outside their

4 property, and they must dodge biohazardous materials. These constant intrusions

5 into their daily lives constitute irreparable harm.

6      These threats of harm are immediate and cause Plaintiffs to alter their daily

7 routines in order to circumvent the dangers they face. Plaintiffs have shown the

8 many obstacles and dangerous situations they confront each day as a result of

9 blocked building entrances and sidewalks. There is no adequate legal remedy to be

10 obtained from homeless drug addicts for the intrusions described above. Thus, this

11 factor weighs strongly in favor of an injunction

12         **3.      The Balance of the Equities Favors Plaintiffs.**

13      As discussed above in relation to the nuisance claims, there appears to be little

14 to no utility related to the specific conduct complained of in this lawsuit: the City's

15 furnishing of fentanyl and methamphetamine pipes to drug addicts, in the

16 Tenderloin. This is true regardless of the time, place or manner in which those pipes

17 are distributed.

18      The City's new policy has had no material improvement on the nuisance

19 conditions in the Tenderloin, as documented throughout the supporting declarations.

20 Rather, it formalizes and facilitates the conduct near Plaintiffs' homes and

21 businesses. As described above, Omar Ward personally witnessed drug-smoking

22 paraphernalia being distributed by two City contractors: SF AIDS and Glide, on

23 three recent occasions in August 2025. Mary Roe previously saw Hospitality House

24 openly distribute drug-smoking paraphernalia "on a table out front." Now, people

25 knock on the door of Hospitality House, receive items from someone inside, walk a

26 short distance, and then smoke the drugs, including right in front of her house. She

27 infers and believes that they are receiving paraphernalia from Hospitality House.

28 Jane Roe lives right next to 685 Ellis and right in between the shelter and the

23.

distribution site at GLIDE. It is reasonable to infer the conditions they faces on a daily basis are the result of individuals retrieving pipes from GLIDE and using them in front of her property with the resulting nuisance effects.

Also, no evidence that enforcing a contract provision to require contractors not to furnish drug pipes would cost the City any substantial expense. The Director of Strategic Initiatives testified that, the City has the capability to insert new provisions into contracts, as needed, with immediate effect. (Director of Strategic Initiatives Depo. at 76:23-77:1.) The City's roll out of its new paraphernalia policy shows that Plaintiffs' requested injunction could be feasibly crafted by the court and enforced at reasonable cost to the City. Thus, the balance of the equities weighs heavily in favor of an injunction.

### 4. An Injunction to Prevent Distribution of Drug Pipes in the Tenderloin Is in the Public Interest.

An order enjoining the furnishing of drug smoking pipes in the Tenderloin will further the Legislature's express effort to ban them. It will prevent the City from continuing to facilitate and condone illegal drug use, and it will remove the harms contributed to by the City and complained of by the various Plaintiffs in this action.

### D. The City Is Not Immune from Injunctive Relief Under Civ. Code § 3482 Because the Statute Under Which It Has Acted Does Not Expressly Sanction Its Conduct.

Plaintiffs anticipate that the City will argue that it is immune from nuisance liability under Civ. Code § 3482 and Health & Safety Code § 121349.1 and that, as a result, its conduct cannot be enjoined. Section 3482 states that "[n]othing which is done or maintained under the express authority of a statute can be deemed a nuisance."

The problem with that argument is twofold. First, section 3482 is construed "narrowly." (*City of Norwalk v. City of Cerritos* (2024) 99 Cal. App. 5th 977, 986.) Second, section 131349.1, on its face, only provides immunity from "criminal prosecution," and only for furnishing specific items like hypodermic needles and

24.

1  syringes, "which are necessary to prevent the spread of communicable diseases." (*Id.*)
2  In this case, Plaintiffs are alleging that the nuisance conditions complained of arise
3  from the furnishing of pipes used for smoking fentanyl and methamphetamine. Thus,
4  the City's conduct falls outside of the narrow scope of the immunity.

5      While there is a statutory exception for syringes and needles (which have
6  uniquely powerful capacity to spread blood-borne pathogens), there is no such carve-
7  out for pipes and other items that are used to smoke fentanyl or methamphetamine.

8                    **IV.    CONCLUSION**

9      Plaintiffs have found themselves at Ground Zero of a nuisance that has
10 impacted the entire Tenderloin neighborhood. It is unclear what, if any, benefit
11 accrues from the distribution of smoking paraphernalia. The harms are manifest.
12 Thus, the Court should issue a preliminary injunction enjoining the City from
13 directly or indirectly supplying or fentanyl or methamphetamine-smoking drug
14 paraphernalia to any individuals, groups, organizations, or entities within the
15 Tenderloin neighborhood, and further enjoining the City from allowing City
16 contractors to furnish such paraphernalia to any individuals, groups, organizations,
17 or entities within the Tenderloin.

18 Dated: August 25, 2025            WALKUP, MELODIA, KELLY & SCHOENBERGER

20                      By: _____
21                          MICHAEL A. KELLY
                            RICHARD H. SCHOENBERGER
22                          MATTHEW D. DAVIS
                            ASHCON MINOIEFAR
23                          Attorneys for ALL PLAINTIFFS

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - CASE NO. 4:24-cv-01562-JST