LAW OFFICES OF
# WALKUP, MELODIA, KELLY & SCHOENBERGER
A PROFESSIONAL CORPORATION

650 CALIFORNIA STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94108-2615
T: (415) 981-7210 · F: (415) 391-6965

MICHAEL A. KELLY (State Bar #71460)
mkelly@walkuplawoffice.com
RICHARD H. SCHOENBERGER (State Bar #122190)
rschoenberger@walkuplawoffice.com
MATTHEW D. DAVIS (State Bar #141986)
mdavis@walkuplawoffice.com
ASHCON MINOIEFAR (State Bar #347583)
aminoiefar@walkuplawoffice.com

SHANIN SPECTER (Pennsylvania State Bar No. 40928)
(Admitted Pro Hac Vice)
shanin.specter@klinespecter.com
ALEX VAN DYKE (CA State Bar No. 340379)
alex.vandyke@klinespecter.com
KLINE & SPECTER, P.C.
1525 Locust Street
Philadelphia, PA 19102
Telephone: (215) 772-1000
Facsimile: (215) 772-1359

**ATTORNEYS FOR ALL PLAINTIFFS**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| JANE ROE, an individual; MARY ROE, an individual; SUSAN ROE, an individual; JOHN ROE, an individual; BARBARA ROE, an individual; PHOENIX HOTEL SF, LLC, a California limited liability company; FUNKY FUN, LLC, a California limited liability company; and 2930 EL CAMINO, LLC, a California limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, a California public entity, <br><br> Defendants. | Case No. 4:24-cv-01562-JST <br><br> **DECLARATION OF ASHCON MINOIEFAR IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> **ASSIGNED FOR ALL PURPOSES TO THE HONORABLE DISTRICT JUDGE JON S. TIGAR, COURTROOM 6** <br><br> **Date: October 27, 2025** <br> **Time: 8:30 am** <br><br> Action Filed: 03/14/2024 <br> Trial Date: Unassigned |

1

I, Ashcon Minoiefar, declare as follows:

1.      I am an attorney duly admitted to practice before this Court.  I am an associate with Walkup, Melodia, Kelly & Schoenberger, attorneys of record for ALL PLAINTIFFS.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto.  I make this declaration in support of Plaintiffs' Motion for Preliminary Injunction.

2.      Attached hereto as **Exhibit A** are true and correct copies of the relevant portions of the December 3, 2024 deposition of Captain Daniel Manning (Ret.).

3.      Attached hereto as **Exhibit B** are true and correct copies of relevant portions of the transcript of the February 7, 2025 deposition of Mark Mazza.

4.      Attached hereto as **Exhibit C** is a true and correct copy of a flyer entitled "Keep Our Streets Healthy and Safe," which was marked as Exhibit 1 to the transcript of the February 7, 2025 deposition of Mark Mazza.

5.      Attached hereto as **Exhibit D** are true and correct copies of the relevant portions of the transcript of the April 7, 2025 deposition of the DPH Community Affairs Manager for Defendant City and County of San Francisco, who is also described in Plaintiffs' motion as "DPH Manager." The witness's name has been removed from the pleadings per agreement of the parties.

6.      Attached hereto as **Exhibit E** are true and correct copies of the relevant portions of the transcript of the April 21, 2025 deposition of the DPH Director of Behavioral Health Services and Mental Health SF for Defendant City and County of San Francisco, who is also described in Plaintiffs' motion as "BH Director." The witness's name has been removed from the pleadings per agreement of the parties.

7.      Attached hereto as **Exhibit F** are true and correct copies of relevant portions of the transcript of the April 18, 2025 deposition of the Director of Strategic Initiatives in the Behavioral Health Services section of Department of Public Health for Defendant City and County of San Francisco, who is also described in Plaintiff's motion as "Director of Strategic Initiatives." The witness's name has been removed

1  from the pleadings per agreement of the parties.

2       8.      Attached hereto as **Exhibit G** are true and correct copies of relevant

3  portions of the transcript of the April 16, 2025 deposition of Emily Cohen.

4       I declare under penalty of perjury under the laws of the United States of

5  America that the foregoing is true and correct to the best of my knowledge.

6       Executed on this 25th day of August, 2025, at San Francisco, California.

7

8  Dated:  August 25, 2025              WALKUP, MELODIA, KELLY & SCHOENBERGER

9

10                                 By: _____

11                                     MICHAEL A. KELLY
                                       RICHARD H. SCHOENBERGER
12                                     MATTHEW D. DAVIS
                                       ASHCON MINOIEFAR
13                                     Attorneys for ALL PLAINTIFFS

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ASHCOM MINOIEFAR IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - CASE NO. 4:24-cv-01562-JST

# EXHIBIT A

(December 3, 2024 deposition of Captain Daniel Manning (Ret.))

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO/OAKLAND

DIVISION

JANE ROE, an individual; MARY ROE, an individual; SUSAN ROE, an individual; JOHN ROE, an individual; BARBARA ROE, an individual; PHOENIX HOTEL SF, LLC, a California limited liability company; FUNKY FUN, LLC, a California limited liability company; and 2930 EL CAMINO, LLC, a California limited liability company,

**CERTIFIED TRANSCRIPT**

CASE NO.
4:24-cv-01562-JST

Plaintiffs,

-vs-

CITY AND COUNTY OF SAN FRANCISCO, a California public entity,

Defendants.

_____/

VIDEOTAPED

DEPOSITION OF CAPTAIN DANIEL MANNING

Taken before KAREN A. CRANGLE
Certified Shorthand Reporter
State of California
C.S.R. License No. 3816

December 3, 2024


CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF CAPTAIN DANIEL MANNING

1   go into that.

2           MR. SCHOENBERGER:  No.

3           Q.  But at any rate, that's why we're here.  You

4   mentioned you've been a sworn officer for 32 years I think

5   you said.  Is that right?

6           A. Yes, sir.

7           Q. How long have you been a captain?

8           A. Just for the record I'm the Acting Captain.

9   There is no captain here currently so I've been in this

10  role since January of 2024.  My rank is a lieutenant.  So

11  I have been filling in on this role for the last year

12  almost.

13          Q. All right.

14          A. I've been at Tenderloin station since February,

15  March of 2022.

16          Q. Is it inappropriate for me to call you Captain

17  Manning or are you okay with that?

18          A. No, I'd rather be called Acting Captain --

19          Q.  Acting Captain.

20          A.  -- if we're going to be truthful; that's the

21  rule.

22          Q. I appreciate that.  Not your first foray in the

23  Tenderloin though, true?  2022?  You've been familiar --

24  well, no.

25          Instead of telling you, tell me when your job

                                                          8



VIDEOTAPED DEPOSITION OF CAPTAIN DANIEL MANNING

1          How has that changed from then to now?

2          A. Sure.  Then I got moved to be in charge of the

3    foot beats, one of the lieutenants in charge of the foot

4    beats for probably a year.

5          So -- and then from that I became the -- when the

6    Captain was gone, I became the Acting Captain.

7          So I've done pretty much three jobs since I've been

8    here since 2022.

9          Q. Tell us, if you would, what being in charge of

10    the foot beats for probably a year means.

11          A. Sure.  The foot beat officers are a group of

12    officers engaged with the community.  Walking around the

13    majority of their shift.  They do have vehicles that they

14    drive, and they will drive to certain locations and get

15    out and walk a beat.  You know, engage, you know, criminal

16    activity, engage residents, merchants, business people in

17    the Tenderloin district.

18          They normally don't have to handle calls for

19    service like the patrol officers who are roaming around so

20    my job was to place them in different areas in the

21    Tenderloin that they can have the most impact.

22          I would get complaints from citizens, merchants,

23    residents about, you know, conditions, street crimes,

24    conditions on the street, and try to maximize the

25    effectiveness of having foot beat officers in those

                                                              11



VIDEOTAPED DEPOSITION OF CAPTAIN DANIEL MANNING

1  the community, that you actually hold community meetings

2  from time to time.

3       A. Yes, we have a community month every month,

4  every captain does.  Every month there's a community

5  meeting.  We hold it right here in our community room for

6  every time that I've done it.

7       We get to hear and meet all the presidents of

8  business owners and all their, you know, all their issues

9  that they're trying to deal with.

10      Q. I think I saw you had one like on the 26th,

11  like right before Thanksgiving.  Is that right?

12      A. Yes, sir, had about 20, 25 people in there.

13      Q. So give us a sense of, to the extent you

14  remember, specifics -- I don't want to spend a lot of time

15  on it -- but what were some of the major complaints that

16  you heard?  And what were some of the compliments that you

17  heard, hoping you heard some.

18      But let's start with the complaints that people had

19  about the neighborhood.

20      A. Sure.  Well, between the community meetings and

21  e-mails and stuff, I get daily complaints about street

22  conditions are pretty much the majority of the complaints

23  I get from people down here.  Large groups of people

24  blocking sidewalks, people using drugs, people selling

25  drugs, general street conditions.  Garbage.

19



VIDEOTAPED DEPOSITION OF CAPTAIN DANIEL MANNING

1 something; I attend a lot of meetings.  I don't recall

2 that specific verbiage from someone outside the police

3 department.

4         Q. Based upon your training and education and

5 experience, do you have an understanding that possession

6 of drug paraphernalia is a Health and Safety Code

7 violation?

8         A. Yes, 11364 of the Health and Safety Code.

9         Q. Has there ever been a directive from outside

10 the police department such as from the City, any City

11 agency, that your officers are to turn a blind eye to the

12 provision of drug paraphernalia on the Tenderloin streets?

13         A. I don't remember anything directly.  I remember

14 when I was one of the foot beat lieutenants we really

15 engaged in citing and were encouraging our officers to

16 actively, proactively, I should say, to cite people that

17 were caught with pipes, caught smoking, using pipes.

18         Um, I do remember like being told that -- I don't

19 remember how I was told -- that nonprofits were giving the

20 people pipes and that we shouldn't be citing people for

21 things that are being given to them by nonprofits.

22         Q. How did you feel about that?

23         A. Not happy.

24         Q. Why not?

25         A. Because it seemed counterproductive to the

22

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF CAPTAIN DANIEL MANNING

1  problems that we're having here with the Tenderloin.

2       Q. Why does, in your view, the provision of pipes

3  or bubbles to addicts or fentanyl use seem

4  counterproductive to the problems that you folks are

5  having in the Tenderloin?

6       A. Well, number one, I remember hearing words like

7  "safe injection" and things like that.  And smoking

8  something out of a pipe has nothing to do with safely

9  injecting yourself with narcotics.

10       I do know through my training and experience over

11  the last 32 years that diseases are transferred from

12  people sharing needles and that's a big problem.

13       But when you're talking about giving people pipes,

14  to smoke something, I don't feel that falls into the same

15  category.  That was number one issue I felt about that.

16       Number two, we received, like I said, I get a lot

17  and lot -- hundreds of complaints about street conditions

18  and people using drugs, and I didn't think it was

19  counterproductive for nonprofits to be giving people tools

20  to be used in the major -- the main complaints we were

21  receiving about drug use.

22       Q. One of the advantages that I have here is

23  something called Realtime, meaning I'm getting a

24  transcript of what you're saying.  And I think you

25  misspoke.  I want to make sure.

23



VIDEOTAPED DEPOSITION OF CAPTAIN DANIEL MANNING

```
 1          MS. MURPHY:  Same objection.
 2          THE WITNESS:  Well, I would say it would be a
 3  negative to have somebody, you know, the convenience of
 4  somebody handing someone a pipe and then ingesting drugs
 5  possibly in front of a business, residents; the
 6  convenience of, you know, someone providing that to them.
 7          MR. SCHOENBERGER:  Q.  Does that help reduce the
 8  problem of drug ingestion in the Tenderloin or increasing?
 9          A. Increasing.
10          Q. You mentioned something like "safe injection
11  sites".
12          Have you ever heard the concept voiced by some
13  folks in the community, either nonprofits or city folks,
14  of, quote, "harm reduction"?  Unquote.
15          A. Yes, I've heard that.
16          Q. What is your understanding of what that means?
17          A. Uh, I've never thought of that.  That's a good
18  one.
19          Uh, I would say "harm reduction" means, you know,
20  causing harm to their bodies, causing harm to the
21  community.
22          Q. All right.  It has been said in the Tenderloin
23  it's not a homeless problem; it's a drug problem.  It's a
24  drug addiction problem.
25          Do you agree with that conceptually?
```

28



VIDEOTAPED DEPOSITION OF CAPTAIN DANIEL MANNING

```
 1           Q. I think take us to page two.
 2           All right.  So have you ever heard of something
 3  called the Linkage Center?
 4           A. Yes, I saw it numerous times while I was out on
 5  my walks.
 6           Q. And what did you understand the Linkage Center
 7  to be?
 8           A. Um, a place where people were ingesting drugs
 9  in a safe environment and that they could get services at,
10  also.
11           Q. And where did you see this?  Where was it?
12           A. In UN Plaza.
13           Q. And for how long was it there, if you recall?
14           A. I don't remember.  I'm going to guess a year or
15  something like that.
16           Q. And what did you think of it?
17           A. I didn't think much of it.  I wasn't thrilled.
18  I don't remember exactly if it was there right when I got
19  here, or if it opened very shortly after I got here.
20           It caused a lot of issues in UN Plaza for sure.  We
21  had a lot of -- I remember a lot of assaults; a lot of,
22  you know, loitering; quality of life type crimes.
23           Q. And when you say "quality of life type of
24  crimes", you mean interfering with the quality of life of
25  the neighbors?
```

32

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF CAPTAIN DANIEL MANNING

1           A. Um, I don't recall.  The time that I was at the
2    Linkage Center, I was the Swing Watch Lieutenant.  I
3    didn't have as much engagement as I do now over the last
4    year with all the City resources.  So I don't remember a
5    specific conversation, no.
6           Q. Are you -- sorry.  Did I interrupt?
7           A. No.
8           Q. Are you aware of any, quote, "safe injection
9    sites" that exist in the Tenderloin in the last six months
10   to a year?
11          A. Currently?
12          Q. Yes.
13          A. No.
14          Q. Were a, quote, "safe injection site" proposed
15   in the, Tenderloin would you be against it?
16          MS. MURPHY:  Object to form.
17          THE WITNESS:  Are you talking about specifically
18   injecting people again?  I mean obviously the spread of
19   disease is a concern with the needles.  I don't think it's
20   a big -- that could be possible for some people in an
21   indoors environment.  But smoking things?  Where you're
22   affecting other people?  I think that's inappropriate.
23          MR. SCHOENBERGER:  Q.  Let me turn my attention a
24   little bit.  Actually, let me ask you this.
25          We are led to believe that there is actually a

                                                          35

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF CAPTAIN DANIEL MANNING

```
 1  smoking site at the Linkage Center.  Do you know whether
 2  or not that's true?
 3          A. Yes.
 4          Q. And can we agree that, or can I infer that that
 5  was a source of frustration for you?
 6          A. Yes.
 7          Q. Do you think that having these injection sites
 8  you mentioned, or the Linkage Center, or sites where
 9  people can do drugs, does that have a spillover effect,
10  for example, shoplifting or fencing stolen goods or open
11  air markets or attracting drug dealers or any of those
12  sorts of things?
13          MS. MURPHY:  Object to form.
14          THE WITNESS:  Yeah, I felt it did at UN Plaza, yes.
15          MR. SCHOENBERGER:  Q.  So I threw out a lot of
16  things there.  Did you have a sense that it attracted drug
17  dealers?
18          MS. MURPHY:  Same objection.
19          THE WITNESS:  Yes.
20          MR. SCHOENBERGER:  Q.  Explain that.
21          A. I actually went into undercover operations
22  again and bought drugs right on the steps behind where the
23  Linkage Center was.  I was an undercover officer around
24  that time.  There was a lot of people loitering, a lot of
25  people, you know, hanging out around the Linkage Center.
```

36

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF CAPTAIN DANIEL MANNING

1   people before on his videos.  So no, it doesn't surprise

2   me.

3        Q. Do you know to what extent the City acquiesces

4   in those specific individuals?

5        A.  No clue.

6        MS. MURPHY:  Object to form.

7        MR. SCHOENBERGER:  Q.  I neglected to ask you a

8   couple of questions about the Linkage Center.

9        Do you know whether or not law enforcement officers

10  were allowed in the Linkage Center?

11        A. I was told we were not allowed in the Linkage

12  Center.

13        Q. And who told you that?

14        A. I don't remember.  Maybe my bosses.  I would be

15  guessing.  I remember being we're not allowed in the

16  Linkage Center.

17        Q. And to the extent it was your bosses, you were

18  obligated to do what they told you to do in that regard.

19        A. I'd say that's fair to say.  I think I tried to

20  go in there one time on some kind of call and they were

21  very hesitant to -- like you can't come in, the employees

22  of the Linkage Center.

23        Q.  Do you know who it was that ran it?

24        A. No.

25        Q. Did you find it frustrating as an officer

61



VIDEOTAPED DEPOSITION OF CAPTAIN DANIEL MANNING

```
 1  STATE OF CALIFORNIA     )
                            )      ss
 2  COUNTY OF ALAMEDA       )

 3

 4        I, Karen A. Crangle, hereby certify that the

 5  witness in the foregoing deposition named

 6

 7                    CAPTAIN DANIEL MANNING

 8

 9  was by me duly sworn to testify to the truth, the whole

10  truth, and nothing but the truth in the within-entitled

11  cause; that said deposition was taken at the time and

12  place herein named; that the testimony of said witness was

13  reported by me, a certified shorthand reporter and a

14  disinterested person, and thereafter transcribed into

15  typewriting.

16

17        And I further certify that I am not of counsel or

18  attorney for either or any of the parties to said

19  deposition, nor in any way interested in the outcome of

20  the cause named in said caption.

21

22  Date: December 9, 2024

23

24  Karen A. Crangle
    Karen A. Crangle, C.S.R.
25
```

90


CRANGLE
REPORTING SERVICES

# EXHIBIT B

(February 7, 2025 deposition of Mark Mazza)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

---oOo---

JANE ROE, an individual; MARY ROE,
an individual; SUSAN ROE, an
individual; JOHN ROE, an
individual; BARBARA ROE, an
individual; PHOENIX HOTEL SF, LLC,
a California limited liability
company; FUNKY FUN, LLC, a
California limited liability
company; and 2930 EL CAMINO, LLC,
a California limited liability
company,

**CERTIFIED TRANSCRIPT**

                    Plaintiffs,

        vs.                         No. 4:24-cv-01562-JST

CITY AND COUNTY OF SAN FRANCISCO,
a California public entity,

                    Defendants.

_____/


        VIDEOTAPED DEPOSITION OF MARK MAZZA


          Taken before GINA V. CARBONE
           CERTIFIED SHORTHAND REPORTER
                STATE OF CALIFORNIA
        CSR License No. 8249, RMR, CRR, CCRR


          Wednesday, February 7, 2025


CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF MARK MAZZA

1        Q.  I represent five individuals that filed a

2   lawsuit against the City and County of San Francisco

3   and also a couple of businesses.  They're all either

4   residents of or located in the Tenderloin.

5              Are you still employed by the City and

6   County of San Francisco?

7        A.  Yes.

8        Q.  And what is your current job title?

9        A.  My current job title is Tenderloin street

10  operations manager for the Department of Emergency

11  Management.

12       Q.  You graduated from Virginia Commonwealth

13  with a master's degree in 2006; is that right?

14       A.  Yes.

15       Q.  Do you have an undergraduate degree?

16       A.  Yes.

17       Q.  From where?

18       A.  From the same school.  The Virginia

19  Commonwealth University.  I have a bachelor's degree

20  in social work.

21       Q.  Great.  When did you get that?

22       A.  2000.

23       Q.  And I believe you became a licensed

24  clinical social worker in 2011?

25       A.  Correct.

9



VIDEOTAPED DEPOSITION OF MARK MAZZA

1   you let me know, and I will accommodate that

2   request.  Okay?

3       A.  That sounds good.

4       Q.  If there's a question pending, I may want a

5   response to that.  But as soon as it makes sense,

6   we'll take a break.

7       A.  Understood.

8       Q.  The other thing, it's my job to ask

9   questions that are objection-free and also

10  understandable to you.

11          So if I don't do my job, if I asked you a

12  question that is in any way confusing to you or if

13  there's a word that you don't understand or it's

14  vague in any way, please let me know and I'll

15  rephrase.

16      A.  Understood.

17      Q.  Any questions before you get started?

18      A.  No.

19      Q.  Okay.  How much experience would you say

20  you have in the Tenderloin neighborhood?  I know

21  that you've been the street ops manager for two-plus

22  years.

23      A.  I would say I have a lot of experience in

24  the Tenderloin neighborhood.  I have worked either

25  primarily or somewhat in the Tenderloin neighborhood

13



VIDEOTAPED DEPOSITION OF MARK MAZZA

 1   since 2006, and I was a Tenderloin resident from

 2   2006 until, I believe, 2021.

 3       Q.  So 15-plus years of experience in that

 4   neighborhood?

 5       A.  Yes.

 6       Q.  And you have been with the City since 2013.

 7   You started with Department of Public Health?

 8       A.  Yes.

 9       Q.  Is that correct?

10          What did you first do when you went to work

11   for the City?

12       A.  I worked in permanent supportive housing

13   which housed people who were formerly homeless, and

14   I worked there as the site social worker.

15       Q.  How long did you do that job?

16       A.  I did that job at two different locations,

17   same job, just different locations for, I believe,

18   four years.

19       Q.  Okay.  And what did you do after that?

20       A.  After that, I continued to work -- I

21   also -- if I can, I want to clarify.

22       Q.  Sure.

23       A.  During those four years, the Department of

24   Public Health split some of their staff because the

25   Department of Homelessness and Supportive Housing

                                                        14



VIDEOTAPED DEPOSITION OF MARK MAZZA

```
 1        Q.  Oh, I'm sorry.  Go ahead.

 2        A.  So after those four years, I did stay with

 3  HSH, but I transitioned from housing to their

 4  outreach division, I guess.

 5            And so I started there as a lead clinical

 6  supervisor for the San Francisco Homelessness

 7  Outreach Team, and then about six months later, I

 8  became the outreach manager citywide for HSH.

 9        Q.  Great.

10            (Whereupon, Exhibit 1 was marked for

11            identification.)

12  BY MR. DAVIS:

13        Q.  Currently, I assume you work full time?

14        A.  Yes.

15        Q.  And of the time that you're working, how

16  much time would you say you spend in the Tenderloin?

17        A.  85 percent.

18        Q.  When you're working in the Tenderloin, are

19  you on the streets, public spaces, or other

20  locations?  You tell me.

21        A.  Majority on the streets.

22        Q.  Do you have an office?

23        A.  I do.

24        Q.  Where is that?

25        A.  City hall.
```

                                                            16

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF MARK MAZZA

1          Q.  Okay.  You've got what's been marked as

2     Exhibit 1.  This is a document, I'll represent to

3     you, that was produced in response to a Public

4     Records Act made to the City, purportedly from the

5     mayor's office.

6               Take a look at Exhibit 1.  Tell me if you

7     recognize the document.

8          A.  I do.

9          Q.  Can you tell us what it is?

10         A.  This is one of what I think there are many

11    versions of a Keep Our Streets Healthy and Safe

12    flier.  If I remember correctly, the first of these

13    came out -- or mid-2020, during the early days of

14    COVID.

15              And the ask was to -- while people were on

16    the streets, we knew that there was an increase of

17    people on the streets due to the shelters having to

18    lessen their numbers, and this was developed around

19    that time as a way -- at that point, when I was the

20    outreach manager, we saw this as a way to give a

21    script to our staff, but it was also something that

22    was handed out to people living on the streets.

23         Q.  Did you have any role in drafting this

24    document that's been marked as Exhibit 1?

25         A.  I remember discussing it on calls, but I

                                                        17

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF MARK MAZZA

1   activity that is harmful to the whole community?

2        A.  I wasn't in the conversations about the

3   creation of the bullet points.

4        Q.  Okay.

5        A.  So I'm happy to answer questions on all of

6   them, but I can say I was not in that conversation.

7        Q.  Based on your experience in the

8   Tenderloin -- first of all, was Exhibit 1 created

9   for use in the Tenderloin?

10       A.  My understanding is yes.

11       Q.  Okay.  And based on your vast experience in

12   the Tenderloin, would you agree that the selling and

13   storing of illegal drugs contributes to unhealthy

14   and unsafe street conditions in that neighborhood?

15       A.  Yes.

16           MS. MURPHY:  Belated object to form.

17   BY MR. DAVIS:

18       Q.  And same question.  The next bullet point

19   says, "Using illegal drugs in public."

20           Would you agree that that is an activity

21   that contributes to unhealthy and unsafe street

22   conditions in the Tenderloin?

23           MS. MURPHY:  Same objection.

24           THE WITNESS:  Yes.

25

20

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF MARK MAZZA

1   BY MR. DAVIS:

2       Q.  Okay.  The next bullet point says,

3   "Preparing to sell or reselling stolen goods."

4           And, again, based on your experience, would

5   you agree that that is an unhealthy and unsafe

6   street condition in the Tenderloin?

7       A.  Yes.

8           MS. MURPHY:  Belated same objection.

9   BY MR. DAVIS:

10      Q.  The next bullet point, "Camping on the

11  street when you have access to shelter," is that

12  something that --

13          MR. SUGERMAN:  Sorry.

14          MR. DAVIS:  -- in your experience --

15          MR. SUGERMAN:  You skipped one.

16          MR. DAVIS:  -- contributes -- sorry?

17          MR. SUGERMAN:  You skipped one.

18          MR. DAVIS:  Oh, I'm sorry.  Thank you,

19  Jeremy.

20          MR. SUGERMAN:  Well, you said "next one."

21  BY MR. DAVIS:

22      Q.  The next one, "Setting up structures and

23  belongings that block sidewalks, entrances or access

24  to public spaces."

25          That is something that, in your experience,

                                                    21

VIDEOTAPED DEPOSITION OF MARK MAZZA

```
 1   contributes to unhealthy and unsafe street

 2   conditions in the Tenderloin?

 3        A.  Yes.

 4            MS. MURPHY:  Belated same objection.

 5   BY MR. DAVIS:

 6        Q.  Next bullet point, "Camping on the street

 7   when you have access to shelter."

 8            That is something that you would agree

 9   contributes to unhealthy and unsafe street

10   conditions in the Tenderloin?

11            MS. MURPHY:  Same objection.

12            THE WITNESS:  Yes.

13   BY MR. DAVIS:

14        Q.  Final bullet point.  "Operating grills,

15   stoves, heaters, fuel and open flames near

16   buildings, vehicles, and other structures."

17            That is something that, in your experience,

18   contributes to unhealthy and unsafe street

19   conditions in the neighborhood?

20            MS. MURPHY:  Same objection.

21            THE WITNESS:  Yes.

22   BY MR. DAVIS:

23        Q.  Now, going through this list again, you

24   have extensive experience in the Tenderloin.  When

25   were you actually last in that neighborhood?
```

22

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF MARK MAZZA

1        A.  What time is it?

2        Q.  It's 10:30-ish.

3        A.  I was there 45 minutes ago.

4        Q.  Okay.  And have you been there every day

5   this workweek?

6        A.  Yes.

7        Q.  And in terms of the selling and storing of

8   illegal drugs, is that an activity that you see

9   occurring in the Tenderloin currently?

10        A.  Yes.

11        Q.  And that is an unhealthy and unsafe street

12   condition that is currently happening in the

13   Tenderloin --

14        A.  Yes.

15        Q.  -- based on your experience?

16        A.  Sorry.

17        Q.  That's okay.

18            MS. MURPHY:  Belated objection to form.

19            THE WITNESS:  Yes.

20   BY MR. DAVIS:

21        Q.  And you would agree that anything that

22   brings the selling or storage of illegal drugs to

23   the neighborhood would contribute to unhealthy and

24   unsafe street conditions in that neighborhood?

25            MR. SUGERMAN:  Object to the form of the

23

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF MARK MAZZA

```
 1   BY MR. DAVIS:
 2       Q.  And I'm going to assume, but let me confirm
 3   this, you have recently seen the use of illegal
 4   drugs in public in the Tenderloin?
 5       A.  Yes.
 6       Q.  That happens rampantly throughout the
 7   neighborhood?
 8           MS. MURPHY:  Object to form.
 9   BY MR. DAVIS:
10       Q.  Fair statement?
11       A.  Fair statement.
12       Q.  This week, can you even give us an estimate
13   of how many times you saw -- have seen people using
14   illegal drugs in public in the neighborhood?
15       A.  How many times?  Or how many people?
16       Q.  Well, let's say how many times?
17       A.  I can't -- too many to count.
18       Q.  And same question in terms of the number of
19   people that you've seen using drugs in public --
20   illegal drugs in public in the Tenderloin.
21       A.  Too many to count.
22       Q.  And you would agree that any activity or
23   conduct that condones or enables people to use
24   illegal drugs in that neighborhood contributes to
25   the unhealthy and unsafe street conditions in that
```

25

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF MARK MAZZA

```
 1              MS. MURPHY:  Same.

 2              MR. SUGERMAN:  Object to the form of the

 3    question.

 4              THE WITNESS:  Yes.

 5    BY MR. DAVIS:

 6        Q.  Next bullet point, "Camping on the street

 7    when you have access to shelter."

 8              Now, that is something that you have

 9    encountered on numerous occasions; fair statement?

10        A.  Yes.

11        Q.  Are there people, in your experience, who

12    continue to camp on the sidewalks and streets of the

13    Tenderloin even when they have been offered access

14    to shelter?

15        A.  Yes.

16        Q.  How frequently do you encounter that?

17        A.  Daily.

18              And just to clarify "daily," my team works

19    seven days a week, so daily.

20        Q.  And you're familiar with the Grants Pass

21    decision?

22        A.  Yes, I am.

23        Q.  And the Coalition on Homelessness'

24    litigation against the City?

25        A.  I'm aware.
```

                                                         27

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF MARK MAZZA

```
 1   BY MR. DAVIS:
 2       Q.  Yeah.  It's your view that many of the
 3   people who continue to camp on the sidewalks and
 4   streets of the Tenderloin, despite being offered
 5   access to shelter, continue to stay on the streets
 6   because of drug addiction?
 7           MR. SUGERMAN:  "Correct?"  You have to make
 8   a question.  Wait for a question.
 9           THE WITNESS:  Yeah.
10   BY MR. DAVIS:
11       Q.  Yeah.  Is that correct?  Is that your view?
12       A.  I think it's difficult to say "correct,"
13   because I want to say that I feel it's a large
14   contributor to people who choose to stay on the
15   street.  I think there are other contributors, but I
16   think that the common theme is drug addiction.
17       Q.  In your experience, are there people who
18   continue to camp and live on the sidewalks and
19   public spaces of the Tenderloin because of drug
20   addiction?
21       A.  Yes.
22       Q.  Okay.  Tell us what you know about the
23   distribution of drug paraphernalia in public spaces
24   of the Tenderloin.
25           MS. MURPHY:  Object to form.
```



CRANGLE
REPORTING SERVICES

1          THE WITNESS:  In my work, I see drug

2    paraphernalia being distributed.  The individuals or

3    programs who are engaging in that work typically

4    don't interact with my team.  I see it sometimes at

5    a location that seems scheduled, and I see it

6    sometimes with people who are mobile, going from

7    block to block.

8    BY MR. DAVIS:

9        Q.  And you know many people who do such work

10   in the Tenderloin, I assume?

11       A.  I see many people.  I know a few people.

12       Q.  Who do you know who is involved in the

13   distribution of drug paraphernalia in the

14   Tenderloin?

15       A.  Let me correct what I said.  I recognize

16   people.  Names, not as much.

17       Q.  Okay.  You are under oath here.

18       A.  Yes.

19       Q.  Do you know the names of anyone who you

20   know or believe to be involved in the distribution

21   of drug paraphernalia in the Tenderloin?

22       A.  And you're asking people who are on the

23   ground distributing?

24       Q.  Anyone who is distributing in the

25   Tenderloin.

                                                      32



VIDEOTAPED DEPOSITION OF MARK MAZZA

 1    Van Ness with a canopy and distributing what they

 2    call harm reduction supplies.

 3         Q.  And in terms of the harm reduction

 4    supplies, can you be specific about what would be in

 5    those supplies or kits?

 6         A.  I typically don't engage when people are

 7    distributing supplies, but what I have seen photos

 8    of and videos of and what I have seen discarded on

 9    the streets, used to be maybe a little longer than

10    two years ago, but maybe still some, clean syringes

11    and bands to tie arms.  More lately, glass pipes,

12    straws, aluminum foil.

13         Q.  What other organizations do you know of or

14    have reason to believe distribute drug paraphernalia

15    in the Tenderloin?

16            MS. MURPHY:  Object to form.

17            THE WITNESS:  I believe that I have seen

18    staff from GLIDE Memorial Church, and I have seen

19    people who are either employed by or contracted by

20    the Department of Public Health.

21    BY MR. DAVIS:

22         Q.  How about the Hospitality House?

23         A.  Hospitality House, if they are distributing

24    supplies, I would assume it's happening inside of

25    their brick-and-mortar locations.  I have not seen

                                                      35



VIDEOTAPED DEPOSITION OF MARK MAZZA

```
1    them on the street.
2         Q.  Okay.  Are you aware that they distribute
3    supplies from their brick-and-mortar locations in
4    the Tenderloin?
5         A.  I'm not aware.
6         Q.  You haven't heard that?
7         A.  I haven't heard that.
8         Q.  Who, from the Department of Public Health,
9    to your knowledge, has been involved in the
10   distribution of drug paraphernalia in the
11   Tenderloin?
12            MS. MURPHY:  Object to form.
13            THE WITNESS:  Are you asking much like the
14   question with Paul Harkin about a leadership role
15   or...?
16   BY MR. DAVIS:
17        Q.  Let's start there.
18        A.  Okay.  So my understanding is that there
19   are some people from the Whole Person Integrated
20   Care division that distribute supplies on the
21   street.  And I -- the person I know from that
22   division is -- I believe her title is the director,
23   is Dara Papo.
24        Q.  Do you mind spelling her name for us?
25        A.  No problem.  D-A-R-A, P-A-P-O.
```

36



1         Q.  And she's with DPH, the Whole Person

2    Integrated Care division?

3         A.  Yes.

4         Q.  Do you know anyone else from DPH who has

5    had a leadership or other role with respect to the

6    distribution of drug paraphernalia in the

7    Tenderloin?

8             MS. MURPHY:  Object to form.

9             THE WITNESS:  There's a woman who -- I

10   couldn't tell you her title now, but I believe she

11   was some type of leadership role that focused on

12   harm reduction, and her name is Eileen Loughran.

13   BY MR. DAVIS:

14        Q.  Anyone else come to mind from the

15   Department of Public Health?

16            MS. MURPHY:  Same objection.

17            THE WITNESS:  Nothing is coming to mind.

18   BY MR. DAVIS:

19        Q.  Okay.  With respect to HealthRIGHT 360,

20   we've talked about Mr. Harkin.  Who else from that

21   organization, to your knowledge, has been involved

22   in the distribution of drug paraphernalia in the

23   Tenderloin?  And I'm going to push it back to even

24   when the Linkage Center was operating.

25        A.  Okay.  I mean, what I can do -- because I

                                                      37



VIDEOTAPED DEPOSITION OF MARK MAZZA

1        A.  Yes.

2        Q.  Have you, yourself, questioned that policy?

3        A.  Yes.

4        Q.  And --

5        A.  Can I ask a question?

6        Q.  Sure.

7        A.  When you say "questioned," do you mean in a

8    professional capacity?  To myself?

9        Q.  Well, in any -- I'll start with, have you

10   ever had a conversation with anyone in the City

11   where you questioned this policy?

12       A.  I'm -- I'm not in a position to question

13   this policy.  It's not my role.  So in a

14   professional capacity, I have not.

15       Q.  Okay.  Do you, yourself, have -- you've had

16   some misgivings about this policy?

17       A.  Yes.

18       Q.  Can you tell us why?

19       A.  In my work, whether it was through working

20   in housing when I worked in outreach and especially

21   now, I find people who are deceased from their

22   addiction.  I speak with people who are distressed

23   because of their addiction.  And I speak with people

24   who would like to recover from their addiction.

25            And while I understand and I have seen

                                                      39

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF MARK MAZZA

1        Q.   Okay.   Have you spoken to anyone from the

2   mayor's office about these misgivings?

3        A.   No.

4        Q.   The drug paraphernalia that gets

5   distributed in the Tenderloin includes fentanyl

6   smoking materials?

7        A.   That's my understanding.

8        Q.   And you've seen those materials discarded

9   all over the neighborhood, I assume?

10        A.   Yes.

11        Q.   I assume that's troubling to you?

12        A.   Yes.

13        Q.   And the distribution of the drug

14   paraphernalia, in your view, does that encourage the

15   use of illegal drugs in the neighborhood?

16           MS. MURPHY:   Object to form.

17           THE WITNESS:   I would use a different word

18   than "encourage."

19   BY MR. DAVIS:

20        Q.   What word would you use?

21        A.   For lack of a better word, I would say it

22   "maintains."

23        Q.   Facilitates?

24           MS. MURPHY:   Object to form.

25           THE WITNESS:   I'll agree with

                                                          41

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF MARK MAZZA

```
 1    "facilitates."

 2    BY MR. DAVIS:

 3         Q.  You mentioned the DPH, and I believe you

 4    mentioned that maybe they use vendors also to

 5    distribute drug paraphernalia?

 6         A.  Contractors.

 7         Q.  Okay.  Do you know any of the contractors

 8    that it works with?

 9         A.  They have a contract, I believe, with RAMS.

10    And I hope I don't get this wrong, but I think that

11    stands for Richmond Area Multi-Services.

12         Q.  Do you know anyone who works for RAMS?

13         A.  I probably do.  The RAMS employees that I

14    would know wear Department of Public Health

15    clothing, and many of them have transitioned back

16    and forth.  So I probably do know some RAMS

17    individuals, but....

18         Q.  Does -- to your knowledge, does DPH give

19    out shirts or uniforms to its contractors?

20         A.  Yes.

21         Q.  Do you know who JJ Smith is?

22         A.  I do.

23         Q.  Do you ever look at the videos he posts on

24    social media?

25         A.  I do.
```

42

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF MARK MAZZA

```
 1              THE WITNESS:  I have not.

 2              MR. DAVIS:  Let's go -- we'll mark this as

 3    Exhibit 3.  It says "Ellis and Taylor video."

 4              (Whereupon, Exhibit 3 was marked for

 5              identification.)

 6              (Video played.)

 7    BY MR. DAVIS:

 8         Q.  Mr. Mazza, one thing I'm going to ask you

 9    to do is if you see -- make a mental note, if you

10    see people in this video that you recognize, if you

11    could just let us know at some point.

12              (Video played.)

13    BY MR. DAVIS:

14         Q.  First of all, do you recognize the location

15    that's being shown here?

16         A.  Yeah, it's not exactly Taylor and Ellis.

17    It's the 300 block of Ellis.  It's the parking lot

18    next to GLIDE.

19         Q.  And have you seen so-called harm reduction

20    activities happening in that area yourself?

21         A.  I've seen activities.  I typically don't go

22    inside, so I can't say that I've seen harm reduction

23    activities there.

24         Q.  Okay.

25              (Video played.)
```

48



VIDEOTAPED DEPOSITION OF MARK MAZZA

```
 1   BY MR. DAVIS:

 2        Q.  Do you recognize that gentleman?

 3        A.  Of course.  Yes.

 4        Q.  And who is that?

 5        A.  That's Grant Colfax, the former department

 6   head for the Department of Public Health.

 7             And I also, just because I'm paying

 8   attention and you asked, I see, I believe, Krista

 9   Gaeta from the Department of Public Health in the

10   back, and also it looks like Section Chief Mike

11   Mason, or Michael Mason, of the fire department in

12   the back.

13        Q.  Okay.

14             (Video played.)

15   BY MR. DAVIS:

16        Q.  Now, do you recognize any of the people we

17   see in this frame right here?  The speaker or the

18   woman who just shouted something out?

19        A.  I do not.

20        Q.  Okay.

21             (Video played.)

22   BY MR. DAVIS:

23        Q.  Do you recognize that woman?

24        A.  I do.

25        Q.  Who is that?
```

49



VIDEOTAPED DEPOSITION OF MARK MAZZA

```
 1        A.  Jennifer Bolen, I think is her last name,

 2   goes by Jen Bo, legislative aide for Dean Preston.

 3        Q.  Is she still working for the City or...?

 4        A.  Not that I'm aware of.

 5            (Video played.)

 6   BY MR. DAVIS:

 7        Q.  So we'll continue looking at this in a

 8   moment, but you heard the speaker there talk about

 9   strategies for harm reduction, including, "Always go

10   to the same dealer."

11            Have you heard people advocate that in the

12   Tenderloin?

13        A.  I have.

14        Q.  What has been your reaction when people

15   advocate that type of approach?

16        A.  I professionally keep my opinions to

17   myself.

18        Q.  Okay.  And this is your opportunity to

19   share them with us.

20            MS. MURPHY:  Object to form.

21            MR. SUGERMAN:  And wait for a question.

22            THE WITNESS:  Yeah.

23   BY MR. DAVIS:

24        Q.  What has been your reaction when you've

25   heard that?
```

50

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF MARK MAZZA

 1          A.  My reaction has been confusion.

 2          Q.  What are you confused about?

 3          A.  I'm confused by people who are in a

 4    professional capacity encouraging drug dealing and

 5    drug use.

 6          Q.  And here you saw Grant Colfax was actually

 7    in the audience?

 8          A.  I did see that.

 9          Q.  Okay.  And to your knowledge, has he been a

10    supporter of this type of harm reduction philosophy?

11              MS. MURPHY:  Object to form.

12              THE WITNESS:  To my -- to my knowledge, my

13    assumption would be yes, as the department head.

14    But I have never had a conversation with him about

15    it.

16    BY MR. DAVIS:

17          Q.  And have you, yourself, heard anyone

18    express a concern that the distribution of drug

19    paraphernalia condones the use of illicit drugs?

20          A.  Have I heard anyone say that?

21          Q.  Yes.

22          A.  Yes.

23          Q.  Who have you heard say that?

24          A.  JJ Smith, Adam Mesnick, Steve Adami.

25          Q.  Who is Steve Adami?

                                                        51


CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF MARK MAZZA

1     A.  Steve Adami used to be in a leadership role

2  for the City with adult probation.  He now is the

3  executive director of The Way Out for Salvation

4  Army.

5     Q.  Okay.

6     A.  Too many to name, but those are three very

7  first --

8     Q.  Is that a reaction that you, yourself, have

9  had, that the distribution of drug paraphernalia in

10  the Tenderloin may actually condone the use of

11  illicit drugs in the neighborhood?

12     A.  That's a reaction I've had.

13     Q.  Have you, yourself, or have you heard

14  anyone express the view that the distribution of

15  drug paraphernalia in the neighborhood will attract

16  drug dealing to the neighborhood?

17     A.  I've heard that -- I've heard people say

18  that.

19     Q.  Is that something that you, yourself, have

20  had that -- shared that reaction?

21        MR. SUGERMAN:  Object to the form of the

22  question.

23        THE WITNESS:  My reaction would be more

24  complicated.

25

www.cranglereporting.com | (510) 653-1312

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF MARK MAZZA

```
 1        Q.  In the past, let's say, two weeks?

 2        A.  My understanding is yes.

 3        Q.  Okay.  Same organizations involved?

 4            MS. MURPHY:  Object to form.

 5            THE WITNESS:  That would be my assumption.

 6   BY MR. DAVIS:

 7        Q.  And if you -- if I asked you to tell me who

 8   you thought the person at DPH who knew the most

 9   about the distribution of drug paraphernalia in the

10   neighborhood was, who would you tell me that is?

11        A.  My assumption would be Eileen Loughran.

12   And I'm probably pronouncing her last name wrong,

13   but that's my best.

14        Q.  To your knowledge, is she a proponent of

15   the distribution of drug paraphernalia?

16        A.  By "proponent," you mean...?

17        Q.  Advocates for it.

18        A.  That's my understanding.

19        Q.  Let me switch topics a little bit.

20            In the response to the Public Records Act

21   request, I've reviewed many emails, and I saw your

22   name associated with emails with respect to the

23   Linkage Center.

24        A.  Yes.

25        Q.  Is that generally correct?
```

55

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF MARK MAZZA

```
 1       A.  That I --
 2            MR. SUGERMAN:  Objection to the form of the
 3   question.
 4   BY MR. DAVIS:
 5       Q.  Well, let me ask a better question.
 6            Were you generally aware of the City's
 7   efforts to open the Tenderloin Linkage Center?
 8       A.  Yes.
 9       Q.  And were you involved in those efforts?
10       A.  Yes.
11       Q.  Tell us about your involvement.
12       A.  At the time the Linkage Center was opened,
13   I was working for the Department of Homelessness and
14   Supportive Housing, still in my capacity as manager
15   of outreach.
16            When the Linkage Center was opening, I was
17   informally the departmental lead for HSH at the
18   site.  My role was to ensure there was a flow for
19   HSH resources, including assessments for eligibility
20   for temporary shelter and permanent housing and
21   pathways to those.
22            Also, I was -- I helped to communicate any
23   challenges with some of the on-site services that
24   were HSH related, namely, the showers and the
25   laundry.
```

56

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF MARK MAZZA

```
 1   belongings would be safe.
 2           They would say what it was they were there
 3   for, and there was a flow to kind of direct them
 4   where to go next.
 5           A lot of the services, if people were
 6   trying to access shelter, housing, or assessment
 7   that we were involved with, were indoors.
 8           While people were waiting to speak with the
 9   staff person, they would wait outside.  So you would
10   walk past some offices into an outside area that was
11   fenced off.
12           In that area, there was a station for
13   charging phones, there was a laundry, and then if
14   you walked further back, there was an area where
15   there was a tent, and that's where HealthRIGHT 360
16   engaged with people.
17       Q.  And what did you see HealthRIGHT 360 doing
18   at the Linkage Center?
19       A.  I saw them distributing drug paraphernalia.
20   I saw them talking with people.
21       Q.  And in this outdoor area, did you see
22   people openly using narcotics?
23       A.  I did.
24       Q.  Okay.  And was that in the presence of
25   HealthRIGHT 360 staff?
```

61



1          A.   Yes.

2          Q.   And did you hear them -- did you hear

3    anyone refer to this area as an overdose prevention

4    site?

5          A.   Probably.

6          Q.   How about a safe consumption site?

7          A.   My recollection is that that's not what

8    people were calling it who were staff.  I've heard

9    it referred to that in the larger community.

10         Q.   Okay.  Did you -- did you see people use

11   narcotics under the supervision of HealthRIGHT 360

12   staff?

13              MS. MURPHY:  Object to form.

14              THE WITNESS:  It's tough for me to say

15   under supervision.  In the vicinity, yes.

16   BY MR. DAVIS:

17         Q.   There was no one who was making any effort

18   to stop or discourage people from using in that

19   area?

20              MS. MURPHY:  Object to form.

21              THE WITNESS:  Not that I recall.

22   BY MR. DAVIS:

23         Q.   And you were allowed in this area --

24         A.   I was.

25         Q.   -- correct?

                                                    62



VIDEOTAPED DEPOSITION OF MARK MAZZA

1          I, GINA V. CARBONE, CSR No. 8249, RPR, RMR, CRR,

2    CCRR, certify: that the foregoing proceedings were taken

3    before me at the time and place herein set forth; at

4    which time the witness was duly sworn; and that the

5    transcript is a true record of the testimony so given.

6

7          Witness review, correction and signature

8    was

9    (X) by code.                    ( ) requested.

10   ( ) waived.                     ( ) not requested.

11   ( ) not handled by the deposition officer due to

12   party stipulation.

13

14        The dismantling or unbinding of the original

15   transcript will render the reporter's certificate null

16   and void.

17        I further certify that I am not financially

18   interested in the action, and I am not a relative or

19   employee of any attorney of the parties, nor of any of

20   the parties.

21        Dated this 17th day of February, 2025.

22

23   _____

           GINA V. CARBONE

24         CSR #8249, STATE OF CALIFORNIA

25

                                                    120



# Exhibit C

(flyer entitled "Keep Our Streets Healthy and Safe," which was marked as Exhibit 1 to the transcript of the February 7, 2025 deposition of Mark Mazza)

# Keep our Streets Healthy and Safe



## Healthy and safe street conditions have:

• Clear doorways, windows, and entrances

• Clear driveways, medians, and roadways

• Clear sidewalks and streets free from belongings, improvised structures, and debris

• Properly disposed of trash and waste

## The following activities are harmful to the whole community and will be lawfully enforced. Unhealthy and unsafe street conditions are:

• Selling and storing illegal drugs

• Using illegal drugs in public

• Preparing to sell or reselling stolen goods

• Setting up structures and belongings that block sidewalks, entranceways or access to public spaces

• Camping on the street when you have access to shelter

• Illegal dumping and disposal of waste

• Operating grills, stoves, heaters, fuel and open flames near buildings, vehicles, and other structures

## How to Contribute to Healthy and Safe Streets:

Following these guidelines will contribute to a healthy and safe community. If you need help, go to a dedicated location that provides food and water, hygiene services, social support, and treatment services.

The Tenderloin Linkage Center is located at
1172 Market Street (in UN Plaza).
Come as you are. You are welcome here.



**City & County of San Francisco**

## For anyone experiencing a medical, police or fire emergency call 9-1-1.

**#1000.1**

# Exhibit D

(April 7, 2025 deposition of the DPH Community Affairs Manager for Defendant City and County of San Francisco, who is also described in Plaintiffs' motion as "DPH Manager")

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

JANE ROE, an individual; MARY ROE,
an individual; SUSAN ROE, an
individual; JOHN ROE, an
individual, BARBARA ROE, an
individual; PHOENIX HOTEL SF, LLC,
a California limited liability
company; FUNKY FUN, LLC, a
California limited liability
company; and 2930 EL CAMINO, LLC,
a California limited liability
company,

        Plaintiffs,

-vs-

CITY AND COUNTY OF SAN FRANCISCO,
a California public entity,

        Defendants.
_____/

**CERTIFIED TRANSCRIPT**

CASE NO.
4:24-cv-01562-JST


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF

EILEEN LOUGHRAN


Stenographically reported before JOAN GRIER
Certified Shorthand Reporter
State of California
C.S.R. License No. 8958


April 7, 2025



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF EILEEN LOUGHRAN

1  Certified Shorthand Reporter, License No. 8958,

2  representing Crangle Reporting Services.

3         Would the reporter please administer the oath,

4  and then counsel may begin.

5                    EILEEN LOUGHRAN,

6         sworn as a witness by the Court Reporter,

7                 testified as follows:

8                 EXAMINATION BY MR. DAVIS

9         MR. DAVIS:  Q.  Good morning.  Will you tell us

10  your name, please.

11      A.  Eileen Loughran.

12      Q.  And are you still working for the City and

13  County of San Francisco?

14      A.  Yes.

15      Q.  What's your current job title?

16      A.  Community affairs manager.

17      Q.  And what department do you work for?

18      A.  Department of Public Health in Behavioral

19  Health.

20         MR. LAKRITZ:  Can I just make a statement on

21  the record --

22         MR. DAVIS:  Sure.

23         MR. LAKRITZ:  -- before I forget.

24         The City is going to designate this deposition

25  as highly confidential under the protective order.

                                                        6

CRANGLE
REPORTING SERVICES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF EILEEN LOUGHRAN

 1          MR. DAVIS:  Okay.  The entire deposition?

 2          MR. LAKRITZ:  Yes.  I'm happy to meet and

 3  confer with you afterwards.

 4          MR. DAVIS:  Okay.  We may need to do that.  But

 5  that's -- I appreciate that.  Thank you.

 6      Q.  Okay.  How long have you worked for the City,

 7  Ms. Loughran?

 8      A.  27 years.  A little over.

 9      Q.  And of those 27 years, how many of them have

10  been with the Department of Public Health?

11      A.  All of them.

12      Q.  And when did you become the community affairs

13  manager?

14      A.  Officially, December 1st of 2024.

15      Q.  What was your job title prior to that?

16      A.  Director of the Office of Overdose Prevention.

17      Q.  And what were the approximate dates that you

18  held that title?

19      A.  I don't remember the exact dates.

20      Q.  Can you give me an estimate?

21      A.  About a year and a half.

22      Q.  Before being the director of the Office of

23  Overdose Prevention, what was your job title?

24      A.  Substance use services manager.

25      Q.  Substance use, not substance abuse?

                                                        7


CRANGLE
REPORTING SERVICES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF EILEEN LOUGHRAN

1       A.  Substance use services manager.

2       Q.  Okay.  And what were your approximate dates of

3  holding that title?

4       A.  April '22.  And then a little under a year

5  before I transitioned to the director of Overdose

6  Prevention.

7       Q.  So early 2023 would have been your end date?

8       A.  Um-hmm.

9       Q.  Okay.  And what job title did you hold before

10  substance use services manager?

11       A.  I was a health program coordinator.

12       Q.  Do you have a physical office?

13       A.  Yes.

14       Q.  Where is that located?

15       A.  1380 Howard.

16       Q.  How long have you worked out of that office?

17       A.  Since fall of '22.

18       Q.  And before the fall of '22, did you have an

19  office?

20       A.  Yes.

21       Q.  Where was that?

22       A.  25 Van Ness.

23       Q.  The Howard Street location, your current

24  office, what's the closest cross street?

25       A.  10th.

8



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF EILEEN LOUGHRAN

1  to -- as part of your job to see whether there were

2  addicts who were living on the streets?

3       A.  No.

4       Q.  Is that something you observed when you were

5  going to and from the Tenderloin?

6       A.  Observed.

7       Q.  Okay.  Do you know who Mark Mazza is?

8       A.  Yes.

9       Q.  Is part of your job -- let's say, in the past

10  four years, have you had any interactions with Mr. Mazza

11  about the Tenderloin neighborhood?

12       A.  Yes.

13       Q.  And tell me what you recall about those

14  interactions.

15       A.  We don't work directly.  So they were more

16  attending meetings together or polite interactions.

17       Q.  Okay.  Now, you've worked for the Department of

18  Public Health for 27 years now.

19            Do I have that right?

20       A.  Correct.

21       Q.  Do you happen to know what the Department's

22  mission statement is?

23       A.  To serve all San Franciscans.

24       Q.  Yeah.  I'm going to read you something.

25            "To protect and promote the health of all

                                                      13



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF EILEEN LOUGHRAN

```
 1  San Franciscans."

 2          Does that sound right?

 3      A.  Yes.

 4      Q.  Would the Department's mission include

 5  protecting the health of San Franciscans who live in the

 6  Tenderloin?

 7      A.  Yes.

 8      Q.  Would the Department's mission include

 9  protecting the children who live in the Tenderloin?

10      A.  Yes.

11      Q.  As an employee of the Department of Public

12  Health for 27 years, you understand that the Tenderloin

13  has more children than just about any other neighborhood

14  in the City?

15      A.  Yes.

16      Q.  Okay.  Let me show you a document.  This was

17  marked as Exhibit 1 to Mark Mazza's deposition.

18          MR. DAVIS:  Thank you.  Can you put that up.

19      Q.  Okay.  This was previously marked when I had

20  the opportunity to speak to Mr. Mazza.

21          (Plaintiffs' Exhibit 1 was reintroduced.)

22          MR. DAVIS:  And, Ashcon, can you -- great.

23      Q.  My first question is, do you recognize this

24  flyer?

25      A.  No.
```

14

CRANGLE
REPORTING SERVICES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF EILEEN LOUGHRAN

1  have access to shelter?

2      A.  I've heard that.

3      Q.  Okay.  And who have you heard that from?

4      A.  People that work with people on the streets.

5      Q.  And can you give me any names that you've heard

6  that from?

7      A.  Mark Mazza.

8      Q.  Okay.  Anyone else?

9      A.  No.

10     Q.  And have you, yourself, seen street conditions

11  that, for lack of a better word, in the Tenderloin, that

12  are just filthy?  Human waste, disposed drug

13  paraphernalia, that type of thing?

14     A.  Yes.

15     Q.  Okay.  And would you agree that that's an

16  unhealthy and unsafe condition in the neighborhood?

17     A.  Yes.

18     Q.  And that would be unhealthy and unsafe for the

19  children who live in the Tenderloin?

20     A.  Yes.

21     Q.  Would you agree that open-air drug sales and

22  use can be injurious to the health of San Franciscans

23  who live or work in the Tenderloin?

24     A.  Yes.

25     Q.  What, to your knowledge, has the Department of

18



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF EILEEN LOUGHRAN

1   Public Health done to stop the open-air drug use in the

2   Tenderloin?

3       A.  I don't know.  That's not my role.

4       Q.  Okay.  Going back to your job as the Overdose

5   Prevention or the -- sorry -- the director of the Office

6   of Overdose Prevention.

7           What were your job duties when you worked in

8   that job title?

9       A.  I oversaw overdose prevention work, such as

10  naloxone distribution, trainings, ensuring we are

11  reaching all communities.

12      Q.  Anything else?

13      A.  A lot of day-to-day stuff, but big picture,

14  that was the extent of it.

15      Q.  I'm going to use the term "drug paraphernalia."

16          Are you familiar with that term?

17      A.  Yes.

18      Q.  And when I use it in this deposition, I'm

19  referring to equipment or tools that are used to ingest,

20  smoke, inject, or otherwise consume illegal drugs.  And

21  that would include things like meth pipes, foils, and

22  straws.

23          With me?

24      A.  (Witness nods head.)

25      Q.  Have your job responsibilities for the City

19


CRANGLE
REPORTING SERVICES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF EILEEN LOUGHRAN

```
 1  ever involved the distribution of drug paraphernalia in
 2  the Tenderloin?
 3      A.  Syringes.
 4      Q.  Okay.  And do you currently have any job
 5  responsibilities with respect to the distribution of
 6  syringes?
 7      A.  No.
 8      Q.  When did you last?
 9      A.  I don't know, but at least a year and a half
10  ago.
11      Q.  And what were you doing when you were involved
12  with the distribution of syringes?
13      A.  Overseeing the contract.
14      Q.  Who had the contract?
15      A.  San Francisco AIDS Foundation.
16      Q.  Anyone else?
17      A.  They subcontract with Glide --
18      Q.  Okay.
19      A.  And Homeless Youth Alliance.
20      Q.  I'm sorry.  Who else?
21      A.  Homeless Youth Alliance.
22      Q.  Are you aware that there has been the
23  distribution of other drug paraphernalia in the
24  Tenderloin?
25      A.  I've heard.
```

20

CRANGLE
REPORTING SERVICES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF EILEEN LOUGHRAN

```
 1        Q.   And what have you heard?

 2        A.   I've heard that foil and smoking supplies have

 3   been distributed.

 4        Q.   Who did you hear that from?

 5        A.   The news, neighbors, community meetings.

 6        Q.   How about from any of the vendors?

 7        A.   No.

 8        Q.   To your knowledge, do any vendors who receive

 9   city funds distribute foil, smoking pipes, or other

10   non-syringe drug paraphernalia in the Tenderloin?

11        A.   I don't know.  The City does not pay for those

12   supplies.

13        Q.   And is it your testimony you're unaware of any

14   organizations that receive city funding -- whether or

15   not the City pays for it, are you aware of any of those

16   organizations distributing drug paraphernalia in the

17   neighborhood, apart from syringes?

18        A.   Yes.  Paraphernalia is a broad term.  That's

19   why I'm saying, like, yes.  So, yeah.  They're the

20   programs -- the ones that I listed are the programs that

21   are funded to provide syringe access and disposal

22   services.

23        Q.   Okay.  Do they distribute other drug

24   paraphernalia in the neighborhood?

25        A.   I'm not onsite with them, so I don't know what
```

21

CRANGLE
REPORTING SERVICES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF EILEEN LOUGHRAN

```
 1  they're distributing every single time that they are

 2  working.

 3        Q.  Okay.  Have you heard from any source other

 4  than your lawyers that they are distributing other drug

 5  paraphernalia --

 6        A.  Yes.

 7        Q.  -- in the Tenderloin?

 8        A.  Yes.

 9        Q.  What have you heard?

10        A.  I have heard smoking supplies and foil, from

11  community meetings, from the news, from residents.

12        Q.  And who have you heard is distributing these

13  smoking supplies such as foil and straws and pipes?

14        A.  Syringe programs.

15        Q.  And that would be SF AIDS Foundation?

16        A.  Correct.

17        Q.  That would be Glide?

18        A.  Correct.

19        Q.  That would be Homeless Youth Alliance?

20        A.  I've not heard of Homeless Youth Alliance being

21  raised in those conversations.

22        Q.  Okay.  How about Richmond RAMS?

23        A.  I don't know.  I'm unfamiliar.

24        Q.  How about HealthRIGHT 360?

25        A.  I don't know, personally.
```

22

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF EILEEN LOUGHRAN

1        Q.  Well, you know that HealthRIGHT 360 has

2   distributed drug paraphernalia in the Tenderloin, don't

3   you?

4        A.  No, I don't.  They're not part of the funded

5   syringe programs.

6        Q.  Were you involved in the operation of the

7   Tenderloin Linkage Center?

8        A.  No.

9        Q.  You had no involvement?

10       A.  I was initial startup staffing.  But that was

11   only for approximately seven shifts that were four

12   hours.

13       Q.  And you were on numerous e-mail communications

14   with respect to the Tenderloin Linkage Center?

15       A.  Yes.

16       Q.  And when you worked the seven or so shifts,

17   what did you do at the Linkage Center?

18       A.  I was really a site manager for the staff and

19   for resources and ensuring the flow outside, that there

20   wasn't a line and that things were working smoothly with

21   Urban Alchemy.

22       Q.  When you worked the seven or so shifts, isn't

23   it correct that HealthRIGHT 360 also had staff onsite?

24       A.  Correct.

25       Q.  And you saw -- you know some of the staff



 1   members?

 2        A.   Yes.

 3        Q.   Who are the staff members from HealthRIGHT 360

 4   that you remember seeing at the Linkage Center?

 5        A.   Paul Harkin, Gary McCoy.  Bill.  Maybe Jason.

 6   Jason Norelli.

 7        Q.   Do you know how to spell that last name?

 8        A.   N-o-r-e-l-l-i.

 9             Other than that, I don't know.  I can't

10   remember.

11        Q.   And what DPH staff do you remember working with

12   at the Linkage Center?

13        A.   I really don't remember.  I -- I did four-hour

14   shifts so my time is very limited.

15        Q.   What part of the center did you work in when

16   you worked on those four-hour shifts?

17        A.   What would it be called?  Like, greeting people

18   when they walked in the door, and making sure there was

19   no crazy line outside.  And then, other than that, just

20   connecting with services.

21        Q.   I'm not sure what that means.  What does that

22   mean, "connecting with services"?

23        A.   Connecting with any of the service providers

24   that were inside if someone expressed interest in being

25   connected to services.

                                                          24



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF EILEEN LOUGHRAN

1       Q.  And you knew that drug paraphernalia was being

2  distributed within the center, didn't you?

3       A.  Yes.

4       Q.  Who was distributing the drug paraphernalia?

5       A.  HealthRIGHT, yeah.

6       Q.  What were they distributing?

7       A.  I don't know.

8       Q.  They were distributing fentanyl-smoking

9  equipment, weren't they?

10       A.  I don't know.  I was not at the table.

11       Q.  Did they have a table from which they were

12  handing out drug paraphernalia?

13       A.  Yes.

14       Q.  And that would have included smoking supplies?

15       A.  I don't -- I don't know.

16       Q.  Who from HealthRIGHT 360 was working that

17  table?

18       A.  I don't know.

19       Q.  And there was an area at the Linkage Center

20  where people were allowed to use drugs; isn't that

21  correct?

22       A.  Yes.

23       Q.  That was the outdoor area?

24       A.  Yes.

25       Q.  And who supervised that area?

25

CRANGLE
REPORTING SERVICES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF EILEEN LOUGHRAN

1        A.  I don't know.

2        Q.  Did anyone from DPH supervise it?

3        A.  I don't know.

4        Q.  What type of activity did you see happening in

5   that outdoor area?

6        A.  I saw people use drugs, but I also saw people

7   sitting down and doing art and reading and just sitting.

8        Q.  Okay.  Let's focus on the people that you saw

9   using drugs.

10           What did you see them doing?

11       A.  I had a different role, so I wasn't engaged.  I

12   saw people using drugs, but I was fixated on my role in

13   the four hours that I was doing shifts there.  So I was

14   moving around a lot.

15       Q.  Well, let's take this in small bits, then.

16           The area where people were using drugs, that

17   was part of the Linkage Center; correct?

18       A.  I think so.

19       Q.  It was an area that was fenced in by the City?

20       A.  There was a back area, yes.

21       Q.  Okay.

22       A.  There was a back area where there were

23   services.  That's the area that I worked.

24       Q.  Right.  And -- okay.

25           The back area where the services are, is that

26

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF EILEEN LOUGHRAN

```
 1  also the area where people were openly using drugs?

 2       A.  No.

 3       Q.  Where was that area?

 4       A.  One area, but separate by space.  So I

 5  didn't -- I was not on the consumption side.  I focused

 6  on engaging with people for services.

 7       Q.  Was it called "the consumption side"?

 8       A.  I don't know.

 9       Q.  Who was in charge of the consumption side?

10       A.  I don't know.

11       Q.  You have no idea?

12       A.  No.

13       Q.  Who is in charge of the Tenderloin Linkage

14  Center?

15       A.  I was only there the first week of services.

16  And it was DEM-led, to my knowledge.

17       Q.  Who from the DEM, Department of Emergency

18  Management --

19       A.  Yeah.  I don't know.  It was, like, way above

20  me.

21       Q.  Who from the Department of Health was the

22  person who was most senior who was involved with the

23  Linkage Center?

24       A.  I don't know.

25       Q.  To your knowledge, was Dr. Colfax involved with
```

27



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF EILEEN LOUGHRAN

```
 1  the Linkage Center?

 2       A.  I don't know.

 3       Q.  How about Dr. Kunins?

 4       A.  I think she just started around that time.  I

 5  did not work for her at that time.

 6       Q.  Dr. Borne?

 7       A.  I don't know what her involvement was.

 8       Q.  Was she involved with the Linkage Center?

 9       A.  Deb Borne?

10       Q.  Yes.

11       A.  I don't -- I don't know.  Again, I had a very

12  specific role, and it was four hours.

13       Q.  Now, I know that your role didn't involve --

14  are you telling us that your role did not involve the

15  consumption site area?

16       A.  That is correct.

17       Q.  You still have -- your senses are still

18  working; in other words, you can see and hear things?

19       A.  Yes.

20       Q.  What did you see and hear or observe happening

21  on the consumption sides?

22       A.  Peripherally, I saw people consume drugs.  But,

23  again, I had a role that was specific.  So I wasn't

24  just -- I was doing my role.  I was there for four hours

25  to do my role.
```

28



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF EILEEN LOUGHRAN

 1      Q.  Did you see -- did you see people smoking

 2  drugs?

 3      A.  I don't know.  I don't remember.

 4      Q.  Did you see people injecting drugs?

 5      A.  I don't remember.

 6      Q.  Okay.  Apart from any communication from a

 7  lawyer who works for the City, before you worked at the

 8  Linkage Center, did it ever come to your attention that

 9  it might be a crime to operate a consumption site?

10      A.  Yes.

11      Q.  How did that come to your attention?

12      A.  Read about it.

13      Q.  Okay.  When you saw that there was a

14  consumption site being operated at the Linkage Center,

15  were you alarmed?

16      A.  I don't remember.

17      Q.  Do you remember anyone expressing concern or

18  alarm about the operation of a consumption site at the

19  Linkage Center?

20      A.  I heard about it on the news.

21      Q.  How about anyone -- was there any discussion

22  within DPH about the operation of a consumption site at

23  the Linkage Center?

24      A.  I don't -- yeah, I don't -- I don't know.

25      Q.  You don't -- is it your testimony that you

                                                          29



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF EILEEN LOUGHRAN

1        Q.  Is he -- does he -- or did he, at the time of

2   this e-mail, which is June of 2022, receive funding from

3   the City?

4        A.  I don't know.

5        Q.  Okay.  And we know who Dr. Kunins is.  And

6   Ms. Gaeta.

7            And then it looks like Vitka Eisen's e-mail,

8   perhaps, but that's okay.

9            Are you familiar with the overdose prevention

10  site at the Tenderloin Linkage Center?

11       A.  We talked about the consumption that was

12  happening, but that's the extent of my knowledge.

13       Q.  Did you hear it referred to as a "safe

14  consumption site"?

15       A.  Not that I recall.

16       Q.  Have you ever heard that term used before?

17       A.  In relation to San Francisco?

18       Q.  Yes.

19       A.  No.

20       Q.  Are you aware of a safe consumption popup that

21  was put up on Willow Street?

22       A.  I heard about it.

23       Q.  Okay.  Do you know any people who were involved

24  in that?

25       A.  No.  I think I learned about it the same way

                                                        36



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF EILEEN LOUGHRAN

```
 1  DEM.

 2        Q.  So the Department of Emergency Management and

 3  HSH oversee the street ambassador contracts?

 4        A.  Correct.

 5        Q.  And let me make sure I understand this.

 6            At some point in the end of 2024, you heard

 7  that the street ambassadors were handing out drug

 8  paraphernalia?

 9        A.  Correct.

10        Q.  But you're telling us you don't remember who

11  told you that?

12        A.  Correct.

13        Q.  And as you sit here today, there's nothing I

14  can do to jog your memory?

15        A.  I don't remember.  It could have been at a

16  community meeting.  It could have been from a provider.

17  I just don't remember.

18        Q.  Okay.

19        A.  But I followed up on it.

20        Q.  And so you, on your own, decided to follow up

21  on it?

22        A.  Correct.

23        Q.  You weren't instructed to do that?

24        A.  Correct.

25        Q.  And tell me everything you did to follow up on
```

48

CRANGLE
REPORTING SERVICES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF EILEEN LOUGHRAN

 1  that.

 2      A.  I had a conversation with the contract manager

 3  at HSH -- and I can't remember her name.  It starts with

 4  a T -- and DEM, Dre from DEM.  They oversee the

 5  contract.  I told them I had heard that supplies were

 6  distributed, and that cannot happen if we hire them to

 7  provide the ambassador role at 822 Geary.

 8      Q.  Okay.  And what did Dre or the other person say

 9  in response?

10      A.  I think they actually spoke to the lead of the

11  Glide ambassadors, the director of that program.

12      Q.  And who was that?

13      A.  I can't remember her name.  I'm sorry.

14          But we were very clear that for DPH -- or I was

15  very clear, for DPH, that street ambassadors do not

16  distribute supplies.

17      Q.  Okay.  Is that the first -- the end of 2024, is

18  that the first time you, yourself, ever heard that Glide

19  or other City-funded vendors were possibly distributing

20  non-syringe drug paraphernalia?

21      A.  I'm talking specifically about this -- the

22  ambassador program.

23      Q.  Before that, had you ever heard that the

24  ambassador program was handing out drug kits?

25      A.  No.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF EILEEN LOUGHRAN

```
1        A.  Yes.

2        Q.  What is it?

3        A.  Syringe access and disposal site.

4        Q.  Do you recognize that as happening in the

5   Tenderloin?

6        A.  Hemlock.

7        Q.  Yeah.

8            Do you recognize any of the people in that

9   video?

10       A.  I do not know.  No.

11       Q.  To your knowledge, is -- who, if anyone, from

12  the City is looking at that program to see whether

13  there's any harmful effect on the neighborhood?

14       A.  I don't know.

15       Q.  To your knowledge, has anyone ever looked at

16  possible harmful effects of handing out drug supplies in

17  the Tenderloin?

18           When I say "harmful effects," I mean harmful

19  effects to children and other people who live in that

20  neighborhood.

21       A.  I don't know.

22       Q.  Did you ever hear Dr. Colfax, when he was the

23  director of DPH, say, "You know what?  I don't know if

24  it's such a good idea to hand out drug supplies in the

25  Tenderloin"?
```

75



1    STATE OF CALIFORNIA      )
                             )      ss
2    COUNTY OF ALAMEDA        )

3

            I, Joan Grier, hereby certify that the
4    witness in the foregoing deposition named

5

6                            EILEEN LOUGHRAN

7

8    was by me duly sworn to testify to the truth, the whole
     truth, and nothing but the truth in the within-entitled
9    cause; that said deposition was taken at the time and
     place herein named; that the testimony of said witness was
10   reported by me, a certified shorthand reporter and a
     disinterested person, and thereafter transcribed into
11   typewriting.
12           And I further certify that I am not of counsel or
     attorney for either or any of the parties to said
13   deposition, nor in any way interested in the outcome of
     the cause named in said caption.

14

15   _____Reading and Signing was requested.
16   _____Reading and Signing was waived.
17   __X__Reading and Signing was not requested.
18
19
20   Date: 4/21/25
21
22   _____
     Joan Grier, C.S.R. #8958
23
24
25

                                                        88

CRANGLE
REPORTING SERVICES

# Exhibit E

(April 21, 2025 deposition of the DPH Director of Behavioral Health Services and Mental Health SF and County of San Francisco, who is also described in Plaintiffs' motion as "BH Director")

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

---oOo---

JANE ROE, an individual; MARY ROE,
an individual; SUSAN ROE, an
individual; JOHN ROE, an
individual; BARBARA ROE, an
individual; PHOENIX HOTEL SF, LLC,
a California limited liability
company; FUNKY FUN, LLC, a
California limited liability
company; and 2930 EL CAMINO, LLC,
a California limited liability
company,

**CERTIFIED TRANSCRIPT**

                    Plaintiffs,

        vs.                         No. 4:24-cv-01562-JST

CITY AND COUNTY OF SAN FRANCISCO,
a California public entity,

                    Defendants.
_____/


CONFIDENTIAL

VIDEOTAPED DEPOSITION OF HILLARY KUNINS, M.D.


Taken before GINA V. CARBONE
CERTIFIED SHORTHAND REPORTER
STATE OF CALIFORNIA
CSR License No. 8249, RMR, CRR, CCRR


Monday, April 21, 2025



CONFIDENTIAL
VIDEOTAPED DEPOSITION OF HILLARY KUNINS, M.D.

```
 1   about 20 years ago, I didn't -- and then the boards
 2   became available in the last couple of years.  And I
 3   passed that official board about three years ago.
 4        Q.  You began working with the Department of
 5   Public Health in San Francisco in 2021?
 6        A.  Yes.
 7        Q.  And I know you had at least analogous jobs
 8   in New York City.  Tell us about those, if you
 9   would.
10        A.  I joined New York City Department of Public
11   Health, Department of -- Department of Health and
12   Mental Hygiene in 2012 as assistant commissioner for
13   the Bureau of Alcohol and Drug Use.  And then was in
14   that department for about eight -- eight years and
15   change, eight and a half years, I think, and held
16   both that role and then a role deputy executive --
17   executive deputy commissioner for mental hygiene,
18   sort of a broader portfolio over both substance use
19   and mental health.
20        Q.  Until?
21        A.  Until I came here.  So until 2021.
22        Q.  Okay.  Generally, what were your duties
23   with the Department of Health and Mental Hygiene in
24   2012 as assistant commissioner until that role
25   changed to deputy executive?
```

10



CONFIDENTIAL
VIDEOTAPED DEPOSITION OF HILLARY KUNINS, M.D.

1    clearly what was happening on the ground here.

2        Q.  Let me zoom out a little bit.

3           When you came to San Francisco, your job

4    was what?  What was your job title?

5        A.  My job -- my job title still is director of

6    Behavioral Health Services and Mental Health SF.

7        Q.  Within the auspices of the Department of

8    Public Health?

9        A.  Yes.

10       Q.  And your immediate supervisor at the time

11   you came was who?

12       A.  Dr. Grant Colfax, the health director.

13       Q.  And your current supervisor is who?

14       A.  Daniel Tsai.

15       Q.  And when did Mr. Tsai become your

16   supervisor, with the election of Mr. Lurie?

17       A.  Yes.  A little -- I guess Dan, Mr. Tsai,

18   joined about seven weeks ago.

19       Q.  All right.  What did you understand your

20   duties to be, generally speaking, upon being hired?

21       A.  What did I understand my duties to be.

22           So in the Department of Public Health, one

23   of the divisions is Behavioral Health Services.

24   That division is responsible to directly run and

25   contract for services to address the needs of people

20



CONFIDENTIAL
VIDEOTAPED DEPOSITION OF HILLARY KUNINS, M.D.

```
1            MR. KNOX:  Objection.  Lack of foundation.
2            You may answer.
3            THE WITNESS:  It can refer to the impact on
4    community, like public drug use, for example.
5    BY MR. SCHOENBERGER:
6         Q.  Is the use of safe consumption sites, in
7    your view, a subset of harm reduction?
8         A.  Yes.
9         Q.  All right.  At any time since you came to
10   San Francisco, did you advocate for the use of safe
11   consumption sites within the city?
12           MR. KNOX:  I advise you to invoke your
13   right to remain silent.
14           THE WITNESS:  I invoke my right to remain
15   silent.
16   BY MR. SCHOENBERGER:
17       Q.  At the time that you came to San Francisco,
18   did you understand the use of controlled substances
19   within the City and County of San Francisco, the
20   unauthorized use, to be illegal?
21           MR. GEORGE:  Objection.  Form.
22           THE WITNESS:  I'm not sure what you mean by
23   the "unauthorized use."
24   BY MR. SCHOENBERGER:
25       Q.  Well, the -- I mean, controlled -- did you
```

24



CONFIDENTIAL
VIDEOTAPED DEPOSITION OF HILLARY KUNINS, M.D.

1          A.  Right.  So I don't -- I mean, I'm not sure

2     where you're going, but I'm not sure whether that

3     specific -- I mean -- yes, I'm not sure.

4          Q.  And that's what I was asking you.

5          A.  Yes.

6          Q.  Sounds like you're not sure.  And that's

7     your answer.

8               Were you aware of the existence of the

9     Linkage Center beginning in January of '22?

10         A.  Yes.

11         Q.  Did you ever visit the Linkage Center from

12    the time it opened in January of 2022 to, I think it

13    closed on December 4th of 2022?

14         A.  Yes.

15         Q.  How often were you there?

16         A.  Um....

17         Q.  And your best estimate is all I'm looking

18    for.

19         A.  Right.  I was not there with -- like on a

20    regular schedule.  So there were times I visited for

21    whatever reason, and then maybe weeks went by and

22    then visited again.

23         Q.  What did you understand -- strike that.

24              Did you understand that there were areas

25    within the Linkage Center where drug use was

28

CRANGLE
REPORTING SERVICES

CONFIDENTIAL
VIDEOTAPED DEPOSITION OF HILLARY KUNINS, M.D.

 1   permitted?

 2          MR. KNOX:  I advise you to invoke your

 3   right to remain silent.

 4          THE WITNESS:  I invoke my right to remain

 5   silent.

 6   BY MR. SCHOENBERGER:

 7      Q.  Do you recall ever fielding any complaints

 8   about the Linkage Center?

 9      A.  I fielded complaints indirectly.

10      Q.  How did you field complaints indirectly?

11      A.  Through different staff members, or perhaps

12   via, you know, another City official, or....

13      Q.  And I don't want any of those City

14   officials or staff members to be lawyers.  In other

15   words, if it came from the City Attorney's Office,

16   I'm not entitled to know about that --

17      A.  Okay.

18      Q.  -- as much as I might want to.  And so

19   exclude that from any information that you heard.

20   And I'm not implying that you did.  I just want to

21   caution you, as I'm sure Mr. Knox has, that I'm not

22   entitled to that information.

23          With that in mind, tell me what you heard

24   indirectly, either from officials or staff members,

25   about complaints related to the Linkage Center.

                                                      29



CONFIDENTIAL
VIDEOTAPED DEPOSITION OF HILLARY KUNINS, M.D.

```
 1               As of the time that you learned there was

 2    going to be the Linkage Center, did you understand

 3    that it was going to be a consumption site?

 4               MR. KNOX:  I advise you to invoke your

 5    right to remain silent.

 6               THE WITNESS:  I invoke my right to remain

 7    silent.

 8    BY MR. SCHOENBERGER:

 9        Q.  Did you understand that at the consumption

10    site, individuals would be using drugs like

11    fentanyl?

12               MR. KNOX:  I advise you to invoke your

13    right to remain silent.

14               MR. GEORGE:  Objection.  Form.

15               THE WITNESS:  I invoke my right to remain

16    silent.

17    BY MR. SCHOENBERGER:

18        Q.  Did you understand that individuals would

19    be allowed to consume drugs like heroin?

20               MR. KNOX:  I advise you to invoke your

21    right to remain silent.

22               THE WITNESS:  I invoke my right to remain

23    silent.

24               MR. SCHOENBERGER:  And Mr. Knox, any

25    question that I ask the doctor about the use of
```

55



CONFIDENTIAL
VIDEOTAPED DEPOSITION OF HILLARY KUNINS, M.D.

1        Q.  And so with the advent of the Linkage

2   Center, you knew there would be a higher

3   concentration of addicts in that particular

4   geographic area, true?

5              MR. GEORGE:  Objection.  Form.

6              THE WITNESS:  No.

7   BY MR. SCHOENBERGER:

8        Q.  If addicts who came to the Linkage Center

9   wanted drug paraphernalia, they were provided it,

10  true?

11             MR. KNOX:  I invoke -- I advise you to

12  invoke your right to remain silent.

13             THE WITNESS:  I invoke my right to remain

14  silent.

15  BY MR. SCHOENBERGER:

16       Q.  Including fentanyl kits and/or --

17             (Phone interruption.)

18             Sorry, strike that.

19             Including bubbles or pipes?

20             MR. KNOX:  I advise you to invoke your

21  right to remain silent.

22  BY MR. SCHOENBERGER:

23       Q.  Do you know who HealthRIGHT 360 is?

24       A.  Yes.

25       Q.  Did HealthRIGHT 360 serve as the supervisor

                                                      57

CRANGLE
REPORTING SERVICES

CONFIDENTIAL
VIDEOTAPED DEPOSITION OF HILLARY KUNINS, M.D.

```
 1              MR. KNOX:  Objection.  Vague with respect
 2   to by whom.
 3              MR. SCHOENBERGER:  Good point.
 4   BY MR. SCHOENBERGER:
 5      Q.  Under the auspices of the City and County
 6   of San Francisco, either directly or indirectly
 7   through contracted groups, have fentanyl pipes been
 8   distributed in the Tenderloin since you began your
 9   job?
10              MR. GEORGE:  Objection.  Form.  Compound.
11              MR. KNOX:  I advise you -- sorry.
12              MR. GEORGE:  Go ahead.
13              MR. KNOX:  I advise you to invoke your
14   right to remain silent.
15              THE WITNESS:  I invoke my right to remain
16   silent.
17   BY MR. SCHOENBERGER:
18      Q.  Were -- strike that.
19              Let me get into your -- strike that.
20              I take it, Mr. Knox, you will instruct her
21   to not answer any questions related to the -- her
22   understanding of the distribution of fentanyl pipes
23   in the Tenderloin under the Fifth Amendment
24   privilege?
25              MR. KNOX:  I will.
```

68

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF HILLARY KUNINS, M.D.

1    strike that.

2            I want to talk to you about fentanyl pipes.

3    Okay?

4            What is your understanding of the new rule

5    that will exist with respect to the distribution of

6    fentanyl pipes as of April 30?

7            MR. GEORGE:  Objection.  Form, as to by

8    whom.  Whose distribution.

9    BY MR. SCHOENBERGER:

10       Q.  Go ahead.

11       A.  Well, reading from the piece of paper from

12    the policy, it says that DPH-funded programs for

13    distribution of all smoking supplies must include

14    proactive counseling and treatment referrals.  And

15    that the distribution of safer smoking supplies,

16    specifically foil pipes and straws, will not happen

17    in public spaces.  They will -- they must happen in

18    either indoor or SF DPH-approved control spaces.

19       Q.  Meaning that indoors and/or on

20    SF DPH-approved control spaces, fentanyl pipes will

21    still be distributed in San Francisco, correct?

22       A.  May -- may still be distributed.  Yeah.

23       Q.  Have there been any efforts made to

24    determine where these indoor spaces will be that may

25    distribute fentanyl pipes?

71



CONFIDENTIAL
VIDEOTAPED DEPOSITION OF HILLARY KUNINS, M.D.

 1              MR. GEORGE:  Objection.  Form.  Vague.

 2    BY MR. SCHOENBERGER:

 3         Q.  Where is this going to happen?

 4         A.  Yes.

 5         Q.  Where is it going to happen?

 6         A.  So the policy goes into effect -- begins to

 7    go into effect April 30th.  And what this doesn't

 8    say is -- sort of in more detail, is it will take

 9    place through May 30th.  So that is -- we are

10    working it out.

11         Q.  In other words, the selection of where

12    these places will be, these indoor spaces, is still

13    under consideration?

14         A.  Yes.

15         Q.  Are there places that are candidates within

16    the Tenderloin for where the distribution of

17    fentanyl pipes will occur, or may occur?

18         A.  I'm thinking.  Yes.  Where -- yes.

19         Q.  What are some of those candidates?

20         A.  So there is a site that is a controlled

21    space, specifically GLIDE parking lot.

22         Q.  Okay.

23         A.  So that's not in a public space.

24         Q.  All right.  But it's not indoors?

25         A.  It's -- it is the category of approved

72

CRANGLE
REPORTING SERVICES

CONFIDENTIAL
VIDEOTAPED DEPOSITION OF HILLARY KUNINS, M.D.

1   controlled space.

2      Q.  All right.  But that has always been a

3   place where fentanyl pipes have been distributed in

4   the past?

5          MR. GEORGE:  Objection.  Form.

6          MR. KNOX:  I advise you to invoke your

7   right to remain silent.

8          THE WITNESS:  I invoke my right to remain

9   silent.

10  BY MR. SCHOENBERGER:

11     Q.  All right.  As of now, what is your

12  understanding of whether or not some of these indoor

13  or approved controlled spaces for the distribution

14  of fentanyl pipes will occur within the Tenderloin?

15     A.  Meaning what are the space -- are there

16  other sites?

17     Q.  How many spaces will be within the

18  Tenderloin?

19     A.  I would need -- so we are in the process of

20  doing this.  We -- it is not finalized.  So I would

21  need -- besides the site I just mentioned, would

22  need to -- I don't know yet.

23     Q.  What is your best estimate of the number of

24  places that will be distributing fentanyl pipes --

25         MR. GEORGE:  Objection.  Form.  Vague.

                                                    73



CONFIDENTIAL
VIDEOTAPED DEPOSITION OF HILLARY KUNINS, M.D.

1        A.   The person is a person who has a substance

2    use disorder or addiction and is likely going to use

3    the material to use drugs.

4        Q.   Will, to your knowledge, those persons be

5    allowed to then use the drugs within the controlled

6    space, such as the parking lot at GLIDE?

7        A.   No.

8        Q.   So do you understand that those people who

9    come to GLIDE to get a fentanyl pipe are likely to

10   then use the fentanyl in a public space outside the

11   GLIDE parking lot?

12           MR. KNOX:  Objection.  Calls for

13   speculation.

14           You may answer.

15           THE WITNESS:  No.  People could be living

16   somewhere, for example.

17   BY MR. SCHOENBERGER:

18       Q.   Is it a concern of yours that the provision

19   of fentanyl pipes to people in the controlled space

20   of the parking lot at GLIDE will result in them then

21   using drugs outside that parking lot on the public

22   streets?

23       A.   What -- let me say that what this policy

24   asserts is asking contractors to make every effort

25   to persuade and offer treatment to people to

79



CONFIDENTIAL
VIDEOTAPED DEPOSITION OF HILLARY KUNINS, M.D.

 1   interrupt their drug use so that no drug use occurs

 2   or declines.

 3       Q.  Understood.  But you know that if someone

 4   gets the pipe and they leave the parking lot, and

 5   they are not so persuaded, then they're going to use

 6   the drug, right?

 7           MR. KNOX:  Objection.  Calls for

 8   speculation.

 9           You may answer.

10           MR. GEORGE:  Same objection.

11           THE WITNESS:  Yes.

12   BY MR. SCHOENBERGER:

13       Q.  And that that can result in crime occurring

14   around the parking lot at GLIDE, true?

15           MR. KNOX:  Objection.  Calls for

16   speculation.

17           You may answer.

18           THE WITNESS:  Yes.

19   BY MR. SCHOENBERGER:

20       Q.  And that that could attract the

21   distribution or sales of fentanyl to that particular

22   area, correct?

23           MR. KNOX:  Objection.  Calls for

24   speculation.

25           MR. GEORGE:  Same objection.

                                                        80



CONFIDENTIAL
VIDEOTAPED DEPOSITION OF HILLARY KUNINS, M.D.

1    and/or drug paraphernalia, can someone be a minor

2    and obtain these, so long as they're counseled?

3        A.  So according to State law, minors may be

4    provided safer use supplies.

5        Q.  So if a 14-year-old came to GLIDE and was

6    counseled, the policy of the City is to provide them

7    with the drug paraphernalia?

8            MR. GEORGE:  Objection.  Form.

9            THE WITNESS:  The policy of the City has

10   been to follow State law.

11   BY MR. SCHOENBERGER:

12       Q.  Well, always?

13       A.  Um....

14       Q.  Let me withdraw that.  The answer to my

15   question is, a 14-year-old who comes into GLIDE in

16   June of 2025 and wants drug paraphernalia, so long

17   as he or she is counseled, will receive it, true?

18       A.  I want to acknowledge the complexity here

19   and say yes.

20       Q.  And as the -- in the position that you hold

21   with the Department of Public Health, and

22   acknowledging the complexity of that, you are in

23   favor of that, true?

24           MR. GEORGE:  Objection.  Form.

25           MR. KNOX:  I'm going to advise you to

121

CONFIDENTIAL
VIDEOTAPED DEPOSITION OF HILLARY KUNINS, M.D.

```
1        I, GINA V. CARBONE, CSR No. 8249, RPR, RMR, CRR,

2   CCRR, certify: that the foregoing proceedings were taken

3   before me at the time and place herein set forth; at

4   which time the witness was duly sworn; and that the

5   transcript is a true record of the testimony so given.

6

7        Witness review, correction and signature

8   was

9   ( ) by code.              ( ) requested.

10  ( ) waived.               (X) not requested.

11  ( ) not handled by the deposition officer due to

12  party stipulation.

13

14       The dismantling or unbinding of the original

15  transcript will render the reporter's certificate null

16  and void.

17       I further certify that I am not financially

18  interested in the action, and I am not a relative or

19  employee of any attorney of the parties, nor of any of

20  the parties.

21       Dated this 28th day of April, 2025.

22

23  _____

         GINA V. CARBONE
24       CSR #8249, STATE OF CALIFORNIA

25

                                                   123
```


CRANGLE
REPORTING SERVICES

# Exhibit F

(April 18, 2025 deposition of the Director of Strategic Initiatives in the Behavioral Health Services section of DPH, who is also described in Plaintiff's motion as "Director of Strategic Initiatives")

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

---oOo---

JANE ROE, an individual; MARY ROE,
an individual; SUSAN ROE, an
individual; JOHN ROE, an
individual; BARBARA ROE, an
individual; PHOENIX HOTEL SF, LLC,
a California limited liability
company; FUNKY FUN, LLC, a
California limited liability
company; and 2930 EL CAMINO, LLC,
a California limited liability
company,

**CERTIFIED TRANSCRIPT**

                    Plaintiffs,

        vs.                          No. 4:24-cv-01562-JST

CITY AND COUNTY OF SAN FRANCISCO,
a California public entity,


                    Defendants.

_____/



        VIDEOTAPED DEPOSITION OF KRISTA GAETA



            Taken before GINA V. CARBONE
             CERTIFIED SHORTHAND REPORTER
                  STATE OF CALIFORNIA
          CSR License No. 8249, RMR, CRR, CCRR


            Friday, April 18, 2025



VIDEOTAPED DEPOSITION OF KRISTA GAETA

1    the San Francisco Department of Public Health; is

2    that right?

3         A.  Yes.

4         Q.  And could you please mind tell me what your

5    current title is.

6         A.  My current title is director of strategic

7    initiatives.

8         Q.  And is there a certain part of the

9    Department of Public Health --

10        A.  Yes.

11        Q.  -- that you work in?

12        A.  I work in the Behavioral Health Services

13   section.

14        Q.  How long have you worked in that section?

15        A.  Three years.

16        Q.  Have you had that same title for all three

17   years?

18        A.  Yes.

19        Q.  Prior to working for the Population

20   Behavioral Health, where did you work?

21        A.  I worked for the Human Services Agency.

22        Q.  And what did you do for the Human Services

23   Agency?

24        A.  I was the director of in-home supportive

25   services.

11



VIDEOTAPED DEPOSITION OF KRISTA GAETA

1      Q.  Sounds like it.

2      A.  Yeah.

3      Q.  For the efforts that you work specifically

4  in regards to overdose prevention, is that in

5  conjunction with other departments in the city?

6      A.  Yes.

7      Q.  Just real briefly, what departments would

8  that be?

9      A.  We work largely in that -- in that

10  section -- I'm trying to think my various work.  I

11  work across a lot of divisions.

12          We work largely with the Department of

13  Homelessness and Supportive Housing.  And that is

14  largely to do the work in permanent supportive

15  housing.  I don't think that group works very

16  closely with other departments.  Not to say that we

17  don't come in contact with them, but that is our

18  largest City partner.

19      Q.  Got it.  Apart from City departments as

20  part of your efforts for overdose prevention, do you

21  work with any nonprofits?

22      A.  Yes.

23      Q.  What are some of those nonprofits that you

24  work with?

25      A.  We work with Code Tenderloin, we work with

                                                        16



VIDEOTAPED DEPOSITION OF KRISTA GAETA

 1   Homeless Children's Services, we work with Glide, we

 2   work with the San Francisco Community Health Center,

 3   we work with the San Francisco AIDS Foundation.

 4   Would you like me to continue?

 5        Q.  If there's a couple more, yeah, that would

 6   be great.

 7        A.  There is the Gubbio.  Trying to think if

 8   there are -- there may be others, I'm just not

 9   recalling them.

10             MR. KNOX:  HealthRIGHT 360 or not?

11             THE WITNESS:  I do not believe that my

12   division holds a HealthRIGHT 360 contract.

13             MR. KNOX:  Didn't mean to step in.

14             THE WITNESS:  There are in the Behavioral

15   Health Services section, but I do not believe we

16   have a HealthRIGHT 360 contract that we are

17   managing.

18   BY MR. MINOIEFAR:

19        Q.  And do you also work at all with the -- I

20   believe it's called the Youth Alliance?

21        A.  The Homeless Youth Alliance.

22        Q.  Yes.

23        A.  Yes.  They -- yes.

24        Q.  And you mentioned that you have -- in

25   reference to HealthRIGHT 360, you mentioned you

                                                       17



VIDEOTAPED DEPOSITION OF KRISTA GAETA

1    don't have a contract with them.  Is your work

2    largely limited to entities that you have a direct

3    contract with through with your office, or is it

4    something else?

5        A.  So in my Population Behavioral Health work,

6    we do not manage any HealthRIGHT 360 contracts.

7    However, I have worked with HealthRIGHT 360 on other

8    projects, and have supported our Substance Use

9    Services system of care section in working with

10   HealthRIGHT 360 contracts.

11       Q.  Got it.  And you mentioned the street

12   health team.  From what I understand, is this

13   separate and apart from the Population Behavioral

14   Health section or part and parcel?

15       A.  It is separate from the Population

16   Behavioral Health section.

17       Q.  For now let's stick with the Population

18   Behavioral Health section.  Is the work involving

19   the prevention of overdoses include the distribution

20   of harm reduction supplies?

21       A.  Yes.

22       Q.  And how is it that your office is involved

23   in the distribution of harm reduction supplies for,

24   let's just say, SF AIDS?

25       A.  We oversee the contract.

18



VIDEOTAPED DEPOSITION OF KRISTA GAETA

1    remember that now.

2         Q.  Thank you.  That's -- very much.  That's

3    very helpful.

4         A.  Okay.

5         Q.  It's always good to clarify something that

6    you want to have clarified.

7         A.  Yeah.

8         Q.  And you mentioned this contingency

9    management.  What is that?

10        A.  Contingency management is an inter- --

11   science evidence-based intervention to work with

12   people generally with stimulant use disorders, so

13   drugs like methamphetamines.  And folks can enroll

14   in this program and they're incentivized, generally

15   through small cash-type payments, to change their

16   behavior.

17            So not use drugs, attend a group session,

18   there could be other positive health activities that

19   we're contracting with someone to do.  And so it has

20   been found to be very successful with people who use

21   stimulants in reducing or ending their use.

22        Q.  Understood.  When it comes to overseeing

23   contracts for the distribution of harm reduction

24   supplies, is part of that determining what supplies

25   will be distributed by the contractor?

                                                      20



VIDEOTAPED DEPOSITION OF KRISTA GAETA

 1         A.  Yes.

 2         Q.  How is it that your office is involved in a

 3    decision on what is distributed by, let's just say,

 4    SF AIDS?

 5         A.  So there's a couple of things.  So one, we

 6    have a contract which specifies some of that.  We

 7    also -- I'm trying to remember the -- I want to say

 8    that in this moment, I'm trying to -- I don't -- I

 9    have other people in my department who work on these

10    particular contracts, so it's not my sole or primary

11    focus.

12            The contracts vary in -- or the funding

13    varies, and sometimes we pay for some of the

14    supplies and often we do not.  They're coming from a

15    state clearinghouse.

16            And we can make modifications to what

17    supplies, or where supplies can be given out.  So

18    recently we've made a policy shift, in coordination

19    with the mayor's office, the City, to dictate what

20    supplies and where they can be distributed.

21         Q.  We'll definitely want to talk about the new

22    mayor's policy.

23            But I want to talk a little bit about what

24    was the current state of affairs prior to that

25    policy for a moment.

                                                        21

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF KRISTA GAETA

```
 1        A.  Sure.
 2            Q.  Prior to the mayor's new policy, was it
 3   your office's policy to allow the distribution of
 4   pipes or smoking materials?
 5               MR. KNOX:  I advise you to invoke your
 6   right to remain silent.
 7   BY MR. MINOIEFAR:
 8            Q.  Will you be taking your counsel's advice?
 9            A.  Yes.
10               MS. MURPHY:  Object to form.
11   BY MR. MINOIEFAR:
12            Q.  Prior to the mayor's new policy, was it
13   your office's policy to allow the distribution of
14   syringes on public streets?
15               MR. KNOX:  I advise you to invoke your
16   right to remain silent.
17   BY MR. MINOIEFAR:
18            Q.  I assume you're taking your counsel's
19   advice?
20            A.  Yes.
21               MS. MURPHY:  Object to form.
22   BY MR. MINOIEFAR:
23            Q.  Moving to -- let me just ask this.  If I
24   were to ask any question along the topic of whether
25   or not your office was involved in the distribution
```

22

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF KRISTA GAETA

1   of either meth pipes, foil, other smoking materials

2   or syringes on public streets, would you be invoking

3   your right under the Fifth Amendment?

4        A.  Yes.

5             MS. MURPHY:  Object to form.

6   BY MR. MINOIEFAR:

7        Q.  I want to switch gears a little bit to --

8   we'll circle back on the mayor's policy.  I want to

9   talk about the street health team that you mentioned

10  earlier.

11       A.  Sure.

12       Q.  I've heard a variety of different groups,

13  such as like the Night Navigators, Street Medicine

14  team.

15            When you say "street health teams," are you

16  referring to more than one team?

17       A.  That's a good question.  And as my -- has

18  recently changed.  So the department has run four

19  street teams, the Tenderloin Night Navigators,

20  Street Medicine, Post-Overdose Engagement Team, and

21  a team we call BEST Neighborhoods, which is a

22  behavioral-health-focused outreach team.

23            We are in the process of consolidating all

24  of these teams into one street health team.  So the

25  Night Navigators continue to work in the evening,



VIDEOTAPED DEPOSITION OF KRISTA GAETA

1    chance to do longitudinal work with them to help

2    motivate them to come indoors and get into

3    treatment.

4    BY MR. MINOIEFAR:

5        Q.  Do you know if any of the supplies that are

6    distributed include things such as like tents or

7    means to camp on the streets?

8        A.  No.

9            MR. KNOX:  I'm sorry, say that again?

10            MR. MINOIEFAR:  The question was, do you

11    know if any of the supplies that are distributed

12    include things such as tents or the means to camp on

13    the streets?

14            MR. KNOX:  Okay.

15            THE WITNESS:  No.  That is strictly

16    prohibited for our teams.

17    BY MR. MINOIEFAR:

18        Q.  Do you know if that prohibition extends to

19    contractors that you work with?

20        A.  Yes.

21        Q.  How is it that that provision -- pardon.

22    How is it that that prohibition is enforced if a

23    contractor is conducting that kind of thing?

24            MS. MURPHY:  Object to form.

25            MR. KNOX:  Objection.  Lack of foundation.

36



 1          You may answer.

 2          THE WITNESS:  If we received information

 3   that that was happening, we would immediately call

 4   that organization and tell them to stop immediately.

 5          If that behavior continued, then we would

 6   explore pathways to enforce that through their

 7   contract with us.

 8   BY MR. MINOIEFAR:

 9      Q.  I think we're done with Plaintiffs' Exhibit

10   1.

11      A.  Okay.

12      Q.  Let me just ask the question first, if I

13   were to ask you questions related to the mayor's new

14   policy in regards to the distribution of fentanyl

15   smoking supplies without counseling or treatment,

16   would you invoke your right under the Fifth

17   Amendment?

18          MR. KNOX:  Yes.  I advise you to invoke.

19          THE WITNESS:  Yes.

20          MR. KNOX:  If I could just have a moment?

21          MS. MURPHY:  Why don't we go off for a

22   second.

23          MR. MINOIEFAR:  Yeah, sure.  We can go off.

24          THE VIDEOGRAPHER:  Going off the record.

25   The time is 10:38.

VIDEOTAPED DEPOSITION OF KRISTA GAETA

```
 1    where the City contractors are distributing syringes
 2    on public streets and whether there should be any
 3    corrections to that practice?
 4         A.  Many of these sites, which are changing
 5    now, have been longstanding.  So I did not -- I was
 6    not part of making those determinations.
 7             If -- the circumstances to change something
 8    would be potentially community complaints about a
 9    certain area, or the operations of a site in that
10    area would raise it to our level to evaluate and
11    consider whether that should continue or move.
12         Q.  Have you heard of community complaints
13    about the operation of a site for the distribution
14    of syringes in the Tenderloin?
15         A.  Yes.
16         Q.  What were the results of those community
17    complaints?
18             MS. MURPHY:  Object to form.
19             THE WITNESS:  There --
20             MR. KNOX:  Objection.  Calls for
21    speculation.  Lack of foundation.
22             You may answer.
23             THE WITNESS:  There was a sort of pop-up
24    site on Willow Alley in the Tenderloin which had
25    significant encampment and other drug use that was
```

47

CRANGLE
REPORTING SERVICES

 1   happening on it.  There was a City effort to change

 2   those conditions, and one of the conditions was our

 3   distribution of supplies on that street.  And so we

 4   moved that location.

 5   BY MR. MINOIEFAR:

 6        Q.  So was the pop-up site on Willow Street a

 7   City-funded distribution site?

 8        A.  Yes.

 9        Q.  And what departments were involved in the

10   distribution of syringes on Willow Street?

11        A.  As far as I know, it was -- as far as I

12   know, it was just the Department of Public Health's

13   contract.

14        Q.  And was the distribution of supplies on

15   Willow Street by the Department of Public Health

16   something that the City received community feedback

17   from?

18            MS. MURPHY:  Object to form.

19            THE WITNESS:  Yes.

20   BY MR. MINOIEFAR:

21        Q.  And what was that feedback?

22        A.  The feedback -- there is a perception by

23   some community members, and I believe this was the

24   community, who felt like the distribution of

25   supplies was an enabler of drug use and attracted

                                                      48



VIDEOTAPED DEPOSITION OF KRISTA GAETA

```
 1   drug use to a location.

 2       Q.  Do you know if the Willow Street

 3   distribution site distributed smoking supplies?

 4           MR. KNOX:  Objection.

 5           Well, hold on a second.

 6           Vague as to time.  I'm going to instruct

 7   you not to answer until it's clarified what time

 8   we're talking about.

 9           MR. MINOIEFAR:  Sure.

10   BY MR. MINOIEFAR:

11       Q.  The Willow Street pop-up distribution site,

12   do you recall when that was?

13       A.  I -- I am not exactly recalling.  I would

14   estimate that six months ago it was maybe still

15   operating before we moved it.  But I -- I actually

16   just -- the timeline is fuzzy for me.

17           MR. KNOX:  So since we're not talking about

18   current policy, I'm going to advise you not to

19   respond to any questions about Willow Alley or any

20   of those other distribution things that occurred

21   before the current policy.

22           THE WITNESS:  Okay.

23           MR. KNOX:  Based on your right to invoke

24   your -- based on your right to remain silent.

25           THE WITNESS:  Got it.
```

49

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF KRISTA GAETA

1      Q.  -- to some of the syringe sites you talked

2   about.

3          You mentioned there was plans for new

4   sites.  Do you have any idea where those new sites

5   are potentially being planned?

6      A.  And so when you say "new sites," I want to

7   clarify they're not additional sites.  These would

8   be taking existing sites and moving them to a new

9   location.  So it's not adding services.

10     Q.  Thank you for that clarification.

11         Do you know the potentially -- potential

12  new sites?

13     A.  I'm trying -- I knew a Mission Neighborhood

14  Resource was one and we've moved in there.  I do not

15  know the other ones.

16     Q.  Okay.  We're done with Plaintiffs'

17  Exhibit 2.  I'll take that.

18     A.  Yes.

19     Q.  Thank you.

20         Is the reasoning that the distribution

21  sites are -- let me take a step back.

22         So is it correct that your testimony was is

23  that there's not an addition of new distribution

24  sites, they're simply relocating existing sites?

25     A.  Correct.

                                                    52



VIDEOTAPED DEPOSITION OF KRISTA GAETA

 1        Q.  Do you know the reason why that they're

 2   relocating sites as opposed to adding new sites?

 3        A.  To comply with the policy.  So it is sites

 4   that are currently outdoors, moving them indoors.

 5        Q.  Understood.  Is part of the relocation of

 6   sites to distribute them from the Tenderloin

 7   neighborhood to other neighborhoods?

 8            MS. MURPHY:  Object to form.

 9            THE WITNESS:  That is not my understanding.

10   BY MR. MINOIEFAR:

11        Q.  Is there any discussions currently

12   regarding the concentration of services in the

13   Tenderloin -- let me clarify.

14            Is there any discussions currently in your

15   department regarding the concentration of homeless

16   services in the Tenderloin?

17            MS. MURPHY:  Same objection.

18            THE WITNESS:  Yes.

19   BY MR. MINOIEFAR:

20        Q.  And what are those conversations?

21        A.  So we, as a Department of Public Health,

22   are tasked with setting up and providing services to

23   meet the health needs of generally low-income folks.

24   But also -- and folks who are experiencing

25   homelessness.  And we are being asked to set up more

                                                        53

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF KRISTA GAETA

1    like RAMS are permitted to distribute smoking

2    supplies, you had mentioned you know it's not

3    currently the policy.

4              So for that current policy and prohibition

5    on distribution of smoking supplies, that is only

6    for public streets; is that correct?

7         A.   Correct.

8         Q.   How is it -- and I don't mean to be

9    sarcastic.  How is it that you or someone else in

10   the public department -- Department of Public Health

11   would know that that activity is no longer

12   occurring?

13        A.   So current policy, our street health team,

14   does not distribute supplies.  We, as part of our

15   policy rollout, we are putting in a monitoring plan.

16   This is in process and shall be finalized very soon,

17   but it will be -- there will be a couple of things.

18              One, through self-report of the

19   organization and their policies and procedures that

20   we expect them to follow; two, through site visits

21   that we will do; and three, we will always have

22   Twitter videos that will become -- are part of my

23   daily life.

24        Q.   What do you mean by that?  Are you

25   referring to --

72



VIDEOTAPED DEPOSITION OF KRISTA GAETA

 1          A.  Meaning JJ, who took this video, is a

 2   prolific filmer and poster on many social media

 3   accounts, and these videos come to my attention

 4   occasionally.

 5          Q.  Understood.  So apart from site visits,

 6   being sent videos from the public, are there any

 7   other means that you have for monitoring contractors

 8   to ensure they're not distributing smoking supplies

 9   on the streets of San Francisco?

10             MS. MURPHY:  Object to form.  I believe the

11   witness has stated self-report in the prior answer.

12             THE WITNESS:  Yes.  Those would be

13   self-report, our own visits, and then any other

14   community complaints that may come up via a video or

15   an email or a call.

16   BY MR. MINOIEFAR:

17          Q.  Understood.  So let me get that correct.

18   So the three so far that you mentioned are

19   self-reporting, site visits, reports from the

20   public?

21          A.  Yeah.

22          Q.  Are there any other means involved in this

23   monitoring plan that I understand is not fully

24   finalized?

25          A.  We will be collecting data on, you know,

73

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF KRISTA GAETA

1    conversations and, you know, connections to care,

2    but that won't necessarily tell me what is happening

3    on the ground.

4        Q.  Anything else besides site visits, being

5    sent reports, self-reports, and data that might

6    eliminate distribution?

7            MS. MURPHY:  Object to form.

8            THE WITNESS:  Not that I can -- I'm aware

9    of right now.

10   BY MR. MINOIEFAR:

11       Q.  Is there a current policy or plan for when

12   the Department of Public Health is notified of

13   distribution of drug paraphernalia on public streets

14   that certain action will be taken against a

15   contractor?

16           MS. MURPHY:  Object to form.

17           THE WITNESS:  As I said previously, if we

18   get a report, we will investigate it, which is, you

19   know, looking at whatever evidence was given to us

20   about the distribution.  If it's a video, very

21   clear, sometimes not.  We will talk with the site

22   themselves.

23           If we determine that they are -- again,

24   this is going to be newly in the contracts.  We will

25   ask them to refrain from that activity and take

74



VIDEOTAPED DEPOSITION OF KRISTA GAETA

```
 1    whatever steps are necessary.  Perhaps an employee
 2    didn't follow the policy, we'll ask them to address
 3    that.
 4              If the organization fails to enforce that
 5    policy, then we will use the mechanisms we have to
 6    enforce it through a contract.  So there's many
 7    different steps from -- and I'm not going to be able
 8    to -- I've never had to go all the way through on
 9    one of these, but we would start with like a
10    technical assistance plan where we would work very
11    closely with the organization to refine the
12    policies, practices --
13              MR. KNOX:  Slow down.
14              THE WITNESS:  -- and, you know, which could
15    include more frequent site visits, et cetera.  We
16    would do something to be able to correct the
17    behavior.
18              Our goal would be that the behavior would
19    be correct at the end of that.  If they don't
20    correct that, and don't seem to be trying, then we
21    could then move that to a more formal corrective
22    action process, which could then put their funding
23    and contract at risk.
24    BY MR. MINOIEFAR:
25         Q.  You had mentioned that the plan is to
```

75

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF KRISTA GAETA

1   include this prohibition in contracts with

2   contractors?

3        A.  Yes.

4        Q.  I take from that, just want to be clear,

5   does that prohibition currently exist in contracts

6   with, let's just say, RAMS, for example?

7             MS. MURPHY:  Object to form.

8             THE WITNESS:  I do not believe it is.

9   BY MR. MINOIEFAR:

10       Q.  This might be kind of a technical question,

11   but can a provision such as that be added to a

12   contract without waiting for the contract to expire,

13   or can it be added?

14       A.  Yes, we can amend the contract.

15            MS. MURPHY:  Belated object to form.

16   BY MR. MINOIEFAR:

17       Q.  And is it the current intention to include

18   a prohibition on the distribution of fentanyl

19   smoking supplies on public streets with all

20   contractors the Department of Public Health engages

21   with?

22            MS. MURPHY:  Object to form.

23            THE WITNESS:  That's a good question.  My

24   understanding is that this will immediately be added

25   to the contracts we have for the specific provision

76

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF KRISTA GAETA

1   of supply distribution.  I do not think there's a

2   plan to put it into every contract because most of

3   our contractors do not do this as part of their

4   services and we don't pay them to do that.

5   BY MR. MINOIEFAR:

6       Q.  Understood.  I'll take down Plaintiffs'

7   Exhibit 2 from the deposition of Mark Mazza.  I can

8   take that back.

9           Is your role, current role, at all involved

10  in the operation of shelters?

11      A.  No.

12      Q.  Do you oversee any programs that are

13  conducted inside shelters in the Tenderloin?

14      A.  The only thing I am directly overseeing is

15  the overdose prevention work, and that has included,

16  when asked for, we help to set up what we call

17  emergency naloxone boxes.  So that is just a stock,

18  and we help the organization set up processes to

19  make sure they have naloxone on site.

20      Q.  Aside from the emergency naloxone boxes in

21  shelters, are there any other programs you directly

22  oversee involved with shelters in the Tenderloin?

23      A.  No.

24      Q.  Really quickly, who would be the person

25  that you report to in the Department of Public

77



VIDEOTAPED DEPOSITION OF KRISTA GAETA

1          I, GINA V. CARBONE, CSR No. 8249, RPR, RMR, CRR,

2     CCRR, certify: that the foregoing proceedings were taken

3     before me at the time and place herein set forth; at

4     which time the witness was duly sworn; and that the

5     transcript is a true record of the testimony so given.

6

7          Witness review, correction and signature

8     was

9     ( ) by code.                    ( ) requested.

10    ( ) waived.                    (X) not requested.

11    ( ) not handled by the deposition officer due to

12    party stipulation.

13

14        The dismantling or unbinding of the original

15    transcript will render the reporter's certificate null

16    and void.

17        I further certify that I am not financially

18    interested in the action, and I am not a relative or

19    employee of any attorney of the parties, nor of any of

20    the parties.

21        Dated this 23rd day of April, 2025.

22

23    _____
          GINA V. CARBONE
24        CSR #8249, STATE OF CALIFORNIA

25

93


CRANGLE
REPORTING SERVICES

# Exhibit G
(April 16, 2025 deposition of Emily Cohen)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

JANE ROE, an individual; MARY ROE,
an individual; SUSAN ROE, an
individual; JOHN ROE, an
individua; BARBARA ROE, an
individual; PHOENIX HOTEL SF, LLC,         CASE NO.
a California limited liability            4:24-cv-01562-JST
company, FUNKY FUN, LLC, a
California limited liability
company; and 2930 EL CAMINO, LLC,
a California limited liability
company,

        Plaintiffs,

-vs-

CITY AND COUNTY OF SAN FRANCISCO,
a California public entity,

        Defendant.
_____/

> **CERTIFIED TRANSCRIPT**


VIDEOTAPED DEPOSITION OF

EMILY COHEN


Stenographically reported before JOAN GRIER
        Certified Shorthand Reporter
           State of California
        C.S.R. License No. 8958


April 16, 2025



VIDEOTAPED DEPOSITION OF EMILY COHEN

1            The court reporter is Joan Grier, Certified

2    Shorthand Reporter, License No. 8958, representing Crangle

3    Reporting Services.

4            And would the reporter please administer the

5    oath, and then counsel may begin.

6                        EMILY COHEN,

7            sworn as a witness by the Court Reporter,

8                    testified as follows:

9                    EXAMINATION BY MR. DAVIS

10           MR. DAVIS:  Q.  Good afternoon.  Will you tell

11   us your name, please.

12           A. Emily Cohen.

13           Q. Once again, my name is Matt Davis.  I'm a

14   lawyer, and I represent some individuals and businesses

15   that have sued the City and County of San Francisco.

16           My clients either reside in or their businesses

17   are located in the Tenderloin District of San Francisco.

18           Are you employed by the City?

19           A. I am.

20           Q. And are you still working for Homelessness and

21   Supportive Housing?

22           A. Yes.

23           Q. And I will call that "HSH" in this deposition.

24           Is that okay?

25           A. Great.  That's what we call it.

                                                              7

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF EMILY COHEN

1           Q. And what does HSH do with it?

2           A. I haven't seen it in use in quite a while.  But

3    I believe our outreach teams were distributing it, and I

4    would often use it in communications with community

5    members to let them know what we considered a clean and

6    safe street and we wanted to achieve.

7           Q. Where is your office, currently?

8           A. 440 Turk.

9           Q. So that is about a block from the federal

10   building?

11          A. Yeah.

12          Q. How long have you had your office on 440 Turk?

13          A. About 2020.  Maybe late 2019, they opened.

14          Q. So you work in the Tenderloin?

15          A. Yes.

16          Q. And as part of your job responsibilities, do

17   you go around the neighborhood at all?

18          A. To and from meetings.

19          Q. Do you ever visit any sites that are under the

20   auspices of HSH?

21          A. Yes.

22          Q. And how frequently does that happen?

23          A. Probably a couple times a month.

24          Q. When was the last time you visited a shelter

25   that was under the auspices of HSH?

                                                           16



VIDEOTAPED DEPOSITION OF EMILY COHEN

1              MS. MURPHY:  Object to form.

2              MR. KNOX:  If you know.

3              THE WITNESS:  So it really varies on the

4    circumstance.  It is not -- when I say it's a policy, I

5    want to be clear.

6              In the lease that the tenant signs with the

7    property manager, there's often a clause that stipulates

8    that drugs are not able to be used.

9              MR. DAVIS:  Q.  Okay.

10              A. And often it will say, in the public areas of

11    the building.  So it would be treated as a lease

12    violation.

13              Q. So the use of drugs in public areas would be a

14    lease violation?

15              A. Depends on the exact wording of the lease.

16              Q. Does HSH mandate that the leases -- first of

17    all, these are all facilities that receive their funding

18    through HSH?

19              A. Correct.

20              Q. And HSH, if you will, enters into agreements

21    with the vendors that run the facilities?

22              A. Correct.

23              Q. And HSH has decision-making control over what

24    agreements the facilities have with their tenants?

25              MS. MURPHY:  Object to form.

33

CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF EMILY COHEN

1             MR. KNOX:  Objection.  Lack of foundation.

2    Lack of personal knowledge.

3             If you know.

4             THE WITNESS:  We don't have total control over

5    the agreements because the nonprofits that operate the

6    sites have their own -- like, are their own entities.

7             MR. DAVIS:  Q.  Okay.  Does HSH impose any

8    requirement with respect to the use of illicit drugs at

9    properties that it funds?  Are there any mandates or

10   requirements with respect to how the vendors treat that

11   issue?

12            MS. MURPHY:  Object to form.

13            THE WITNESS:  I'm not sure I know the answer to

14   that.

15            MR. DAVIS:  Q.  Are you aware of any mandates

16   or requirements by HSH with respect to the use of drugs in

17   facilities -- we'll stick to the Tenderloin -- facilities

18   in the Tenderloin that the HSH funds?

19            MS. MURPHY:  Same objection.

20            THE WITNESS:  I don't know for sure.

21            MR. DAVIS:  Q.  Who would know?

22            A.  I would have to reread the contracts.  You'd

23   have the look at the contracts to see exactly what is

24   written in them.

25            Q.  You have -- sorry.  Okay.

                                                              34



VIDEOTAPED DEPOSITION OF EMILY COHEN

1              You have personally received many, many

2   complaints about drug use in HSH-supported facilities

3   spilling out into public areas around the facilities.

4              Is that a true statement?

5         A. Yes.

6              Q. You've received many complaints about people

7   openly using drugs around HSH-supported facilities, like

8   the Adante, like the Monarch, like the Cova when it was in

9   operation?

10              MR. KNOX:  Objection.  Vague as to time.

11              You may answer.

12              THE WITNESS:  Yes.

13              MR. DAVIS:  Q.  You have received many reports

14   that there are drug sales happening around these

15   facilities.

16              Is that a true statement?

17              MR. KNOX:  Same objection.

18              THE WITNESS:  Yes.

19              MR. DAVIS:  Q.  You -- you were aware that many

20   people have died of drug overdoses within these

21   facilities?

22              MR. KNOX:  Same objection.

23              You may answer.

24              THE WITNESS:  Yes.

25              MR. DAVIS:  Q.  Okay.  Has anyone at HSH ever

                                                       35



VIDEOTAPED DEPOSITION OF EMILY COHEN

```
 1          A. I find public drug use to be unhealthy.  So
 2   when I walk through the Tenderloin, whether that is in
 3   front of a homeless shelter or not, if I see somebody
 4   injecting drugs, that, to me, would be an unhealthy
 5   situation.
 6          Q. And have you seen drug paraphernalia littering
 7   the streets of the Tenderloin?
 8          A. Yes.
 9          Q. And I assume you agree that's an unhealthy
10   street condition?
11          A. Absolutely.
12          Q. And you have seen encampments that are filthy?
13          A. Yes.
14          Q. And that's an unhealthy street condition?
15          A. Nobody should -- yes.
16          Q. And you have seen people who are vending on the
17   street what appear to be stolen goods?
18          MR. KNOX:  Objection.  Calls for speculation.
19   Lack of foundation.
20          You can answer.
21          THE WITNESS:  I've seen people vending on the
22   streets.
23          MR. DAVIS:  Q.  And you can agree that that can
24   be an unhealthy condition?
25          A. Yes.
```

53



VIDEOTAPED DEPOSITION OF EMILY COHEN

1          MR. DAVIS:  Q.  To your knowledge, do
2    organizations hand out drug paraphernalia in the
3    Tenderloin?
4          MR. KNOX:  Objection.  Vague with -- sorry, go
5    ahead.
6          MS. MURPHY:  Object to form.
7          MR. KNOX:  Objection.  Vague with respect to
8    what you mean by "organizations."
9          You may answer.
10         THE WITNESS:  Can you clarify what you mean?
11         MR. DAVIS:  Q.  Do any entities or
12    organizations, to your knowledge, hand out drug
13    paraphernalia in the neighborhood?
14         MS. MURPHY:  Same objection.
15         MR. KNOX:  Same objection.
16         THE WITNESS:  I would assume so.
17         MR. DAVIS:  Q.  And why would you assume so?
18         A. Because I know that there are needle exchange
19    programs and other programs.  I don't know their specific
20    addresses and if they're in the Tenderloin or not.
21         Q. Are you aware of organizations that hand out
22    fentanyl and meth smoking devices?
23         MS. MURPHY:  Object to form.
24         MR. KNOX:  Objection.  Vague with respect to
25    the definition.  And by fentanyl and other devices, you

57



VIDEOTAPED DEPOSITION OF EMILY COHEN

1  mean not just fentanyl, but fentanyl devices and other

2  devices.  Nobody is giving out fentanyl.

3          MR. DAVIS:  Q.  Pipes, straws, foil.

4          MS. MURPHY:  Same objection.

5          THE WITNESS:  Our programs don't do that.  I

6  assume there might be some Harm Reduction programs in the

7  community that do.

8          MR. DAVIS:  Q.  And why do you assume that?

9          A. Because I see them on the street.

10          Q. You see them with the carts handing it out?

11          A. No, no, no.  Sorry.

12          I see the paraphernalia in use.

13          Q. Are you aware that Glide hands out drug

14  paraphernalia in the neighborhood?

15          MS. MURPHY:  Object to form.

16          THE WITNESS:  No.

17          MR. DAVIS:  Q.  That's news to you?

18          A. Yes.

19          Q. Would you be surprised to learn that Glide has

20  been handing out fentanyl-smoking materials in the

21  neighborhood?

22          A. No.

23          Q. You're not surprised by that?

24          A. No.

25          Q. Does HSH have any position whether that's a

58


CRANGLE
REPORTING SERVICES

VIDEOTAPED DEPOSITION OF EMILY COHEN

1  good idea?

2              MS. MURPHY:  Object to form.

3              THE WITNESS:  No.

4              MR. DAVIS:  Q.  What involvement did you have

5  with the operation of the Tenderloin Linkage Center?

6          A. Very minimal.

7              MS. MURPHY:  Object to form.

8              MR. DAVIS:  Q.  Tell me what it was.

9          A. I think I helped draft some communications

10  materials about it.  And I took a couple members of the

11  press on a tour of it once, went on a tour of it once, but

12  I was not involved in the operations.

13          Q. So how many tours of the center did you take?

14          A. I would say I was probably there three to five

15  times over the course of its operation.

16          Q. Who from the City was in charge of the

17  Linkage Center, to your knowledge?

18          A. I believe it was facilitated by the Department

19  of Emergency Management.  And each social service

20  department contributed different types of services.

21              So I know we had staff who were stationed there

22  who did housing assessments, made shelter placements.  I

23  know the Human Services Agency had people there to connect

24  people with public benefits.

25          Q. So HSH had staff working at the Linkage Center?

                                                            59



VIDEOTAPED DEPOSITION OF EMILY COHEN

```
 1   STATE OF CALIFORNIA    )
                            )     ss
 2   COUNTY OF ALAMEDA      )


 3
             I, Joan Grier, hereby certify that the
 4   witness in the foregoing deposition named


 5


 6                         EMILY COHEN


 7


 8   was by me duly sworn to testify to the truth, the whole
     truth, and nothing but the truth in the within-entitled
 9   cause; that said deposition was taken at the time and
     place herein named; that the testimony of said witness was
10   reported by me, a certified shorthand reporter and a
     disinterested person, and thereafter transcribed into
11   typewriting.
12           And I further certify that I am not of counsel or
     attorney for either or any of the parties to said
13   deposition, nor in any way interested in the outcome of
     the cause named in said caption.
14
15   __X__Reading and Signing was requested.
16   _____Reading and Signing was waived.
17   _____Reading and Signing was not requested.
18
19
20   Date: 4/28/25
21
22   _____
     Joan Grier, C.S.R. #8958
23
24
25
```

88

CRANGLE
REPORTING SERVICES