# EXHIBIT 30
# to

**DECLARATION OF ABIGAIL WALD IN SUPPORT OF DEFENDANT CITY AND COUNTY OF SAN FRANCISCO'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

***ROUGH DRAFT MAY CONTAIN CONFIDENTIAL INFORMATION***

1    THIS IS AN UNCERTIFIED ROUGH DRAFT
2  TRANSCRIPT AND CANNOT BE QUOTED IN ANY PLEADINGS OR
3  FOR ANY OTHER PURPOSE AND MAY NOT BE FILED WITH ANY
4  COURT.  PAGE AND LINE NUMBERS WILL CHANGE.  ANY
5  PUNCTUATION ERRORS OR OMISSIONS, UNTRANSLATED
6  SHORTHAND SYMBOLS, OR REPORTER'S NOTES WILL BE
7  CORRECTED IN THE FINAL CERTIFIED TRANSCRIPT.
8
9     THE VIDEOGRAPHER:  Good morning.  Here
10  begins media number one in the deposition of Sam
11  Patel, the person most knowledgeable for 2930 El
12  Camino LLC in the matter of Jane Roe, Mary Roe,
13  Susan Roe, et al., vs. City and County of San
14  Francisco, venued in the U.S. District Court for the
15  Northern District of California.  Case number is
16  424CV01562 JST.
17     Today's date is Thursday, September 18,
18  2025.  The time on the video monitor is
19  approximately 10:08 a.m. Pacific time.  The video
20  operator is Steve Patapoff, contracted by Behmke
21  Reporting & Video Services, Incorporated.  This
22  video deposition is taking place at 1390 Market
23  Street, 7th Floor, San Francisco, California 94102,
24  and was noticed by John George, deputy city attorney
25  of the San Francisco city attorneys office.

1  What is it supposed to do?

2      A.  So --

3          MR. MINOIEFAR:  Object to form.

4          THE WITNESS:  It should have regular -- why

5  are there no regular patrols going on there.  Why

6  did the city allow people to hang there for that

7  long?  If it -- if we didn't complain, the city

8  never would have done anything with it.  They would

9  have just allowed it.

10  BY MR. GEORGE:

11     Q.  So it's the cities failure to do something

12  that allowed that to happen.  Is that what you're

13  saying?

14         MR. MINOIEFAR:  Object to form.

15         THE WITNESS:  Yes.

16  BY MR. GEORGE:

17     Q.  Did the -- did Glide distribution of smoking

18  supplies cause the specific incident that you're

19  describing where the sidewalk was impassable to

20  happen?

21         MR. MINOIEFAR:  Object to form.

22         THE WITNESS:  I don't know.  I have no

23  knowledge of that.

24  BY MR. GEORGE:

25     Q.  Do you have any position whatsoever on that?

136

1   A.  No.

2   Q.  Did the Cova hotel cause that specific

3   impasse ability that you just described on Polk

4   street?

5       MR. MINOIEFAR:  Object to form.

6       THE WITNESS:  I don't know.  I have no

7   opinion.

8   BY MR. GEORGE:

9   Q.  You have no opinion one way or the other?

10  A.  No.

11  Q.  Do you have any evidence to support the

12  position that the Cova caused that impasse ability?

13      MR. MINOIEFAR:  Object to form.

14      THE WITNESS:  No.

15  BY MR. GEORGE:

16  Q.  Do you have any evidence whatsoever to show

17  that the 685 Ellis Street caused that impasse

18  ability that you just described?

19      MR. MINOIEFAR:  Object to form.

20      THE WITNESS:  No.

21  BY MR. GEORGE:

22  Q.  Do you have any position whatsoever that the

23  operation of the Tenderloin linkage center caused

24  that to happen?

25      MR. MINOIEFAR:  Object to form.

1  A. I don't know where. Like I said, I -- if
2  you don't mind just asking me two different
3  questions, I'd appreciate it. If it's on the
4  property, just tell me and I'll answer that. Then
5  if it's -- if you're talking about the surrounding
6  property, I'll answer it that way so it will
7  probably be easier for both of us.
8  Q. Well, I mean, it's kind of a full stop
9  question. It seems like you don't know of any
10 incident -- let me say it this way. You don't know
11 of any incident in which a Best Western guest has
12 been injured by a homeless person or a drug addict
13 since 2020 at all in San Francisco. Is that
14 correct?
15 A. That's correct.
16 Q. Okay?
17 A. I don't know.
18 Q. Great, great. Ken might know that?
19 A. No he's not going to know if somebody got
20 hurt in San Francisco.
21 Q. And on the property, I think we covered this
22 already. But on the property there hasn't been an
23 incident where a guest has been injured by a person
24 whose causing these nuisances. Is that right?
25     MR. MINOIEFAR: Object to form.

142

1     THE WITNESS: That's correct.

2 BY MR. GEORGE:

3   Q. When was the last time that the fear of

4 physical harm interfered with the Best Western use

5 or enjoyment of the property?

6     MR. MINOIEFAR: Object to form.

7     THE WITNESS: From people not coming the our

8 property. I mean, that's creating a problem for us,

9 through the reviews. When the reviews say hey,

10 don't go there, the surrounding area is bad.

11 BY MR. GEORGE:

12   Q. Do you -- when people don't book a room at

13 the Best Western, do you know why they did not book

14 a room at the Best Western?

15   A. Personally? I mean, specifically for

16 individual person, no. I can't do that. I'm just

17 relying on and I see what the reviews say, what they

18 say.

19   Q. So you are assuming that those reviews are

20 causing a decline in your business. Is that

21 correct?

22   A. I'm relying on that and the star reports.

23 Can I see what our competitors and what the San

24 Francisco itself is doing and what my property is

25 doing and then I compare it to the reviews. So

BY MR. GEORGE:

2   Q.  Do you have any reason to believe that those
3  people were specifically at that location doing
4  drugs because of an act by the city?

5       MR. MINOIEFAR:  Object to form.

6       THE WITNESS:  Well, the city itself didn't
7  act to it to tell them to go do drugs there but they
8  didn't not act on it saying hey what are you doing,
9  what is going on here.

10  BY MR. GEORGE:

11   Q.  So the failure that you see on behalf of the
12  city is that the city didn't prevent those people
13  from sitting down in that spot and doing drugs.  Is
14  that right?

15   A.  That's right.

16   Q.  And the city failed to have a cop there or
17  somebody to you know, get those people out of that
18  location?

19   A.  Yes.

20   Q.  Any other failing that the city -- any other
21  action that the city should have taken to deal with
22  those people?

23       MR. MINOIEFAR:  Object to form.

24       THE WITNESS:  I don't know any other.

25  BY MR. GEORGE:

1     MR. MINOIEFAR:  Object to form.

2     THE WITNESS:  I haven't taken any action but

3  I can tell you why I didn't if you want to know

4  that.

5  BY MR. GEORGE:

6     Q.  Have you reported any drug sales to a police

7  non-emergency number?

8     A.  No.

9     Q.  Do you know if Ken has?

10    A.  I don't know that.

11    Q.  Would Ken know about any documentation of

12  any open drug sales around the Best Western?

13       MR. MINOIEFAR:  Object to form.

14       THE WITNESS:  He may.

15  BY MR. GEORGE:

16    Q.  Do you know why -- well, let me withdraw

17  that.  Do you know if the open drug sales that are

18  around the Best Western that were happening are

19  connected in any way to the distribution of any drug

20  paraphernalia by Glide?

21    A.  No.

22    Q.  Do you know if they're connected in any way

23  to any distribution of drug paraphernalia by SF AIDS

24  foundation?

25    A.  No.

1   A. Yes.

2   Q. Does 2390 know why those people are doing

3 those particular actions that are causing the

4 problems on 6 and 7?

5       MR. MINOIEFAR: Object to form.

6       THE WITNESS: No.

7 BY MR. GEORGE:

8   Q. Does 2390 believe that the city distributing

9 smoking supplies has caused the problems on 6 and 7?

10       MR. MINOIEFAR: Object to form.

11       THE WITNESS: I don't know that.

12 BY MR. GEORGE:

13   Q. You don't know one way or the other whether

14 Best Western thinks that these problems identified

15 in Exhibit 3 on 6 and 7 were caused by the

16 distribution of smoking supplies. Is that correct?

17   A. That's correct.

18   Q. Are you familiar with a phrase containment

19 zone?

20   A. Yes.

21   Q. What does that mean to you?

22   A. You put a barrier around something to

23 contain it.

24   Q. Has the city created a containment zone in

25 the Tenderloin?

1      MR. MINOIEFAR:  Object to form.

2      THE WITNESS:  Not to my knowledge.

3  BY MR. GEORGE:

4      Q.  Does the Best Western serve alcohol?

5      A.  No.

6      Q.  Is there a bar on the premises?

7      A.  No.

8      Q.  Okay.  I think I may have asked this so I

9  apologize if I have.  But are you familiar with

10  glides distribution of smoking supplies?

11      A.  No.

12      Q.  Do you have any reason to believe that the

13  people who have done drugs or are camping in front

14  of the Best Western have gotten drug surprise from

15  Glide?

16      MR. MINOIEFAR:  Object to form.

17      THE WITNESS:  No.

18  BY MR. GEORGE:

19      Q.  Any reason to believe that they've gotten

20  their drug supplies from the SF AIDS foundation?

21      MR. MINOIEFAR:  Object to form.

22      THE WITNESS:  No.

23  BY MR. GEORGE:

24      Q.  Any reason to believe that they have gotten

25  their drug supplies from the city in any way?

1  MR. MINOIEFAR: Object to form.

2  THE WITNESS: No.

3  BY MR. GEORGE:

4  Q. Have you ever had positive experience with

5  city employee who is trying to keep the streets

6  clean?

7  A. Yes.

8  Q. And when was the last time that that

9  happened where you had a positive experience?

10  A. Just last week.

11  Q. And can you describe that for me?

12  A. It was with Sam Dodge. We talked about the

13  area. We talked about the property at 790 Ellis

14  Street, we met with the Tenderloin captain, I

15  believe his name is mat, I forgot his last name.

16  Met with him and he met with one other officer also

17  at the property.

18  Q. So you met with -- this was at 790 Ellis.

19  Is that correct?

20  A. That's correct.

21  Q. And you met with sounds like two SFPD

22  officers, including the captain of the Tenderloin

23  station is that right?

24  A. Yes.

25  Q. Did you ask for that meeting?

1  see any of the nuisances that you've described

2  today?

3     A.  No.

4     Q.

5         MR. MINOIEFAR:  Object to form, belatedly.

6  BY MR. GEORGE:

7     Q.  Is the -- do you have any reason to doubt

8  that this is an accurate photo of the premises, the

9  Best Western premises in January of 2023?

10        MR. MINOIEFAR:  Object to form.

11        THE WITNESS:  No.

12 BY MR. GEORGE:

13    Q.  I'm going to introduce Exhibit 9?

14        (Whereupon Exhibit # was marked for

15         identification.)

16 BY MR. GEORGE:

17    Q.  And Exhibit 9 is another Google street view

18 image.  This one at 701 Polk treat which is the

19 corner of Polk and Eddy and it's dated

20 December 2024.  Do you recognize this scene?

21    A.  Yes.

22    Q.  And do you recognize the hotel as the Best

23 Western in this photo?

24    A.  Yes.

25    Q.  Do you see any of the nuisances that you are

225

1  discussing today?

2        MR. MINOIEFAR:  Object to form.

3        THE WITNESS:  No.

4  BY MR. GEORGE:

5     Q.  Do you have any reason to doubt that this is

6  an accurate photo of the seen in front of the Best

7  Western in December of 2024?

8        MR. MINOIEFAR:  Object to form.

9        THE WITNESS:  No.

10  BY MR. GEORGE:

11     Q.  I'll introduce exhibit number ten?

12        (Whereupon Exhibit # was marked for

13        identification.)

14  BY MR. GEORGE:

15     Q.  Exhibit 10 is another Google street view

16  image.  This one pictures Polk as well as willow

17  street.  It's on the corner of Polk and willow.  The

18  address is 716 Polk Street, and it's dated January

19  of 2025.

20        Do you recognize what's in this image?

21     A.  Yes.

22     Q.  Do you recognize it as the Best Western

23  hotel?

24     A.  Yes.

25     Q.  And do you see any of the nuisances that

226

1  we've discussed today?

2    MR. MINOIEFAR:  Object to form.

3    THE WITNESS:  No.

4  BY MR. GEORGE:

5    Q.  Do you have any reason to doubt that this is

6  an accurate image of this location in January of

7  2025?

8    MR. MINOIEFAR:  Object to form.

9    THE WITNESS:  No.

10  BY MR. GEORGE:

11    Q.  You can set that one aside.  I want to

12  introduce number 11?

13    (Whereupon Exhibit # was marked for

14    identification.)

15  BY MR. GEORGE:

16    Q.  Exhibit No. 11 is another Google street view

17  image.  This one is dated May of 2025, and it

18  pictures the corner of Polk and Eddy street and the

19  address is 701 Polk.  Do you recognize the hotel as

20  the Best Western in this photo?

21    A.  Yes.

22    Q.  And do you see any of the nuisances that

23  you've described today in the photo?

24    A.  No.

25    Q.

227

1    MR. MINOIEFAR:  Object to form.

2  BY MR. GEORGE:

3    Q.  Any reason to doubt that this is an accurate

4  photo from the date that it was taken in May of

5  2025?

6    A.  No.

7    Q.  I'll do exhibit number 12?

8    (Whereupon Exhibit # was marked for

9    identification.)

10  BY MR. GEORGE:

11    Q.  Exhibit 12 is another Google street view

12  image.  This one is picketing Polk -- the Polk side

13  of the building, and it's dated March of 2022.  Do

14  you recognize the building in this image as the Best

15  Western?

16    A.  Yes.

17    Q.  And the sign is the old motor lodge sign,

18  correct?

19    A.  Yes.

20    Q.  Was this before the hotel had reopened as a

21  tourist hotel?

22    A.  Yes.

23    Q.  So during this time period, this was while

24  it was being operated as a shelter in place hotel.

25  Is that correct?

BY MR. GEORGE:

Q. Exhibit 14 is a Google street view image, this one the address is 718 Polk, and it pictures a portion of willow street as well as Polk street and it's dated December 2024. Do you recognize the hotel in this as the Best Western hotel?

A. Yes.

Q. And do you see any of the nuisances that you've described today that are in this?

MR. MINOIEFAR: Object to form.

THE WITNESS: No.

BY MR. GEORGE:

Q. Do you have any reason to doubt that this is an accurate photograph of the scene that's pictured in this image when it was taken in December of 2024?

MR. MINOIEFAR: Object to form.

THE WITNESS: No.

BY MR. GEORGE:

Q. I'll introduce Exhibit 15?

(Whereupon Exhibit # was marked for identification.)

BY MR. GEORGE:

Q. Exhibit 15 is a Google street view image, the address is 729 Polk Street, and it's dated May of 2025 and it pictures the back of the hotel,

232

1  including a portion of willow street as well as part

2  of Polk street.  Do you recognize the image in this

3  photograph?

4      A.  Yes.

5      Q.  And is the Best Western hotel?

6      A.  Yes.

7      Q.  Do you see any of the nuisances that we've

8  been discussing today in this photograph?

9          MR. MINOIEFAR:  Object to form.

10         THE WITNESS:  No.

11 BY MR. GEORGE:

12     Q.  Do you have any reason to doubt that this is

13 an accurate photo of the seen when it was taken in

14 May of 2025?

15         MR. MINOIEFAR:  Object to form.

16         THE WITNESS:  No.

17 BY MR. GEORGE:

18     Q.  All right.  I'm going to introduce

19 Exhibit 16?

20         (Whereupon Exhibit # was marked for

21         identification.)

22 BY MR. GEORGE:

23     Q.  Exhibit 16 is a Google street view image,

24 address 729 Polk Street, and it's dated November of

25 2015.  Do you recognize the image in this -- in this

1  A. Yes.

2  Q. Do you recall contacting Sam at all in

3  January of 2023?

4  A. I don't recall.

5  Q. I'll introduce exhibit number 20?

6     (Whereupon Exhibit # was marked for

7     identification.)

8  BY MR. GEORGE:

9  Q. Exhibit 20 is a Google street view image,

10 the address is 120 Willow Street, and it's dated

11 January of 2025. It's looking east on willow

12 towards Polk street. Do you recognize the scene in

13 this photograph?

14 A. Yes.

15 Q. And does it picture the back of the Best

16 Western and willow street?

17 A. Yes.

18 Q. Do you see any of the nuisances that we've

19 been talking about today in this photo?

20 A. No.

21 Q. Do you have any reason to doubt that this is

22 an accurate photo of the seen as it was on the day

23 it was taken in January of 2025?

24    MR. MINOIEFAR: Object to form.

25    THE WITNESS: No.

1  BY MR. GEORGE:

2      Q.  Can you see the exit from -- the exit garage

3  door from the Best Western?

4      A.  Yes.

5      Q.  Is there anything obstructing it?

6      A.  No.

7      Q.  I'll introduce Exhibit 21?

8         (Whereupon Exhibit # was marked for

9         identification.)

10  BY MR. GEORGE:

11     Q.  Exhibit 21 is a Google street view image

12  from 120 Willow Street and it's dated May of 2025.

13  It pictures willow street looking east towards Polk

14  street.  Do you recognize the scene in this image?

15     A.  Yes.

16     Q.  And it's the back of the Best Western hotel

17  as well as a portion of willow street.  Is that

18  right?

19     A.  Yes.

20     Q.  Do you see the exit door, the garage door to

21  the garage from the Best Western?

22     A.  Yes.

23     Q.  Is anything obvious instructing it?

24     A.  No.

25     Q.  Do you see any of the nuisances that we've

1  been describing today in this photo?

2      MR. MINOIEFAR:  Object to form.

3      THE WITNESS:  No.

4  BY MR. GEORGE:

5     Q.  Do you have any reason to doubt this is an

6  accurate photograph of the scene as it was on the

7  day it it was taken in May of 2025?

8      MR. MINOIEFAR:  Object to form.

9      THE WITNESS:  No.

10  BY MR. GEORGE:

11     Q.  I'll introduce Exhibit 22?

12      (Whereupon Exhibit # was marked for

13      identification.)

14  BY MR. GEORGE:

15     Q.  Exhibit 22 is a Google street view image

16  from 120 Willow Street.  It's dated April of 2019

17  and it's an image of Polk street looking east

18  towards -- sorry.  It's an image of willow street

19  looking east towards Polk street.  Do you recognize

20  the back of the Best Western hotel here?

21     A.  Yes.

22     Q.  And it's on the right-hand side of the

23  photograph, correct?

24     A.  Yes.

25     Q.  Do you see any of the nuisances that we've