**REDACTED PURSUANT TO ECF NO. 111**

# EXHIBIT 11
# to

**DECLARATION OF ABIGAIL WALD IN SUPPORT OF DEFENDANT CITY AND COUNTY OF SAN FRANCISCO'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1            UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3    - - - - - - - - - - - - - - - - - - - -

4    JANE ROE, an individual; MARY ROE,    )  CASE NO.

5    an individual; SUSAN ROE, an          )  4:24-cv-01562-

6    individual, JOHN ROE, an individual;  )  JST

7    BARBARA ROE, an individual; PHOENIX   )

8    HOTEL SF, LLC, a California limited   )

9    liability company, et al.,            )

10                   Plaintiffs,           )

11   vs.                                   )

12   CITY AND COUNTY OF SAN FRANCISCO, a   )

13   California public entity,             )

14                   Defendant.            )

15   - - - - - - - - - - - - - - - - - - - -

16        CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

17            VIDEOTAPED DEPOSITION OF JOHN ROE

18             TUESDAY, SEPTEMBER 9, 2025

19               PAGES 1 - 180; VOLUME 1

20             BEHMKE REPORTING & VIDEO SERVICES, INC.

21                BY:  PAULA S. BEHMKE, CSR NO. 6284

22              and MICHELLE CORRIGAN, CSR NO. 9079

23                550 CALIFORNIA STREET, SUITE 820

24                SAN FRANCISCO, CALIFORNIA  94104

25                          (415) 597-5600

```
 1
 2
 3
 4
 5
 6
 7
 8            Confidential Videotaped Deposition of JOHN ROE,
 9   Volume 1, taken on behalf of Defendant, at 1390 Market
10   Street, 7th Floor, San Francisco, California, commencing
11   at 9:23 A.M., TUESDAY, SEPTEMBER 9, 2025, before Paula
12   S. Behmke, Certified Shorthand Reporter No. 6284
13   (via Zoom), and Michelle Corrigan, Certified Shorthand
14   Reporter No. 9079 (In-person), pursuant to Notice.
15
16
17
18
19
20
21
22
23
24
25
```

```
 1      Q.   And when you -- would you say that you are
 2  familiar with how to use the 311 App on your phone?
 3      A.   No.  No, because I haven't used it that much as
 4  to say that I am familiar.  In fact, I deleted many
 5  times and uploaded many times.
 6      Q.   What's you best estimate of the number of times
 7  you've used the 311 App to communicate with the City
 8  about conditions in the Tenderloin between 2020 and
 9  today?
10      A.   I have no idea.
11      Q.   This question might seem absurd, but is there
12  any way it's more than a thousand?
13      A.   Oh, no.
14      Q.   Is there anyway it's more than 100?
15      A.   No.
16      Q.   Is there anyway it's more than 50?
17      A.   No, I would say that probably around 10 times.
18                  (Reporter interrupts.)
19      THE WITNESS:  Ten times, yes.
20  BY ATTORNEY MURPHY:
21      Q.   When is the last time you remember using the
22  311 App to communicate with the City about conditions in
23  the Tenderloin?
24      A.   I don't remember.
25      Q.   Do you remember doing it all in 2025?
```

```
 1      A.    No.

 2      Q.    Do you remember doing it all in 2024?

 3      A.    I don't think so.

 4      Q.    The same questions about 911.

 5            What's your best estimate of the number of

 6    times you've called 911 because of conditions in the

 7    Tenderloin?

 8      A.    I don't know.  Probably five times?

 9      Q.    And that's five times between 2020 and today?

10      A.    I haven't called in 2025, so probably was

11    between 2020 and 20- -- beginning of 2024.

12      Q.    I think I'm following.  Let me repeat it back

13    and you tell me if I have it right.

14            You recall using 911 to contact the City about

15    conditions in the Tenderloin approximately five times

16    between 2020 and today, but none of those times were in

17    2025, and the last one you recall was early 2024.

18      A.    Yes.

19      Q.    New topic.  Social media.

20            Have you ever used a social media account to

21    talk about conditions in the Tenderloin?

22      A.    Yes.

23      Q.    What, if any, social media accounts have you

24    used?

25      A.    The App called X.
```

1    Q.   When is the last time you remember posting on
2  the X account you used to communicate about the
3  Tenderloin?
4    A.   I don't remember, but I could say that was
5  probably -- I'm not even sure if in 2024 I uploaded any
6  image or create any post.
7    Q.   So is it fair to say that without looking at
8  the account, your best recollection, the last time you
9  posted on the Tenderloin X account was either in 2023 or
10 maybe early 2024?
11   A.   Yes.
12   Q.   Why haven't you posted anything to the
13 Tenderloin X account in the past year or so?
14   A.   Because when the City placed an Urban Alchemy
15 employee, I -- I stop.
16   Q.   So another one of those basic questions.
17        What is your understanding of what Urban
18 Alchemy is?
19   A.   It's a nonprofit that employs ex-convicts to be
20 ambassadors in the Tenderloin.
21   Q.   And your understanding is that the City
22 contracts with Urban Alchemy to provide services?
23   A.   Again?
24   Q.   Your understanding is that the reason Urban
25 Alchemy is in the Tenderloin is because the City

```
 1   contracts with them?
 2       A.   Yes.
 3       Q.   And your best recollection is that someone from
     ██████████████████████████████████████████████
 5   either the end of 2023 or early 2024?
 6       A.   Yes.
 7       Q.   What, if any, impact did you notice when
     ██████████████████████████████████████████████████
 9   in the end of 2023 or early 2024?
10       ATTORNEY MINOIEFAR:  Object to form.
11       THE WITNESS:  What I perceived visually was a
12   decrease in the amount of people coming to stay in
     ████████████████
14   BY ATTORNEY MURPHY:
15       Q.   Did you visually observe a decrease in the
16   number of people you believed to be using drugs in front
     ████████████████████████████████████
18       A.   I -- I mean, what I can say is that I saw the
19   decrease in the number of people.  What these people do,
20   I cannot really say.
21       Q.   Is it fair to say that, in general, you can
     ████████████████████████████████████████
23   can't always observe what that individual is doing?
24       A.   Yes.
25       Q.   Other than the account you had on X, any other
```

```
1              TUESDAY, SEPTEMBER 9, 2025; 11:18 A.M.
2         (Whereupon, the following proceedings were
3         reported by Michelle Corrigan, CSR NO. 9079.)
4              THE VIDEOGRAPHER:  We're back on the record.
5    Time is 11:18.
6              THE REPORTER:  My name is Michelle Corrigan,
7    Certified Shorthand Reporter for the State of California,
8    CSR Number 9079.
9              MS. MURPHY:  Just for the record, we swapped
10   court reporters, but everyone else is in the room is still
11   the same.  Agreed?
12             MR. MINOIEFAR:  Agreed.
13                      EXAMINATION RESUMED
14   BY MS. MURPHY:
15   Q.       Ask you some more questions with conditions in
16   the Tenderloin.
17             Do you know, one way or the other, if there are
18   businesses in the Tenderloin that sell smoking supplies?
19   A.       Yes.
20   Q.       Yes, there are?
21   A.       Yes.
22   Q.       And do you know, one way or the other, if there
23   are people in the Tenderloin that sell smoking supplies on
24   the street?
25   A.       Yes.
```

```
 1  Q.        Yes, there are?
 2  A.        Yes.
 3  Q.        Do you know, one way or the other, if there are
 4  people in the Tenderloin that sell fentanyl on the street?
 5  A.        I've read about it in the newspapers.
 6  Q.        But from your personal knowledge, you don't know
 7  one way or the other if people sell fentanyl in the street
 8  in the Tenderloin; is that fair?
 9  A.        I've seen people selling powder substances -- I
10  can't tell if that's fentanyl -- but with an electronic
11  portable scale on the sidewalk.  Probably it's some
12  substance that is not legal, but I can't assure.
13  Q.        That's fair.  So is it fair to say that you have
14  seen people selling white powder with scales on the side of
15  the street -- in the side of the street in the Tenderloin,
16  but you've never actually done a test to see chemically if
17  it was fentanyl?
18  A.        Yes.
19  Q.        Is it fair to say that you've seen people sell
20  methamphetamines on the street in the Tenderloin?
21  A.        Again, I've seen selling crystals, rocks,
22  powders, but I can't tell what substance it is.
23  Q.        And would you agree that substance use is a
24  complex problem?
25  A.        Ask me again.
```

```
 1   Q.        Would you agree that substance use is a complex
 2   problem?
 3   A.        Substance use?
 4   Q.        Yeah.
 5   A.        A complex problem?
 6   Q.        (Nods.)
 7   A.        No.  It's very easy to consume a substance.
 8   Q.        Okay.  Would you agree that dealing with
 9   addiction from substance use is a complex problem?
10   A.        Yes.
11   Q.        Would you agree that there's no easy solution to
12   dealing with the problems that come from addiction to a
13   substance?
14             MS. MURPHY:  Object to form.
15             THE WITNESS:  Ask again.
16   BY MS. MURPHY:
17   Q.        Would you agree that there's no easy solution to
18   dealing with the problems that come from addiction to a
19   substance?
20             MR. MINOIEFAR:  Object.
21             THE WITNESS:  I can't tell, honestly.
22   BY MS. MURPHY:
23   Q.        So is it fair to say that you don't know, one way
24   or the other, if there is an easy solution to problems that
25   come from addiction to a substance?
```

```
 1   A.        Yes.  I cannot tell.
 2   Q.        Would you agree that reasonable people can
 3   disagree about the right approach to deal with problems
 4   that stem from addiction to a substance?
 5   A.        Yes.
 6   Q.        Would you agree that homelessness is a complex
 7   problem?
 8   A.        Yes.
 9   Q.        Would you agree that there's no easy solution to
10   the problems that stem from homelessness?
11             MR. MINOIEFAR:  Object to form.
12             THE WITNESS:  I can't answer because I lack the
13   expertise to say.
14   BY MS. MURPHY:
15   Q.        Is it fair to say that you don't know, one way or
16   the other, if there is an easy solution to the problems
17   that stem from homelessness?
18             MR. MINOIEFAR:  Object to form.
19             THE WITNESS:  Again, I am not an expert so it's
20   hard for me to --
21   BY MS. MURPHY:
22   Q.        I'm not trying to push you.  I just want to make
23   sure I understand.
24             It sounds like what you're saying is you don't
25   have an opinion, one way or the other, if there is an easy
```

1  solution to the problem?

2  A.        Yes.  I don't have it.

3  Q.        Would you agree that homelessness is an issue

4  where reasonable people may disagree about the approach?

5            MR. MINOIEFAR:  Object to form.

6            THE WITNESS:  Ask me again.

7  BY MS. MURPHY:

8  Q.        Would you agree that homelessness is an issue

9  that reasonable people might disagree about the approach?

10 A.        Yes.

11 Q.        Would you agree that the City of San Francisco is

12 not responsible for the actions of third parties?

13           MR. MINOIEFAR:  Object to form.  Calls for legal

14 conclusion.

15 BY MS. MURPHY:

16 Q.        Would you agree that the City of San Francisco is

17 not responsible for the actions of third parties?

18           MR. MINOIEFAR:  Objection.

19           THE WITNESS:  I can't tell.

20 BY MS. MURPHY:

21 Q.        So you don't know, one way or the other, if the

22 City is responsible for the actions of third parties?

23 A.        (Shakes head.)

24           MR. MINOIEFAR:  Object to form.

25           Mr. Roe, at times when I object, leave a space

```
 1   for me to make the objection so the court reporter can take
 2   my objection down, and your answer.
 3   BY MS. MURPHY:
 4   Q.       That's a good reminder for both of us.  We both
 5   speak quickly, I think.
 6            Would you agree that, based on your personal
 7   understanding, fentanyl is highly indicative?
 8   A.       Yes.
 9   Q.       Would you agree that, based on your personal
10   understanding, methamphetamines are highly addictive?
11   A.       Yes.
12   Q.       Would you agree, based on your personal
13   understanding, that a person who is addicted to fentanyl is
14   not likely to stop using it even if the City stopped
15   handing out smoking supplies?
16            MR. MINOIEFAR:  Object to form.
17            THE WITNESS:  Again, I mean, I don't know.  I am
18   not an expert, so --
19   BY MS. MURPHY:
20   Q.       So is it fair to say that you don't have an
21   opinion, one way or the other, if a person who's addicted
22   to fentanyl would keep using it even if the City stopped
23   handing out smoking supplies?
24            MR. MINOIEFAR:  Object to form.
25            THE WITNESS:  Again, I can't tell.
```

```
 1   BY MS. MURPHY:
 2   Q.        And would your answer be the same if it was
 3   methamphetamines instead of fentanyl?
 4   A.        Yes.
 5   Q.        What is your understanding of when the City first
 6   started offering smoking supplies in the Tenderloin?
 7   A.        My understanding on when?
 8   Q.        Yes.  When?
 9   A.        I have no idea.
10   Q.        Do you know whether the City was offering smoking
11   supplies in the Tenderloin in 2020?
12   A.        I can't assure.
13   Q.        Do you know whether the City was offering smoking
14   supplies in the Tenderloin in 2000?
15   A.        In 2000?
16   Q.        Yes.  So 25 years ago?
17   A.        Oh, no.  I wasn't in the City.
18             MR. MINOIEFAR:  And, Mr. Roe, to the extent that
19   the question implicates information you only know because
20   of information provided to you by your attorney, don't
21   share that information.  If you need to ask me questions
22   about that, we can go on a break and discuss it.
23             THE WITNESS:  Okay.
24   BY MS. MURPHY:
25   Q.        Did that instruction make sense?
```

```
1   A.         Yes.
2   Q.         So excluding any conversations with your
3   attorney, do you know, one way or the other, if the City
4   was distributing smoking supplies in the Tenderloin in
5   2000?
6   A.         I have no knowledge of that.
7   Q.         And is it fair to say, then, that you have no
8   opinion about whether or not the conditions in the
9   Tenderloin changed at all when the City started offering
10  smoking supplies?
11            MR. MINOIEFAR:  Object to form.
12            THE WITNESS:  I -- yeah.  I don't have an opinion
13  on that.
14  BY MS. MURPHY:
15  Q.         And that's because you don't know when that
16  conduct started, and so how could you know it was different
17  before or after; is that right?
18  A.         But even if I knew, it's such a -- you know,
19  collecting information by my senses can give me a
20  completely misleading understanding, and that's why I'm
21  trying to be as close as possible to truthful and accurate
22  information.
23  Q.         That's helpful.  So to make sure I'm tracking,
24  for you, based on your personal experience, there are
25  occasions where collected information from your senses can
```

```
 1    end of 2023, in my experience.
 2    Q.        When is the time that you've noticed the least
 3    amount of police presence in the Tenderloin since you lived
 4    there?
 5    A.        That is hard to say because, as I said, you
 6    usually perceive the things that call your attention.  So I
 7    don't know, honestly.
 8    Q.        That's fair.  So to make sure I'm tracking, you
 9    don't know the timeframe when the police presence was the
10    lowest in the Tenderloin because your attention is more
11    naturally drawn to when they're there, and you might not
12    pay attention when they're missing; is that fair?
13    A.        Yes.
14    Q.        And I think you also mentioned compliments for
15    Urban Alchemy in the Tenderloin; is that right?
16    A.        Yes.
17    Q.        Can you tell me a little bit more about what that
18    specific compliment is?
      █  █              ████████████████████████████
20    there is a person from 7:00 PM -- from 7:00 AM to 7:00 PM,
21    seven days a week.  The person comes, starts cleaning the
22    street, cleaning all the pink tubes and paraphernalia left
23    behind, the garbage, even human feces.  And by the time I
24    go out, the street is clean.
25              Also, when there are people coming, trying to
```

██████

██████

██████

██████

██████

6    came, they ask all these people not to be.  So that's why I

7    compliment Urban Alchemy.

8    Q.        And I think you said before, Urban Alchemy has

██████

10   in 2024; is that right?

11   A.        No.  I think that they have been earlier.

12   Q.        Okay.

13   A.        Probably at the beginning of 2023.  I can't

14   pinpoint when, but I think that in 2023 they were there.

15   Q.        And so understanding that you don't know the

16   exact date, your best estimate is that Urban Alchemy

██████

18   that right?

19   A.        Yes.

20   Q.        And is it fair to say that Urban Alchemy has been

██████

22   A.        Yes.

23   Q.        I think you -- oh.  How would you describe the

24   impact, if any, that you've seen of Urban Alchemy's

25   presence in the Dodge Place area?

```
 1   A.        The impact, in which sense?
 2   Q.        The impact, if at all, on the conditions that
 3   you're explaining about in this lawsuit.
 4             MR. MINOIEFAR:  Object to form.
 5             THE WITNESS:  As I described, what they have been
 6   doing by not letting people there.  That has been a
 7   positive effect.
 8   BY MS. MURPHY:
 9   Q.        So would you say, in general, since Urban Alchemy
10   started coming to Dodge Place, there have been fewer people
11   congregating on the street and that people aren't staying
12   there full-time because Urban Alchemy --
13   A.        During the day, because at 7:00 PM they leave,
14   and it's again no lens, and people come back together.
15   Q.        So is it fair to say that between the hours of
16   7:00 AM and 7:00 PM, Urban Alchemy has been effective at
17   preventing people from congregating or sitting outside your
18   home at Dodge Place?
19   A.        Yes.
20   Q.        I think you also mentioned as a third compliment
21   that the City's been active on Dodge, for example, by
22   painting walls and painting the floor; is that right?
23   A.        Yes.
24   Q.        Can you tell me what you mean by painting the
25   wall and the floor?
```

```
 1   home.
 2   Q.        So in other words the map on top of Exhibit 2 is
 3   a fair description of the location where you live, but the
 4   photo on the bottom isn't your house, right?
 5   A.        Correct.
 6   Q.        No more questions for Exhibit 2, but I am going
 7   to mark Exhibit 3.
 8             (Exhibit 3 was marked for identification.)
 9             THE COURT REPORTER:   Exhibit 3 marked.
10             THE WITNESS:  Thank you.
11   BY MS. MURPHY:
12   Q.        Take as much time as you need to look at it.  My
13   first question is, do you recognize Exhibit 3?
14   A.        I do.
15   Q.        Is Exhibit 3 a series of photos of your home and
16   then it looks like a layout of the apartment on the fourth
17   page?
18   A.        Yes.
19   Q.        And are you -- is it your understanding that the
20   person who owns the building where you live is currently
21   trying to sell it?
22   A.        Yes.
23   Q.        And is Exhibit 3 a copy of the photos that are
24   put online with a listing for that property?
25             MR. MINOIEFAR:  Object to form.
```

```
 1            THE WITNESS:  I don't -- I don't think so,
 2   honestly.  But this seems to be from just a website.
 3   Except for that -- I don't think they have done this, but
 4   except for that, yes.
 5   BY MS. MURPHY:
 6   Q.        Have you seen the photos in Exhibit 3 before this
 7   deposition?
 8   A.        These pictures?
 9   Q.        Yes.
10   A.        I've seen them in websites.  That's why I said I
11   don't think it's directly the heirs of the deceased owner.
12   But yes, I've seen them generally on the website.
13   Q.        And your understanding is that the three photos
14   in Exhibit 3 are photos of the place where you live?
15   A.        One of the buildings is my place, correct.
16   Q.        So that was going to be my first question is,
17   looking at the first page of Exhibit 3, do you see your
18   home there?
19   A.        I do.
20   Q.        Can you describe to me where, on the first page
21   of Exhibit 3, you see your home?
22   A.        In the building, the first building starting from
23   the right on the picture, that's my building.  The three
24   windows on the top with the flowers and the green entrance,
25   that's my building.
```

1  Q.      And on the first page of Exhibit 3, I also see

2  some kind of painting on the street, like an artist

3  painting.  Do you see that?

4  A.      Yes.

5  Q.      Is that the painting that you were describing

6  that the City did sometime in 2024?

7  A.      Yes.

8  Q.      Okay.  And there are some very beautiful red

9  flowers in the planters in your windows, do you see that?

10  A.      Yes.

11  Q.      Did you put those there?

12  A.      Yes.

13  Q.      Do you remember when you put those there?

14  A.      That had to be probably in April this year, or --

15  yeah.

16  Q.      So your recollection is that you put red flowers

17  in the planter boxes over your window sometime in April of

18  2025?

19  A.      Correct.

20  Q.      Does exhibit -- the first page of Exhibit 3

21  appear to be a photo of what your home looked like on some

22  day between April 2025 and today?

23  A.      Yes.

24  Q.      Okay.  Same thing for the second page of

25  Exhibit 3.  I see the same red planters on the second page.

1    Do you see those?

2    A.        Yes.

3    Q.        And the home with the red planters -- red flowers

4    in the planters on the second page of Exhibit 3, that's

5    your home?

6    A.        Yes.

7    Q.        Does the second page on Exhibit 3 appear to be a

8    photo of what your home looked like sometime between April

9    2025 and today?

10   A.        Yes.

11   Q.        Okay.  And same thing for the third page of

12   Exhibit 3.  Do you see the home with the three planter

13   boxes on the third page?  The home with the planter boxes?

14   A.        Oh, yeah.  Yeah.  Yeah.  Sorry.  I was on the

15   wrong page.

16   Q.        No worries.  Let me know when you get to

17   page 3.

18   A.        I am.

19   Q.        Do you see the home with the three planter boxes

20   on the third page of Exhibit 3?

21   A.        Yes.

22   Q.        And that's your home?

23   A.        Yes.

24   Q.        Does page 3 of Exhibit 3 appear to be a photo of

25   what your home looked like some day between April 2025 and

1  today?

2  A.        Yes.

3  Q.        I also see, on -- let's go back to the first page

4  of Exhibit 3, just because it's easier on the front.  I see

5  some kind of planter boxes on the sidewalk of the first

6  page in Exhibit 3.  Do you see those?

7  A.        Yes.

8  Q.        Do you remember when those showed up?

9  A.        Those showed up probably -- could be at the end

10  of 2023, beginning 2024.

11  Q.        And have those planters been there consistently

12  since they first arrived through today?

13  A.        No.

14  Q.        When do you remember them being gone?

15  A.        Probably two weeks ago.

16  Q.        Do you remember who put those planters there?

17  A.        My understanding is the deceased owner that died

18  in January 2025, the one that put them there.  But I --

19  that is not a firm knowledge.

20  Q.        So is it fair to say your -- you have some basis

21  of understanding that the former owner might have put them

22  there but you're not confident to your own personal

23  knowledge?

24  A.        Yes.

25  Q.        My understanding is that there is a contingent

```
1    basically the people has migrated to other areas.
██   ██          ██████   ███████████████████████████
3    So the -- would you call it a street or an alley where you
4    live?
5    A.         Alley.
██   ██          ███████████████████████████████████
██   ████████   ███████████████████████████
8    A.         Yes.
██   ██          ███████████████████████████████████
10   have changed for the better since you moved in?
11            MR. MINOIEFAR:  Object to form.
12            THE WITNESS:  How?  Because the amount of people
13   there, the concentration has decreased.
14   BY MS. MURPHY:
15   Q.         Any other ways, from your experience, that the
██   ████████████████████████████████████████████████████
17   A.         Yes.  The people from Urban Alchemy are cleaning,
18   are keeping it very, very organized.  The City painted the
19   wall, the floor.  They have been doing events.  And the
20   ambassador that is there from 7:00 to 7:00 deter people
21   from coming to -- I don't know what other word than "hang
22   out" I can use to describe what they do there.
23   Q.         Are there any ways, from your perception, that
██   ████████████████████████████████████████████████
25   you moved in and now?
```

```
 1            MR. MINOIEFAR:  Object to form.
 2            THE WITNESS:  No, I wouldn't say that they've
 3  gotten worse.
 4  BY MS. MURPHY:
 5  Q.        We talked a little bit ago about the fact that
 6  you moved into the Tenderloin during covid; is that fair?
 7  A.        Yes.
 8  Q.        Were you familiar at all with the conditions in
 9  the Tenderloin before covid started?
10            MR. MINOIEFAR:  Object to form.
11            THE WITNESS:  Yes.
12  BY MS. MURPHY:
13  Q.        Do you feel you have enough experience to say how
14  the conditions during covid changed from what they were
15  like before covid in the Tenderloin?
16  A.        No.
17  Q.        Okay.  Let's say in the past -- well, let me back
18  up.
19            Do you feel like you have enough information that
20  if you saw an employee of the Department of Public Works in
21  the City, you could recognize them?
22  A.        Ask me again, please.
23  Q.        Yeah.  So I'm wondering, like, sometimes if
24  people see a police officer, it's pretty obvious.  They've
25  got the uniform.  Other city departments, it's maybe less
```

```
 1  Q.        Do you have any basis to believe that the City
 2  distributes smoking supplies at 685 Ellis Street?
 3            MR. MINOIEFAR:  Object to form.
 4            THE WITNESS:  I have no idea, to be honest.
 5  BY MS. MURPHY:
 6  Q.        Do you have any basis to believe that anybody
 7  distributes smoking supplies at 685 Ellis Street?
 8            MR. MINOIEFAR:  Object to form.
 9            THE WITNESS:  Not from firsthand.
10  BY MS. MURPHY:
11  Q.        What about secondhand?
12  A.        Sorry?
13  Q.        What about secondhand?
14  A.        I know because when I was working in
15  Larkin Street Youth Services they mentioned that the City
16  was distributing, but I cannot tell if it's specifically in
17  that location they were doing that.
18  Q.        Do you remember who said that?
19  A.        No.  That was general knowledge.
20  Q.        Do you have any reason to believe the conditions
21  in the Tenderloin that you're complaining about are caused
22  by the distribution of smoking supplies at 685
23  Ellis Street?
24            MR. MINOIEFAR:  Object to form.
25            THE WITNESS:  I can't answer that.  I have no
```

1    knowledge.

2    BY MS. MURPHY:

3    Q.        Same questions but now for the Cova Hotel.  Did

4    you see there's a hotel called the Cova mentioned in

5    paragraph 2?

6    A.        Mm-hmm.

7    Q.        Is that a yes?

8    A.        Sorry.  What's your question?

9    Q.        Is that a yes?

10    A.        About what --

11    Q.        Let me ask a better question, and I'll start with

12    a clarification.  Because the court reporter is

13    transcribing everything we say, sometimes people will

14    answer with an uh-huh or huh-uh.  If that happens, I'll

15    follow up and say "Is that a yes or is that a no?"

16    A.        Sorry.

17    Q.        I don't mean to be rude.  I just want to make

18    sure the record's clear on a sound, kind of similar.  Does

19    that make sense?

20    A.        Yes.  Yes.

21    Q.        The specific question then is, do you see that

22    the Cova Hotel is one of the places you mention in

23    paragraph 2 of Exhibit 4?

24    A.        Yes.

25    Q.        Do you have any basis to believe that the City

1    distributes smoking supplies at the Cova Hotel?

2    A.        I have no knowledge about it.

3    Q.        Do you have any basis to believe that anybody

4    distributes smoking supplies at the Cova Hotel?

5              MR. MINOIEFAR:  Object to form.

6              THE WITNESS:  I don't know, honestly.

7    BY MS. MURPHY:

8    Q.        Do you have any basis to believe that the

9    conditions you're complaining about in this case are caused

10   by the distribution of smoking supplies at the Cova Hotel?

11             MR. MINOIEFAR:  Object to form.

12             THE WITNESS:  It's a multifaceted problem, so I

13   can't pinpoint to one specific reason.

14   BY MS. MURPHY:

15   Q.        Same thing now for Glide Memorial Church.  Do you

16   see that you mention Glide Memorial Church at 330

17   Ellis Street in paragraph 2 of Exhibit 4?

18   A.        Mm-hmm.

19   Q.        Is that a yes?

20   A.        Yes.  Sorry.

21   Q.        Do you have any basis to believe that the City

22   distributes smoking supplies at Glide Memorial Church?

23             MR. MINOIEFAR:  Object to form.

24             THE WITNESS:  I'm not sure.

25   ///

```
 1  BY MS. MURPHY:
 2  Q.        Do you have any basis to believe that anybody
 3  distributes smoking supplies at Glide Memorial Church?
 4            MR. MINOIEFAR:  Object to form.
 5            THE WITNESS:  I have no knowledge of that.
 6  BY MS. MURPHY:
 7  Q.        Same question as before.  Do you have any reason
 8  to believe that the conditions you're complaining about in
 9  this case are caused by somebody distributing smoking
10  supplies at Glide Memorial Church?
11            MR. MINOIEFAR:  Object to form.
12            THE WITNESS:  I cannot, no.
13  BY MS. MURPHY:
14  Q.        I'm going to switch to paragraph 3 --
15  A.        Yes.
16  Q.        -- in Exhibit 4.  In paragraph 3, the first
17  sentence says, "The sidewalks in my neighborhood are
18  frequently blocked by groups of people who appear to be
19  homeless and drug users."  Do you see that?
20  A.        Yes.
21  Q.        What specific sidewalks were you referring to in
22  paragraph 3?
23            MR. MINOIEFAR:  Object to form.
24            THE WITNESS:  It would be all afternoon if I
25  start to describe it because it's -- well, I mean, I can't
```

```
 1   coming when they know it's gone, and intensifies between
 2   midnight and 7:00, which is when the ambassador came.
 3   Q.        What about the volume of people that you see on
     █ ██████████████    ████████████████████████████████
 5   in 2020?
 6   A.        Yes.
 7   Q.        Any details about how much less?
 8   A.        Well, since the ambassadors are here, it's
 9   dramatically less.  I would say that then, if we use ten as
10   a barometer, maybe now it's a three.
11   Q.        That's helpful.  So on a scale of one to ten, you
12   would say in October 2020 it was at a ten?
13   A.        Yeah.
14   Q.        And in September 2025 it's a three; is that --
15   A.        Yes.
16   Q.        Anybody else besides you who would have knowledge
17   about this?
18             MR. MINOIEFAR:  Object to form.
19             THE WITNESS:  I can only guess that my neighbors
20   experience the same.  So probably yes, they.
21   BY MS. MURPHY:
22   Q.        Besides your neighbors, anybody else that you
23   believe would have knowledge about this, what you're
24   describing in paragraph 3 of Exhibit 4?
25   A.        Probably my husband too.
```

```
 1   Q.         So in addition to your husband and the other
 ■   ████████████████████████████████████████████████
 3   would know about the conditions of in paragraph 3 of
 4   Exhibit 4?
 5   A.         Maybe, but I don't know.
 6   Q.         Yeah.  All right.  I'm going to look one to two
 7   sentences further down in paragraph 3.
 8   A.         Yes.
 9   Q.         It says, "I also see lots of discarded items such
10   as garbage, syringes, needles, aluminum foil, and what
11   appear to be pipes for smoking drugs."  Do you see that?
12   A.         Yes.
13   Q.         Has the volume of those materials that you see in
14   Dodge Place changed over time?
15   A.         Yes.
16              MR. MINOIEFAR:  Object to form.
17   BY MS. MURPHY:
18   Q.         How has it changed over time?
19   A.         It's correlated to the amount of people.
20   Q.         Mm-hmm.
21   A.         So now that there are less people congregated
22   there, the material and garbage they leave behind is less.
23   Q.         So is it fair to say, in terms of the one to ten
 ■   ████████████████████████████████████████████████
25   in October 2020 was a ten, right now it would be a three?
```

1  are undocumented people and they are a variable, very hard

2  to understand because they haven't changed the ways that

3  they deal drugs.  So that is another concern.  I don't know

4  if, you know, somebody like, for example, in El Salvador,

5  Bukele, the President, was pushing gangs to stop and I've

6  heard many of those illegally enter the country.  And they

7  have houses in El Salvador in very remote areas with signs

8  of the Giants or the Forty-Niners, like, because they

9  receive the money from here after dealing drugs.  So that

10 is another variable.

11 Q.       To make sure I'm tracking it, the reasons you're

12 not confident that the positive response in the Tenderloin

13 will remain consistent over time are funding, political

14 issues, national variables, the potential for a new mayor,

15 and international variables?

16 A.       Yes, of course.  That is very macro.

17 Q.       Any other reasons that you're not confident the

18 response in the Tenderloin will remain consistent over

19 time?

20 A.       Not that I can think of.

21 Q.       And a couple questions about you and

22 travel/vacations.  So I think I heard you mention that your

23 most recent degree was from Buenos Aires; is that right?

24 A.       Yes.

25 Q.       Was that online or did you travel?

```
1              THE WITNESS:  No.  I can't say that.
2   BY MS. MURPHY:
3   Q.         Turning to the final page of Exhibit 4 that's got
4   paragraph 7.  Let me know when you get there.
5   A.         Yes.
6   Q.         Paragraph 7 mentions that the condition --
7   conditions outside your home do improve at times.  Do you
8   see that?
9   A.         Yes.
10  Q.         What do you mean when you say that they improve
11  at times?
12  A.         Because sometimes in the morning when I go out
13  early, the street is clean.  Some other times, it's not
14  clean.  So what causes this, no idea.  Sometimes there are
15  more people during the night leaving way more things
16  behind, and some other times they are not.  So that's why
17  it's variable.
18  Q.         Yeah.  Paragraph 7 also says that the conditions
19  in the Tenderloin have been largely consistent over time.
20  Do you see that?
21             MR. MINOIEFAR:  Object to form.
22             THE WITNESS:  Let me see.
23             MS. MURPHY:  Yeah.  Take your time.
24             THE WITNESS:  Oh.  Yes.  My home will improve,
25  they have been largely consistent and have had a
```

```
 1   Q.       What's the difference for you?
 2   A.       Because by burning, they burn cardboards in
 3   winter to be warm, and they burn substances in their foil
 4   paper or their pipes, the glass pipes they use.  That's --
 5   those are the gases liberated.
 6   Q.       Let me try to then rephrase number one to make
 7   sure I'm tracking.  The substantial impact on your use and
 8   enjoyment of your home in number one is people either
 9   burning or smoking items that, to you, smell like an
10   electric short, and as a result you believe that your --
11   whatever the thing is they're smoking or burning, you're
12   now inhaling it because --
13   A.       Yes.
14   Q.       -- You can smell it?
15   A.       Exactly.
16   Q.       Other than these 18 things, anything else, as you
17   sit here today, you believe that is a substantial impact on
18   your ability to use and enjoy your home from the conduct
19   described in Exhibit 4, as you used that phrase in your
20   declaration?
21           MR. MINOIEFAR:  Object to form.
22           THE WITNESS:  No.  That -- to my best
23   recollection, that would be it.
24   BY MS. MURPHY:
25   Q.       Okay.  I'm going to ask the same couple questions
```

 1  about each of these 18 things.  So for number one, the
 2  smell when someone is burning or smoking outside your home,
 3  do you have any basis to believe that's caused by the
 4  City's affirmative conduct?
 5  A.        I have no idea.
 6            MR. MINOIEFAR:  Object to form.
 7  BY MS. MURPHY:
 8  Q.        Do you have any basis to believe that number one,
 9  the burning and smoking, is caused by the City distributing
10  smoking supplies in the Tenderloin?
11            MR. MINOIEFAR:  Object to form.
12            THE WITNESS:  I have no idea.
13  BY MS. MURPHY:
14  Q.        This is going to be very similar.  I'm going to
15  go through all 18.
16            For number two, smelling unusual smells.  Any
17  reason to believe that's caused by the City's affirmative
18  conduct?
19            MR. MINOIEFAR:  Object to form.
20            THE WITNESS:  I have no idea.
21  BY MS. MURPHY:
22  Q.        For number two, smelling unusual smells, any
23  reason to believe that is caused by the City distributing
24  smoking supplies in the Tenderloin?
25            MR. MINOIEFAR:  Object to form.

```
 1              THE WITNESS:  I don't know.
 2   BY MS. MURPHY:
 3   Q.       Number 3, having to call the fire department
 4   because of fires.  Any reason to believe that's because of
 5   the City's affirmative conduct?
 6              MR. MINOIEFAR:  Object to form.
 7              THE WITNESS:  I don't know.
 8   BY MS. MURPHY:
 9   Q.       Any reason to believe that's because of the City
10   distributing smoking supplies in the Tenderloin?
11              MR. MINOIEFAR:  Object to form.
12              THE WITNESS:  I don't know.
13   BY MS. MURPHY:
14   Q.       Number 4, not being able to have your dogs use
15   the sidewalk in front of your home for fear of needles or
16   syringes, any reason to believe that's caused by the City's
17   affirmative conduct?
18              MR. MINOIEFAR:  Object to form.
19              THE WITNESS:  Well, many of the broken items left
20   behind, I cannot say if they are coming from the City.  But
21   those are the items that make challenging to walk my dogs.
22   Might or might not be connected.  I don't know if those are
23   the items that the City distributes.  If they are, yes,
24   that is a hazard that I have to endure.  But I cannot say
25   if they bought it or it was given to them.
```

1  BY MS. MURPHY:

2  Q.        That's my question, is do you have any reason to

3  believe that the City caused the thing you're complaining

4  about as Number 4, which is your inability to let your dog

5  use the sidewalk in front of your home for fear that

6  there's going to be needles or glass pipes or something for

7  them to step on?

8            MR. MINOIEFAR:  Object to form.

9            THE WITNESS:  I cannot offer that.

10 BY MS. MURPHY:

11 Q.        Any reason to believe that Number 4 on your list,

12 the ability for your dog to use the street, was caused by

13 the City distributing smoking supplies in the Tenderloin?

14           MR. MINOIEFAR:  Object to form.

15           THE WITNESS:  No, I can't.

16 BY MS. MURPHY:

17 Q.        Number 5, you mentioned distressing background

18 sounds while you're on a professional Zoom.  Any reason to

19 believe that's caused by the City's affirmative conduct?

20           MR. MINOIEFAR:  Object to form.

21           THE WITNESS:  No, I can't.

22 BY MS. MURPHY:

23 Q.        Any reason to believe that's caused by the City

24 distributing smoking supplies in the Tenderloin?

25           MR. MINOIEFAR:  Object to form.

```
 1              THE WITNESS:  I don't know.
 2   BY MS. MURPHY:
 3   Q.        Number 6, noises on the street that will wake you
 4   up at night.  Any reason to believe that's caused by the
 5   City's affirmative conduct?
 6              MR. MINOIEFAR:  Object to form.
 7              THE WITNESS:  I don't know.
 8   BY MS. MURPHY:
 9   Q.        Any reason to believe that's caused by the City
10   distributing smoking supplies in the Tenderloin?
11              MR. MINOIEFAR:  Object to form.
12              THE WITNESS:  I don't know.
13   BY MS. MURPHY:
14   Q.        Number 7, people putting things through your mail
15   slot that come into your home.  Any reason to believe
16   that's caused by the City's affirmative conduct?
17              MR. MINOIEFAR:  Object to form.
18              THE WITNESS:  I don't know.
19              MS. MURPHY:  Let me pause for a second.  Is it
20   fair to say that you have a standing objection to all these
21   questions?
22              MR. MINOIEFAR:  That will work, yes.
23   BY MS. MURPHY:
24   Q.        For Number 7, people putting things through your
25   mail slots and they come into your home, any reason to
```

```
 1   believe that's caused by the City's affirmative conduct?
 2   A.        I don't know.
 3   Q.        Any reason to believe that's caused by the City
 4   distributing smoking supplies in the Tenderloin?
 5   A.        I have no idea.
 6   Q.        Number 8, the stress hormones that come with
 7   dealing with everything else on this list, any reason to
 8   believe that's caused by the City's affirmative conduct?
 9   A.        I can't say that.
10   Q.        Any reason to believe that's caused by the City
11   distributing smoking supplies in the Tenderloin?
12   A.        I don't know.
13   Q.        Number 9, hesitancy to invite people or family
14   members over for dinner because they'd have to encounter
     ████████████████████████████████████████████████████
16   caused by the City's affirmative conduct?
17   A.        I can't say.
18   Q.        Any reason to believe that's caused by the City
19   distributing smoking supplies in the Tenderloin?
20   A.        I don't know.
21   Q.        Number 9, finding people camped in front of your
22   garage so it makes you not want to use the garage yourself,
23   any reason to believe that's caused by the City's
24   affirmative conduct?
25   A.        I can't say.
```

```
1    Q.        Any reason to believe it's caused by the City
2    distributing smoking supplies in the Tenderloin?
3    A.        I don't know.
4    Q.        Number 11, people actually putting their tents
5    inside your garage.  Any reason to believe that's caused by
6    the City's affirmative conduct?
7    A.        I can't say.
8    Q.        Any reason to believe that's caused by the City
9    distributing smoking supplies in the Tenderloin?
10   A.        I don't know.
11   Q.        People stealing or -- from your garage, or
12   panhandling in front of your garage, any reason to believe
13   that's caused by the City's affirmative conduct?
14   A.        I can't say.
15   Q.        Any reason to believe that's caused by the City
16   distributing smoking supplies in the Tenderloin?
17   A.        I don't know.
18   Q.        We're making progress.
19             Number 13, people destroying the flowers from the
20   planters in front of your home, any reason to believe
21   that's caused by the City's affirmative conduct?
22   A.        I don't know.
23   Q.        Any reason to believe that's caused by the City
24   distributing smoking supplies in the Tenderloin?
25   A.        I can't say.
```

2 | Place.  Any reason to believe that's caused by the City's
3 | affirmative conduct?
4 | A.        I don't know.
5 | Q.        Any reason to believe that's caused by the City
6 | distributing smoking supplies in the Tenderloin?
7 | A.        I can't say.
8 | Q.        Number 15, loud music at night that wakes you up,
9 | it makes you have to confront the people who are making the
10 | noise.  Any reason to believe that's caused by the City's
11 | affirmative conduct?
12 | A.        I don't know.
13 | Q.        Any reason to believe that's caused by the City
14 | distributing smoking supplies in the Tenderloin?
15 | A.        I don't know.
16 | Q.        Number 16, internet connectivity issues caused by
17 | people breaking the plastic pipe around the internet cable.
18 | Any reason to believe that's caused by the City's
19 | affirmative conduct?
20 | A.        I don't know.
21 | Q.        Any reason to believe that's caused by the City
22 | distributing smoking supplies in the Tenderloin?
23 | A.        I can't say.
24 | Q.        Number 17, needing to clean feces off the walls,
25 | garage, and ground near your home.  Any reason to believe

```
 1  that's caused by the City's affirmative conduct?
 2  A.        I don't know.
 3  Q.        Any reason to believe that's caused by the City
 4  distributing smoking supplies in the Tenderloin?
 5  A.        I can't say.
 6  Q.        And Number 18, having to clean up your dog after
 7  he's -- he or she has investigated feces around your home
    ████████████████    ██████████████████████████████████
 9  City's affirmative conduct?
10  A.        I can't say.
11  Q.        Any reason to believe that's caused by the City
12  distributing smoking supplies in the Tenderloin?
13  A.        I don't know.
14  Q.        Thank you.
15            MR. MINOIEFAR:  Just to put on the record, my
16  same objection spoke is now ending with that last question.
17            MS. MURPHY:  Thank you.
18  Q.        We just talked a little bit about harm that you
19  believe you suffered from the conduct described in
20  Exhibit 4.  I now want to turn slightly to see if there are
21  any additional things that you believe caused the -- or let
22  me ask a better question.
23            I want to make sure I understand all of the
24  conditions in the Tenderloin that you're complaining about
25  in this case.  We just got a good list, I think one through
```

1    review the record and provisionally designate as

2    confidential, pending my review and line item designations.

3              MS. MURPHY:  Anything else you need from us

4    before we agree to go off the record?

5              THE REPORTER:  No.

6              MS. MURPHY:  Agree to go off?

7              MR. MINOIEFAR:  Agree.

8              THE VIDEOGRAPHER:  This concludes the deposition

9    of John Roe.  The number of media files uses was four.  The

10   originals will be retained by Behmke Reporting & Video

11   Services.

12        (At 1:28 P.M., the deposition proceedings adjourned

13        sine die.)

14

15

16              _____

17                        JOHN ROE

18

19

20

21

22

23

24

25

```
 1   STATE OF CALIFORNIA        )
 2   COUNTY OF SONOMA           ) ss.
 3              I, PAULA BEHMKE, CSR No. 6284 for the State of
 4   California, do hereby certify:
 5              That the witness in the foregoing deposition of
 6   JOHN ROE, was by me duly sworn to testify to the truth, the
 7   whole truth and nothing but the truth, in the
 8   within-entitled cause; that said deposition was taken at
 9   the time and place herein named; and that the deposition is
10   is a true record of the witness's testimony as reported by
11   me, a duly certified shorthand reporter and a disinterested
12   person, and was thereafter transcribed into typewriting by
13   computer.
14              I further certify that I am not interested in the
15   outcome of the said action, nor connected with nor related
16   to any of the parties in said action, nor to their
17   respective counsel.
18              IN WITNESS WHEREOF, I have hereunto set my
19   hand this 16th day of September, 2025.
20   Read and Sign was:  Requested.
21
22
23
24              PAULA S. BEHMKE, CSR NO. 6284
25              STATE OF CALIFORNIA
```

```
1   STATE OF CALIFORNIA      )
2   COUNTY OF NAPA           ) ss.
3            I, MICHELLE CORRIGAN, CSR NO. 9079 for the State
4   of California, do hereby certify:
5            That the witness in the foregoing deposition of
6   JOHN ROE, was by me duly sworn to testify to the truth, the
7   whole truth and nothing but the truth, in the
8   within-entitled cause; that said deposition was taken at
9   the time and place herein named; and that the deposition is
10  is a true record of the witness's testimony as reported by
11  me, a duly certified shorthand reporter and a disinterested
12  person, and was thereafter transcribed into typewriting by
13  computer.
14           I further certify that I am not interested in the
15  outcome of the said action, nor connected with nor related
16  to any of the parties in said action, nor to their
17  respective counsel.
18           IN WITNESS WHEREOF, I have hereunto set my
19  hand this 16th day of September, 2025.
20  Read and Sign was:  Requested.
21
22
23
24           MICHELLE CORRIGAN, CSR NO. 9079
25           STATE OF CALIFORNIA
```