**REDACTED PURSUANT TO ECF NO. 111**

# EXHIBIT 14
# to

**DECLARATION OF ABIGAIL WALD IN
SUPPORT OF DEFENDANT CITY AND COUNTY
OF SAN FRANCISCO'S OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION**

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3   - - - - - - - - - - - - - - - - - - -

 4   JANE ROE, an individual; MARY ROE,    )  CASE NO.

 5   an individual; SUSAN ROE, an          )  4:24-cv-01562-

 6   individual, JOHN ROE, an individual;  )  JST

 7   BARBARA ROE, an individual; PHOENIX   )

 8   HOTEL SF, LLC, a California limited    )

 9   liability company, et al.,            )

10                  Plaintiffs,            )

11   vs.                                   )

12   CITY AND COUNTY OF SAN FRANCISCO, a   )

13   California public entity,             )

14                  Defendant.             )

15   - - - - - - - - - - - - - - - - - - -

16

17      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

18          VIDEOTAPED DEPOSITION OF BARBARA ROE

19              FRIDAY, SEPTEMBER 12, 2025

20

21          BEHMKE REPORTING AND VIDEO SERVICES, INC.

22            BY:  SUZANNE I. ANDRADE, CSR NO. 10682

23              550 CALIFORNIA STREET, SUITE 820

24              SAN FRANCISCO, CALIFORNIA  94104

25                  (415) 597-5600
```

1

2

3

4

5

6

7

8

9

10          Confidential Videotaped Deposition of BARBARA

11   ROE, taken on behalf of Defendant, at 1390 Market

12   Street, 7th Floor, San Francisco, California, commencing

13   at 10:01 A.M., FRIDAY, SEPTEMBER 12, 2025, before

14   Suzanne I. Andrade, Certified Shorthand Reporter

15   No. 10682, pursuant to Notice.

16

17

18

19

20

21

22

23

24

25

1   excluding your professional one?

2       A.    Two.

3       Q.    And any reason to think you would have used

4   your professional e-mail address to communicate at all

5   about the issues in this case?

6       A.    No.

7       Q.    What are your two current personal e-mail

8   addresses?

■       ■       ████████████████████████

■       ████████████████████████

11      Q.    Have you had both of those e-mail addresses for

12  the full period between 2020 and today?

13      A.    Yes.

14      Q.    Did you search both of those e-mail accounts

15  for information related to this case?

16      A.    Yes.

17      Q.    Do you have any social media accounts?

18      A.    Yes.

19      Q.    Do you have any social media accounts where

20  you've ever posted about neighborhood issues or issues

21  related to this case?

22      A.    No.

23      Q.    New topic.

24            What is your current address?

■       ■       ████████████████████████

1      A.    Is he a writer?

2      Q.    Have you, to the best of your knowledge, ever

3  met a writer named Randy Shaw?

4      A.    I think I have met him.

5      Q.    Tell me about that.

6      A.    There was a UC Law opening of their new

7  building, and I think I met him there just very briefly.

8      Q.    Have you ever spoken with Randy Shaw about

9  conditions in the Tenderloin?

10     A.    No.

11     Q.    Ever spoken with him about this lawsuit?

12     A.    No.

13     Q.    New topic just generally about based on your

14  personal experience with kind of drug use or substance

15  use in the Tenderloin.

16            Would you agree that, based on your

17  understanding, fentanyl is highly addictive?

18     A.    Yes.

19     Q.    Would you agree, based on your personal

20  understanding, that methamphetamines are highly

21  addictive?

22     A.    Yes.

23     Q.    Would you agree, based on you personal

24  understanding, that fentanyl can either be injected or

25  smoked?

```
 1   BY ATTORNEY MURPHY:
 2       Q.   Yeah.
 3            My question is slightly different, which is:  I
 4   hear you saying it doesn't look like Exhibit 4 all the
 5   time.
 6       A.   Right.
 7       Q.   Is that fair?
 8       A.   That's fair.
 9       Q.   What I'm asking, though, is:  Do you think
10   Exhibit 4 is, in fact, a photo of, at some point in
11   time, the area in front of your home from March of
12   2023 --
13       A.   Yes.
14       Q.   -- even if you think at other points of time it
15   looked different?
16       A.   Yes.  I -- I think I was thrown off earlier
17   because you asked if it represented the conditions, and
18   I don't think it does.
19       Q.   Yeah.  Let me try to ask a better question,
20   then.
21       A.   Okay.
22       Q.   Looking at Exhibit 3, so the one before --
23       A.   Mm-hmm.
24       Q.   -- do you agree that Exhibit 3 is, in fact, a
25   true and correct photo of the area in front of your
```

 1  house at some moment in time in January of 2025?

 2      A.   Yes.

 3      Q.   And do you agree that Exhibit 2 is a true and

 4  correct photo of the area in front of your home at some

 5  point in time in May of 2025?

 6      A.   Yes.

 7      ATTORNEY MURPHY:  One more of these to mark as

 8  Exhibit 5.

 9          (Deposition Exhibit 5 was marked for

10          identification.)

11  BY ATTORNEY MURPHY:

12      Q.   Take as long as you need to look at it.

13          My first question is:  Do you recognize Exhibit

14  5?

15      A.   (Examines document.)

16          Yes.

17      Q.   Is Exhibit 5 a photo of the area in front of

18  your house?

19      A.   Yes.

20      Q.   And your door is, again, to the left of the

21  large center tree?

22      A.   Yes.

23      Q.   Is Exhibit 5 a true and correct copy of what

24  the area in front of your home looked like at some

25  moment in time in September 2022?

```
 1      A.   It appears so, yes.

 2      Q.   Any reason to think that it would be incorrect?

 3      A.   It doesn't look doctored.

 4   ATTORNEY MURPHY:  Mark as Exhibit 6.

 5        (Deposition Exhibit 6 was marked for

 6        identification.)

 7   THE WITNESS:  Thank you.

 8 BY ATTORNEY MURPHY:

 9      Q.   Take as much time as you need to look at it.

10        Do you recognize Exhibit 6?

11      A.   Yes.

12      Q.   And does Exhibit 6 appear to be a photo of the

13 area in front of your home?

14      A.   Yes.

15      Q.   Your front door is the black one immediately to

16 the left of the center tree?

17      A.   Yes.

18      Q.   And does Exhibit 6 appear to be a true and

19 correct copy of a photograph of what the front of your

20 home looked like at a snapshot in time in June 2021?

21      A.   I think so.  I -- to be honest, I -- I don't

22 have a perfect memory of what it looked like at that

23 time, but I -- I trust the image capture from Google

24 Street View.

25      Q.   Any reason to think that Exhibit 6 is not a
```

```
 1  true and correct photo of what the front of your home
 2  looked like at a snapshot in time in June of 2021?
 3      A.   No.
 4      Q.   Any specific recollection you have of what the
 5  front of your home looked like in June of 2021 that's
 6  different than Exhibit 6?
 7      A.   Yeah.  I mean, it's totally different at times.
 8  Yeah.
 9      Q.   So is it fair to say that there are times where
10  the area in front of your home is clear and sometimes
11  where it's crowded?
12      A.   Yes.
13      Q.   And that that varies depending on the hour of
14  the day?
15      ATTORNEY MINOIEFAR:  Object to form.
16      THE WITNESS:  It varies over time.
17  BY ATTORNEY MURPHY:
18      Q.   So there are times where the area in front of
19  your home is completely clear, without a single person
20  in front of it?
21      ATTORNEY MINOIEFAR:  Object to form.
22      THE WITNESS:  I see from the photograph, yes.
23  BY ATTORNEY MURPHY:
24      Q.   I'm asking about your personal recollection.
25           Is it fair to say that, as a person who lives
```

1    changed in the Tenderloin from when you filed the

2    complaint on March 15, 2024, through today?

3        ATTORNEY MINOIEFAR:  Object to form.

4        THE WITNESS:  I don't know.

5    BY ATTORNEY MURPHY:

6        Q.   You have no -- no comments either way?

7        ATTORNEY MINOIEFAR:  Object to form.

8        THE WITNESS:  I would have to look at the data.

9    BY ATTORNEY MURPHY:

10       Q.   Okay.  When you talked about crowded, dangerous

11   situations in the Tenderloin, have you ever been injured

12   in the Tenderloin?

13       ATTORNEY MINOIEFAR:  Object to form.

14       THE WITNESS:  No, thankfully.

15   BY ATTORNEY MURPHY:

16       Q.   Have you ever asked the people who are crowding

17   in front of your building to move?

18       A.   Yes.

19       Q.   And what was the result?

20       A.   Sometimes they move, sometimes they don't.

21       Q.   So there are times when you've asked the people

22   in front of your building to move, and they moved and

23   you got in?

24       A.   Yes.

25       Q.   What happens in the time that they don't move?

```
 1      Q.   Ever a time where trying to get into your home
 2   through a crowd, you were injured?
 3      A.   No.
 4      Q.   Ever a time trying to get out of your home
 5   through a crowd, you were injured?
 6      A.   No.
 7      Q.   You also mentioned that sometimes when there is
 8   a crowd in front of your home, you're able to get a
 9   San Francisco police officer to help you get home?
10      A.   In the past, I've asked the Parks & Rec ranger.
11   Typically they have one stationed on the other side of
12   the building.
13      Q.   And that's because UN Plaza is a park in
14   San Francisco --
15      A.   Mm-hmm.
16      Q.   -- right?
17      A.   That's -- I guess.  That would make sense.
18      Q.   Is that your understanding, that UN Plaza is a
19   park?
20      A.   Now it is.
21      Q.   And as a result, the City has employees that
22   they pay to be in the park?
23      ATTORNEY MINOIEFAR:  Object to form.
24      THE WITNESS:  I -- I don't really know all of the,
25   like, ins and outs of where the funding comes from and
```

1    that area in front of our building isn't part of their
2    jurisdiction.
3        Q.   And the -- the UN Plaza park that we're talking
4    about is kind of on the opposite site of the front of
5    door of your home; is that fair?
6        A.   That's fair.
7        Q.   And there's an alleyway between them that has a
8    dog park?
9        A.   Yes.
10       Q.   Do you have a belief one way or the other about
11   what's causing the open-air drug use in the area around
12   your home?
13       A.   I don't.
14       Q.   Same question seven more times.
15       A.   Yeah.
16       Q.   Do you have a belief one way or the other about
17   what's causing the drug sales in the area around your
18   home?
19       A.   No.
20       Q.   Do you have a belief one way or the other about
21   what's causing the presence of weapons in the area
22   around your home?
23       A.   No.
24       Q.   Do you have a belief one way or the other about
25   what's causing the people to be lighting fires in the

1    area around your home?

2        A.    No.

3        Q.    Do you have a belief one way or the other about

4    what's causing the crowding you see in the area around

5    your home?

6        A.    No.

7        Q.    Do you have a belief one way or the other about

8    what's causing the fighting you see in the area around

9    your home?

10       A.    No.

11       Q.    Do you have a belief one way or the other about

12   what's causing the general violence you see in the area

13   around your home?

14       A.    No.

15       Q.    And do you have a belief one way or the other

16   about what's causing the general level of addiction you

17   see in the area around your home?

18       A.    No.

19       ATTORNEY MURPHY:  I think we've been going for a

20   little longer than an hour.  Should we take a break?

21       ATTORNEY MINOIEFAR:  Sounds good.

22       ATTORNEY MURPHY:  Agree to go off.

23       THE VIDEO OPERATOR:  Going off the record.  The time

24   is 12:34.

25              (Recess taken from 12:34 p.m. to 12:45 p.m.)

1    a result of the conditions you're complaining about in

2    this case?

3        A.    Not that I recall.

4        Q.    In your role as the president and CEO of the

5    condo association, do you receive communications from

6    other members?

7        A.    Sometimes.

8        Q.    And can you recall ever receiving a

9    communication from another condo member about an injury

10   that they suffered as a result of the conditions you're

11   complaining about in this case?

12       A.    I don't know if this is exactly what you're

13   asking for, but I have been made aware of harm that has

14   been done to the building: graffiti, people cracking the

15   door window, coming in, and wrenching open the mailbox,

16   those sorts of things.

17       Q.    So is the answer to my question that you can't

18   recall as you sit here today a single time where a

19   member of your condo association has contacted you about

20   a physical injury they suffered as a result of the

21   conditions you're complaining about in this case?

22       ATTORNEY MINOIEFAR:  Object to form.

23       THE WITNESS:  Not off the top of my head.

24   BY ATTORNEY MURPHY:

25       Q.    And what makes you believe that the person who

1    Q.   And is that something you believed at the time
2   the safety meeting happened, that Urban Alchemy, in
3   general, did an excellent job of maintaining safety
4   around residential buildings?
5    A.   I think it was the general sentiment of the
6   residents.
7    Q.   Was it your sentiment?
8    A.   I -- I don't think that they harm.  I think
9   that they do help.  I don't know I would say they're
10  responsible for maintaining safety.
11   Q.   Do you think they do an excellent job?
12   ATTORNEY MINOIEFAR:  Object to form.
13   THE WITNESS:  Just in general?
14  BY ATTORNEY MURPHY:
15   Q.   What do you think Urban Alchemy does?
16   A.   I think I answered this earlier, but they --
17  they're around the area to help community members.
18   Q.   And they make you feel safer, is what you said
19  before, right?
20   A.   Yes.
21   Q.   Do you think Urban Alchemy does an excellent
22  job of making you feel safer around your building?
23   A.   I think -- I think they're doing pretty good at
24  what they do, yeah.
25   Q.   Would you say they do an excellent job?

1      ATTORNEY MINOIEFAR:  Objection.  Object to form.

2      THE WITNESS:  Yeah.

3    BY ATTORNEY MURPHY:

4      Q.   I'm going to ask now a couple of questions

5    about No. 10 in Exhibit 7, so the third to last

6    paragraph.

7      A.   Mm-hmm.

8      Q.   Is it fair to say that No. 10 in Exhibit 7

9    talks about vendors and people selling things?

10     A.   Yes.

11     Q.   Is one of your complaints about the area around

12   your home that there are illegal markets or illegal

13   vending?

14     A.   Is that --

15     ATTORNEY MINOIEFAR:  Object to form.

16        Hmm?

17     THE WITNESS:  Oh, I'm actually not sure if that's

18   included, which is kind of why I looked at Ashcon.

19   BY ATTORNEY MURPHY:

20     Q.   So you're not sure one way or the other if, in

21   this case, one of the things you're complaining about is

22   illegal vending or illegal markets around your home?

23     ATTORNEY MINOIEFAR:  Object to form.

24     THE WITNESS:  I -- I think it's a problem.  I just

25   don't remember if we officially included it in the

1      ATTORNEY MINOIEFAR:  Object to form.

2      THE WITNESS:  I'm hesitant to say because I know

3  it's complex.  And so I -- I guess I don't quite feel

4  comfortable -- it would feel like guessing.

5  BY ATTORNEY MURPHY:

6      Q.   Yeah.  That's helpful.  I think I understand.

7          So is what you're saying you have identified

8  conditions around your home that you believe cause you

9  harm; you don't know what causes them, but you do

10 believe in general it's kind of a complex situation, and

11 it's likely a bunch of stuff mixed together; is that

12 fair?

13     A.   That's fair.

14     Q.   Is that the same for all eight of the

15 conditions that you're complaining about around your

16 home?

17     A.   Yeah.

18     Q.   Okay.  Why did you decide to sue the City as

19 opposed to, like, anybody else if you're not sure

20 whether or not they caused the things you're complaining

21 about?

22     ATTORNEY MINOIEFAR:  Object to form.

23     THE WITNESS:  I felt that even if the cause is

24 complex, the City has the ability to make positive

25 change.  And my -- my personal belief by getting

1   involved in this is that I could also help push the City
2   to do more.
3   BY ATTORNEY MURPHY:
4       Q.   Yeah.
5           When you say that the City has the ability to
6   effect positive change, what is the positive change that
7   you're hoping for from this lawsuit?
8           What do you -- what do you hope to get from it?
9       ATTORNEY MINOIEFAR:  Object to form.
10      THE WITNESS:  I'd like the place where I live to be
11  healthier and safer and more vibrant.
12  BY ATTORNEY MURPHY:
13      Q.   How do you want San Francisco to make the place
14  where you live healthier, safer, and more vibrant?
15      ATTORNEY MINOIEFAR:  Object to form.
16      THE WITNESS:  I think the -- the "how" is why I feel
17  I need help.
18  BY ATTORNEY MURPHY:
19      Q.   Yeah.
20          So, in other words -- let me try to summarize,
21  and let me know if I'm getting any of this wrong.
22      A.   Okay.
23      Q.   You've identified at least eight conditions
24  around your home that you feel like are worrisome and
25  troubling.  You -- your understanding is that you sued

1    the City about those conditions not necessarily because

2    you believe the City caused them, but the City is a big

3    entity, and it has the ability to make positive

4    neighborhood change.

5           And the positive neighborhood change you are

6    hoping the City will make from this lawsuit is that it

7    will do something that makes the area around where you

8    live healthier, safer, and more vibrant than it is

9    today; is that fair?

10   ATTORNEY MINOIEFAR:  Object to form, calls for a

11   legal conclusion, compound.

12   THE WITNESS:  I mean, I think that the City has a

13   role to play in the problem.  So I wouldn't say that --

14   you know, cause -- the cause of it is complex, for sure.

15          I struggle to say that I'm -- I'm involved just

16   because I feel like the City can do something.  Like, I

17   do feel like there's something there, which is why I'm

18   working with a lawyer.

19   BY ATTORNEY MURPHY:

20      Q.   Yeah.

21          So when I hear you say the City has a role to

22   play in the problem, that's what I want to know, is

23   what's that role, what's the role you believe the City

24   is playing?

25          Does that make sense?

1      A.    Mm-hmm.

2      ATTORNEY MINOIEFAR:  Object to form.

3  BY ATTORNEY MURPHY:

4      Q.    So when you say you believe the City has a role

5  to play in the problem, which is the conditions around

6  your neighborhood, what is that role?

7      ATTORNEY MINOIEFAR:  Object to form.

8      THE WITNESS:  I don't know.

9  BY ATTORNEY MURPHY:

10      Q.    Did you -- do you recall, after this 2023

11  meeting with the police, kind of putting together some

12  takeaways or summarizing and then circulating the notes

13  from the meeting?

14      A.    Yes.

15      ATTORNEY MURPHY:  I'm going to mark as Exhibit 9 a

16  document with no Bates number that says "SFPD Community

17  Safety Meeting," and it's dated October 17th, 2023.

18          (Deposition Exhibit 9 was marked for

19          identification.)

20  BY ATTORNEY MURPHY:

21      Q.    Take as long as you need to look at it.

22          My first question is:  Do you recognize

23  Exhibit 9?

24      A.    Yes, I do.

25      Q.    Is this the takeaways you summarized from the

```
 1              FRIDAY, SEPTEMBER 12, 2025; P.M. SESSION
 2         THE VIDEO OPERATOR:  We're back on the record.  The
 3    time is 2:35.
 4                      EXAMINATION RESUMED
 5    BY ATTORNEY MURPHY:
 6         Q.   Good afternoon.
 7         A.   Good afternoon.
 8         Q.   I'm going to ask you a couple of questions
 9    about the fencing in front of your house.
10         A.   Okay.
11         Q.   Would you agree that, because of the fencing,
12    you're able to walk outside into a safe, clean space?
13         A.   I would agree with that.
14         Q.   I'm going to ask a couple questions about
15    photos I received and see if we can learn about them.
16              So I'll mark this photo without a Bates number
17    as Exhibit 14.
18              (Deposition Exhibit 14 was marked for
19              identification.)
20         THE WITNESS:  Thank you.
21    BY ATTORNEY MURPHY:
22         Q.   Take as much time as you need to look at it.
23              My first question will be:  Do you recognize
24    Exhibit 14?
25         A.   I do.
```

1     Q.   What is it?

2     A.   It's a picture of the area from the viewpoint

3   of the front door out to the fence and beyond.

4     Q.   Did you take Exhibit 14?

5     A.   I believe so.

6     Q.   Do you remember when?

7     A.   This was somewhat recent.  Probably in the last

8   three or four months.

9     Q.   We're in September 2025.

10        So does that mean that you likely took Exhibit

11   14 sometime between June and September 2025?

12     A.   It might have even been May.

13     Q.   So is it fair to say you took Exhibit 14

14   sometime between May 2025 and today?

15     A.   Yes.

16     Q.   And best estimate of the time of day you took

17   Exhibit 14?

18     A.   I don't know.  It was at night.

19     Q.   Okay.  Remember why you took it?

20     A.   I do remember this one.

21        I -- when new potential tenants reach out to

22   me, I want to be very transparent about the conditions

23   around the building, and so I often take pictures so

24   that they're not surprised when they get here.

25     Q.   So is Exhibit 14 a photo of the area in front

1   of the condo that you took to provide to a potential new

2   tenant?

3       A.   Yes.

4       Q.   And you took Exhibit 14 because you wanted a

5   truthful representation of what the area in front of the

6   building looked like, fair?

7       A.   Fair.

8       Q.   And so, from your perspective, Exhibit 14 is a

9   fair depiction of what the area in front of your

10  building looks like in the evening sometime between May

11  and September 2025, correct?

12      ATTORNEY MINOIEFAR:   Object to form.

13      THE WITNESS:   I think it's a -- yeah, it's pretty

14  fair.   Some nights are more crowded than others, but

15  it -- at least in the last few months, this is a better

16  representation.

17  BY ATTORNEY MURPHY:

18      Q.   And when you took Exhibit 14, you weren't

19  trying to find a photo that had, like, the best-case

20  scenario; you wanted to give this person an accurate

21  representation of what things would be like?

22      A.   Yeah.

23      Q.   Best estimate, since you've taken over as the

24  president/CEO of the condo association, the number of

25  potential new condo members you've interacted with?

```
 1  BY ATTORNEY MURPHY:
 2      Q.   Take as much time as you need to look at it.
 3           My first question is:  Do you recognize
 4  Exhibit 15?
 5      A.   Yes.
 6      Q.   What is it?
 7      A.   It is the area outside of the fence of my
 8  building.
 9      Q.   And the Coldwell Banker sign in Exhibit 15, is
10  that in the same place as it is in Exhibit 14?
11      A.   Yeah, it looks like it.
12      Q.   Okay.  Do you know who took Exhibit 15?
13      A.   I believe I took this one too.
14      Q.   Best estimate of time frame?
15      A.   I think it's similar time frame to the other
16  one.
17      Q.   So that would mean your best estimate is you
18  took Exhibit 15 sometime between May and September 2025?
19      A.   Yeah.  In looking at it, actually, the person
20  is -- it's the same people.  So this must have been the
21  same night.
22      Q.   Got it.  Okay.
23           So your best recollection is that Exhibits 14
24  and 15 are from the same day in -- in the time range May
25  to September 2025?
```

1       A.   Yes.

2       Q.   Did you also take Exhibit 15 to give a

3   potential tenant a kind of accurate representation of

4   what the sidewalk looks like?

5       A.   Yes.

6       Q.   And when you took Exhibit 15, you weren't

7   trying to get the best or the worst; you wanted to give

8   them just kind of an accurate representation?

9       A.   That's right.

10      Q.   Okay.  New topic.

11      A.   Okay.

12      Q.   Sometimes in cases there are people who testify

13  just based on their personal knowledge about things they

14  know.  Sometimes a person testifies, you know, on behalf

15  of their employer or company.  And sometimes there are

16  people that come in that they don't have any firsthand

17  knowledge, but they have expertise in the area, and so

18  they're offering opinions because it's something, you

19  know, that they know about.

20      A.   Mm-hmm.

21      Q.   So, for example, if there was a case related

22  to, like, geography, that might be one where you would

23  show up as an expert.

24           Do you have a sense one way or the other of

25  whether you intend to be an expert on any topic in this

```
 1      A.    Do you mind if I read through it?

 2      Q.    Take your time.

 3      A.    Okay.

 4            (Examines document.)

 5            I wouldn't change anything.

 6      Q.    I'm going to ask you some questions about some

 7   paragraphs in the declaration.

 8      A.    Okay.

 9      Q.    So if you look at paragraph 4 of Exhibit 16, it

10   mentions that one of your neighbors was recently

11   attacked outside the building.

12            Do you see that?

13      A.    Yes.

14      Q.    Is that the same person you mentioned before as

15   the mugging?

16      A.    Yes.

17      Q.    Then in paragraph 5 of Exhibit 16, you

18   mentioned that people sometimes light bonfires on the

19   sidewalks around the building.

20            Do you see that?

21      A.    Yes.

22      Q.    Have you ever been injured by any of the

23   bonfires?

24      A.    No.

25      Q.    Okay.  Other than having them trigger the fire
```

1       Q.   And what do they tell you?

2       A.   They'll either tell us that there was smoke in

3  someone's unit or that it was triggered by the fire

4  outside.

5       Q.   Do you keep a record of any of that?

6       A.   I don't.

7       Q.   Do you know whether anybody within the condo

8  association keeps a record of that?

9       A.   I don't.

10      Q.   I'm going to ask about paragraph 6 in

11  Exhibit 16.  Here you're mentioning that you will step

12  off the sidewalk into the busy street to bypass

13  sidewalks and obstacles.

14           Do you see that?

15      A.   Yes.

16      Q.   What do you mean by "busy street"?

17      A.   "Busy street" meaning that there's car

18  activity.

19      Q.   Have you ever been injured by stepping off the

20  sidewalk into the street because the sidewalk was

21  blocked?

22      A.   No.

23      Q.   Have you ever been prevented from getting to

24  your final destination because the sidewalk was blocked?

25      A.   No.

1    A.    I believe they did.

2    Q.    Did you suffer any repercussions as a result of

3    publicly complaining about the conditions in the

4    Tenderloin?

5    A.    Thankfully, no.

6    Q.    Why say "thankfully"?

7    ATTORNEY MINOIEFAR:  Object to form.

8    THE WITNESS:  I requested to be anonymized.  And as

9    a policy, The Chronicle will not anonymize.  And -- and

10   so I put my name out there knowing there might be some

11   risk.

12   BY ATTORNEY MURPHY:

13   Q.    So you -- it sounds like you wanted to be

14   anonymous.  The reporter told you that that wasn't

15   possible, and then you said, even knowing that, you

16   wanted the quote with your name included; is that fair?

17   A.    Yes.

18   Q.    Okay.  And have you suffered any injury or

19   retaliation as a result of being publicly linked with a

20   complaint about the Tenderloin neighborhood?

21   ATTORNEY MINOIEFAR:  Asked and answered; object to

22   form.

23   THE WITNESS:  Thankfully, no.

24   BY ATTORNEY MURPHY:

25   Q.    It's fair to say you're proceeding anonymously

1   know what I'm referring to?

2        A.   Do you mean like pipes?

3        Q.   Yes.

4        A.   Yes.

5        Q.   Okay.  Are you aware that there are businesses

6   in the Tenderloin that sell smoking supplies?

7        A.   Yes.

8        Q.   Are you aware that there are people in the

9   Tenderloin that sell smoking supplies on the street?

10       A.   Yes.

11       Q.   Have you ever seen what you believe to be

12  someone selling smoking supplies in front of your

13  apartment building?

14       A.   Yes.

15       Q.   Are you aware that there are people who sell

16  drugs on the street in the Tenderloin?

17       A.   Yes.

18       Q.   Would you agree that substance use is a complex

19  problem?

20       A.   Yes.

21       Q.   Would you agree that homelessness is a complex

22  problem?

23       A.   Yes.

24       Q.   Would you agree that substance use --

25            (Cell phone interruption.)

```
 1       ATTORNEY MURPHY:  Agree to go off.
 2       ATTORNEY MINOIEFAR:  Agree.
 3       THE WITNESS:  Thank you.
 4       THE VIDEO OPERATOR:  Going off the record.  The time
 5   is 3:47.
 6            (Recess taken from 3:47 p.m. to 3:53 p.m.)
 7       THE VIDEO OPERATOR:  Back on the record.  The time
 8   is 3:53.
 9       ATTORNEY MURPHY:  Ms. Andrade, could you remind me
10   the last question?
11       THE REPORTER:  Sure.  It was a partial question.
12            (Record read as follows:
13             "QUESTION:  Would you agree that substance
14             use --")
15       ATTORNEY MURPHY:  Thank you.
16   BY ATTORNEY MURPHY:
17       Q.   Would you agree that substance use is an area
18   where reasonable minds could disagree about the best
19   approach?
20       ATTORNEY MINOIEFAR:  Object to form.
21       THE WITNESS:  Yes.
22   BY ATTORNEY MURPHY:
23       Q.   And would you agree that homelessness is an
24   area where reasonable minds could disagree about the
25   best approach?
```

```
 1        ATTORNEY MINOIEFAR:  Object to form.
 2        THE WITNESS:  Yes.
 3   BY ATTORNEY MURPHY:
 4        Q.   If I use the phrase "consumption site" to you,
 5   is that a phrase you have any, like -- are you familiar
 6   with that phrase?
 7        A.   I've heard the phrase before.
 8        Q.   What does the phrase "consumption site" mean to
 9   you?
10        A.   I'm familiar with it in the context of the
11   Linkage Center.
12        Q.   Are you aware of any currently operating
13   consumption sites in the Tenderloin?
14        A.   Since the Linkage Center closed, I don't know
15   of any specifics.
16        Q.   I'm going to switch topics a little bit now and
17   just kind of ask more broadly about the lawsuit.
18             In these questions, I don't want to know
19   anything about a conversation you had with your lawyer.
20   So either exclude that from the answer or, if you would
21   need to tell me that, just say, "I'd have to tell you
22   about something I talked about with my lawyer."
23             Make sense?
24        A.   Mm-hmm.
25        Q.   Is that a yes?
```

1    is 4:04.

2          (At 4:04 P.M., the deposition proceedings

3          adjourned.)

4

5

6

7          _____

8                    BARBARA ROE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    STATE OF CALIFORNIA          )

 2                                 )  ss.

 3    COUNTY OF SAN MATEO          )

 4              I hereby certify that the witness in the

 5    foregoing deposition, BARBARA ROE, was by me duly sworn

 6    to testify to the truth, the whole truth and nothing but

 7    the truth, in the within-entitled cause; that said

 8    deposition was taken at the time and place herein named;

 9    and that the deposition is a true record of the

10    witness's testimony as reported by me, a duly certified

11    shorthand reporter and a disinterested person, and was

12    thereafter transcribed into typewriting by computer.

13              I further certify that I am not interested in

14    the outcome of the said action, nor connected with nor

15    related to any of the parties in said action, nor to

16    their respective counsel.

17              IN WITNESS WHEREOF, I have hereunto set my

18    hand this 16th day of September, 2025.

19    Read and Sign was:  Requested.

20

21

22

23

24         SUZANNE I. ANDRADE, CSR NO. 10682

25         STATE OF CALIFORNIA
```