**REDACTED PURSUANT TO ECF NO. 111**

# EXHIBIT 22
# to

**DECLARATION OF ABIGAIL WALD IN SUPPORT OF DEFENDANT CITY AND COUNTY OF SAN FRANCISCO'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

```
 1                UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF CALIFORNIA
 3     - - - - - - - - - - - - - - - - - - - -
 4     JANE ROE, an individual; MARY ROE,    )  CASE NO.
 5     an individual; SUSAN ROE, an          )  4:24-cv-01562-
 6     individual, JOHN ROE, an individual;  )  JST
 7     BARBARA ROE, an individual; PHOENIX   )
 8     HOTEL SF, LLC, a California limited   )
 9     liability company, et al.,            )
10                    Plaintiffs,            )
11     vs.                                   )
12     CITY AND COUNTY OF SAN FRANCISCO, a   )
13     California public entity,             )
14                    Defendant.             )
15     - - - - - - - - - - - - - - - - - - - -
16
17       CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
18            VIDEOTAPED DEPOSITION OF MARY ROE
19               MONDAY, SEPTEMBER 15, 2025
20
21           BEHMKE REPORTING AND VIDEO SERVICES, INC.
22               BY:  SUZANNE I. ANDRADE, CSR NO. 10682
23                   550 CALIFORNIA STREET, SUITE 820
24                   SAN FRANCISCO, CALIFORNIA  94104
25                               (415) 597-5600
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10          Confidential Videotaped Deposition of MARY
11  ROE, taken on behalf of Defendant, at 1390 Market
12  Street, 7th Floor, San Francisco, California, commencing
13  at 10:10 A.M., MONDAY, SEPTEMBER 15, 2025, before
14  Suzanne I. Andrade, Certified Shorthand Reporter
15  No. 10682, pursuant to Notice.
16
17
18
19
20
21
22
23
24
25
```

```
 1        A.   Because, like I said, I -- I go to the city --
 2   I go to city meetings all the time.  We go -- you know,
 3   but I've never made a complaint directly.
 4        Q.   Yeah.
 5             When you go to city meetings all the time, are
 6   they in City Hall or what building?
 7        A.   They're at City Hall.
 8        Q.   Okay.  And do you walk there?
 9             How do you get there?
10        A.   Yes.
11        Q.   Do you go in -- you know, that kind of -- the
12   main entrance that looks out into the, like, Civic
13   Center UN Plaza area.
14             Is that the entrance you use?
15        A.   I go on the Polk Street side, whatever.
16        Q.   Polk Street.  Okay.
17             Do you know what 311 is?
18        A.   Yes.
19        Q.   Have you ever made a complaint to 311?
20        A.   Yes.
21        Q.   What's your best estimate of the number of
22   complaints you've made to 311?
23        A.   One.
24        Q.   And was that in Labor Day of 2024?
25        A.   No.
```

```
 1     Q.   Okay.  When did you make a complaint to 311?
 2     A.   Okay.  I got to think 'cause it's...
 3          Approximately two months ago.
 4     Q.   Had you known about 311 before that?
 5     A.   Oh, yes.
 6     Q.   What was the thing that you complained to 311
 7  about approximately two months ago?
 8     A.   That somebody was illegally building a store
 9  that had no permits -- work permits or licensing.
10     Q.   Have you ever used 311 to make a complaint
11  about open-air drug use?
12     A.   No.
13     Q.   Have you ever used 311 to make a complaint
14  about the cleanliness of city streets?
15     A.   No.
16     Q.   Have you ever used 311 to make a complaint
17  about the deterioration of human life in the Tenderloin?
18     A.   No.
19     Q.   Same questions for 911.
20          Do you know what 911 is?
21     A.   No -- I mean, I know what it -- yes.  Yes.  I'm
22  sorry.
23     Q.   No worries.
24          So is it fair to say you know what 911 is, but
25  you've never called 911?
```

```
 1        Q.   Do you have a belief one way or the other about
 2   what's causing the open-air drug use in the Tenderloin?
 3        ATTORNEY MINOIEFAR:   Object to form.
 4        THE WITNESS:   No.
 5   BY ATTORNEY MURPHY:
 6        Q.   Do you have a belief one way or the other about
 7   what's causing the problems with cleanliness on the
 8   streets in the Tenderloin?
 9        ATTORNEY MINOIEFAR:   Object to form.
10        THE WITNESS:   No.
11   BY ATTORNEY MURPHY:
12        Q.   Same question.
13             Do you have a belief --
14        A.   No.
15        Q.   -- one way or the other -- let me just get it
16   out.
17             This is one where the deposition is, like, a
18   little bit different than regular --
19        A.   Sorry.
20        Q.   Do you have a belief one way or the other about
21   what's causing what you see as the deterioration of
22   human life in the Tenderloin?
23        ATTORNEY MINOIEFAR:   Object to form.
24        THE WITNESS:   No.
25   BY ATTORNEY MURPHY:
```

1   Q.  Do you have a belief one way or the other about
2  what, if any, role the City has in causing the open-air
3  drug use you see in the Tenderloin?
4       ATTORNEY MINOIEFAR:  Object to form.
5       THE WITNESS:  No.
6  BY ATTORNEY MURPHY:
7       Q.  Same question for cleanliness.
8           Do you have a belief one way or the other about
9  what role the City has in causing the problems with
10 cleanliness in the streets in the Tenderloin you see?
11      ATTORNEY MINOIEFAR:  Object to form.
12      THE WITNESS:  Not holding their offices accountable.
13 BY ATTORNEY MURPHY:
14      Q.  When you say "their offices," what do you mean?
15      A.  Their departments.  Excuse me.
16      Q.  I'm sorry.  Which departments?
17      A.  Department of Public Works, HSH.
18      Q.  Is it your opinion that DPW is causing the
19 cleanliness issues, or they're just failing to clean it
20 up?
21      ATTORNEY MINOIEFAR:  Object to form.
22      THE WITNESS:  Failing to clean it up.
23 BY ATTORNEY MURPHY:
24      Q.  And then same thing for HSH.
25          Is it your opinion that HSH is causing the

```
 1  cleanliness conditions, or they're failing to clean it
 2  up?
 3       ATTORNEY MINOIEFAR:  Object to form.
 4       THE WITNESS:  Failing to...
 5  BY ATTORNEY MURPHY:
 6       Q.   I think I'm tracking.  Let me make sure I'm
 7  following.
 8            Which is, someone is -- is making the streets
 9  in the Tenderloin not clean, and your belief is that
10  either DPW or HSH should be cleaning it, and they're not
11  doing a good enough job; is that fair?
12       A.   Correct.
13       Q.   Any other belief you have about the City's role
14  in causing the cleanliness issues you see in the
15  Tenderloin?
16       ATTORNEY MINOIEFAR:  Object to form.
17       THE WITNESS:  No.
18  BY ATTORNEY MURPHY:
19       Q.   Same question for deterioration.
20            Do you have a belief one way or the other about
21  the City's role in causing the deterioration of human
22  life you see in the Tenderloin?
23       ATTORNEY MINOIEFAR:  Object to form.
24       THE WITNESS:  No.
25  BY ATTORNEY MURPHY:
```

```
 1      Q.    And you stayed at Civic Center until November
 2   ████████████████████████████████████████████████
 3   ███████████████████████████
 4      █     █████
 5      █    ████████████████████████████████████████
 6   ██████████████████████████
 7      A.    Correct.
 8      Q.    Thank you.
 9            Any other clarifications you want to make at
10   this point?
11      A.    (Shakes head.)
12      Q.    Is that a no?
13      A.    No.
14      Q.    New topic.
15            Would you agree that fentanyl is highly
16   addictive?
17      A.    Yes.
18      Q.    Would you agree that methamphetamines are
19   highly addictive?
20      A.    Yes.
21      Q.    Based on your understanding, would you agree
22   that fentanyl is something that can either be injected
23   or smoked?
24      A.    Yes.
25      Q.    Based on your understanding, are
```

```
 1  methamphetamines something that can be injected or
 2  smoked?
 3       A.   Yes.
 4       Q.   Is it fair to say that reasonable people can
 5  disagree about the best way to deal with the problem of
 6  fentanyl use?
 7       A.   I'm not sure I understand.
 8       ATTORNEY MINOIEFAR:  Object to form.
 9  BY ATTORNEY MURPHY:
10       Q.   Yeah.
11            So would you say that fentanyl use is a
12  problem?
13       A.   Yes.
14       Q.   And would you say that reasonable people could
15  disagree about the way to solve that problem?
16       A.   Yes.
17       Q.   Same thing for methamphetamines.
18            Would you agree that methamphetamine use is a
19  problem?
20       A.   Yes.
21       Q.   And would you agree that reasonable people
22  could disagree about the best way to solve that problem?
23       A.   Yes.
24       Q.   Do you have an understanding one way or the
25  other about whether the City of San Francisco
```

```
 1        THE WITNESS:  I'm not sure because sometimes it's
 2   this way, but most -- sometimes there's people in front
 3   of there.
 4   BY ATTORNEY MURPHY:
 5        Q.   Yeah.
 6        A.   So that's why -- I guess it just depends on
 7   what time of day.
 8        Q.   So that's -- that's what I'm asking.
 9             It sounds like what you're saying is that what
10   the front of your building looks like changes, you
11   know --
12        A.   Yes.
13        Q.   -- from one hour to the next; is that fair?
14        A.   Yes.  So...
15        Q.   So is it fair to say, then, that Exhibit 5,
16   based on your personal experience, looks like the front
17   of your building at a snapshot in time --
18        A.   Yes.
19        Q.   -- sometime in June 2021?
20        A.   Yes.
21        Q.   Okay.  And I'm going to ask the same question
22   for No. 4.
23        A.   Yes.
24        Q.   Is Exhibit 4 a photo of what the front of your
25   building looks like at a snapshot in time sometime in
```

```
1   March 2022?
2        A.   Yes.
3        Q.   Same thing for Exhibit 3.
4             Based on your experience, is Exhibit 3 a photo
5   of what the front of your building looked like at a
6   snapshot in time in --
7        A.   Yes.
8        Q.   -- February 2023?
9        ATTORNEY MINOIEFAR:   Ms. Roe, I'd advise you to look
10  at the document first before answering the question.
11       THE WITNESS:   Okay.
12  BY ATTORNEY MURPHY:
13       Q.   In general, anytime I ask you about a document,
14  take as much time as you need to look at it before you
15  answer.
16       A.   Okay.
17       Q.   Don't feel like you need to rush.
18            Okay.  Last question, going back to Exhibit 2.
19            Is Exhibit 2 a photo of what the front of your
20  building looked like at a snapshot in time in January
21  2025?
22       ATTORNEY MINOIEFAR:   Object to form.
23       THE WITNESS:   Yes.
24  BY ATTORNEY MURPHY:
25       Q.   Sometimes in a lawsuit, there are people who
```

```
 1   the next one down on Exhibit 6.
 2          In this paragraph, you say that when you
 3   venture outside, you have no choice but to jaywalk,
 4   which is especially dangerous because of your age and
 5   medical conditions make it difficult for you to avoid
 6   moving vehicles.
 7          Do you see that?
 8      A.  True.
 9      Q.  Have you ever been hit by a moving vehicle in
10   the --
11      A.  No.
12      Q.  -- Tenderloin?
13          Have you ever been injured by stepping from the
14   sidewalk into the street in the Tenderloin?
15      ATTORNEY MINOIEFAR:  Object to form.
16      THE WITNESS:  No.
17   BY ATTORNEY MURPHY:
18      Q.  When you -- do you ever walk with somebody else
19   in the Tenderloin?
20      A.  Occasionally.
21      Q.  When you've been walking with somebody else,
22   have you ever been with somebody who themselves was
23   injured, you know, walking from the sidewalk into the
24   street in the Tenderloin?
25      A.  No.
```

```
 1   afraid and frequently mortified."
 2           Do you see that?
 3      A.   Yes.
 4      Q.   When you say you're afraid, what are you afraid
 5   of?
 6      ATTORNEY MINOIEFAR:  Ms. Roe, I would advise you to
 7   read the whole paragraph before answering the question.
 8      THE WITNESS:  (Examines document.)
 9           Can you repeat the question?
10   BY ATTORNEY MURPHY:
11      Q.   Yeah.
12           So when you say that you are always afraid and
13   frequently mortified, what's the thing you're afraid of?
14           What were you referring to?
15      A.   I'm afraid of being injured, of being
16   assaulted.
17      Q.   Anything else that you're afraid of based on
18   the conditions outside your apartment building?
19      A.   Being shot at, being shot, being stabbed.
20      Q.   Anything else you're afraid of based on the
21   conditions outside your apartment building?
22      ATTORNEY MINOIEFAR:  Object to form.
23      THE WITNESS:  No.
24   BY ATTORNEY MURPHY:
25      Q.   Okay.  Have you ever been stabbed outside your
```

```
 1  apartment building?
 2       A.   No.
 3       Q.   Have you ever been stabbed anywhere in the
 4  Tenderloin?
 5       A.   No.
 6       Q.   Have you ever been shot at outside your
 7  apartment building?
 8       A.   No.
 9       Q.   Have you ever been shot at anywhere in the
10  Tenderloin?
11       A.   No.
12       Q.   Have you ever been assaulted outside your
13  apartment building?
14       ATTORNEY MINOIEFAR:   Object to form.
15       THE WITNESS:   No.
16  BY ATTORNEY MURPHY:
17       Q.   Have you ever been assaulted anywhere in the
18  Tenderloin?
19       ATTORNEY MINOIEFAR:   Object to form.
20       THE WITNESS:   No.
21  BY ATTORNEY MURPHY:
22       Q.   Have you ever been injured outside your
23  apartment building?
24       ATTORNEY MINOIEFAR:   Object to form.
25       THE WITNESS:   Yes.
```

1   A.  Yes.
2   Q.  Did you clean it up afterwards?
3   A.  No.
4   Q.  What was the smell that you were experiencing
5   before that?
6   A.  It was human feces.
7   Q.  Any other time that you've thrown up from being
8   nauseous from smells around your building?
9   A.  No.
10  Q.  Any reason to believe that the City's conduct
11  caused that feces to be there?
12  A.  Other than the fact that they are in charge of
13  overseeing that department and that they aren't
14  following up to make sure that they're doing the job
15  they're supposed to be.
16  Q.  Yeah.  So let me make sure I'm following.
17      Your complaint is not that the City put the
18  feces there in the first place --
19  A.  Right.
20  Q.  -- but that you believe the City should have
21  had affirmative conduct to get rid of the feces for you;
22  is that fair?
23  A.  Correct.
24      ATTORNEY MINOIEFAR:  Object to form.
25  BY ATTORNEY MURPHY:

```
 1         ATTORNEY MINOIEFAR:  Object to form.
 2         THE WITNESS:  I don't know.
 3   BY ATTORNEY MURPHY:
 4         Q.   Okay.  Do you know one way or the other if your
 5   son has been arrested for alleged drug sales between
 6   2020 and today?
 7         ATTORNEY MINOIEFAR:  Object to form.
 8         THE WITNESS:  No.
 9   BY ATTORNEY MURPHY:
10         Q.   No, you don't know, or he hasn't?
11         A.   No, he has not.
12         Q.   Is it fair to say that there are businesses in
13   the Tenderloin that sell smoking supplies?
14         A.   Yes.
15         Q.   And that's something that you would like to see
16   stop?
17         A.   Yes.
18         Q.   Do you also agree that there are people on the
19   street who sell smoking supplies in the Tenderloin?
20         A.   No.  I've never seen it.
21         Q.   Do you agree that there are people who sell
22   fentanyl itself, not the smoking supply but the drug --
23         A.   Yes.
24         Q.   -- on the street in the Tenderloin?
25         A.   Yes.
```

```
 1       Q.   Which police captain did you say you sent the
 2   photo to?
 3       A.   The one -- it's Tenderloin, Matt.  He's no
 4   longer there; he's retired now.  But it was Captain
 5   Manning.
 6       Q.   Did you -- how did you send it to him?
 7       A.   E-mail.
 8       Q.   Did you receive a response?
 9       A.   No -- well, yes.
10       Q.   What was the response?
11       A.   The next day, there were a whole lot of
12   people out there getting people out in front of our
13   building.
14       Q.   So, in other words -- in other words, you send
15   the police captain an e-mail; the next day, the problem
16   was removed?
17       A.   There it was.
18       Q.   I think you said -- a couple more questions
19   about Exhibit 12 -- that your -- the building where you
20   live has two access doors; is that right?
21       A.   That's correct.
22       Q.   And one anybody can go through.  The other is
23   set up for people who have, like, a wheelchair, a
24   mobility-based disability.  Is that right?
25       A.   Yes.
```

```
 1         (At 2:36 P.M. the deposition proceedings
 2      adjourned.)
 3
 4
 5         _____
 6                   MARY ROE
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1  STATE OF CALIFORNIA          )
 2                               ) ss.
 3  COUNTY OF SAN MATEO          )
 4           I hereby certify that the witness in the
 5  foregoing deposition, MARY ROE, was by me duly sworn to
 6  testify to the truth, the whole truth and nothing but
 7  the truth, in the within-entitled cause; that said
 8  deposition was taken at the time and place herein named;
 9  and that the deposition is a true record of the
10  witness's testimony as reported by me, a duly certified
11  shorthand reporter and a disinterested person, and was
12  thereafter transcribed into typewriting by computer.
13           I further certify that I am not interested in
14  the outcome of the said action, nor connected with nor
15  related to any of the parties in said action, nor to
16  their respective counsel.
17           IN WITNESS WHEREOF, I have hereunto set my
18  hand this 17th day of September, 2025.
19  Read and Sign was:  Requested.
20
21
22              [signature]
23
24         SUZANNE I. ANDRADE, CSR NO. 10682
25         STATE OF CALIFORNIA
```