LAW OFFICES OF
**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION

650 CALIFORNIA STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94108-2615
T: (415) 981-7210 · F: (415) 391-6965

MICHAEL A. KELLY (State Bar #71460)
mkelly@walkuplawoffice.com
RICHARD H. SCHOENBERGER (State Bar #122190)
rschoenberger@walkuplawoffice.com
MATTHEW D. DAVIS (State Bar #141986)
mdavis@walkuplawoffice.com
ASHCON MINOIEFAR (State Bar #347583)
aminoiefar@walkuplawoffice.com

SHANIN SPECTER (Pennsylvania State Bar No. 40928)
(Admitted Pro Hac Vice)
shanin.specter@klinespecter.com
ALEX VAN DYKE (CA State Bar No. 340379)
alex.vandyke@klinespecter.com
KLINE & SPECTER, P.C.
1525 Locust Street
Philadelphia, PA  19102
Telephone:  (215) 772-1000
Facsimile:  (215) 772-1359

ATTORNEYS FOR ALL PLAINTIFFS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA,

SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| JANE ROE, an individual; MARY ROE, an individual; SUSAN ROE, an individual; JOHN ROE, an individual; BARBARA ROE, an individual; PHOENIX HOTEL SF, LLC, a California limited liability company; FUNKY FUN, LLC, a California limited liability company; and 2930 EL CAMINO, LLC, a California limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, a California public entity, <br><br> Defendants. | Case No. 4:24-cv-01562-JST <br><br> **PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> **ASSIGNED FOR ALL PURPOSES TO THE HONORABLE DISTRICT JUDGE JON S. TIGAR, COURTROOM 6** <br><br> Action Filed:   03/14/2024 <br> Trial Date:     Unassigned |

## **TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................1

II.  STATEMENT OF ADDITIONAL FACTS AND EVIDENCE ................................2

   A.  The City Has Averred on the Record in Multiple Prior Lawsuits that Distribution of DSP in the Tenderloin is Both Harmful and a Nuisance. ......2

   B.  The City's New Policy Regarding Distribution of DSP. ...................................3

   C.  The City's Policy Sanctions the Distribution of DSP to Minors......................3

   D.  The City's Policy Vests Its Contractors with Vast Discretion to Forego Counseling When Handing Out DSP. ............................................................4

   E.  SFPD Commander Scott Biggs's Testimony Confirms That the Distribution of Smoking Supplies Fuels the Tenderloin Drug Market. ...............................4

   F.  Deposition Testimony of Omar Ward........................................................7

   G.  Deposition Testimony of Susan Philip, MD. ...............................................8

   H.  Declaration of Dr. Ricky Bluthenthal. ......................................................9

III. Legal Argument .................................................................................9

   A.  The City Contradicts Its Prior Averments and Admissions About the Many Harms Caused by DSP. .........................................................................9

   B.  The City's Claimed Benefits Are Speculative and Outweighed by the Harm Its Policy Causes. .............................................................................11

   C.  The City Has Presented a Distorted Visual Record to the Court. .................12

   D.  The City Is Not Immune from Nuisance Liability. ......................................13

IV.  CONCLUSION..................................................................................15

# TABLE OF AUTHORITIES

**Federal Cases**                                                                     Page(s)

*Hamilton v. State Farm Fire & Cas. Co.* 270 F.3d 778 (9th Cir. 2001) ...    10

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ..................................    10

*Rissetto v. Plumbers & Steamfitters Local 343*
94 F.3d 597, (9th Cir. 1996) ...............................................    10

**State Cases**

*Greater Westchester Homeowners Assoc. v. City of Los Angeles*
(1970) 26 Cal.3d 86 ..........................................................    13

*Hassell v. San Francisco* (1938) 11 Cal.2d 168 ................................    13, 15

*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920 ...........................    13

*Varjabedian v. City of Madera* (1978) 20 Cal.3d 285 ..........................    13

**State Statutes**

Civil Code § 3479  ...........................................................    14

Civil Code § 3482 ............................................................    2, 13, 14

Health & Safety Code Section 120780.2 ........................................    14

Health & Safety Code § 121349  ...............................................    3

Health & Safety Code § 121349.1  .............................................    13, 14

# I.    <u>INTRODUCTION</u>

Plaintiffs are not asking the Court to wade into the murky waters of the homeless or drug crises, as the City contends. They simply ask the Court to enjoin the City from the affirmative conduct of allowing and encouraging its contractors and vendors to distribute drug smoking paraphernalia (DSP) in the Tenderloin. That conduct contributes to the nuisance conditions that Plaintiffs and their neighbors experience on a daily basis. Plaintiffs have been given the opportunity to supplement the record with additional evidence that the City's updated DSP policy is causing harm in the Tenderloin, and they are doing so herewith. The evidence shows that the harm to Plaintiffs and their neighbors outweighs any purported benefit. (As discussed below, the City has expressly agreed with that proposition in multiple other lawsuits.) Thus, the Court has grounds to enjoin that specific conduct.

Plaintiffs filed the operative complaint in July 2024. (ECF No. 050.) In April 2025, acknowledging the harms described by Plaintiffs and their neighbors, the City announced it was changing its policies related to the distribution of DSP. The City claimed that it was henceforth mandating that distribution occur only in non-public areas and only after the recipient was offered counseling and treatment. As shown herein, the changes to the City's DSP furnishing policy are illusory and leave City-funded contractors with broad discretion to ignore the new mandates. Under the new policy, it is business as usual. The City granted its lead DSP contractor, the SF AIDS Foundation (SFAF), discretion to issue to DSP on demand, even to children.

The City asserts that the distribution of DSP coupled with an offer of counseling may produce the benefit of encouraging drug addicts to seek treatment. But they have offered only aspirational statements and *no evidence* to support that. The City's proffered expert's opinion relies on *injection*-based drug harm reduction studies. But the City's own officials acknowledge that the current drug crisis in San Francisco is unique and different from the problems faced in the past, such as IV-borne infections during the AIDS crisis, or in other cities or countries. Thus, Plaintiffs object to the

purported expert opinion as lacking foundation and being irrelevant to the City's *smoking*-based harm reduction policies that are currently under scrutiny.

The City is not immune from Plaintiffs' public and private nuisance claims. Its immunity claim is based entirely on its interpretation of Civ. Code § 3482. That code section provides immunity only in situations where the nuisance conduct is "done or maintained under the express authority of a statute." But the City has shown no express statutory language that allows it to distribute otherwise-illegal drug smoking paraphernalia such as fentanyl pipes. As discussed below, the Legislature has allowed the distribution of *injection*-related supplies such as syringes, and related materials, to IV drug users in order to prevent *bloodborne* pathogens.

## II.    STATEMENT OF ADDITIONAL FACTS AND EVIDENCE

**A.    The City Has Averred on the Record in Multiple Prior Lawsuits that Distribution of DSP in the Tenderloin is Both Harmful and a Nuisance.**

The City's own litigation and public statements demonstrate that it recognizes the harms caused by the open availability of drug-smoking paraphernalia in the Tenderloin. On April 10, 2025, the City Attorney, acting on behalf of the City and the People of the State of California, filed multiple civil enforcement actions against Tenderloin markets—including Ed's Market, Family Corner Discounts, and 115 Turk Street LLC—alleging that the sale of glass pipes, steel wool, and other smoking paraphernalia created a public nuisance. (Declaration of Ashcon Minoiefar ("Minoiefar Dec.") ¶¶2-4, Ex. A–C.) The City Attorney simultaneously issued a press release about those lawsuits. (Minoiefar Dec. ¶5, Ex. D.)

In those complaints, the City alleged that selling such paraphernalia "attracted criminal and nuisance activity to the surrounding community…adversely affecting the neighborhood and the health, safety, and well-being of those who live and work in the area." (Minoiefar Dec. ¶¶2-4, Ex. A ¶2; Ex. B ¶2; Ex. C ¶2.) It further alleged that the sale of items "used to ingest or inhale controlled substances" "adversely affects public health, contributes to illegal drug activity, and contributes to other criminal activity."

1   (Minoiefar Dec. ¶2-4,Ex. A ¶ 54; Ex. B ¶ 45; Ex. C ¶ 41.) The City Attorney's press

2   release reinforced those allegations, describing the stores as "magnets for substantial

3   illegal activity" that "threaten the safety of the children, families, and seniors in [the]

4   community." (Minoiefar Dec. ¶5, Ex. D.)

5   **B.     The City's New Policy Regarding Distribution of DSP.**

6          Plaintiffs recently obtained a copy of the City's April 2, 2025 directive setting

7   forth the City's new policy regarding distribution of DSP, which took effect on April 30,

8   2025. (Minoiefar Dec. ¶6, Ex. E.) Notably, this version of the policy differs significantly

9   from a version dated a day earlier, April 1, 2025, which the City proffered in its

10  opposition. (ECF No. 105-53, Ex. G to Philip Dec.) The April 2 policy lists actions that

11  DSP suppliers "must implement," including providing proactive counseling and

12  connections to treatment as part of distribution of DSP. The policy then adds qualifying

13  language "to the extent practical and receivable by the participant." (Minoiefar Dec.

14  ¶6, Ex. E at 2.)  As discussed below, the City allows its lead DSP contractor to interpret

15  this qualifying language as giving them license to do business as usual, meaning hand

16  out the DSP without counseling.

17  **C.     The City's Policy Sanctions the Distribution of DSP to Minors.**

18         The City's new policy expressly authorizes the distribution of smoking

19  paraphernalia to minors. (Minoiefar Dec. ¶6, Ex. E at section 4, p.3.)[1] The policy

20  provides that "safer use supply services may not be restricted by age" and that

21  programs "must provide more frequent proactive counseling and age-appropriate

22  connections to treatment for people seeking services under the age of 18."[2] (*Id*.) In other

23  words, the City formally permits its contractors to hand out fentanyl pipes and other

24  smoking implements to children.

25         Tyler TerMeer, PhD, the CEO of SFAF—the City's principal contractor for

---

[1] The April 1 version that the City supplied to this Court did not contain this provision.

[2] The policy claims this provision is "in alignment with" California Health & Safety Code §121349. However, nothing in that statute remotely authorizes the distribution of DSP to minors.

distributing DSP—confirmed that this policy is applied literally. When asked if a person "who looked like they were ten years old" could obtain smoking paraphernalia, TerMeer answered that under the policy "no matter their age, they would show up and go through the same process" and "they would get supplies if that's what they were there for after they have received counseling." (Minoiefar Dec. ¶8, Ex. F, at 72:15–25.) He explained that SFAF does not ask for identification and provides the same supplies—including glass pipes—to any individual who requests them. (*Id*.) Dr. Susan Philip, the City's Health Officer and its declarant, gave similar testimony. She admitted that, under the City's new 2025 policy, "it is possible that [a 14-year-old] could" receive smoking supplies so long as counseling is offered. (Minoiefar Dec. ¶9, Ex. G, at 168:13–23.) Indeed, earlier this year, Omar Ward documented a 17-year-old collecting DSP in the Tenderloin. (Minoiefar Dec. ¶9, Ex. H, at 222:10-17.)

**D.     The City's Policy Vests Its Contractors with Vast Discretion to Forego Counseling When Handing Out DSP.**

Dr. TerMeer testified that SFAF was directed to draft its own policies expounding on the City's new April 2 policy, that the DPH then approved. (Minoiefar Dec. ¶8, Ex. F, at 40:2-11.) The SFAF's policy gives staff wide discretion to hand out DSP without offering counseling or connections to treatment. (*Id*., at 47:20-49:20.) "We would still provide them with access to the safer use supplies they are requesting." (*Id*., at 48:6-8.) When asked about the public health benefits of furnishing DSP, he "believes" it would reduce the risk of people "burning their lips," inhaling other substances, and infectious diseases. (*Id*., at 55:21-56:15.)

**E.     SFPD Commander Scott Biggs's Testimony Confirms That the Distribution of Smoking Supplies Fuels the Tenderloin Drug Market.**

Commander Scott Biggs is among the most senior officers in the San Francisco Police Department. He reports directly to the Deputy Chief of the Field Operations Bureau and has command responsibility for multiple police districts, including the Tenderloin. (Minoiefar Dec. ¶11, Ex. I, at 11:8-10.) Three captains report to him—those

-4-

commanding the Tenderloin, Mission, and Northern Stations. (*Id.*, at 11:14-12:02.) Within his portfolio, Commander Biggs oversees the Drug Market Agency Coordination Center ("DMACC"), the City's multi-agency initiative charged with dismantling the open-air drug markets that have long plagued the Tenderloin. (ECF no. 105-72, at ¶ 2.)

DMACC coordinates the work of more than a dozen City and state entities, including SFPD, the Department of Public Health ("DPH"), Public Works, the Department of Emergency Management ("DEM"), and the City Attorney's Office. (ECF No. 105-72, at ¶ 4.) Its mission is to identify drug hot spots, direct enforcement operations, and coordinate abatement and outreach efforts. (Minoiefar Dec. ¶11, Ex. I, 22:9-21 and 23:18-25; ECF no. 105-72, at ¶¶ 3-4.) Biggs explained that this assignment places him at the center of the City's response to the Tenderloin drug crisis. (Minoiefar Dec. ¶11, Ex. I, at 14:22-24.)

Biggs testified that through his work he has come to understand the Tenderloin's drug problem as a single, interconnected "ecosystem." (*Id.*, at 30:1-19.) In this ecosystem, open-air drug dealing, street-level fencing, and theft feed one another: users steal goods, resell them in sidewalk markets, and use the proceeds to buy drugs. (*Id.*) Biggs explained that handing out smoking paraphernalia perpetuates this cycle, because it normalizes street-level drug use and enables users to remain in the open-air markets longer. He described this as part of a "vicious cycle" in which public use and public dealing reinforce one another. (*Id.*, at 30:20-21.)

Biggs testified that the two illicit drugs most commonly used in the Tenderloin are fentanyl and methamphetamine (*Id.*, at 17:8-11.) He explained that glass pipes, tin foil, and Brillo are used to smoke these drugs. (*Id.*, at 18:6-20:15.) He agreed that this photo, taken on October 25, 2025, showed typical night street conditions in the Tenderloin:



(Minoiefar Dec. ¶11, Ex. I, at 31:7-32:22 and Ex. 1 thereto.)

Biggs confirmed that crowds such as the one shown in the above photo are typically made up of drug users and drug dealers. (*Id.*, at 32:23-33:06.)

Despite his central role and knowledge base, no one from SFDPH, the Mayor's Office, or the City Attorney's Office consulted Biggs before implementing or expanding the City's DSP policy. (*Id.*, at 42:6-19; 43:7-12; 47:11-19.) He was not asked to provide input, has never been briefed on where the supplies are being distributed, and had no opportunity to explain the policy's predictable impact on neighborhood safety. Indeed, the City's own senior law-enforcement official responsible for combating Tenderloin drug markets was excluded entirely from the policy-making process.

Biggs further testified that the same types of paraphernalia the City now funds for free distribution—pipes, foil, and straws—are recognized by law enforcement as indicators of drug activity. (*Id.*, at 36:11-37:08) He confirmed that SFPD officers have supported the City Attorney's nuisance lawsuits against Tenderloin stores that sold such items, and that the sale or possession of this paraphernalia is commonly treated as evidence of illegal drug activity. (*Id.*, at 36:11-37:13.) Biggs's testimony, from a City-

-6-

1   selected declarant, establishes that the policy directly undermines his department's

2   efforts to suppress drug markets and protect Tenderloin residents.

3   **F.    Deposition Testimony of Omar Ward**

4           Omar Ward provided a declaration in support of plaintiffs' motion, and the City

5   deposed him on November 7, 2025. He does not know any of the plaintiffs. (Minoiefar

6   Dec. ¶10, Ex. H,. at 17:14-17.) He spends the majority of every day in the Tenderloin

7   and frequently walks or ride his scooter around the sidewalks and streets there. (*Id*.

8   at 186:7-18.) He also owns a business in the Tenderloin. (*Id*. at 62:6-15.) Mr. Ward has

9   been aware of drug use on the streets of San Francisco for decades, but not the way it

10  has evolved in the past five to six years. (*Id*. at 175:1-11.) Unlike before, people now

11  use drugs openly. (*Id*. at 175:5-11.) Drug sales are also conducted in the open. (*Id*. at

12  175:12-24.) Since 2022, he has been video documenting the conditions, and he has a

13  catalog of over 500 videos. (*Id*. at 24:5-9 and 40:20-21.) He posts about Tenderloin

14  conditions through his social media account. (*Id*. at 24:5-7.)

15          Since Ward started making his videos in 2022, there have been no significant

16  changes in the Tenderloin. (*Id*. at 167:25-168:04.) "[E]verything just shift from street

17  to street, another block to another block." (*Id*.) In the past six months, there have been

18  improvements in some areas (*Id*. at 176:5-6.), but even after City street crews address

19  a nuisance complaint, the drug users immediately return. (*Id*. at 169:19-170:11 and

20  176:7-15.)

21          Ward has witnessed the distribution of DSP from 290 Turk Street, the

22  headquarters of the Hospitality House ("HH") (*Id*. at 191:3-10), which corroborates the

23  averments of Plaintiff Mary Roe. (ECF no. 101-5 at ¶¶ 2, 6.) Plaintiffs deposed Joseph

24  Wilson, the executive director of HH. He testified that HH has had a contract with the

25  City for a number of years to provide "harm reduction" services out of 290 Turk Street.

26  (Minoiefar Dec. ¶12, Ex. J, at 7:6-8, 12:11-14, and 15:8-20.) Under a 2024 contract, the

27  City is paying HH as much as $8.6 million over a two-year period. (*Id*. at 37:13-38:10.)

28

HH subcontracts with the "Harm Reduction Therapy Center," which also provides services at 290 Turk Street. (*Id.* at 14:3-12 and 33:1-8.) Wilson learned of allegations that smoking supplies were being handed out at 290 Turk Street, but did nothing to investigate them. (*Id.* at 31:2-32:07 and 35:7-20.) He was given several opportunities to acknowledge that open drug use on the Tenderloin's sidewalks causes harm. But he declined, replying, "That's a subjective, you know, opinion." (*Id.* at 42:14-43:18.) He has seen children walking by open drug use and drug sales but reaffirmed that he had "[n]o real opinion" about whether that could be harmful to them. (*Id.* at 44:7-14.)

**G.    Deposition Testimony of Susan Philip, MD.**

Dr. Susan Philip, the City's Health Officer and Director of the Population Health Division, testified about her understanding of the City's policies and the rationale advanced for distributing drug-smoking paraphernalia. Her testimony confirms both the speculative nature of the City's claimed benefits and the absence of evidence that those benefits are being realized in practice.

Dr. Philip identified three potential public-health "benefits" that she believes might arise from the City's distribution of drug-smoking supplies: (1) that coupling the distribution with counseling could help connect people who use drugs to treatment or recovery services; (2) that providing sterile smoking materials might reduce the spread of communicable or viral disease; and (3) that furnishing unbroken pipes might prevent users from cutting their lips on cracked or damaged ones. (Minoiefar Dec. ¶9, Ex. G, at 106:21-107:08.)

Dr. Philip testified that one possible benefit is "engaging a person who uses drugs via smoking in a conversation with a health worker or a member of a staff of a community-based organization so that they are told about opportunities for treatment and recovery in San Francisco." (*Id.* at 112:2-13.) She further explained that continuing engagement with service providers "could be a benefit," by "keeping a person engaged with public health entities to continue to assess readiness for core treatment and offer

1    those." (*Id*. at 112:14-113:2.) She also stated that providing new supplies might reduce

2    disease transmission because "there can also be transmission of communicable

3    diseases through sharing of those materials, including potentially hepatitis and viral

4    infections." (*Id*. at 107:2-5.) Finally, she suggested that providing new pipes could

5    "avoid that potential for injury from a cracked or broke pipe." (*Id*. at 107:23-108:13.)

6          However, Dr. Philip acknowledged that she has no evidence that any of these

7    potential benefits are occurring in practice. When asked if she knew whether people

8    receiving smoking supplies were actually being linked to treatment, she responded: "I

9    am not aware of - - those data." (*Id*. at 164:9–14.) She also admitted she had never

10   "heard of" anyone cutting their lips on broken pipes (*Id*. at 108:15–109:2.) and could

11   not identify any instances of diseases being transmitted or prevented through shared

12   smoking implements in San Francisco. (*Id*. at 109:19-110:10.) She conceded that she

13   had never published any work in the field of addiction medicine and could not cite any

14   peer-reviewed article documenting a public-health benefit from distributing smoking

15   paraphernalia. (*Id*. at 9:11–13 and 171:2–17.)

16   **H.    Declaration of Dr. Ricky Bluthenthal.**

17         Plaintiffs have separately objected to Dr. Bluthenthal's declaration and the

18   statements therein. (See Plaintiff's Obj to Dec, of Dr. Bluthenthal.) As stated in the

19   objections, his testimony is based on literature related to IV drug use. There is

20   insufficient data and literature to support his conjecture and aspirational statements

21   about the efficacy of DSP programs.

### III.    LEGAL ARGUMENT

22

23   **A.    The City Contradicts Its Prior Averments and Admissions About the Many Harms Caused by DSP.**

24

25         The City's nuisance complaints, discussed above, identified the same harms that

26   Plaintiffs and even the City's own employees have described—crime, disorder, and

27   neighborhood decay caused by the open availability of drug paraphernalia. Yet while

28   the City Attorney condemns private retailers for selling such items, the City now

-9-

1    defends a policy that funds their free distribution through its contractors. The

2    inconsistency between the City's prior and present positions is striking: it asserts that

3    the sale of drug-smoking paraphernalia harms public health when done by others but

4    claims it promotes public health when done by itself.

5         This contradiction is important to the fair adjudication of this matter. Judicial

6    estoppel "prevents parties from deliberately changing positions according to the

7    exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). Courts

8    applying the doctrine consider whether (1) a party's later position is clearly

9    inconsistent with an earlier one, (2) the earlier position was accepted by a court, and

10   (3) allowing the change would create an unfair advantage or impose an unfair

11   detriment. *Id.* at 750–51. The Ninth Circuit applies these factors flexibly to protect

12   "the integrity of the judicial process," even when the prior proceedings are ongoing and

13   subject to additional considerations to inform the doctrine's application in specific

14   factual contexts. *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782–83 (9th

15   Cir. 2001); *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600–04 (9th

16   Cir. 1996).

17        The City's current position—that distributing identical paraphernalia through

18   City-funded programs benefits public health and mitigates harm—is directly

19   inconsistent with the position it has taken in its own nuisance suits. Although those

20   suits remain pending and no court has yet granted relief, the Court may consider these

21   contradictions under this specific factual context. It is enough that the City invoked

22   the courts' equitable powers to abate nuisance conditions caused by the sale of drug-

23   smoking paraphernalia, then reversed course to defend the same conduct under a

24   different label. Permitting the City to advance these incompatible positions would

25   undermine confidence in the judicial process and afford it an unfair advantage.

26        At minimum, the City's conflicting pleadings and public statements confirm its

27   awareness that distributing or selling drug paraphernalia fosters the very harms it

28   now minimizes—open drug use, crime, and deterioration of neighborhood conditions.

-10-

1  That acknowledgment, made in the City's own name and in formal court filings,

2  reinforces Plaintiffs' showing that the City's drug-smoking-supply policy perpetuates

3  a public nuisance in the Tenderloin rather than alleviating it.

4  **B.    The City's Claimed Benefits Are Speculative and Outweighed by the Harm Its Policy Causes.**

5

6  Only two of the City's declarants—Dr. Susan Philip and Dr. Ricky

7  Bluthenthal—offer opinions about any purported benefits from furnishing drug-

8  smoking paraphernalia. Every other City declarant confines their testimony to

9  describing the City's law-enforcement, outreach, and cleanup efforts in the Tenderloin.

10  Far from supporting the City's position, this evidence underscores Plaintiffs' point: the

11  City's own witnesses confirm that its substantial resources are devoted to mitigating

12  the very harms that its DSP-distribution policy helps create. The City thus offers

13  speculation from two public-health officials about hypothetical benefits, while the rest

14  of its record acknowledges an ongoing need to combat the disorder and nuisance

15  conditions the policy perpetuates.

16  Dr. Philip identified three speculative possibilities: that distribution might help

17  connect users to treatment, prevent the spread of communicable disease, or avoid

18  minor lip injuries. Yet she conceded that she has no data showing that any of these

19  outcomes are occurring, has never heard of anyone cutting their lips on broken pipes,

20  and could not identify a single example of reduced disease transmission or successful

21  treatment referral. Dr. Bluthenthal's opinions are based on literature about syringe-

22  exchange programs and intravenous drug use, not the smoking-based paraphernalia

23  at issue here. Neither witness offers evidence that the City's policy has produced any

24  measurable benefit.

25  Even if limited benefits occur in isolated instances, the record shows that the

26  harms of the City's policy greatly outweigh them. As Commander Biggs's testimony

27  and the City's own nuisance lawsuits demonstrate, the open availability of smoking

28  paraphernalia fosters public drug use, attracts dealers, and contributes to disorder,

crime, and neighborhood decay in the Tenderloin. The policy normalizes visible drug activity in a neighborhood with a high concentration of families and children, creating unsafe conditions for residents and undermining the City's efforts to restore safety and public health.

Moreover, the City's policy is neither narrowly tailored nor effectively implemented. The April 2, 2025 directive allows distribution "to the extent practical and receivable by the participant," leaving its enforcement to contractor discretion. The City's lead contractor, SFAF, admits it continues to hand out supplies even when counseling does not occur. Dr. Philip herself could not identify a single individual who has entered treatment as a result of this policy. Without data showing that distribution has produced actual treatment linkages or measurable public-health gains, the purported benefits remain theoretical.

The record also reveals that these supposed benefits come at a steep cost to the surrounding community. Dr. Philip agreed that public drug use and discarded paraphernalia create unhealthy and unsafe conditions in neighborhoods like the Tenderloin. (Minoiefar Dec. ¶9 Ex. G, at 38:14–23 and 183:22–184:05.) Yet the City continues to defend a policy that perpetuates those very conditions. The City's speculative hopes for incidental benefits cannot outweigh the documented harms of its own conduct—harms the City itself has recognized in its pending nuisance lawsuits. Handing out smoking paraphernalia under the guise of "harm reduction" deepens, rather than relieves, the crisis in the Tenderloin.

## C.    The City Has Presented a Distorted Visual Record of Conditions.

The City's credibility on the claimed benefits of the DSP policy is further undermined by its presentation of evidence in its opposition. In support of its contention that conditions have been abated, Defendant showed Google Street View images to plaintiffs depicting the blocks where they live or work – for example the 30(b)(6) witness for Plaintiff Phoenix Hotel. (ECF. No. 105-1, Defs. Opp., at 11:20-25; ECF. No. 105-27, Ex, 27, at 179:22-25.) In that instance, the City showed a partial

-12-

Google Street View from November 2021, that appeared to depict the hotel's sidewalk orderly and free of drug activity, eliciting the witness's reluctant concession that it appeared to be a fair and accurate depiction of conditions on that date. (*Id*.) But when the complete Street View image is viewed, it reveals just off screen highly relevant evidence the City left on the editing room floor—depicting large numbers of people congregated along the sidewalk, debris, encampments, and the very nuisance conditions alleged by Plaintiffs. (Minoiefar Decl. 13-16, Ex. K-M.) This selective and misleading presentation of evidence to the Court undermines the City's credibility and reinforces the need for the Court to view the City's factual assertions with caution.

## D. The City Is Not Immune from Nuisance Liability.

Civil Code § 3482 states, "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance." The California Supreme Court has repeatedly held that immunity from nuisance liability under section 3482 applies only if the acts complained of as a nuisance are authorized either "by the express terms of the statute under which the justification is made," or "by the plainest and most necessary implication from the powers expressly conferred." (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 938, fn. 16, citing *Hassell v. San Francisco* (1938) 11 Cal.2d 168, 171.)

The Supreme Court has explained that the requirement of "express authorization *embodied in the statute itself*" ensures that "an unequivocal legislative intent to sanction a nuisance will be effectuated, while avoiding the uncertainty that would result were every generally worded statute a source of undetermined immunity from nuisance liability." (*Greater Westchester Homeowners Assoc. v. City of Los Angeles* (1970) 26 Cal.3d 86, 101, citing *Varjabedian v. City of Madera* (1978) 20 Cal.3d 285, 291, emphasis added.)

### 1. Section 121349.1 Does Not Support the City's Argument

Health & Safety Code Section 121349.1 merely states that, in the context of a needle and syringe exchange program to "combat the spread of HIV and bloodborne

-13-

hepatitis infection among *injection* drug users," those who participate in a needle and syringe exchange program:

> "shall not be subject to *criminal* prosecution for violation of any law related to the possession, furnishing, or transfer of hypodermic needles or syringes or any materials deemed by a local or state health department to be necessary to prevent the spread of communicable diseases, or to prevent drug overdose, injury, or disability during participation in an exchange project." (*Id.*, emphasis added.)

In other words, the conduct remains illegal (and a nuisance under Civ. Code § 3479) but needle exchange program participants are immunized from *criminal* prosecution. This language shows that the legislature contemplated the possibility of liability and expressly limited the scope of immunity to criminal prosecution only.

### 2.    Section 120780.2 Does Not Support the City's Argument

In 2021, Health & Safety Code Section 120780.2 was amended to specify that the purchase of "hypodermic needles and syringes, and other supplies" was intended to reduce the spread of "potentially deadly *bloodborne* pathogens" (emphasis added). The prior version of section 120780.2 referred more generally to "potentially deadly pathogens." The addition of the limiting term "bloodborne" shows a clear legislative intent to limit the purchase (and subsequent furnishing) of such supplies by the State to people who *inject* drugs.

### 3.    There Is Simply No Express Language to Support an Immunity.

There is no statutory language explicitly authorizing the furnishing of "drug smoking paraphernalia," pipes, straws, foil, or (in the City's words) "safer smoking supplies." The California Supreme Court has repeatedly held that such express language is necessary in order invoke the section 3482 immunity. The words "any materials" in section 121349.1 and "other supplies" in section 120780.2 are vague because they are categorical, general, and unspecified. They epitomize the type of "generally worded statute" that the Supreme Court feared would make the scope of an immunity uncertain.

## IV.   <u>CONCLUSION</u>

Ironically, the City *itself* has sued several local business that it alleges sell DSP. In those lawsuits, the City has taken on Plaintiffs' position: that the presence of DSP is a nuisance that causes harm in the neighborhoods where it is distributed and attracts other forms of criminal activity such as loitering and drug sales. The City has rhetorically transmuted the vague wording and limited immunity from criminal prosecution into full-blown immunity from all liability, including nuisance liability. This is impermissible under the *Hassell* line of cases discussed above. Because the cited statutory language is vague, it affords no immunity for nuisance conditions arising from the furnishing of drug smoking paraphernalia to drug addicts. Given that the harms of the City's policy clearly outweigh any benefits, and given the City's lack of immunity for its conduct, the Court should grant Plaintiffs' motion.

Dated:  November 21, 2025          WALKUP, MELODIA, KELLY & SCHOENBERGER

By: _____

MICHAEL A. KELLY
RICHARD H. SCHOENBERGER
MATTHEW D. DAVIS
ASHCON MINOIEFAR
Attorneys for ALL PLAINTIFFS

PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION - CASE NO. 4:24-cv-01562-JST

## PROOF OF SERVICE

**Jane Roe, et al. v. City and County of San Francisco, et al.**
**USDC-Northern California Case No. 4:24-cv-01562-JST**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the county where the mailing took place,  My business address is 650 California Street, 26th Floor, City and County of San Francisco, CA 94108-2615.

On the date set forth below, I caused to be served true copies of the following document(s) described as

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

to:

| | |
|---|---|
| Shanin Specter, Esq. (Admitted Pro Hac Vice) Alex Van Dyke, Esq. KLINE & SPECTER, P.C. 1525 Locust Street Philadelphia, PA 19102 | **Co-Counsel for Plaintiffs** Telephone: (215) 772-1000 shanin.specter@klinespecter.com alex.vandyke@klinespecter.com escalanteyleana@uclawsf.edu |
| David Chiu, Esq., City Attorney Yvonne R. Meré, Esq., Chief Deputy City Attorney Wayne Snodgrass, Esq., Deputy City Attorney Tara M. Steeley, Esq., Deputy City Attorney John H. George, Esq., Deputy City Attorney Kaitlyn M. Murphy, Esq., Deputy City Attorney Abigail Wald, Esq., Deputy City Attorney Deputy City Attorneys City Hall, Room 234 1 Dr. Carlton B. Goodlett Place San Francisco, CA  94102-4682 | **Counsel for City and County of San Francisco** Steeley Direct: (415) 554-4655 George Direct:  (415) 554-4223 Murphy Direct:  (415) 554-6762 Facsimile: (415) 554-4699 Mere Direct:  (415) 554-4700 Mere Facsimile:  (415) 554-4757 tara.steeley@sfcityatty.org john.george@sfcityatty.org kaitlyn.murphy@sfcityatty.org Abigail.Wald@sfcityatty.org anita.murdock@sfcityatty.org sophia.garcia@sfcityatty.org holly.chin@sfcityatty.org pamela.cheeseborough@sfcityatty.org Elizabeth.coolbrith@sfcityatty.org |
| John K. Dipaolo, Esq. General Counsel Secretary to the Board of Directors College of the Law, San Francisco 200 McAllister Street San Francisco, CA 94102 | **Counsel for Plaintiff College of the Law, San Francisco** (related case USDC-Northern California case #:20-cv-03033-JST) Telephone: (415) 565-4787 Facsimile: (415) 565-4825 dipaolojohn@uchastings.edu |

PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION - CASE NO. 4:24-cv-01562-JST

| 1  | Lauren Hansen, Esq. | **Counsel for Proposed Intervenors** |
| 2  | Melissa A. Morris, Esq.<br>Public Interest Law Project | **Hospitality House; Coalition on Homelessness; and Faithful Fools** |
|    | 449 15th Street, Suite 301 | (related case USDC-Northern California |
| 3  | Oakland, CA 94612-06001 | case #4:20-cv-03033-JST) |
| 4  | | Office: (510) 891-9794 |
|    | | Fax: (510) 891-9727 |
| 5  | | lhansen@pilpca.org |
|    | | mmorris@pilpca.org |
| 6  | | |
| 7  | Lili V. Graham, Esq. | **Counsel for Proposed Intervenors** |
|    | Disability Rights California | **Hospitality House; Coalition on** |
| 8  | 350 S. Bixel Street Suite 290 | **Homelessness; and Faithful Fools** |
|    | Los Angeles, CA 90017-1418 | (related case USDC-Northern California |
| 9  | | case #4:20-cv-03033-JST) |
| 10 | | Office: (213) 213-8000 |
|    | | Fax: (213) 213-8001 |
| 11 | | lili.graham@disabilityrightsca.org |
| 12 | | |
|    | Michael David Key, Esq. | **Counsel for Proposed Intervenors** |
| 13 | Jessica Berger, Esq. | **Hospitality House; Coalition on** |
|    | Bay Area Legal Aid | **Homelessness; and Faithful Fools** |
| 14 | 1454 43rd Avenue | (related case USDC-Northern California |
|    | San Francisco, CA 94122 | case #4:20-cv-03033-JST) |
| 15 | | |
| 16 | | Office: (415) 982-1300 |
|    | | Fax: (415) 982-4243 |
| 17 | | mkeys@baylegal.org |
|    | | jberger@baylegal.org |
| 18 | | |
| 19 | John Thomas H. Do, Esq. | **Counsel for Amicus Curiae** |
|    | ACLU Foundation of Northern | **(ACLU Foundation of Northern** |
| 20 | California | **California)** |
|    | 39 Drumm Street | (related case USDC-Northern California |
| 21 | San Francisco, CA 94111 | case #4:20-cv-03033-JST) |
| 22 | | Office: (415) 621-2943 |
|    | | jdo@aclunc.org |
| 23 | | |
| 24 | | |

25         **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants

26    in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

27         I declare under penalty of perjury under the laws of the United States of

28    America that the foregoing is true and correct and that I am employed in the office of

a member of the bar of this Court at whose direction the service was made.

Executed on November 21, 2025, at San Francisco, California.

_____

Kirsten Benzien