LAW OFFICES OF

**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION

650 CALIFORNIA STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94108-2615
T: (415) 981-7210 · F: (415) 391-6965

MICHAEL A. KELLY (State Bar #71460)
mkelly@walkuplawoffice.com
RICHARD H. SCHOENBERGER (State Bar #122190)
rschoenberger@walkuplawoffice.com
MATTHEW D. DAVIS (State Bar #141986)
mdavis@walkuplawoffice.com
ASHCON MINOIEFAR (State Bar #347583)
aminoiefar@walkuplawoffice.com

SHANIN SPECTER (Pennsylvania State Bar No. 40928)
(Admitted Pro Hac Vice)
shanin.specter@klinespecter.com
ALEX VAN DYKE (CA State Bar No. 340379)
alex.vandyke@klinespecter.com
KLINE & SPECTER, P.C.
1525 Locust Street
Philadelphia, PA 19102
Telephone: (215) 772-1000
Facsimile: (215) 772-1359

**ATTORNEYS FOR ALL PLAINTIFFS**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO/OAKLAND
DIVISION

| | |
|---|---|
| JANE ROE, an individual; MARY ROE, an individual; SUSAN ROE, an individual; JOHN ROE, an individual; BARBARA ROE, an individual; PHOENIX HOTEL SF, LLC, a California limited liability company; FUNKY FUN, LLC, a California limited liability company; and 2930 EL CAMINO, LLC, a California limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, a California public entity,<br><br>Defendants. | Case No. 4:24-cv-01562-JST<br><br>**DECLARATION OF ASHCON MINOIEFAR IN SUPPORT OF PLAINTIFFS' REPLY, REQUEST FOR JUDICIAL NOTICE AND OBJECTIONS TO EVIDENCE**<br><br>**ASSIGNED FOR ALL PURPOSES TO THE HONORABLE DISTRICT JUDGE JON S. TIGAR, COURTROOM 6**<br><br>Action Filed: 03/14/2024<br>Trial Date: Unassigned |

1

1    I, Ashcon Minoiefar, declare as follows:

2    1.    I am an attorney duly admitted to practice before this Court. I am an

3    associate with Walkup, Melodia, Kelly & Schoenberger, attorneys of record for ALL

4    PLAINTIFFS. I have personal knowledge of the facts set forth herein, and if called

5    as a witness, I could and would competently testify thereto. I make this declaration

6    based in support of Declaration of Ashcon Minoiefar in Support of Plaintiffs' Reply.

7    2.    Attached hereto as Exhibit A is a true and correct copy of the file-

8    endorsed complaint filed by the San Francisco City Attorney's Office in *City and*

9    *County of San Francisco and the People of the State of California v. 2008 Oh Family*

10    *Trust, et al.*, Case No. CGC-25-624263, filed in the San Francisco Superior Court on

11    April 10, 2025. This complaint is a matter of public record, available through the San

12    Francisco Superior Court's public docket and the City Attorney's website at

13    https://webapps.sftc.org/ci/CaseInfo.dll?CaseNum=CGC25624263&SessionID=E778F

14    61A599538CC06A418DFC4D2A4EB2A06BFDD. I personally accessed and

15    downloaded this complaint from the website on November 20, 2025.

16    3.    Attached hereto as Exhibit B is a true and correct copy of the file-

17    endorsed complaint filed by the San Francisco City Attorney's Office in *City and*

18    *County of San Francisco and the People of the State of California v. Ursula Fung, et*

19    *al.*, Case No. CGC-25-624264, filed in the San Francisco Superior Court on April 10,

20    2025. This complaint is a matter of public record, available through the San

21    Francisco Superior Court's public docket and the City Attorney's website at

22    https://webapps.sftc.org/ci/CaseInfo.dll?CaseNum=CGC25624264&SessionID=A16F2

23    BCBF17416AE2682A5F073E9D83BE345BA20. I personally accessed and

24    downloaded this complaint from the website on November 20, 2025.

25    4.    Attached hereto as Exhibit C is a true and correct copy of the file-

26    endorsed complaint filed by the San Francisco City Attorney's Office in *City and*

27    *County of San Francisco and the People of the State of California v. 155 Turk Street*

28    *Associates L.P.*, Case No. CGC-25-624266, filed in the San Francisco Superior Court

2

1  on April 10, 2025. This complaint is a matter of public record, available through the

2  San Francisco Superior Court's public docket and the City Attorney's website at

3  https://webapps.sftc.org/ci/CaseInfo.dll?CaseNum=CGC25624266&SessionID=A16F2

4  BCBF17416AE2682A5F073E9D83BE345BA20. I personally accessed and

5  downloaded this complaint from the website on November 20, 2025.

6      5.    Attached hereto as Exhibit D is a true and correct copy of the official

7  press release issued by the San Francisco City Attorney's Office on April 11, 2025,

8  titled *"City Attorney Sues Tenderloin Drug and Gambling Dens Fronting as Small*

9  *Businesses."* This press release was publicly posted on the City Attorney's official

10 government website at https://sfcityattorney.org/city-attorney-sues-tenderloin-drug-

11 and-gambling-dens-fronting-as-small-businesses/. I personally accessed and

12 downloaded this press release from the website on November 20, 2025

13     6.    Attached hereto as Exhibit E is a true and correct copy of the *San*

14 *Francisco Department of Public Health Pilot Treatment Connections and Safer Use*

15 *Supplies Distribution Policy*, dated April 2, 2025. This document was published and

16 distributed by the San Francisco Department of Public Health ("SFDPH") and is

17 publicly on the City and County of San Francisco's *Behavioral Health Services*

18 *Policies and Procedures* webpage, under the "DPH BHS Policies" section

19 (https://www.sf.gov/resource--2024--behavioral-health-services-policies-and-

20 procedures). I personally accessed and downloaded this document on November 20,

21 2025 from that website at

22 https://media.api.sf.gov/documents/SFDPH_Pilot_Treatment_Connections_and_Safer

23 _Use_Supplies_Distribution_Policy_0_jFdYzBG.pdf.

24     7.    Each of the foregoing exhibits is an official government record or

25 publication whose authenticity can be verified from public sources. These documents

26 are not subject to reasonable dispute and are appropriate for judicial notice under

27 Federal Rule of Evidence 201(b).

28

DECLARATION OF ASHCON MINOIEFAR IN SUPPORT OF PLAINTIFFS' REPLY, REQUEST
FOR JUDICIAL NOTICE AND OBJECTIONS TO EVIDENCE - CASE NO. 4:24-cv-01562-JST

8.      Attached hereto as <u>Exhibit F</u> is a true and correct copy of relevant excerpts from the deposition transcript of Tyler TerMeer, Ph.D dated November 14, 2025.

9.      Attached hereto as <u>Exhibit G</u> is a true and correct copy of relevant excerpts from the deposition transcript of Susan Philip, M.D. dated November 14, 2025.

10.      Attached hereto as <u>Exhibit H</u> is a true and correct copy of relevant excerpts from the deposition transcript of Omar Ward dated November 7, 2025.

11.      Attached hereto as <u>Exhibit I</u> is a true and correct copy of relevant excerpts from the deposition transcript of Commander Scott Biggs dated October 29, 2025.

12.      Attached hereto as <u>Exhibit J</u> is a true and correct copy of relevant excerpts from the deposition transcript of Joseph Wilson dated November 14, 2025.

13.      Attached hereto and depicted below is <u>Exhibit K</u> is a true and correct copy of Exhibit 18 from the deposition of the Person Most Qualified on behalf of Plaintiff Pheonix Hotel, Isabel Manchester.



DECLARATION OF ASHCON MINOIEFAR IN SUPPORT OF PLAINTIFFS' REPLY, REQUEST FOR JUDICIAL NOTICE AND OBJECTIONS TO EVIDENCE - CASE NO. 4:24-cv-01562-JST

14.    Attached hereto and depicted below as <u>Exhibit L</u> is a true and correct copy of a google street image view from the same date at <u>Exhibit K</u>, November 2021. I accessed and downloaded the image on November 20, 2025. <u>Exhibit L</u> depicts the same silver Toyota depicted in <u>Exhibit K</u>, but depicts the nuisance conditions hidden behind the Corolla and just off screen.



15.    Attached hereto, and depicted below, as <u>Exhibit M</u> is a true and correct copy of a google street image view from the same date at <u>Exhibit K</u>, November 2021. I accessed and downloaded the image on November 20, 2025. <u>Exhibit M</u> depicts the sidewalk outside the Pheonix Hotel that was cut out of <u>Exhibit K</u>.

////

////

////

////

////

////

////

////

DECLARATION OF ASHCON MINOIEFAR IN SUPPORT OF PLAINTIFFS' REPLY, REQUEST FOR JUDICIAL NOTICE AND OBJECTIONS TO EVIDENCE - CASE NO. 4:24-cv-01562-JST



I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on this 21st day of November, 2025, at San Francisco, California.

DECLARATION OF ASHCON MINOIEFAR IN SUPPORT OF PLAINTIFFS' REPLY, REQUEST FOR JUDICIAL NOTICE AND OBJECTIONS TO EVIDENCE - CASE NO. 4:24-cv-01562-JST

# EXHIBIT A

DAVID CHIU, State Bar #189542
City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief Deputy City Attorney
WADE CHOW, State Bar #168527
Chief Attorney
Code Enforcement Team
HUNTER W. SIMS III, State Bar #266039
Deputy City Attorney
Fox Plaza
1390 Market Street, Seventh Floor
San Francisco, California 94102-5406
Telephone:     (415) 554-4259
Facsimile:      (415) 437-4644
E-Mail:         hunter.sims@sfcityatty.org

Attorneys for Plaintiffs
CITY AND COUNTY OF SAN FRANCISCO and
PEOPLE OF THE STATE OF CALIFORNIA

ELECTRONICALLY

**F I L E D**

*Superior Court of California,*
*County of San Francisco*

**04/10/2025**
**Clerk of the Court**
BY: SAHAR ENAYATI
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

UNLIMITED JURISDICTION

**CGC-25-624263**

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, a Municipal Corporation; and the PEOPLE OF THE STATE OF CALIFORNIA, by and through David Chiu, City Attorney for the City and County of San Francisco,<br><br>        Plaintiffs,<br><br>        vs.<br><br>2008 OH FAMILY TRUST, YONG D. OH, an individual, KIL S. OH, an individual, FAMILY CORNER DISCOUNTS WADHAH ALBARAK, an individual, US SMOKE SHOP, MOHAMMED HASSAN, an individual, DOE ONE through DOE FIFTY,<br><br>        Defendants. | Case No.<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND PENALTIES**<br><br>Type of Complaint [42] Other |

/ / /

/ / /

/ / /

1

The CITY AND COUNTY OF SAN FRANCISCO, a municipal corporation, and the PEOPLE OF THE STATE OF CALIFORNIA, by and through San Francisco City Attorney DAVID CHIU (collectively "Plaintiffs"), file their Complaint against Defendants 2008 OH FAMILY TRUST, YONG D. OH, an individual, KIL S. OH, an individual, FAMILY CORNER DISCOUNTS, WADHAH ALBARAK, an individual, US SMOKE SHOP, MOHAMMED HASSAN, and, DOE ONE through DOE FIFTY (collectively "Defendants"). PLAINTIFFS hereby allege as set forth below:

## INTRODUCTION

1. Since DEFENDANTS have been in business, the residents of the Tenderloin neighborhood have suffered due to the DEFENDANTS' illegal acts and business practices at the property located at parcel 0333, lot 001, at the corner of Ellis Street and Jones Street in San Francisco, California. DEFENDANTS operate two separate businesses at this parcel and lot, at 401 and 415 Ellis Street, that contribute to the criminal activity in the Tenderloin. This action seeks to put an end to that activity.

2. DEFENDANT WADHAH ALBARAK has owned and operated the FAMILY CORNER DISCOUNTS since at least February 2024. Due to the illegal gambling, fencing and drug sales at the property, the FAMILY CORNER DISCOUNTS has attracted criminal and nuisance activity to the surrounding community, necessitating police intervention and adversely affecting the neighborhood and the health, safety, and well-being of those who live and work in the area, as well as the general public.

3. By allowing illegal gambling to occur at the FAMILY CORNER DISCOUNTS, DEFENDANTS have maintained the property as a nuisance in violation of California Penal Code sections 11225-11235 ("Red Light Abatement Law").

4. In addition to the illegal gambling occurring at the FAMILY CORNER DISCOUNTS, DEFENDANTS contribute to the problems on the 400 block of Ellis Street and in the surrounding neighborhood by maintaining a safe haven at the FAMILY CORNER DISCOUNTS for drug dealers and users. DEFENDANTS sell drug paraphernalia at the FAMILY CORNER DISCOUNTS and permit the service, storage and possession of controlled substances at the FAMILY CORNER

DISCOUNTS.  Drug dealers routinely loiter inside and in front of FAMILY CORNER DISCOUNTS, attracting large groups of drug users to this area.

5.     Defendants also operate FAMILY CORNER DISCOUNTS in an illegal manner by knowingly purchasing and selling stolen property.

6.     DEFENDANT MOHAMMED HASSAN have owned and/or operated the US SMOKE SHOP since at least September 2022.  Due to the illegal gambling, fencing and drug sales at the property, the US SMOKE SHOP has attracted criminal and nuisance activity to the surrounding community, necessitating police intervention and adversely affecting the neighborhood and the health, safety, and well-being of those who live and work in the area, as well as the general public.

7.     By allowing illegal gambling to occur at the US SMOKE SHOP, DEFENDANTS have maintained the property as a nuisance in violation of California Penal Code sections 11225-11235 ("Red Light Abatement Law").

8.     In addition to the illegal gambling occurring at the US SMOKE SHOP, DEFENDANTS contribute to the problems on the 400 block of Ellis Street and in the surrounding neighborhood by maintaining a safe haven at the US SMOKE SHOP for drug dealers and users. DEFENDANTS sell drug paraphernalia at US SMOKE SHOP and permit the service, storage and possession of controlled substances at the US SMOKE SHOP.  Drug dealers routinely loiter inside and in front of US SMOKE SHOP, attracting large groups of drug users to this area.

9.     Defendants also operate US SMOKE SHOP in an illegal manner by knowingly purchasing and selling stolen property.

10.     By allowing illegal gambling and the sale of drug paraphernalia to occur at FAMILY CORNER DISCOUNTS and the US SMOKE SHOP, DEFENDANTS have maintained the property as a public nuisance in violation of California Civil Code sections 3479-3480.

11.     By operating, and/or allowing the operation of, the FAMILY CORNER DISCOUNTS and the US SMOKE SHOP in repeated violation of applicable state and local laws and as a nuisance, DEFENDANTS have also demonstrated a pattern and practice of engaging in unlawful business practices in violation of the Unfair Competition Law ("UCL"), California Business and Professions Code sections 17200-17210.

Complaint, Case No.                                                    n:\codenf\li2025\250757\01823571.docx

12.     California's Gambling Control Act ("GCA"), Business and Professions Code sections 19800 *et seq.* was passed in 1997.  While gambling establishments have existed in California for over 100 years, the legal gambling industry prior to 1984 was almost entirely unregulated; California law has since outlawed certain forms of gambling and left other forms free of government oversight or regulation.

13.     With the passage of the GCA, the California Legislature recognized that "[u]nregulated gambling enterprises are inimical to the public health, safety, welfare, and good order.  Accordingly, no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state and by the ordinances of local governmental bodies."  Business and Professions Code section 19801(d).

14.     California has long recognized the adverse impact of gambling on individuals and communities and has consequently restricted legal gambling to the California Lottery, "card rooms," casinos operated by Native American tribes, and race tracks.  State law and many local ordinances make virtually all other forms of gambling expressly illegal and provide local governments both civil and criminal remedies to address the crime and nuisance created by illegal gambling operations.  *See* Penal Code Chapter 10, sections 330-337 *et seq.* and 11225-11235; San Francisco Municipal Police Code sections 325-327.

15.     In order to lawfully operate a business in which drug paraphernalia is offered, sold, or given away, the business must keep and display the drug paraphernalia in a separate room, and the business must exclude minors not accompanied by a parent or legal guardian from entry. *See* Health and Safety Code, Chapter 6, section 11364.5.

16.     By allowing controlled substances to be sold, served, stored, kept, manufactured, or given away at FAMILY CORNER DISCOUNTS and the US SMOKE SHOP, DEFENDANTS also have maintained the PROPERTY as a *per se* public nuisance, in violation of the state Drug Abatement Law, California Health and Safety Code Sections 11570-11587, and California Civil Code Sections 3479, 3480, 3491, and 3494.

/ / /

/ / /

Complaint, Case No.                                                                      n:\codenf\li2025\250757\01823571.docx

## PARTIES AND SUBJECT PROPERTY

17.     Plaintiff CITY AND COUNTY OF SAN FRANCISCO (the "CITY") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a city and county.  The CITY brings this action under the Red Light Abatement Law, the Drug Abatement Act, California Civil Code sections 3479, 3480, 3491, 3494, and California Code of Civil Procedure section 731.

18.     Plaintiff PEOPLE OF THE STATE OF CALIFORNIA (the "PEOPLE"), by and through David Chiu, City Attorney of the City and County of San Francisco, bring this action pursuant to the Red Light Abatement Law, the Unfair Competition Law, Drug Abatement Act, Civil Code Sections 3479,3480, 3491, 2494, and Code of Civil Procedure Section 731.

19.     Defendant 2008 OH FAMILY TRUST, ("TRUST") owns the property where the FAMILY CORNER DISCOUNTS and the US SMOKE SHOP are located, parcel 0333, lot 001 located at the corner of Ellis Street and Jones Street in San Francisco, California.   ("PROPERTY").

20.     YONG D. OH, an individual, is a trustee of the TRUST and is domiciled in San Francisco, California.

21.     KIL S. OH, an individual, is a trustee of the TRUST and is domiciled in San Francisco, California.

22.     WADHAH ALBARAK is an individual who owns, manages and/or operates FAMILY CORNER DISCOUNTS, a commercial business located at 401 Ellis Street, in the City and County of San Francisco.  FAMILY CORNER DISCOUNTS is an illegal gambling business, where patrons pay to play slot machines for the chance to win cash payouts.  WADHAH ALBARAK owns FAMILY CORNER DISCOUNTS and is the commercial tenant of the TRUST.  Actions taken, or omissions made, by WADHAH ALBARAK's employees or agents in the course of their employment or agency at FAMILY CORNER DISCOUNTS are considered to be actions or omissions of WADHAH ALBARAK for the purposes of this Complaint.

23.     WADHAH ALBARAK is domiciled in Oakland, California.

24.     MOHAMMED HASSAN is the individual who owns, manages and/or operates the US SMOKE SHOP, a commercial business located at 415 Ellis Street, in the City and County of San

5

Francisco.  The US SMOKE SHOP is an illegal gambling business, where patrons pay to play slot machines for the chance to win cash payouts.  MOHAMMED HASSAN owns US SMOKE SHOP and is the commercial tenant of the TRUST.  Actions taken, or omissions made, by MOHAMMED HASSAN's employees or agents in the course of their employment or agency at US SMOKE SHOP are considered to be actions or omissions of MOHAMMED HASSAN for the purposes of this Complaint.

25.     MOHAMMED HASSAN is domiciled in Torrance, California.

26.     Defendants DOE ONE through DOE FIFTY are sued herein under fictitious names. Plaintiffs do not at this time know the true names or capacities of said defendants, but pray that the same may be alleged herein when ascertained.

**GENERAL ALLEGATIONS**

**I.     FAMILY CORNER DISCOUNTS IS A GAMBLING SHACK WHERE DRUGS ARE SOLD**

27.     FAMILY CORNER DISCOUNTS is a commercial business located on a busy commercial street in the Tenderloin district of San Francisco.  WADHAH ALBARAK owns and/or operates FAMILY CORNER DISCOUNTS, which has been in operation since at least February 2024. MOHAMMED HASSAN leases the commercial space from the TRUST.  .

28.     FAMILY CORNER DISCOUNTS has the appearance of a convenience store. However, at all times pertinent to the allegations of this Complaint, DEFENDANTS kept electronic slot machines on site. Patrons inserted cash into these slot machines for a chance to win cash payouts.

29.     The FAMILY CORNER DISCOUNTS had electronic slot machines to satisfy almost any patron; the machines were different varieties of "spinning reel" slot machine games.  Patrons who inserted cash into the machines obtained "points" or "credits" that they used to play the machines. Patrons played by selecting buttons on the video displays or on the machine, and won or lost their "points" or "credits" as they played, depending on chance.  The outcome of the games was unpredictable to the patrons.  The machines kept track of the patron's "wins," and a winning player collected their winnings from a cashier at the FAMILY CORNER DISCOUNTS, who paid out the winnings in cash.

/ / /

Complaint, Case No.                                                                n:\codenf\li2025\250757\01823571.docx

30.    On January 14, 2025, a San Francisco Police Department officer conducted surveillance on the FAMILY CORNER DISCOUNTS. The officer saw the outline of what they believed to be a gambling machine. Many people were loitering around the machine.  Some of those people would occasionally walk to the clerk and then return to the machine. No one exited the store carrying a grocery bag or appeared to have made any purchases at the store.

31.    The officer then saw an individual enter FAMILY CORNER DISCOUNTS who appeared to be concealing something under his jacket. This individual opened his jacket to the store clerk, showing was he was carrying. The clerk looked at the inside of his jacket and appeared to decline what the individual was offering. As the individual exited the store, the officer saw that the person was carrying a container of laundry detergent. These observations made the officer believe the store was buying and reselling stolen goods.

32.    On January 15, 2025, two undercover San Francisco Police Department officers entered the FAMILY CORNER DISCOUNTS and saw five gambling machines. There were several people playing the machines.  The undercover officers played two separate the machines and lost money.  The officers then heard another patron playing a game next to him request a "cash out." The officer saw the store clerk pay the patron $25. The officers then saw the clerk "cash out" a different patron, but was unable to determine the amount the clerk paid.

33.    On January 28, 2025, members of the San Francisco Police Department obtained and executed a search warrant at the FAMILY CORNER DISCOUNTS.

34.    Members of the San Francisco Police Department found significant evidence of criminal activity while executing the search warrant at the FAMILY CORNER DISCOUNTS. Officers seized 6 electronic gambling machines, 50.8 grams of methamphetamine located under a display shelf, and  $4,456 of cash from the electronic gambling machines and the register. The officers also seized a ledger that contained "pay/owe" sheets.

35.    In addition, officers seized evidence indicating FAMILY CORNER DISCOUNTS was selling contraband and stolen property. Officers found cartons of cigarettes that were manufactured outside of the United States. In addition, officers seized merchandise displayed for sale that had original price stickers for a different business, namely CVS.

36.    Lastly, the officers obtained evidence showing FAMILY CORNER DISCOUNTS was profiting from the drug crisis in the Tenderloin. Officers saw hundreds of glass pipes, which are commonly used to smoke methamphetamine and crack cocaine, and small plastic baggies for sale at the FAMILY CORNER DISCOUNTS.  The glass pipes were kept at the front of the store by the cash register, in an area of the FAMILY CORNER DISCOUNTS that was accessible to minors.

37.    The FAMILY CORNER DISCOUNTS' gambling operation is illegal under Penal Code section 330b, which makes it unlawful for businesses to operate or possess, and property owners to allow the operation or possession of, slot machines, which it defines as follows:

> [A] machine, apparatus, or device that is adapted, or may readily be converted, for use in a way that, as a result of the insertion of any piece of money or coin or other object, or by any other means, the machine or device is caused to operate or may be operated, and by reason of any element of hazard or chance or of other outcome of operation unpredictable by him or her, the user may receive or become entitled to receive any piece of money, credit, allowance, or thing of value, or additional chance or right to use the slot machine or device, or any check, slug, token, or memorandum, whether of value or otherwise, which may be exchanged for any money, credit, allowance, or thing of value, or which may be given in trade, irrespective of whether it may, apart from any element of hazard or chance or unpredictable outcome of operation, also sell, deliver, or present some merchandise, indication of weight, entertainment, or other thing of value.

38.    The FAMILY CORNER DISCOUNTS also violates San Francisco Municipal Police Code section 325, which provides:

> It shall be unlawful for any person, either as owner, lessee, agent, employee, mortgagee or otherwise to operate, keep, maintain, rent, use or conduct, within the City and County of San Francisco, any clock, tape, slot or card machine, or any other machine, contrivance or device upon which money is staked or hazarded upon chance or into which money is paid, deposited, or played, upon chance or upon result of the action of which money or any other article or thing of value is staked, bet, hazarded, won or lost upon chance.

39.    The FAMILY CORNER DISCOUNTS violates Health and Safety Code Section 11570, which makes it unlawful for a building to be used to sell, serve, store, keep, manufacture or give away any controlled substance.

/ / /

Complaint, Case No.                                                      n:\codenf\li2025\250757\01823571.docx

40.     Since the FAMILY CORNER DISCOUNTS opened, criminal and nuisance activity have increased in the area, necessitating police intervention and adversely affecting the surrounding neighborhood.  The neighborhood has experienced a rising number of thefts, assaults, drug-related offenses and arrests of FAMILY CORNER DISCOUNTS customers wanted on outstanding warrants. DEFENDANTS' maintenance of the FAMILY CORNER DISCOUNTS has interfered with the comfortable enjoyment of life and property in the surrounding community.  Its continued operation is a nuisance that threatens the health and safety of the neighborhood and the well-being of those who live and work in the area, as well as the general public.

## II.    US SMOKE SHOP IS A GAMBLING SHACK WHERE DRUGS AND ILLEGAL FLAVORED TOBACCO PRODUCTS ARE SOLD

41.     US SMOKE SHOP is a commercial business located on a busy commercial street in the Tenderloin district of San Francisco.  MOHAMMED HASSAN owns and/or operates US SMOKE SHOP, which has been in operation since at least 2022.  MOHAMMED HASSAN leases the commercial space from the TRUST.  .

42.     US SMOKE SHOP has the appearance of a smoke shop. However, at all times pertinent to the allegations of this Complaint, DEFENDANTS kept electronic slot machines on site. Patrons inserted cash into these slot machines for a chance to win cash payouts.

43.     The US SMOKE SHOP had electronic slot machines to satisfy almost any patron; the machines were different varieties of "spinning reel" slot machine games.  Patrons who inserted cash into the machines obtained "points" or "credits" that they used to play the machines.  Patrons played by selecting buttons on the video displays or on the machine, and won or lost their "points" or "credits" as they played, depending on chance.  The outcome of the games was unpredictable to the patrons.  The machines kept track of the patron's "wins," and a winning player collected their winnings from a cashier at the US SMOKE SHOP, who paid out the winnings in cash.

44.     Members of the San Francisco Police Department received a number of complaints of illegal gambling occurring inside the US SMOKE SHOP in early January 2025. One officer walked by the US SMOKE SHOP in response to these complaints and saw at least two gambling machines in plain view.

Complaint, Case No.                                                                              n:\codenf\li2025\250757\01823571.docx

45.     On January 19, 2025, an undercover San Francisco Police officer entered the US SMOKE SHOP. The officer , the undercover officer observed five electronic gambling machines along one of the walls. The officer then used $15 to gamble on one of the machines. The officer lost the money and left the store.

46.     On January 28, 2025, members of the San Francisco Police Department obtained and executed a search warrant at the US SMOKE SHOP.

47.     Members of the San Francisco Police Department found significant evidence of criminal activity while executing the search warrant at the US SMOKE SHOP. Officers seized 5 electronic gambling machines, two pistol magazines, a digital scale, $17,269 of cash from the machines and the register, and a substantial amount of loose leaf cannabis, pre-rolled cannabis joints and individual vape cartridges containing cannabis. There was a sign posted on one gambling machine saying "Don't cash yourself out!! We will not be responsible!!" The officers also seized a ledger that contained "pay/owe" sheets.

48.     The officers also seized a substantial number of illegal flavored tobacco products that were for sale. These items were found in a back room of the US SMOKE SHOP that was inaccessible to the public.

49.     The US SMOKE SHOP's gambling operation is illegal under Penal Code section 330b, which makes it unlawful for businesses to operate or possess, and property owners to allow the operation or possession of, slot machines, which it defines as follows:

> [A] machine, apparatus, or device that is adapted, or may readily be converted, for use in a way that, as a result of the insertion of any piece of money or coin or other object, or by any other means, the machine or device is caused to operate or may be operated, and by reason of any element of hazard or chance or of other outcome of operation unpredictable by him or her, the user may receive or become entitled to receive any piece of money, credit, allowance, or thing of value, or additional chance or right to use the slot machine or device, or any check, slug, token, or memorandum, whether of value or otherwise, which may be exchanged for any money, credit, allowance, or thing of value, or which may be given in trade, irrespective of whether it may, apart from any element of hazard or chance or unpredictable outcome of operation, also sell, deliver, or present some merchandise, indication of weight, entertainment, or other thing of value.

Complaint, Case No.                                                                 n:\codenf\li2025\250757\01823571.docx

50.     The US SMOKE SHOP also violates San Francisco Municipal Police Code section 325, which provides:

> It shall be unlawful for any person, either as owner, lessee, agent, employee, mortgagee or otherwise to operate, keep, maintain, rent, use or conduct, within the City and County of San Francisco, any clock, tape, slot or card machine, or any other machine, contrivance or device upon which money is staked or hazarded upon chance or into which money is paid, deposited, or played, upon chance or upon result of the action of which money or any other article or thing of value is staked, bet, hazarded, won or lost upon chance.

51.     The US SMOKE SHOP violates Health and Safety Code Section 11570, which makes it unlawful for a building to be used to sell, serve, store, keep, manufacture or give away any controlled substance. The US SMOKE SHOP is not a licensed cannabis dispensary and cannot lawfully sell cannabis.

52.     The US SMOKE SHOP violates San Francisco Health Code Sections 581(b)(18), 600(b), 19H.3, 19H.18, 19Q.3(a), and 19R.2, which collectively bans the sale of flavored tobacco products.

53.     Since the US SMOKE SHOP opened, criminal and nuisance activity have increased in the area, necessitating police intervention and adversely affecting the surrounding neighborhood.  The neighborhood has experienced a rising number of thefts, assaults, drug-related offenses and arrests of US SMOKE SHOP customers wanted on outstanding warrants.  DEFENDANTS' maintenance of the US SMOKE SHOP has interfered with the comfortable enjoyment of life and property in the surrounding community.  Its continued operation is a nuisance that threatens the health and safety of the neighborhood and the well-being of those who live and work in the area, as well as the general public.

///

///

///

11

**FIRST CAUSE OF ACTION**
**FOR VIOLATION OF THE RED LIGHT ABATEMENT ACT  BROUGHT BY PLAINTIFFS**
**PEOPLE OF THE STATE OF CALIFORNIA AND THE CITY AND COUNTY OF SAN**
**FRANCISCO AGAINST ALL DEFENDANTS BASED ON GAMBLING AT FAMILY**
**CORNER DISCOUNTS AND THE US SMOKE SHOP**
**(Penal Code Sections 11225 -11235)**

54.     Plaintiffs PEOPLE OF THE STATE OF CALIFORNIA and the CITY AND COUNTY OF SAN FRANCISCO hereby incorporate by reference paragraphs 1 through 54 above, as though fully set forth herein.

55.     From 2023 through the present, DEFENDANTS have operated, and/or permitted the operation of, an illegal gambling establishment at FAMILY CORNER DISCOUNTS and the US SMOKE SHOP by possessing and/or operating, or permitting the possession and operation of, "machine[s] or device[s]" that "may be operated, and by reason of . . . hazard or chance or of other outcome of operation unpredictable by [the user], the user may receive or become entitled to receive . . . [an] additional chance or right to use the slot machine or device" or a "token, or memorandum . . . which may be exchanged for any money, credit, allowance, or thing of value."  Penal Code section 330b(d).  By possessing and/or operating, and/or permitting the possession and/or operation of, these machines or devices, DEFENDANTS have violated and continue to violate Penal Code section 330b(d) and San Francisco Municipal Police Code sections 325-327.  This illegal gambling operation constitutes a nuisance as a matter of law under Penal Code section 11225.

56.     Pursuant to Penal Code section 11230, PLAINTIFFS request that the Court order the closure of FAMILY CORNER DISCOUNTS and the US SMOKE SHOP for one year and impose civil penalties of $25,000.00 against each Defendant to prevent DEFENDANTS from continuing to maintain or permit a nuisance at the property.

57.     Unless said nuisance is abated, the surrounding community and neighborhood, and the residents and citizens of the City and County of San Francisco and the People of California, will suffer irreparable injury and damage, in that said conditions will continue to be dangerous to the life, safety or health of those who live and work near FAMILY CORNER DISCOUNTS and the US SMOKE SHOP and the general public.

///

Complaint, Case No.                                                                     n:\codenf\li2025\250757\01823571.docx

58.    PLAINTIFFS have no adequate remedy at law in that damages alone are insufficient to protect the public from the present injury and harm caused by the conduct described above.

### SECOND CAUSE OF ACTION

**FOR PUBLIC NUISANCE BROUGHT BY PLAINTIFFS PEOPLE OF THE STATE OF CALIFORNIA AND THE CITY AND COUNTY OF SAN FRANCISCO AGAINST ALL DEFENDANTS BASED ON THE SALE OF NARCOTICS AT FAMILY CORNER DISCOUNTS AND THE US SMOKE SHOP**

**(Health And Safety Code Sections 11570 -11587)**

40.    Plaintiffs People of the State of California and the City and County of San Francisco hereby incorporate by reference paragraphs 1 through 39 above, as though fully set forth herein.

41.    DEFENDANTS and their employees and agents have sold, stored, or possessed controlled substances at FAMILY CORNER DISCOUNTS and the US SMOKE SHOP and/or permitted the sale, storage, possession, manufacture, consumption or distribution of controlled substances at FAMILY CORNER DISCOUNTS and the US SMOKE SHOP.  Such conduct constitutes a nuisance as a matter of law pursuant to California Health and Safety Code Section 11570.

42.    Pursuant to California Health and Safety Code Section 11581, Plaintiffs request that the Court close FAMILY CORNER DISCOUNTS and the US SMOKE SHOP for one year and impose civil penalties of $25,000.00 against each DEFENDANT to prevent DEFENDANTS from continuing to maintain a nuisance at FAMILY CORNER DISCOUNTS and the US SMOKE SHOP.

43.    Unless said nuisance is abated, the residents and citizens of the City and County of San Francisco and the People of California will suffer irreparable injury and damage, in that said conditions will continue to be dangerous to the life, safety or health of those who live and work near FAMILY CORNER DISCOUNTS and the US SMOKE SHOP and the general public.

44.    Plaintiffs have no adequate remedy at law in that damages alone are insufficient to protect the public from the present injury and harm caused by the conduct described above.

### THIRD CAUSE OF ACTION

**FOR UNLAWFUL BUSINESS PRACTICES BROUGHT BY PLAINTIFF PEOPLE OF THE STATE OF CALIFORNIA AGAINST ALL DEFENDANTS**

**(California Business and Professions Code Sections 17200-17210)**

45.    Plaintiff, the PEOPLE OF THE STATE OF CALIFORNIA, hereby incorporates by reference paragraphs 1 through -- above, as though fully set forth herein.

13

46.     The PEOPLE bring this cause of action in the public interest in the name of the PEOPLE OF THE STATE OF CALIFORNIA, pursuant to Business and Professions Code sections 17200 through 17210, in order to protect the residents and owners of properties adjoining FAMILY CORNER DISCOUNTS and the US SMOKE SHOP from the unlawful business practices committed by DEFENDANTS in the operation of FAMILY CORNER DISCOUNTS and the US SMOKE SHOP within the City and County of San Francisco, State of California.

47.     The violations of law described herein have been, and are being, carried out wholly or in part within the City and County of San Francisco.  The actions of DEFENDANTS are in violation of the laws and public policies of the City and County of San Francisco and the State of California, and are inimical to the rights and interest of the general public.

48.     DEFENDANTS are now engaging in and, for a considerable period of time and at all times pertinent to the allegations of this Complaint, have engaged in, unlawful business practices prohibited by California's Unfair Competition Law by managing and operating, and/or allowing the management and operation of, FAMILY CORNER DISCOUNTS and the US SMOKE SHOP in violation of the following laws:

- Penal Code sections 11225-11235 by allowing illegal gambling to occur at FAMILY CORNER DISCOUNTS and the US SMOKE SHOP;

- Penal Code section 330b by possessing and/or operating, or permitting the possession and/or operation, of slot machines or devices (as defined in Penal Code section 330b(d)) FAMILY CORNER DISCOUNTS and the US SMOKE SHOP;

- San Francisco Municipal Police Code sections 325-327 by operating and/or keeping slot machines or their equivalent at FAMILY CORNER DISCOUNTS and the US SMOKE SHOP.

- Health and Safety Code Sections 11570 -11587 by permitting the sale, storage, possession, manufacture, consumption or distribution of controlled substances at FAMILY CORNER DISCOUNTS and the US SMOKE SHOP;

- Health and Safety Code section 11364.5 for unlawfully keeping and selling drug paraphernalia in an area accessible to minors.

14

- Health and Safety Code section 11364.7 by delivering, furnishing, transferring, and possessing with intent to deliver, furnish or transfer drug paraphernalia, knowing or under circumstances where one reasonably should know that it will be used to ingest, inhale or otherwise introduce into the human body a controlled substance.

- California Penal Code Sections 496 by knowingly purchasing and selling stolen property.

49.    As a direct and proximate result of the foregoing acts and practices, DEFENDANTS have received income, profits, and other benefits, which they would not have received if DEFENDANTS had not engaged in the violations of the Unfair Competition Law described in this Complaint.

50.    The PEOPLE have no adequate remedy at law in that damages are insufficient to protect the public from the harm caused by the conditions described in this Complaint.

51.    Unless injunctive relief is granted to enjoin the unlawful business practices of DEFENDANTS, the PEOPLE will suffer irreparable injury and damage.

52.    By engaging in the unlawful business practices described herein, DEFENDANTS are each subject to civil penalties in the amount of $2,500.00 per violation, pursuant to Business and Professions Code section 17206.

**FOURTH CAUSE OF ACTION**

**PUBLIC NUISANCE BROUGHT BY PLAINTIFF PEOPLE OF THE STATE OF CALIFORNIA AGAINST ALL DEFENDANTS**
**(California Civil Code Sections 3479 and 3480, and California Code of Civil Procedure Section 731)**

53.    PLAINTIFFS hereby incorporate by reference all of the foregoing paragraphs, as though fully set forth herein.

54.    DEFENDANTS and their employees have sold and offered for sale paraphernalia used to ingest or inhale controlled substances at FAMILY CORNER DISCOUNTS and the US SMOKE SHOP. Such conduct adversely affects public health, contributes to illegal drug activity, and contributes to other criminal activity.

///

///

15

55.    DEFENDANTS and their employees have sold and offered for sale controlled substances at FAMILY CORNER DISCOUNTS and the US SMOKE SHOP. Such conduct adversely affects public health, contributes to illegal drug activity, and contributes to other criminal activity.

56.    DEFENDANTS and their employees have purchased, sold and offered for sale property they know to be stolen at FAMILY CORNER DISCOUNTS and the US SMOKE SHOP. Such conduct promotes crimes of theft and contributes to other criminal activity.

57.    DEFENDANTS and their employees have operated an illegal gambling operation at FAMILY CORNER DISCOUNTS and the US SMOKE SHOP. Such conduct adversely affects public health and contributes to other criminal activity, including violent crimes such as robbery.

58.    As described above, DEFENDANTS are now, and for a considerable period of time, and at all times pertinent to the allegations in this Complaint have been, maintaining the PROPERTY in such a manner as to constitute a continuing public nuisance within the meaning of Civil Code sections 3479 and 3480. The practices described above are injurious to the health and safety of the residents and the community, are offensive to the senses, and interfere with the comfortable enjoyment of life and property. The practices described above also affect a considerable number of people and an entire community and neighborhood.

59.    At all times herein mentioned, DEFENDANTS have had notice and knowledge that the PROPERTY constituted a public nuisance because of the multiple calls for service to the PROPERTY by members of the San Francisco Police Department, but DEFENDANTS have taken inadequate steps to abate the public nuisance.

60.    PLAINTIFFS have no adequate remedy at law in that damages are insufficient to protect the public from the present danger and harm caused by the conditions described herein.

61.    Unless these nuisance conditions are abated, the occupants and neighbors of the subject PROPERTY and the residents of the City and County of San Francisco will suffer irreparable injury and damage because the nuisance conditions will continue to be injurious to the continuous enjoyment of life and the free use of property of the neighbors and the public.

///

///

Complaint, Case No.                                                                    n:\codenf\li2025\250757\01823571.docx

**FIFTH CAUSE OF ACTION**
**FOR VIOLATIONS OF THE SAN FRANCISCO HEALTH CODE BY PLAINTIFF CITY AND COUNTY OF SAN FRANCISCO AGAINST US SMOKE SHOP AND MOHAMMED HASSAN**
**(San Francisco Health Code Sections 581(b)(18), 600(b), 19H.3, 19H.18, 19Q.3(a), and 19R.2)**

62.     PLAINTIFFS hereby incorporate by reference all of the foregoing paragraphs, as though fully set forth herein.

63.     Plaintiff CITY brings this Count pursuant to Health Code sections 581(b)(18), 600(b), 19H.3, 19H.18, 19Q.3(a), and 19R.2.

64.     DEFENDANTS US SMOKE SHOP and MOHAMMED HASSAN as owners, managers and operators of the US SMOKE SHOP engaged in the sale of flavored tobacco products in violation of Sections 19Q.3(a) and 19Q.4(a) of the Health Code; and the sale of e-cigarettes lacking Food and Drug Administration Premarket Order of Approval in violation of Section 19R.2 of the Health Code.

65.     Pursuant to Health Code section 19H.18(a), violations of Article 19H of the Health Code, including the violations set forth above, constitute public nuisances.

66.     The conditions constituting the violations of the Health Code are more fully described above,

67.     Pursuant to Health Code section 600(b)(3), DEFENDANTS are subject to civil penalties of up to $1000 per day per violation for having violated the above provisions of the Health Code.

## PRAYER

WHEREFORE, PLAINTIFFS pray that:

**Declaratory Relief**

1.     FAMILY CORNER DISCOUNTS and the US SMOKE SHOP be declared  nuisances in violation of Penal Code sections 11225-11235;

2.     FAMILY CORNER DISCOUNTS and the US SMOKE SHOP be declared nuisances in violation of Health & Safety Code section 11570;

3.     DEFENDANTS be declared to have engaged in unlawful business acts and practices in violation of Business and Professions Code sections 17200-17210;

17

**Injunctive Relief**

4.     The nuisance be preliminarily and permanently abated in accordance with Penal Code sections 11225-11235;

5.     All movable property used in the maintenance of the nuisance at the FAMILY CORNER DISCOUNTS and the US SMOKE SHOP be removed and sold, pursuant to Penal Code section 11230;

6.     FAMILY CORNER DISCOUNTS and the US SMOKE SHOP be closed for one year, pursuant to Penal Code section 11230;

7.     FAMILY CORNER DISCOUNTS and the US SMOKE SHOP be closed for one year, pursuant to Health & Safety Code section 11581(b)(1);

8.     In the event the Court decides that any vacancy resulting from closure will be harmful to the community, in lieu of closing the FAMILY CORNER DISCOUNTS and the US SMOKE SHOP, each Defendant be ordered to pay damages in an amount equal to the fair market rental value of the commercial space occupied by the FAMILY CORNER DISCOUNTS and the US SMOKE SHOP for one year, pursuant to Penal Code section 11230 and pursuant to Health & Safety Code section 11581(c)(1);

9.     In the event that the Court does not order FAMILY CORNER DISCOUNTS and the US SMOKE SHOP closed, all DEFENDANTS, their agents, officers, lessees, managers, representatives, employees, and anyone acting on their behalf, and their heirs and assignees be preliminarily and permanently enjoined from operating, conducting, using, occupying, or in any way permitting the use of FAMILY CORNER DISCOUNTS and the US SMOKE SHOP as a nuisance pursuant to Penal Code sections 11225-11235;

10.     DEFENDANTS be enjoined and restrained from occupying or operating, and/or allowing the occupation or operation of, FAMILY CORNER DISCOUNTS and the US SMOKE SHOP while the conditions described in this Complaint exist and until all of the violations at FAMILY CORNER DISCOUNTS and the US SMOKE SHOP have been abated;

/ / /

/ / /

11.     DEFENDANTS be ordered to cause the FAMILY CORNER DISCOUNTS and the US SMOKE SHOP to conform to law, and maintain such structures and all parts thereof in accordance with law;

12.     Pursuant to California Business and Professions Code sections 17203-17204, DEFENDANTS, their agents, officers, lessees, managers, representatives, employees, and anyone acting on their behalf, and their heirs, successors, and assignees be enjoined from operating, conducting, using, occupying, or in any way permitting the use of FAMILY CORNER DISCOUNTS and the US SMOKE SHOP in the unlawful business practices described in this Complaint;

13.     DEFENDANTS, and each of them, inclusive, be enjoined from spending, transferring, encumbering, or removing from California any money received from FAMILY CORNER DISCOUNTS and the US SMOKE SHOP or in payment for the unlawful acts alleged in the Complaint;

**Penalties**

14.     The Court impose civil penalties of  up to $25,000.00 against each Defendant to prevent them from continuing to maintain, and/or to allow the maintenance of, a nuisance at FAMILY CORNER DISCOUNTS and the US SMOKE SHOP, pursuant to Penal Code section 11230;

15.     The Court impose civil penalties of up to $25,000.00 against each Defendant to prevent them from continuing to maintain, and/or to allow the maintenance of, a nuisance at FAMILY CORNER DISCOUNTS and the US SMOKE SHOP, pursuant to Health & Safety Code section 11581(b)(2);

16.     DEFENDANTS be ordered to each pay a civil penalty of up to $2,500.00 for each act of unlawful competition, pursuant to Business and Professions Code section 17206;

///

///

///

///

///

///

**Fees and Costs**

17.    DEFENDANTS be ordered to pay PLAINTIFFS ' reasonable attorney's fees and costs, including the cost of investigation and discovery, pursuant to Civil Code sections 3496(b) and 3496(c).

18.    PLAINTIFFS be awarded their costs incurred herein pursuant to Code of Civil Procedure section 1032; and

19.    The Court grant such other and further relief as this Court should find just and proper.

Dated:  April 10, 2025

> DAVID CHIU
> City Attorney
> YVONNE R. MERÉ
> Chief Deputy City Attorney
> WADE CHOW
> Chief Attorney
> Code Enforcement Team
> HUNTER W. SIMS III
> Deputy City Attorney
>
>
> By:_____
>    HUNTER W. SIMS III
>
> Attorneys for Plaintiffs
> CITY AND COUNTY OF SAN FRANCISCO and
> PEOPLE OF THE STATE OF CALIFORNIA

20

EXHIBIT B

1  DAVID CHIU, State Bar #189542
   City Attorney
2  YVONNE R. MERÉ, State Bar #173594
   Chief Deputy City Attorney
3  WADE CHOW, State Bar #168527
   Chief Attorney
4  Neighborhood and Resident Safety Division
   HUNTER W. SIMS III, State Bar #266039
5  Deputy City Attorneys
   Fox Plaza
6  1390 Market Street, Seventh Floor
   San Francisco, California 94102-5406
7  Telephone:    (415) 554-4259 (Sims)
   Facsimile:    (415) 437-4644
8  E-Mail:    hunter.sims@sfcityatty.org

9
   Attorneys for Plaintiffs
10 CITY AND COUNTY OF SAN FRANCISCO and
   PEOPLE OF THE STATE OF CALIFORNIA

11

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**04/10/2025**
**Clerk of the Court**
BY: SAHAR ENAYATI
Deputy Clerk

12          SUPERIOR COURT OF THE STATE OF CALIFORNIA    **CGC-25-624264**

13                      COUNTY OF SAN FRANCISCO

14                        UNLIMITED JURISDICTION

15 | CITY AND COUNTY OF SAN | Case No.
16 | FRANCISCO, a Municipal Corporation; and
   | the PEOPLE OF THE STATE OF | **COMPLAINT FOR INJUNCTIVE AND**
17 | CALIFORNIA, by and through David Chiu, | **DECLARATORY RELIEF AND PENALTIES**
   | City Attorney for the City and County of San
18 | Francisco, | Type of Complaint [42] Other

19          Plaintiffs,

20      vs.

21 URSULA FUNG, an individual, REX TIN
   CHAN, an individual, EZ DOLLAR
22 DISCOUNT STORE, MOHAMED MUFTAH,
   an individual, and DOE ONE through DOE
23 FIFTY,

          Defendants.

24

25

26      / / /

27      / / /

28      / / /

                                    1

The CITY AND COUNTY OF SAN FRANCISCO, a municipal corporation, and the PEOPLE OF THE STATE OF CALIFORNIA, by and through San Francisco City Attorney DAVID CHIU (collectively "Plaintiffs"), file their Complaint against Defendants URSULA FUNG, an individual, REX TIN CHAN, an individual, EZ DOLLAR DISCOUNT STORE, MOHAMED MUFTAH, an individual, and DOE ONE through DOE FIFTY (collectively "Defendants").  PLAINTIFFS hereby allege as set forth below:

## INTRODUCTION

1.      Since DEFENDANTS have been in business, the residents of the Tenderloin neighborhood have suffered due to the DEFENDANTS' illegal acts and business practices at the property located at 335 Jones Street, San Francisco, California, mid-block between Ellis and Eddy Streets.  DEFENDANTS operate a business at 335 Jones Street that contributes to the criminal activity in the Tenderloin. This action seeks to put an end to that activity.

2.      DEFENDANTS have owned and operated the EZ DOLLAR DISCOUNT STORE since at least January 2024.  Due to the illegal gambling and sale of drug paraphernalia occurring at the property, the EZ DOLLAR DISCOUNT STORE has attracted criminal and nuisance activity to the surrounding community, necessitating police intervention and adversely affecting the neighborhood and the health, safety, and well-being of those who live and work in the area, as well as the general public.

3.      By allowing illegal gambling to occur at the EZ DOLLAR DISCOUNT STORE, DEFENDANTS have maintained the property as a nuisance in violation of California Penal Code sections 11225-11235 ("Red Light Abatement Law").

4.      In addition to the illegal gambling at the EZ DOLLAR DISCOUNT STORE, DEFENDANTS have maintained 335 Jones Street in such a way that that it violates the San Francisco Building Code and San Francisco Planning Code and substantially endangers the health, welfare, and safety of its neighbors, the neighborhood, and the City and County of San Francisco.

5.      By allowing illegal gambling, the sale of drug paraphernalia and violations of the San Francisco Building and Planning Codes to occur at the EZ DOLLAR DISCOUNT STORE,

Complaint; Case No.                                    n:\codenf\li2025\250733\01819324.docx

DEFENDANTS have maintained the property as a public nuisance in violation of California Civil Code sections 3479-3480.

6.     By operating, and/or allowing the operation of, the EZ DOLLAR DISCOUNT STORE in repeated violation of applicable state and local laws and as a nuisance, DEFENDANTS have also demonstrated a pattern and practice of engaging in unlawful business practices in violation of the Unfair Competition Law ("UCL"), California Business and Professions Code sections 17200-17210.

7.     California's Gambling Control Act ("GCA"), Business and Professions Code sections 19800 *et seq*. was passed in 1997.  While gambling establishments have existed in California for over 100 years, the legal gambling industry prior to 1984 was almost entirely unregulated; California law has since outlawed certain forms of gambling and left other forms free of government oversight or regulation.

8.     With the passage of the GCA, the California Legislature recognized that "[u]nregulated gambling enterprises are inimical to the public health, safety, welfare, and good order.  Accordingly, no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state and by the ordinances of local governmental bodies."  Business and Professions Code section 19801(d).

9.     California has long recognized the adverse impact of gambling on individuals and communities and has consequently restricted legal gambling to the California Lottery, "card rooms," casinos operated by Native American tribes, and race tracks.  State law and many local ordinances make virtually all other forms of gambling expressly illegal and provide local governments both civil and criminal remedies to address the crime and nuisance created by illegal gambling operations.  *See* Penal Code Chapter 10, sections 330-337 *et seq*. and 11225-11235; San Francisco Municipal Police Code sections 325-327.

10.    In order to lawfully operate a business in which drug paraphernalia is offered, sold, or given away, the business must keep and display the drug paraphernalia in a separate room, and the business must exclude minors not accompanied by a parent or legal guardian from entry. *See* Health and Safety Code, Chapter 6, section 11364.5.

**PARTIES AND SUBJECT PROPERTY**

11.     Plaintiff CITY AND COUNTY OF SAN FRANCISCO (the "CITY") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a city and county.  The CITY brings this action under the Red Light Abatement Law, California Civil Code sections 3479, 3480, 3491, 3494, and California Code of Civil Procedure section 731.

12.     Plaintiff PEOPLE OF THE STATE OF CALIFORNIA (the "PEOPLE"), by and through David Chiu, City Attorney of the City and County of San Francisco, bring this action pursuant to the Red Light Abatement Law, the Unfair Competition Law, Civil Code Sections 3479, 3480, 3491, 2494, and Code of Civil Procedure Section 731.

13.     Defendants URSULA FUNG and REX TIN CHAN are individuals who own the property where the EZ DOLLAR DISCOUNT STORE is located, 335 Jones Street, San Francisco, California, San Francisco Assessor's Block 0333, Lot 004 ("PROPERTY"). URSULA FUNG and CHAN REX TIN are domiciled in San Francisco, California.

14.     Defendant MOHAMED MUFTAH is an individual who owns, manages and/or operates the EZ DOLLAR DISCOUNT STORE, a commercial business located at 335 Jones Street, in the City and County of San Francisco.  The EZ DOLLAR DISCOUNT STORE is an illegal gambling business, where patrons pay to play slot machines for the chance to win cash payouts.  Actions taken, or omissions made, by MOHAMED MUFTAH's employees or agents in the course of their employment or agency at the EZ DOLLAR DISCOUNT STORE are considered to be actions or omissions of MOHAMED MUFTAH for the purposes of this Complaint.  On information and belief, PLAINTIFFS believe MOHAMED MUFTAH is domiciled in San Francisco, California.

15.     Defendants DOE ONE through DOE FIFTY are sued herein under fictitious names. Plaintiffs do not at this time know the true names or capacities of said defendants, but pray that the same may be alleged herein when ascertained.

**GENERAL ALLEGATIONS**

16.     The EZ DOLLAR DISCOUNT STORE is a commercial business located on the ground floor of 335 Jones Street, San Francisco, California, a busy commercial street in the Tenderloin District of San Francisco.  MOHAMED MUFTAH owns and/or operates the EZ DOLLAR

4

DISCOUNT STORE, which has been in operation since at least January 2024.  MOHAMED

MUFTAH leases the commercial space from URSULA FUNG and REX TIN CHAN.

## I.  SAN FRANCISCO POLICE DEPARTMENT'S INVESTIGATION OF THE EZ DOLLAR DISCOUNT STORE

17.    The EZ DOLLAR DISCOUNT STORE has the appearance of a convenience store.

However, Defendant MOHAMED MUFTAH ran a gambling operation at the business where patrons

could wager on various gaming machines.

18.    On October 2, 2024, a San Francisco Police Department ("SFPD") officer entered the

EZ DOLLAR DISCOUNT STORE and saw two coin pusher games in the front of the store. The

object of these games is to shoot a coin towards a prize so that the prize falls into a payout slot.

However, instead of prizes, the machines was filled with quarters and paper currency.

19.    The officer then walked to the back of the store and saw six arcade style gambling

machines lined up in the back left corner of the store.  The officer saw a woman playing one of the

games. The woman held a piece of burnt aluminum foil and a plastic straw, which the officer

recognized as paraphernalia used to ingest Fentanyl.

20.    SFPD officers conducted surveillance at the EZ DOLLAR DISCOUNT STORE on

January 2, 2025.  They saw many people coming in and out of the store, but no one exiting the store

appeared to have made any purchases.  In addition, several people exited the store empty handed and

then re-entered multiple times.  This unusual foot traffic was consistent with and supported the

officers' opinion that patrons were gambling inside the store.

21.    SFPD officers conducted an undercover operation on January 15, 2025.  Two

undercover officers entered the store and saw four gambling machines in the back of the store.  The

officers had a total of $100 in marked City funds. One officer used $40 of the City funds and

immediately lost all of his money.

22.    The other officer played $20 and won $1.  The officer asked the clerk to cash him out.

The clerk reviewed the store camera footage, removed $21 from the register, and gave it to the officer.

The clerk then used a key to open the machine and reset the credits to zero.

/ / /

Complaint; Case No.                                                      n:\codenf\li2025\250733\01819324.docx

23.    On January 27, 2025, SFPD members obtained and executed a search warrant at the EZ DOLLAR DISCOUNT STORE.

24.    SFPD officers found significant evidence of criminal activity while executing the search warrant at the EZ DOLLAR DISCOUNT STORE.  Officers seized 5 working electronic gambling machines and 3 broken electronic gambling machines.  The prizes inside one gambling machine included Visa gift cards, a Bluetooth speaker, a solar charger, and a watch. Officers seized $2,181 in cash from the machines and the register. The officers also seized a ledger that contained "pay/owe" sheets. Images of two of the electronic gambling machines are shown below.

 

25.    In addition to illegal gambling, DEFENDANTS have permitted the EZ DOLLAR DISCOUNT STORE to be used as a place where stolen merchandise is bought and sold.  Officers seized merchandise on display that had retail stickers and other indicia from Walgreens, CVS, Safeway, Big 5, Trader Joe's, Target, and Harbor Freight.  The fact that these items were on display for sale indicate that the EZ DOLLAR DISCOUNT STORE was selling stolen merchandise.

26. The officers also seized hundreds of glass pipes used for ingesting illegal narcotics as well as small plastic baggies commonly used to package narcotics for sale from the display cases, which were located in an area accessible to minors. The store also sold digital scales.

## II.    UNABATED VIOLATIONS OF SAN FRANCISCO'S BUILDING AND PLANNING CODES

### A.    San Francisco Department of Building Inspection Notice of Violation for Work Without a Permit (Complaint No. 202430228)

27. On October 31, 2024, San Francisco's Department of Building Inspection ("DBI") issued Notice of Violation ("NOV") No. 202430228 for work without a permit based on the removal of the permitted storefront for the EZ DOLLAR DISCOUNT STORE and the installation of a new storefront. In addition, the NOV cited the unauthorized removal of a partition in the right rear of the EZ DOLLAR DISCOUNT STORE. The NOV ordered DEFENDANTS to obtain a building permit within sixty days and to complete all work within ninety days. DBI mailed the NOV to DEFENDANTS on November 1. A true and correct copy of the NOV is attached hereto as **Exhibit A** and incorporated as part of this Complaint.

28. On November 27, 2024, DBI amended NOV No. 202430228 following a reinspection of the EZ DOLLAR DISCOUNT STORE. The reinspection revealed that additional work had been done without a permit, including adding a door and removing a partition dividing the storage rooms. The inspector noted exposed and unprotected electrical wiring. Finally, a new condenser unit had been installed on the roof without a permit. The amended NOV ordered DEFENDANTS to obtain a building permit within sixty days and to complete the work within ninety days. DBI mailed the amended NOV to DEFENDANTS on November 27, 2024. A true and correct copy of the amended NOV is attached hereto as **Exhibit B** and incorporated as part of this Complaint.

29. DBI NOV No. 202430228 remains unabated.

### B.    San Francisco Planning Department NOV 2024-00949ENF

30. On November 27, 2024, San Francisco's Planning Department ("Planning") issued Notice of Enforcement ("NOE") No. 2024-00949ENF for selling tobacco paraphernalia without a permit and having the security gate at the storefront partially closed during business hours. The NOE ordered DEFENDANTS to provide evidence that the violations had been abated and that corrective

7

1    action had been taken to bring the EZ DOLLAR DISCOUNT STORE into compliance.  A true and

2    correct copy of the NOE is attached hereto as **Exhibit C** and incorporated as part of this Complaint.

3        31.    On January 31, 2025, Planning issued NOV 2024-00949ENF after DEFENDANTS

4    failed to take action to abate NOE No. 2024-00949ENF.  The NOV provided thirty (30) days to file an

5    appeal or take corrective action to abate the violations outlined in NOV 2024-00949ENF.  A true and

6    correct copy of the NOV is attached hereto as **Exhibit D** and incorporated as part of this Complaint.

**FIRST CAUSE OF ACTION**

**FOR VIOLATION OF THE RED LIGHT ABATEMENT ACT BROUGHT BY PLAINTIFFS CITY AND PEOPLE AGAINST ALL DEFENDANTS**

**(Penal Code Sections 11225 -11235)**

10        32.    Plaintiffs PEOPLE OF THE STATE OF CALIFORNIA and the CITY AND COUNTY

11    OF SAN FRANCISCO hereby incorporate by reference paragraphs 1 through 32 above, as though

12    fully set forth herein.

13        33.    From 2024 through the present, DEFENDANTS have operated, and/or permitted the

14    operation of, an illegal gambling establishment at the EZ DOLLAR DISCOUNT STORE by

15    possessing and/or operating, or permitting the possession and operation of, "machine[s] or device[s]"

16    that "may be operated, and by reason of . . . hazard or chance or of other outcome of operation

17    unpredictable by [the user], the user may receive or become entitled to receive . . .  [an] additional

18    chance or right to use the slot machine or device" or a "token, or memorandum . . . which may be

19    exchanged for any money, credit, allowance, or thing of value."  Penal Code section 330b(d).  By

20    possessing and/or operating, and/or permitting the possession and/or operation of, these machines or

21    devices, DEFENDANTS have violated and continue to violate Penal Code section 330b(d) and San

22    Francisco Municipal Police Code sections 325-327.  This illegal gambling operation constitutes a

23    nuisance as a matter of law under Penal Code section 11225.

24        34.    Pursuant to Penal Code section 11230, PLAINTIFFS request that the Court order the

25    closure of the EZ DOLLAR DISCOUNT STORE for one year and impose civil penalties of

26    $25,000.00 against each Defendant to prevent DEFENDANTS from continuing to maintain or permit

27    a nuisance at the property.

28

Complaint; Case No.                                                    n:\codenf\li2025\250733\01819324.docx

35.     Unless said nuisance is abated, the surrounding community and neighborhood, and the residents and citizens of the City and County of San Francisco and the People of California, will suffer irreparable injury and damage, in that said conditions will continue to be dangerous to the life, safety or health of those who live and work near the EZ DOLLAR DISCOUNT STORE and the general public.

36.     PLAINTIFFS have no adequate remedy at law in that damages alone are insufficient to protect the public from the present injury and harm caused by the conduct described above.

**SECOND CAUSE OF ACTION**
**FOR PUBLIC NUISANCE BY PLAINTIFFS CITY AND PEOPLE AGAINST ALL DEFENDANTS**
**(San Francisco Planning Code; San Francisco Building Code; California Civil Code sections 3479, 3480, and 3494; and California Code of Civil Procedure section 731)**

40.     Plaintiff CITY hereby incorporates by reference all preceding paragraphs of this Complaint and makes them part of this Second Cause of Action, as though fully set forth herein.

41.     As described above, and as set forth in the incorporated Exhibits to this COMPLAINT, DBI issued NOVs to DEFENDANTS for violations of the San Francisco Building Code at the EZ DOLLAR DISCOUNT STORE.

42.     As described above, and as set forth in the incorporated Exhibits to this COMPLAINT, Planning issued NOEs and NOVs to DEFENDANTS for violations of the San Francisco Planning Code at the EZ DOLLAR DISCOUNT STORE.

43.     Plaintiff CITY brings this Count pursuant to San Francisco Planning Code section 176.

44.     Plaintiff City brings this Count pursuant to San Francisco Building Code section 103A.

45.     Plaintiff PEOPLE bring this cause of action pursuant to California Code of Civil Procedure section 731 and California Civil Code sections 3479, 3480, and 3494.

46.     Pursuant to San Francisco Planning Code section 176, any non-code compliant use, structure, lot, feature, or condition is a public nuisance.  DEFENDANTS are now, and for a considerable period of time, and at all times herein mentioned, have been maintaining the PROPERTY as a public nuisance and in violation of San Francisco Planning Code sections 135, 145.1(d)(3)(A), 176, and 249.5. The conditions constituting the continuing public nuisance and violations of the San Francisco Planning Code are more fully described above, and in the Exhibits attached hereto.

9

47.     As described above, DEFENDANTS have failed to comply with, ignored, and disobeyed the NOE and NOV properly issued by Planning, and have allowed the PROPERTY to remain in a substandard, unsafe, and illegal condition for a substantial period of time.

48.     Pursuant to San Francisco Building Code section 103A, any non-code compliant use, structure, lot, feature, or condition is a public nuisance.  DEFENDANTS are now, and for a considerable period of time, and at all times herein mentioned, have been maintaining the PROPERTY as a public nuisance and in violation of San Francisco Building Code section 106A.1 and San Francisco Electrical Code section 89.116.  The conditions constituting the continuing public nuisance and violations of the San Francisco Building Code are more fully described above, and in the Exhibits attached hereto.

49.     As described above, DEFENDANTS have failed to comply with, ignored, and disobeyed the NOVs properly issued by DBI, and have allowed the PROPERTY to remain in a substandard, unsafe, and illegal condition for a substantial period of time.

45.     DEFENDANTS and their employees have sold and offered for sale paraphernalia used to ingest or inhale controlled substances at the EZ DOLLAR DISCOUNT STORE. Such conduct adversely affects public health, contributes to illegal drug activity, and contributes to other criminal activity.

46.     DEFENDANTS and their employees have purchased, sold and offered for sale property they know to be stolen at the EZ DOLLAR DISCOUNT STORE. Such conduct promotes crimes of theft and contributes to other criminal activity.

47.     DEFENDANTS and their employees have operated an illegal gambling operation at the EZ DOLLAR DISCOUNT STORE. Such conduct adversely affects public health and contributes to other criminal activity, including violent crimes such as robbery.

48.     As described above, DEFENDANTS are now, and for a considerable period of time, and at all times pertinent to the allegations in this Complaint have been, maintaining the PROPERTY in such a manner as to constitute a continuing public nuisance within the meaning of Civil Code sections 3479 and 3480.  The practices described above are injurious to the health and safety of the residents and the community, are offensive to the senses, and interfere with the comfortable enjoyment

10

of life and property.  The practices described above also affect a considerable number of people and an entire community and neighborhood.

49.     At all times herein mentioned, DEFENDANTS have had notice and knowledge that the PROPERTY constituted a public nuisance, but DEFENDANTS have taken inadequate steps to abate the public nuisance.

50.     PLAINTIFFS have no adequate remedy at law in that damages are insufficient to protect the public from the present danger and harm caused by the conditions described herein.

50.     Unless these nuisance conditions are abated, the occupants and neighbors of the subject PROPERTY and the residents of the City and County of San Francisco will suffer irreparable injury and damage because the nuisance conditions will continue to be injurious to the continuous enjoyment of life and the free use of property of the neighbors and the public.

**THIRD CAUSE OF ACTION**

**FOR UNLAWFUL BUSINESS PRACTICES BROUGHT BY PLAINTIFF CITY AND PEOPLE AGAINST ALL DEFENDANTS**

**(California Business and Professions Code Sections 17200-17210)**

51.     Plaintiff, the PEOPLE OF THE STATE OF CALIFORNIA, hereby incorporates by reference paragraphs 1 through 50 above, as though fully set forth herein.

52.     The PEOPLE bring this cause of action in the public interest in the name of the PEOPLE OF THE STATE OF CALIFORNIA, pursuant to Business and Professions Code sections 17200 through 17210, in order to protect the residents and owners of properties adjoining the EZ DOLLAR DISCOUNT STORE from the unlawful business practices committed by DEFENDANTS in the operation of the EZ DOLLAR DISCOUNT STORE within the City and County of San Francisco, State of California.

53.     The violations of law described herein have been, and are being, carried out wholly or in part within the City and County of San Francisco.  The actions of DEFENDANTS are in violation of the laws and public policies of the City and County of San Francisco and the State of California, and are inimical to the rights and interest of the general public.

54.     DEFENDANTS are now engaging in and, for a considerable period of time and at all times pertinent to the allegations of this Complaint, have engaged in, unlawful business practices

11

prohibited by California's Unfair Competition Law by managing and operating, and/or allowing the management and operation of, the EZ DOLLAR DISCOUNT STORE in violation of the following laws:

- Penal Code sections 11225-11235 by allowing illegal gambling to occur at the EZ DOLLAR DISCOUNT STORE;

- Penal Code section 330b by possessing and/or operating, or permitting the possession and/or operation, of slot machines or devices (as defined in Penal Code section 330b(d)) at the EZ DOLLAR DISCOUNT STORE;

- San Francisco Municipal Police Code sections 325-327 by operating and/or keeping slot machines or their equivalent at the EZ DOLLAR DISCOUNT STORE.

- Health and Safety Code section 11364.5 for unlawfully keeping and selling drug paraphernalia in an area accessible to minors.

- Health and Safety Code section 11364.7 by delivering, furnishing, transferring, and possessing with intent to deliver, furnish or transfer drug paraphernalia, knowing or under circumstances where one reasonably should know that it will be used to ingest, inhale or otherwise introduce into the human body a controlled substance.

- California Penal Code Sections 496 by knowingly purchasing and selling stolen property.

- Commencing work without a permit in violation of San Francisco Building Code Section 106A.

- Violating San Francisco Planning Code sections 249.5, illegal sale of tobacco paraphernalia, and 145.1(d)(3)(A) for closing the storefront security gate during business hours.

- Creating and maintaining a public nuisance in violation of California Civil Code sections 3479, 3480, and 3494, the San Francisco Planning Cod and the San Francisco Building Code.

55.     As a direct and proximate result of the foregoing acts and practices, DEFENDANTS have received income, profits, and other benefits, which they would not have received if

12

DEFENDANTS had not engaged in the violations of the Unfair Competition Law described in this Complaint.

56.    DEFENDANTS have been able to unfairly compete with other businesses by offering gambling games that cannot be offered legally and are therefore unavailable to their competitors. Moreover, patrons attracted by illegal gambling are likely to purchase items at the EZ DOLLAR DISCOUNT STORE that they might otherwise purchase at a competitor business.

57.    DEFENDANTS have been able to unfairly compete with other businesses by selling stolen products that on information and belief DEFENDANTS were able to acquire and sell at a lower price than available to their law-abiding competitors.

58.    The PEOPLE have no adequate remedy at law in that damages are insufficient to protect the public from the harm caused by the conditions described in this Complaint.

59.    Unless injunctive relief is granted to enjoin the unlawful business practices of DEFENDANTS, the PEOPLE will suffer irreparable injury and damage.

60.    By engaging in the unlawful business practices described herein, DEFENDANTS are each subject to civil penalties in the amount of $2,500.00 per violation, pursuant to Business and Professions Code section 17206.

### PRAYER

WHEREFORE, PLAINTIFFS pray that:

**Declaratory Relief**

1.    The EZ DOLLAR DISCOUNT STORE be declared a public nuisance;

2.    DEFENDANTS be declared to have violated the San Francisco Municipal Codes, including the San Francisco Building Code, the San Francisco Planning Code, and California Civil Code sections 3479 and 3480;

3.    DEFENDANTS be declared to have engaged in unlawful business acts and practices in violation of Business and Professions Code sections 17200-17210;

**Injunctive Relief**

4.    The nuisance be preliminarily and permanently abated in accordance with Penal Code sections 11225-11235;

5. All movable property used in the maintenance of the nuisance at the EZ DOLLAR DISCOUNT STORE be removed and sold, pursuant to Penal Code section 11230;

6. The EZ DOLLAR DISCOUNT STORE be closed for one year, pursuant to Penal Code section 11230;

7. In the event that the Court does not order the EZ DOLLAR DISCOUNT STORE closed, all DEFENDANTS, their agents, officers, lessees, managers, representatives, employees, and anyone acting on their behalf, and their heirs and assignees be preliminarily and permanently enjoined from operating, conducting, using, occupying, or in any way permitting the use of the EZ DOLLAR DISCOUNT STORE as a nuisance pursuant to Penal Code sections 11225-11235;

8. DEFENDANTS be enjoined and restrained from occupying or operating, and/or allowing the occupation or operation of, the EZ DOLLAR DISCOUNT STORE while the conditions described in this Complaint exist and until all of the violations at the EZ DOLLAR DISCOUNT STORE have been abated;

9. DEFENDANTS be ordered to cause the EZ DOLLAR DISCOUNT STORE to conform to law, and maintain such structures and all parts thereof in accordance with law;

10. Pursuant to California Business and Professions Code sections 17203-17204, DEFENDANTS, their agents, officers, lessees, managers, representatives, employees, and anyone acting on their behalf, and their heirs, successors, and assignees be enjoined from operating, conducting, using, occupying, or in any way permitting the use of the EZ DOLLAR DISCOUNT STORE in the unlawful business practices described in this Complaint;

11. DEFENDANTS, and each of them, inclusive, be enjoined from spending, transferring, encumbering, or removing from California any money received from the EZ DOLLAR DISCOUNT STORE or in payment for the unlawful acts alleged in the Complaint;

**Penalties**

12. The Court impose civil penalties of up to $25,000.00 against each Defendant, pursuant to Penal Code section 11230;

13. DEFENDANTS be ordered to each pay a civil penalty of up to $2,500.00 for each act of unlawful competition, pursuant to Business and Professions Code section 17206;

14

1    **Fees and Costs**

2    14.    DEFENDANTS be ordered to pay PLAINTIFFS ' reasonable attorney's fees and costs,

3    including the cost of investigation and discovery, pursuant to Civil Code sections 3496(b) and 3496(c).

4    15.    PLAINTIFFS be awarded their costs incurred herein pursuant to Code of Civil

5    Procedure section 1032; and

6    16.    The Court grant such other and further relief as this Court should find just and proper.

7    Date:  April 10, 2025                    DAVID CHIU
                                             City Attorney
8                                            YVONNE R. MERÉ
                                             Chief Deputy City Attorney
9                                            WADE CHOW
                                             Chief Attorney
10                                           Neighborhood and Resident Safety Division
                                             HUNTER SIMS
11                                           Deputy City Attorneys

12                                   By:_____
13                                           HUNTER W. SIMS III
                                             Attorneys for Plaintiffs
14                                           CITY AND COUNTY OF SAN FRANCISCO and
                                             PEOPLE OF THE STATE OF CALIFORNIA

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint; Case No.                                    n:\codenf\li2025\250733\01819324.docx

## <u>INDEX TO EXHIBITS</u>

| <u>Exhibit</u> | <u>Description</u> |
|---|---|
| A | NOV No. 202430228 |
| B | NOV No. 202430228 |
| C | NOE No. 2024-00949ENF |
| D | NOE No. 2024-00949ENF |

# EXHIBIT A



# NOTICE OF VIOLATION
### of the San Francisco Municipal Codes Regarding Unsafe, Substandard or Noncomplying Structure or Land or Occupancy

**DEPARTMENT OF BUILDING INSPECTION**  ☒ **FIRST NOTICE**    **COMPLAINT NUMBER**

City and County of San Francisco    ☐ **SECOND NOTICE**
49 South Van Ness Av Suite#400
San Francisco, CA 94103    ☐ **OTHER:** _____    **202430228**

**ADDRESS**  335 JONES ST    **DATE**  10/31/2024

**OCCUPANCY/USE**    M, B    **BLOCK** 0333  **LOT** 004

**CONST. TYPE**    3    **STORIES**  1  ☐ **BASEMENT**

☒ If checked, this information is based upon site-observation only.  Further research may indicate that legal use is different.  If so, a revised Notice of Violation will be issued.

**OWNER / AGENT:**  FUNG URULA & CHAN REX TIN    **PHONE#:**

**MAILING ADDRESS:**    3197 HALYARD WAY    **CITY**    ELK GROVE    **ZIP**  95758

**PERSON CONTACTED @ SITE** _____    **PHONE#:** _____

## VIOLATION DESCRIPTION:

☒ **WORK WITHOUT PERMIT (SFBC 103A);**    ☐ **ADDITIONAL WORK-PERMIT REQUIRED (SFBC 106.4.7);**
☐ **EXPIRED PERMIT (SFBC 106A.4.4)**  ☐ **CANCELLED PERMIT (SFBC 106.3.7)**    **PA#:** _____ ;
☐ **UNSAFE BUILDING  (SFBC 102A);**  ☐ **SEE ATTACHMENTS**    **CODE / SECTION #**

A TENDERLOIN BUSINESS INSPECTION REVEALED:  ALUMINUM STOREFRONT REMOVED, NEW STOREFRONT INSTALLED.  PARTITION IN RIGHT REAR OF RETAIL SPACE REMOVED.  NO ACCESS GIVING TO ROOMS IN REAR OF UNIT.    **103A**

MONTHLY MONITORING FEE Section 110A TABLE 1A-k

**BC – Building Code**  HC – Housing Code    PC – Plumbing Code    [EC – Electrical Code]    MC – Mechanical Code

## CORRECTIVE ACTION:

## ☒ STOP ALL WORK SFBC 104.2.4

☒ FILE BUILDING PERMIT APPLICATION WITHIN _____ **30** _____ **DAYS** ☒ **WITH PLANS)** A Copy of This Notice Must Accompany the Permit Application.
☒ OBTAIN PERMIT WITHIN ____ **60** ____ DAYS AND COMPLETE ALL WORK WITHIN ____ **90** ____ DAYS, INCLUDING FINAL INSPECTION AND SIGNOFF.
☐ CORRECTION VIOLATIONS WITHIN _____ DAYS. ☐ NO PERMIT REQUIRED.
☐ YOU FAILED TO COMPLY WITH THE NOTICE(S) DATED _____ , THEREFORE THIS DEPT. HAS INITIATED ABATEMENT PROCEEDINGS.
☑ FAILURE TO COMPLY WITH THIS NOTICE WILL CAUSE ABATEMENT PROCEEDING TO BEGIN. SEE REVERSE SIDE FOR ADDITIONAL WARNINGS.

 IF UNABLE TO PROVIDE DOCUMENTATION OF LEGALITY OF PRESENT CONDITIION, OBTAIN PERMIT WITH PLANS AND PLANNING APPROVAL TO ADDRESS THE VIOLATION DESCRIPTION ABOVE. ELECTRICAL PERMIT REQUIRED. OBTAIN ALL REQUIRED INSPECTIONS TO ABATE NOV. PERMITS MUST STATE TO COMPLY WITH NOV.  PROVIDE ACCESS TO THE INSPECTOR BELOW TO ALL AREAS WITHIN 15 DAYS.

**INVESTIGATION FEE OR OTHER FEE WILL APPLY**    See reverse side for further explanation

☒ 9x Fee (Work w/o Permit after 9/1/60)    ☐ 2x Fee (Work Exceeding Scope of Permit)
☐ OTHER: _____    ☐ Re-inspection Fee$ _____  ☐ No penalty (Work w/o permit prior to 9/1/60)

**APPROX. DATE OF WORK W/O PERMIT** _____ **N/A**    **VALUE OF WORK PERFORMED W/O PERMITS $12,000**

## BY ORDER OF THE DIRECTOR, DEPARTMENT OF BUILDING INSPECTION

CONTACT INSPECTOR ____**Chris Francis**_____
(Inspector – Print Name)

OFFICE HOURS  8:00 AM  TO  9:00  AM AND  3:00 PM  TO  4:00  PM

PHONE #  **(628)652-3612 Chris.Francis@sfgov.org**

☐ Building Inspection Division
    49 S. Van Ness Av, Suite# 400 (628) 652-3450
☐ Housing Inspection Division
    49 S. Van Ness Av, Suite# 400 (628) 652-3700
☐ Electrical Inspection Division
    49 S. Van Ness Av, Suite# 400 (628) 652-3450
☐ Plumbing Inspection Division
    49 S. Van Ness Av, Suite# 400 (628) 652-3450
☐ Code Enforcement Division
    49 S. Van Ness Av, Suite# 400 (628) 652-3430

By: _____ (Inspector's Signature)

CC: ☐ DCP ☐ EID ☐ PID ☐ BID ☐ HIS ☐ CED ☐ CPC ☐ DAD ☐ SFFD ☐ DPH ☐ RPC

M 9003  05  (Rev. 5/96)

Pursuant to SFBC 107A.5 and 106A.4.7 investigation fees are charged for work begun or performed without permits or for Work exceeding the scope of permits. Such fees may be appealed to the Board of Permit Appeals within 15 days of permit issuance, at 49 South Van Ness Ave., Suite 1475 (14th Floor). (628) 652-1150.

**WARNING:** Failure to take immediate action as required to correct the above violations will result in abatement proceedings by the Department of Building Inspection. If an Order of Abatement is recorded against this property, the owner will be billed or the property will be liened for all costs incurred in the code enforcement process from the posting of the first "Notice of Violation" until all costs are paid, SFBC 102A.2 & 110A.

**WARNING:** Section 204 of the San Francisco Housing Code provides for immediate fines of $100 for each instance of initial non-compliance, followed by $200 fines per violation for the second instance of non-compliance, up to a maximum of $7,500 per building. This section also provides for issuance of a criminal charge as a misdemeanor for each violation, resulting in fines of not less than $1,000 per day or six months' imprisonment or both.

**WARNING:** Anyone who derives rental income from housing determined by the Department of Building Inspection to be substandard cannot deduct from state personal income tax and bank and corporate income tax interest, depreciation or taxes attributable to such substandard structure. If correction work is not completed or being diligently, expeditiously and continuously prosecuted after six (6) months from the date of this notice, notification will be sent to the Franchise Tax Board as provided in Section 17264(6) of the Revenue and Taxation Code.

**WARNING:** Section 103A of the San Francisco Building Code provides for civil fines of up to $500 per day for any person who violates, disobeys, omits, neglects or refuses to comply with or opposes the execution of any provisions of this code. This section also provides for misdemeanor fines, if convicted, of up to $500 and/or imprisonment up to six months for each separate offense for every day such offense occurs.

De acuerdo a las Secciones 107A.5 y 106A.4.7 de el Codigo de Construcción. de Edificios de San Francisco, gastos de investigación serán cobrados por trabajo empezado o realizado sin los debidos permisos o por trabajo que exceda el limite estipulado en los permisos. Dichos cobros pueden ser apelados ante la Junta de Apelaciones de Permisos (Board of Permit Appeals) dentro de los primeros quince dias de haberse obtenido el permiso. Las apelaciones se hacen en el 49 South Van Ness Ave., Suite 1475 (14th Floor), telefono (628) 652-1150.

**ADVERTENCIA:** Si no cumple con las acciones immediatas requeridas para corregir las infracciones, el Departamento de Inspección de Edificios tendra el derecho de iniciar el proceso de mitigación. Si una Orden de Mitigación es registrada contra dicha propiedad, los gastos incurridos durante el proceso de aplicación del código, desde la primera puesta del Aviso de Infracción hasta que todos los gastos esten pagados, se le cobraran al dueno del edificio o la propiedad sera embargada para recuperar dichos gastos. Referencia a la Sección 102A.2 y 110A de el Código de Construccion de Edificios.

**ADVERTENCIA:** La Sección 204 de el Código de Vivienda de San Francisco permite que se multe inmediatamente $100 por cada primer caso de inconformidad, seguida por una multa. de $200 por cada segunda infracción de inconformidad, aumentando hasta un maximo de $7,500 por cada edificio. Esta Sección tambien permite obtener cargos criminales como delito menor, resultando en multas de no menos de $1,000 diarios ó 6 meses de encarcelamiento o ambas sanciones.

**ADVERTENCIA:** Cualquier persona que reciba renta:por una vivienda que haya sido declarada que no satisface las normas requeridas por el Departamento de Inspección de.Edificios, no puede deducir del estado:personales, de banco o empresa, depreciacion o taxes atribuidos sobre dicha estructura. Si el trabajo de reparación no se termina o esta diligentemente, rapidamente y continua.mente acusado despues de seis(c) meses de la fecha de este aviso, se le enviara una notificación a la Junta de Concesion de Impuestos (Franchise Tax Board) de acuerdo a la Sección 1264(c) del Código de Ingresos e Impuestos (Revenue and Taxation Code).

**ADVERTENCIA:** La Sección 103A de el Código de edificios de San Francisco impone multas civiles hasta de $500 por cada dia a cualquier persona que infrinja, desobedezca, omita, descuide, se niega a cumplir, resiste o se opone a la ejecucion de las provisiones de este codigo. Esta sección tambien impone multas per delito menor, si es declarado culpable, de hasta $500 o encarcelamiento de hasta 6 meses, o ambas sanciones, por cada una de las ofensas y por cada dia que dicha ofensa occurs.

Sang-ayon sa SFBC 107A.5 at 106A.4.7 ay bayad sa pagsusuri ay sisingilin sa mga gusaling naumpisahan na o ginawa na walang permit o sa mga gawaing labis sa sakop ng permit. Ang gayong singil ay maaring iapela sa Board of Permit Appeals sa loob ng 15 na araw mula sa pag-isyu ng permit sa 49 South Van Ness Ave., suite 1475 (14th palapag). (628)652-1150.

**BABALA:** Ang kabiguan na gumawa ng aksiyon tulad ng kinakailangan upang iwasto ang mga nasabing paglabag ay magreresulta sa paglilitis ng abatement ng Kagawaran ng Inspeksyon ng Gusali. Kung meron Order of Abatement ang naitala laban sa isang ari-arian, ang may-ari ay sisingilin o di kaya ang ari-arian ay gagamitin na lien sa lahat ng mga gastos na natamo sa proseso ng pagpapatupad mula sa unang "Paunawa sa Paglabag" hanggang sa lahat ng gastos ay mabayaran, SFBC 102A.2 & 110A.

**BABALA:** Ang Seksyon 204 ng Housing Code ng San Francisco ay nagtatakda ng agad-agad na multa na $100 sa bawat halimbawa ng unang hindi pagsunod, at susundan ng multa na $200 sa bawat paglabag sa pangalawang hindi pagsunod, hanggang sa sukdulan na $7,500 sa bawat gusali. Ang seksyon na ito ay itinatakda na magsasampa rin ng kasong kriminal bilang isang misdemeanor sa bawat paglabag at magreresulta sa multa na hindi bababa ng $1,000 sa bawat araw o di kaya sa anim na buwan na pagkabilanggo o parehong ipapataw.

**BABALA:** Sinumang kumikita sa pag-upa ng pabahay na tinukoy ng Kagawaran ng Inspeksyon ng Gusali na substandard, ay hindi maaring ibawas ang ganoong kita sa buwis sa estado ng kitang personal, at gayundin sa buwis na kita sa interes sa bangko at korporasyon, at sa depresasyon o mga buwis na maiiugnay sa gusaling substandard. Kung ang Gawain sa pagwawasto ay hindi nakumpleto o hindi masigasig, mabilis at tuloy-tuloy ang paggawa matapos ang anim (6) na buwan mula sa petsa nitong paunawa, ay magpapadala ng abiso sa Franchise Tax Board na itinakda sa Seksyon 17264(6) ng Revenue and Taxation code.

**BABALA:** Ang Seksyon 103A ng Building Code ng San Francisco ay nagtatakda ng mga multang sibil hanggang sa $500 sa bawat araw sa sinumang lumabag, sumuway, magtanggal, magpabaya o tumangging sumunod o di kaya sumalungat sa pagpatupad ng mga probisyon nitong code. Nagpapataw din itong seksyon ng multang misdemeanor kapag nahatulan, ng hanggang sa $500 at o di kaya anim na buwan na pagkabilanggo sa bawat magkahiwalay na pagkasala para sa bawat araw na nangyari ang ganoong pagkasala.

根據《三藩市房屋法規》(簡稱 SFBC)第 107.5 項和106.4.7項修改款的規定，對沒有許可 證便已開始的工程和或超出許可的工程、或超出程序中管理的工程，將收取調查費。這些費 用可以在許可證發出後 15 天之内，到位於可以向許可上訴委員會申述。這些費用 可 地址在 South Van Ness 街 49 號4 樓。電話：(628) 652-3430 。

警告：如不按照要求立即採取行動，以糾正上述違章行為，

警告：任何人透過出租房屋獲得收入、而該房屋已被確認等有固定或低於規定標準者、不 能依加州個人所得稅、銀行和公司所得稅利益、以及與此結構或固定資產相關的折舊 或稅款中扣除減免。如果未在此通告公布六個月後，改正工程沒有完成，或積快有積極、迅 速和持續地進行起訴，將根據《國家稅收法規》(即 Revenue & Taxation Code) 第 1264 (c) 項款次，通知加州徵稅委員會。

# EXHIBIT B



# NOTICE OF VIOLATION

of the San Francisco Municipal Codes Regarding Unsafe,
Substandard or Noncomplying Structure or Land or Occupancy

**DEPARTMENT OF BUILDING INSPECTION**
**City and County of San Francisco**
49 South Van Ness Ave, Suite 400 San Francisco, CA

**Notice: 1**   **COMPLAINT NUMBER:**   **202430228**
**DATE:**   **11/27/2024**

**ADDRESS : 335 JONES ST**   **BLOCK : 0333**   **LOT : 004**

**OCCUPANCY/USE : M | MERCANTILE**
☐ If checked, this information is based upons site-observation only. Further research may indicate that legal use is different. If so, a revised Notice of Violation will be issued.

**ON SITE CONTACT : FUNG URSULA & CHAN REX TIN**

## VIOLATION DESCRIPTION:

| | | |
|---|---|---|
| Y | WORK WITHOUT PERMIT | 103A |
| ☐ | ADDITIONAL WORK-PERMIT REQUIRED | 106A.4.7 |
| ☐ | EXPIRED PERMIT | 106A.4.4 |
| ☐ | CANCELLED PERMIT PA#: | 106A.3.7 |
| ☐ | UNSAFE BUILDING | 102A |
| ☐ | SEE ATTACHMENTS | |

**CODE VIOLATION DESC :** AMENDMENT TO NOV 202430228 DATED 10/31/2024 A TENDERLOIN BUSINESS INSPECTION REVEALED: ALUMINUM STOREFRONT REMOVED, NEW STOREFRONT INSTALLED. PARTITION IN RIGHT REAR OF RETAIL SPACE REMOVED. 2ND SITE INSPECTION OF REAR STORAGE ROOMS ON 11/20/24 REVEALED PARTITION DIVIDING STORAGE ROOMS REMOVED AND DOOR ADDED BETWEEN STORAGE ROOM AND STAIR AREA. WALL DAMAGED AT MEZZANINE EXPOSING UNPROTECTED WIRING. NEW CONDENSOR UNIT INSTALLED ON ROOF. Code/Section: SFBC 103A Monthly monitoring fee applies. Code/Section: SFBC 110A, Table 1A-K

## CORRECTIVE ACTION:

Y   STOP ALL WORK SFBC 104.2.4

Y   FILE BUILDING PERMIT WITHIN 30 DAYS

Y   (WITH PLANS) A copy of this notice must accompany the permit application

Y   OBTAIN PERMIT WITHIN 60 DAYS AND COMPLETE ALL WORK WITHIN 90 DAYS, INCLUDING FINAL INSPECTION SIGNOFF.

☐   CORRECT VIOLATIONS WITHIN DAYS.

☐   NO PERMIT REQUIRED

☐   YOU FAILED TO COMPLY WITH THE NOTICE(S) DATED,
THEREFORE THIS DEPT. HAS INITIATED ABATEMENT PROCEEDINGS.

**FAILURE COMMENT DESCRIPTION :** IF UNABLE TO PROVIDE DOCUMENTATION OF LEGALITY OF PRESENT CONDITIION, OBTAIN PERMIT WITH PLANS AND PLANNING APPROVAL TO ADDRESS THE VIOLATION DESCRIPTION ABOVE. ELECTRICAL AND PLUMBING PERMIT REQUIRED. OBTAIN ALL REQUIRED INSPECTIONS TO ABATE NOV. PERMITS MUST STATE TO COMPLY WITH NOV.

**INVESTIGATION FEE OR OTHER FEE WILL APPLY**

| | | | |
|---|---|---|---|
| Y | 9x Permit Fee (Work w/o Permit after 9/1/60) | ☐ | 2x Permit Fee (Work Exceeding Scope of Permit) |
| ☐ | Other | | |
| ☐ | Reinspection Fee   $ | ☐ | NO penalty (Work w/o permit prior to 9/1/60) |
| ☐ | approx. date of work w/o permit | | |
| ☐ | value of work performed without permits   $   15000 | | |

**CONTACT INSPECTOR : Chris Francis BID / 628-652-3612**

# EXHIBIT C



49 South Van Ness Avenue, Suite 1400
San Francisco, CA 94103

628.652.7600
www.sfplanning.org

# NOTICE OF ENFORCEMENT

## RESPOND WITHIN 30 DAYS OF THIS NOTICE

Date:                          November 27, 2024

Property Owner/s:              Fung Ursula & Chan Rex Tin
                               3197 Halyard Way
                               Elk Grove, CA 95758

Business Owner:                EZ Dollar
                               335 Jones Street
                               San Francisco, CA 94102

Record No.:                    2024-009497ENF
Site Address:                  335 Jones Street
Block/Lot:                     0333/004
Zoning District:               RC-4, RESIDENTIAL- COMMERCIAL, HIGH DENSITY
Height and Bulk District:      80-T
Special Use District           Within 1/4 Mile of an Existing Fringe Financial Service
                               North of Market Residential 1
                               Fringe Financial Services RUD
                               Group Housing Special Use District
                               Priority Equity Geographies SUD
Planning Code Violations:      Section 145.1(d)(3)(A): Security Gate Deployed During Business Hours
                               Section 249.5(f): Tobacco Paraphernalia Establishment use Not Permitted

Enforcement Fee:               $1,725.00 Minimum Fee for Confirmed Violations
Time and Materials:            If the Cost of Reviewing a Confirmed Violation Exceeds the Minimum Fee Above,
                               Additional Billing for Staff Time and Materials will be Charged.
Administrative Penalty:        Up to $1,000 per Day for Each Violation

Enforcement Planner:           Jia Hong Situ, 628-652-7384, JiaHong.Situ@sfgov.org

The Planning Department has received a complaint and has verified that a Planning Code violation exists on the above referenced property that must be resolved. As the property owner or the business owner, you are a Responsible Party. The purpose of this notice is to inform you about the Planning Code enforcement process so you can take appropriate action to bring this property into compliance with the Planning Code.

NOTICE OF ENFORCEMENT                                      Record No. 2024-009497ENF
November 27, 2024                                          335 Jones Street

## PROPERTY INFORMATION

Our records indicate that the subject property is currently authorized as Restaurant and General Grocery uses. The property is identified as a Category A – Historic Resource located within the Listed Uptown Tenderloin Historic District National and California Registers of Historic Districts, and subject to Planning Department preservation review.

## DESCRIPTION OF VIOLATION

The Planning Department finds that the subject property has the following Planning Code violations:

(1) Section 145.1(d)(3)(A)- Storefront security gate was deployed during business hours.
(2) Section 249.5(f)- Any amount of tobacco paraphernalia is a Tobacco Paraphernalia Establishment use which is Not Permitted in the North of Market residential Special Use District.

Pursuant to Planning Code Section 145.1(d)(3)(A), existing security gates for a use established prior to September 06, 2022, may only be deployed when a business is not open to the public and does not exempt the use from any required building permit. As such, the security gates cannot be closed during business hours.

Pursuant to Planning Code Section 102,

> **Tobacco Paraphernalia Establishment use is defined** as "A Retail Sales and Service Use where more than 10% of the square footage of Occupied Floor Area, as defined in Section 102, or more than 10 linear feet of display area projected to the floor, whichever is less, is dedicated to the sale, distribution, delivery, furnishing, or marketing of Tobacco Paraphernalia from one person to another. For purposes of Sections 249.5, 719, 723, and 744 of this Code, however, Tobacco Paraphernalia Establishments shall mean retail uses where any Tobacco Paraphernalia is sold, distributed, delivered, furnished, or marketed from one person to another. **"Tobacco Paraphernalia" means** paraphernalia, devices, or instruments that are designed or manufactured for the smoking, ingesting, inhaling, or otherwise introducing into the body of tobacco, products prepared from tobacco, or controlled substances as defined in California Health and Safety Code Sections 11054, et seq. "Tobacco Paraphernalia" does not include lighters, matches, cigarette holders, any device used to store or preserve tobacco, tobacco, cigarettes, cigarette papers, cigars, or any other preparation of tobacco that is permitted by existing law."

Pursuant to Planning Code Section 249.5, in the North of Market Residential Special Use District, a special definition of "Tobacco Paraphernalia Establishments" applicable to the North of Market Residential Special Use District is set forth in Section 102. **Tobacco Paraphernalia Establishments are not permitted in the North of Market Residential Special Use District.** In the North of Market Residential Special Use District, a legal non-conforming Tobacco Paraphernalia Establishment shall be deemed abandoned after 180 days of non-use.

Failure to comply with any Planning Code provision constitutes a violation of the Planning Code and is subject to an enforcement process, pursuant to Planning Code Section 176.



NOTICE OF ENFORCEMENT                                         Record No. 2024-009497ENF
November 27, 2024                                                      335 Jones Street

## PROPERTY HISTORY

|   | Date | Document | Description | Result | Notes |
|---|------|----------|-------------|--------|-------|
| 1 | 06/29/2012 | BPA No. 201206293816 | Change of use to general grocery, storefront alterations with outdoor seating on site. | Completed 11/21/2012 | Issued 07/26/2012 |
| 2 | 02/28/2019 | 2019-002508MIS | Retail Sales and Services use dba. EZ Dollar in RC-4 District. No alcohol sales. | Approved 03/14/2019 | |

## TIMELINE OF INVESTIGATION

On October 18, 2024, Planning Complaint No. 2024-009497ENF was accepted.

On October 29, 2024, during a City Attorney Task Force Inspection, Planning Department staff (Jia Hong Situ) conducted a site visit of the space dba. "EZ Discount" at the subject property and found the following:

1. Sale of Tobacco Paraphernalia products beyond the thresholds defined in Planning Code Section 102 and the establishment of a Tobacco Paraphernalia Establishment use, which is not permitted in the North of Market Residential Special Use District.
2. An accordion-style metal security gate at the storefront entrance deployed during business hours. The gate was partially opened and only allowed enough room to enter the entry door.

Three rooms in the rear were locked and access was not given.

On November 20, 2024, during a second City Task Force Inspection, Planning Department staff (Jia Hong Situ) conducted an inspection of the three rooms in the rear. Staff observed:

1. Sale of Tobacco Paraphernalia products and the establishment of a Tobacco Paraphernalia Establishment use, which is not permitted in the North of Market Residential Special Use District.
2. An accordion-style metal security gate at the storefront entrance deployed during business hours. The gate was partially opened and only allowed enough room to enter the entry door.

To date, the Planning Department has not received evidence to demonstrate that the above violation has been abated or a corrective action has been taken to bring the subject property into compliance with the Planning Code.

## COMPLIANCE ACTIONS

### How to Correct the Violation

The Planning Department requires that you immediately proceed to abate the violations by taking the following steps:

1. **Comply with Planning Code Section 249.5** by removing <u>all</u> Tobacco Paraphernalia products and signage. A definition of Tobacco Paraphernalia products is provided above.

2. **Comply with Planning Code Section 145.1(d)(3)(A)** by not deploying the storefront security gate



during business hours. Not deploying the gate means that the gate is <u>fully</u> open.

3. **Provide photographic evidence** of the gate not deployed during business hours and the removal of all Tobacco Paraphernalia products from the store. A site visit may also be required to verify code compliance.

Please visit our website https://sfplanning.org/ for plan submittal guidelines https://sfplanning.org/resource/plan-submittal-guidelines, and the code enforcement process https://sfplanning.org/code-enforcement.

## TIMELINE TO RESPOND

The timeline to respond to this Notice of Enforcement is **thirty (30) days** from the date of this notice. The corrective actions shall be taken as early as possible. Failure to respond to this notice by correcting the violation or demonstrating compliance with the Planning Code will result in the issuance of a Notice of Violation by the Zoning Administrator.

Please contact the Enforcement Planner with any questions, to submit evidence of correction, and discuss the corrective steps to abate the violation. Should you need additional time to respond to and/or abate the violation, please discuss this with the Enforcement Planner, who will assist you in developing a reasonable timeline.

## NOTICE OF VIOLATION, ADMINISTRATIVE PENALTIES AND APPEAL RIGHTS

**Please Note: This Notice of Enforcement is NOT a Notice of Violation.**

Once a Notice of Violation is issued and finalized, administrative penalties of up to $1,000 per day along with any applicable additional penalties referenced above for each violation, may be assessed to the Responsible Party for each day beyond the timeline to respond provided in the Notice of Violation, if the violation is not abated.

If the Responsible Party believes that a Notice of Violation to correct a violation of the Planning Code is an abuse of discretion by the Zoning Administrator, the following appeal processes are available:

1) **Zoning Administrator Hearing.**  The Responsible Party may request a Zoning Administrator Hearing under Planning Code Section 176 within thirty (30) days from the date of the Notice of Violation by submitting to the Enforcement Planner the Request for Zoning Administrator Hearing Form Request for Zoning Administrator (ZA) Hearing | SF Planning with supporting evidence to the Planning Department. The request will need to show cause as to why this Notice of Violation has been issued in error and should be rescinded. Provide the emails for all parties interested in attending this hearing. The Zoning Administrator shall render a decision on the Notice of Violation within thirty (30) days of such hearing. If the Responsible Party disagrees with the Zoning Administrator's decision, they may then appeal the Zoning Administrator's written decision to the Board of Appeals within thirty (30) days from the date of the decision.



2)  **Board of Appeals.** The Responsible Party or any interested party may waive the right to a Zoning Administrator Hearing and proceed directly to appeal the Notice of Violation within thirty (30) days from the date of the Notice of Violation to the Board of Appeals located at:

    49 South Van Ness Avenue, Suite 1475
    San Francisco, CA 94103
    Phone: (628) 652-1150
    Website: Board of Appeals | San Francisco (sf.gov)

    If Board of Appeals upholds the Notice of Violation the Board may not reduce the amount of penalty below $200 per day for each day the violation continues unabated.

Penalties are not assessed during the period when the matter is pending either before the Zoning Administrator or before the Board of Appeals.  However, if the Responsible Party requests continuance of the appeal without a reasonable cause with the Board of Appeals, the penalties may still be assessed during the continuation period.

## ENFORCEMENT TIME AND MATERIALS FEE

Pursuant to Planning Code Section 350(g)(1), the Planning Department shall charge for "Time and Materials" to recover the cost of correcting the Planning Code violations. **Accordingly, the "Time and Materials" cost associated with the Code Enforcement investigation to date is currently $1,725.00. The Responsible Party is responsible to pay this fee for any confirmed violations.** Additional fees continue to accrue until the violation is abated. The fee is separate from the administrative penalties described above and is not appealable.

### Failure to Pay Penalties and Fees

If the Responsible Party fails to pay the "Administrative Penalties" and "Time and Materials" fee to the Planning Department within thirty (30) days of the issuance of Notice of Penalty and Fee, the Zoning Administrator may take action to collect the "Penalties" and any unpaid "Time and Materials" fee owed to the Department, including:

1)  Referral of the matter to the Bureau of Delinquent Revenue (BDR) under Chapter 10, Article V, Section 10.39 of the San Francisco Administrative Code. The BDR may apply a 25% surcharge for their collection services. Please note that such surcharge will be considered part of the cost of correcting the violation, and the Responsible Party will be responsible for such charges.

2)  Initiation of lien proceedings under Chapter 10, Article XX, Section 10.230 et seq. of the San Francisco Administrative Code; and

3)  Requesting the San Francisco Office of City Attorney to pursue collection of the "Administrative Penalties" and "Time and Materials" imposed against the Responsible Party in a civil action.

### Other Applications Under Consideration



**NOTICE OF ENFORCEMENT**                                    Record No. 2024-009497ENF
**November 27, 2024**                                                    335 Jones Street

The Planning Department requires that any pending violations be resolved prior to the approval and issuance of any separate applications for work proposed on the same property. Therefore, any applications not related to abatement of the violation on the subject property will be placed on hold until a corrective action is taken to abate the violation.

We want to assist you to bring the subject property into full compliance with the Planning Code. If you have any questions on the enforcement and appeal processes, or if you need additional time to correct the violations, please contact the Enforcement Planner noted above and we will assist you in developing a reasonable timeline.

CC:

Hunter W. Sims, Deputy City Attorney, City Attorney's Office, hunter.sims@sfcityatty.org

Kimia Haddadan, Tenderloin Community Equity Manager, Planning Department, kimia.haddadan@sfgov.org

Carl Malchow, Acting Chief Building Inspector, Department of Building Inspection, carl.malchow@sfgov.org

Chris Francis, Building Inspector, Department of Building Inspection, chris.francis@sfgov.org

Jimmy Guaiumi, Acting Senior Building Inspector, Department of Building Inspection, jimmy.guaiumi@sfgov.org

Gilbert Lam, Senior Building Inspector, Department of Building Inspection, gilbert.lam@sfgov.org



# EXHIBIT D



49 South Van Ness Avenue, Suite 1400
San Francisco, CA 94103

628.652.7600
www.sfplanning.org

# NOTICE OF VIOLATION

## RESPOND WITHIN 30 DAYS OF THIS NOTICE

Date:                          January 31, 2025

Property Owners:               Fung Ursula & Chan Rex Tin
                               3197 Halyard Way
                               Elk Grove, CA 95758

Business Owner:                EZ Dollar
                               335 Jones Street
                               San Francisco, CA 94102

Record No.:                    2024-009497ENF
Site Address:                  335 Jones Street
Block/Lot:                     0333/004
Zoning District:               RC-4, RESIDENTIAL- COMMERCIAL, HIGH DENSITY
Height and Bulk District:      80-T
Special Use Districts:         Within 1/4 Mile of an Existing Fringe Financial Service
                               North of Market Residential 1
                               Fringe Financial Services RUD
                               Group Housing Special Use District
                               Priority Equity Geographies SUD
Planning Code Violations:      Section 145.1(d)(3)(A)- Security Gate Deployed During Business Hours
                               Section 249.5(f)- Tobacco Paraphernalia Establishment use Not Permitted

Enforcement Fee:               $1,725.00 Minimum Fee for Confirmed Violations
Time and Materials:            If the Cost of Reviewing a Confirmed Violation Exceeds the Minimum Fee Above,
                               Additional Billing for Staff Time and Materials will be Charged.
Administrative Penalty:        Up to $1,000 per Day for Each Violation

Enforcement Planner:           Jia Hong Situ, 628-652-7384, JiaHong.Situ@sfgov.org

The Planning Department has verified that a Planning Code violation exists on the above referenced property that must be resolved. As the property owner or the business owner, you are a Responsible Party. The purpose of this notice is to inform you about the Planning Code enforcement process so you can take appropriate

action to bring this property into compliance with the Planning Code.

## PROPERTY INFORMATION

Our records indicate that the subject property is currently authorized as Restaurant and General Grocery uses. The property is identified as a Category A – Historic Resource located within the Listed Uptown Tenderloin Historic District National and California Registers of Historic Districts, and subject to Planning Department preservation review.

## DESCRIPTION OF VIOLATION

The Planning Department finds that the subject property has the following Planning Code violations:

(1) Section 145.1(d)(3)(A)- Storefront security gate was deployed during business hours.
(2) Section 249.5(f)- Any amount of tobacco paraphernalia is a Tobacco Paraphernalia Establishment use which is Not Permitted in the North of Market residential Special Use District.

Pursuant to Planning Code Section 145.1(d)(3)(A), existing security gates for a use established prior to September 06, 2022, may only be deployed when a business is not open to the public and does not exempt the use from any required building permit. As such, the security gates cannot be closed during business hours.

Pursuant to Planning Code Section 102,

> **Tobacco Paraphernalia Establishment use is defined** as "A Retail Sales and Service Use where more than 10% of the square footage of Occupied Floor Area, as defined in Section 102, or more than 10 linear feet of display area projected to the floor, whichever is less, is dedicated to the sale, distribution, delivery, furnishing, or marketing of Tobacco Paraphernalia from one person to another. For purposes of Sections 249.5, 719, 723, and 744 of this Code, however, Tobacco Paraphernalia Establishments shall mean retail uses where any Tobacco Paraphernalia is sold, distributed, delivered, furnished, or marketed from one person to another. **"Tobacco Paraphernalia" means** paraphernalia, devices, or instruments that are designed or manufactured for the smoking, ingesting, inhaling, or otherwise introducing into the body of tobacco, products prepared from tobacco, or controlled substances as defined in California Health and Safety Code Sections 11054, et seq. "Tobacco Paraphernalia" does not include lighters, matches, cigarette holders, any device used to store or preserve tobacco, tobacco, cigarettes, cigarette papers, cigars, or any other preparation of tobacco that is permitted by existing law."

Pursuant to Planning Code Section 249.5, in the North of Market Residential Special Use District, a special definition of "Tobacco Paraphernalia Establishments" applicable to the North of Market Residential Special Use District is set forth in Section 102. **Tobacco Paraphernalia Establishments are not permitted in the North of Market Residential Special Use District.** In the North of Market Residential Special Use District, a legal non-conforming Tobacco Paraphernalia Establishment shall be deemed abandoned after 180 days of non-use.



**NOTICE OF VIOLATION**                     Record No. 2024-009497ENF
**January 31, 2025**                        335 Jones Street

Failure to comply with any Planning Code provision constitutes a violation of the Planning Code and is subject to an enforcement process, pursuant to Planning Code Section 176.

## PROPERTY HISTORY

|   | Date | Document | Description | Result | Notes |
|---|------|----------|-------------|--------|-------|
| 1 | 06/29/2012 | BPA No. 201206293816 | Change of use to general grocery, storefront alterations with outdoor seating on site. | Completed 11/21/2012 | Issued 07/26/2012 |
| 2 | 02/28/2019 | 2019-002508MIS | Retail Sales and Services use dba. EZ Dollar in RC-4 District. No alcohol sales. | Approved 03/14/2019 | |

## TIMELINE OF INVESTIGATION

On October 18, 2024, Planning Complaint No. 2024-009497ENF was accepted.

On October 29, 2024, during a City Attorney Task Force Inspection, Planning Department staff (Jia Hong Situ) conducted a site visit of the ground floor retail space, occupied by a business tenant (DBA "EZ Dollar") at the subject property and found the following:

1. Sale of Tobacco Paraphernalia products beyond the thresholds defined in Planning Code Section 102 and the establishment of a Tobacco Paraphernalia Establishment use, which is not permitted in the North of Market Residential Special Use District.
2. An accordion-style metal security gate at the storefront entrance deployed during business hours. The gate was partially opened and only allowed enough room to enter the entry door.

Three rooms in the rear were locked and access was not given.

On November 20, 2024, during a second City Task Force Inspection, Planning Department staff (Jia Hong Situ) conducted a site visit of the space dba. "EZ Dollar" at the subject property, including the three rooms in the rear and the roof. Staff observed the same issues as the first inspection and no additional code violation.

On November 27, 2024, the Planning Department sent you a Notice of Enforcement informing you about the violation and the abatement process. In that notice, you were advised to take corrective action and provide evidence of compliance to the Planning Department.

To date, the Planning Department has not received evidence to demonstrate that the above violation has been abated or a corrective action has been taken to bring the subject property into compliance with the Planning Code.

## COMPLIANCE ACTIONS

**How to Correct the Violation**

The Planning Department requires that you immediately proceed to abate the violations by taking the



following steps:

1. **Comply with Planning Code Section 249.5** by removing <u>all</u> Tobacco Paraphernalia products and signage. A definition of Tobacco Paraphernalia products is provided above.

2. **Comply with Planning Code Section 145.1(d)(3)(A)** by not deploying the storefront security gate during business hours. Not deploying the gate means that the gate is <u>fully</u> open.

3. **Provide photographic evidence** of the gate not deployed during business hours and the removal of all Tobacco Paraphernalia products from the store. A site visit may also be required to verify code compliance.

Please visit our website <u>https://sfplanning.org/</u> for plan submittal guidelines <u>https://sfplanning.org/resource/plan-submittal-guidelines</u>, and the code enforcement process <u>https://sfplanning.org/code-enforcement</u>.

## APPEAL RIGHTS

If the Responsible Party believes that this Notice of Violation to correct a violation of the Planning Code is an abuse of discretion by the Zoning Administrator, the following appeal processes are available:

1) **Zoning Administrator Hearing.** The Responsible Party may request a Zoning Administrator Hearing under Planning Code Section 176 within **thirty (30) days** from the date of this Notice of Violation by submitting to the Enforcement Planner the Request for Zoning Administrator Hearing Form <u>Request for Zoning Administrator (ZA) Hearing | SF Planning</u> with supporting evidence to the Planning Department. The request will need to show cause as to why this Notice of Violation has been issued in error and should be rescinded. Provide the emails for all parties interested in attending this hearing. The Zoning Administrator shall render a decision on the Notice of Violation within thirty (30) days of such hearing. If the Responsible Party disagrees with the Zoning Administrator's decision, they may then appeal the Zoning Administrator's written decision to the Board of Appeals within **thirty (30) days** from the date of the decision.

2) **Board of Appeals.** The Responsible Party or any interested party may waive the right to a Zoning Administrator Hearing and proceed directly to appeal the Notice of Violation within **thirty (30) days** from the date of the Notice of Violation to the Board of Appeals located at:

   49 South Van Ness Avenue, Suite 1475
   San Francisco, CA 94103
   Phone: (628) 652-1150
   Email: <u>boardofappeals@sfgov.org</u>
   Website: <u>www.sfgov.org/bdappeal</u>

   If Board of Appeals upholds the Notice of Violation the Board may not reduce the amount of penalty below $200 per day for each day the violation continues unabated.



Penalties are not assessed during the period when the matter is pending either before the Zoning Administrator or before the Board of Appeals**.**  However, if the Responsible Party requests continuance of the appeal without a reasonable cause with the Board of Appeals, the penalties may still be assessed during the continuation period.

## TIMELINE TO RESPOND AND ADMINISTRATIVE PENALTIES

**If the Responsible Party does not request an appeal process and does not take corrective action to abate the violation within thirty (30) days, this Notice of Violation will become final.** Beginning on the following day, administrative penalties of up to $1,000 per day for each violation will be assessed to the Responsible Party and will continue to accrue for each day the violation continues without corrective action.

If penalties are assessed and begin to accrue, the Planning Department will issue a Notice of Penalty and Fee. The accrued penalty amount shall be paid within thirty (30) days from the issuance date of that Notice. Please be advised that payment of accrued penalties does not excuse failure to correct the violation or bar further enforcement action. Additional penalties will continue to accrue until corrective action is taken to abate the violation.

## ENFORCEMENT TIME AND MATERIALS FEE

Pursuant to Planning Code Section 350(g)(1), the Planning Department shall charge for "Time and Materials" to recover the cost of correcting the Planning Code violations. **Accordingly, the Responsible Party is currently subject to a fee of $1,725.00 for "Time and Materials" cost associated with the Code Enforcement investigation to date for the confirmed violations.** Additional fees continue to accrue until the violation is abated. The fee is separate from the administrative penalties described above and is not appealable. For information on how to pay, contact the enforcement planner listed above.

## FAILURE TO PAY PENALTIES AND FEES

If the Responsible Party fails to pay the "Administrative Penalties" and "Time and Materials" fee to the Planning Department within thirty (30) days of the issuance of Notice of Penalty and Fee, the Zoning Administrator may take action to collect the "Penalties" and any unpaid "Time and Materials" fee owed to the Department, including:

1) Referral of the matter to the Bureau of Delinquent Revenue (BDR) under Chapter 10, Article V, Section 10.39 of the San Francisco Administrative Code. The BDR may apply a 25% surcharge for their collection services. Please note that such surcharge will be considered part of the cost of correcting the violation, and the Responsible Party will be responsible for such charges.

2) Initiation of lien proceedings under Chapter 10, Article XX, Section 10.230 et seq. of the San Francisco Administrative Code; and

3) Requesting the San Francisco Office of City Attorney to pursue collection of the "Administrative



**NOTICE OF VIOLATION**                                    Record No. 2024-009497ENF
**January 31, 2025**                                              335 Jones Street

Penalties" and "Time and Materials" imposed against the Responsible Party in a civil action.

## OTHER APPLICATIONS UNDER CONSIDERATION

The Planning Department requires that any pending violations be resolved prior to the approval and issuance of any separate applications for work proposed on the same property. Therefore, any applications not related to abatement of the violation on the subject property will be placed on hold until a corrective action is taken to abate the violation.

We want to assist you to bring the subject property into full compliance with the Planning Code. If you have any questions on the enforcement and appeal processes, or if you need additional time to correct the violations, please contact the Enforcement Planner noted above and we will assist you in developing a reasonable timeline.

## RECORDATION OF ORDER OF ABATEMENT

Ninety (90) days following the finalization of this Notice of Violation as described under the Administrative Penalties of this Notice, an Order of Abatement may be recorded against the property's records in the Office of the Recorder of the City and County of San Francisco.

The obligation to correct the violations as set forth in the Notice of Violation, Notice of Violation and Penalty Decision, or Notice of Penalty and Fee shall be Planning Code conditions pursuant to Planning Code Section 174 and shall run with title to the property. Further, such recordation shall provide notice to each Responsible Party and any subsequent "successor" or "assign of title" to the property that the failure to perform such obligations is a violation of the Planning Code and may be enforced pursuant to Planning Code Section 176.

Any fees associated with recordation and/or revocation of an Order of Abatement will be assessed to the Responsible Party and added to the "Time and Materials" fee discussed above. All daily penalties assessed and/or Time and Materials incurred is required to be paid prior to the revocation of the Order of Abatement.

Sincerely,

Kelly Wong
Acting Zoning Administrator

Enc.:
Notice of Enforcement dated November 27, 2024.

CC:    Hunter W. Sims, Deputy City Attorney, City Attorney's Office, hunter.sims@sfcityatty.org
       Kimia Haddadan, Tenderloin Community Equity Manager, Planning Department,
       kimia.haddadan@sfgov.org



**NOTICE OF VIOLATION**                                                    Record No. 2024-009497ENF
**January 31, 2025**                                                                    335 Jones Street

Chris Francis, Building Inspector, Department of Building Inspection, chris.francis@sfgov.org
Jimmy Guaiumi, Acting Senior Building Inspector, Department of Building Inspection,
jimmy.guaiumi@sfgov.org
Gilbert Lam, Senior Building Inspector, Department of Building Inspection, gilbert.lam@sfgov.org





49 South Van Ness Avenue, Suite 1400
San Francisco, CA 94103

628.652.7600
www.sfplanning.org

# NOTICE OF ENFORCEMENT

## RESPOND WITHIN 30 DAYS OF THIS NOTICE

Date:                              November 27, 2024

Property Owner/s:                  Fung Ursula & Chan Rex Tin
                                   3197 Halyard Way
                                   Elk Grove, CA 95758

Business Owner:                    EZ Dollar
                                   335 Jones Street
                                   San Francisco, CA 94102

Record No.:                        2024-009497ENF
Site Address:                      335 Jones Street
Block/Lot:                         0333/004
Zoning District:                   RC-4, RESIDENTIAL- COMMERCIAL, HIGH DENSITY
Height and Bulk District:          80-T
Special Use District               Within 1/4 Mile of an Existing Fringe Financial Service
                                   North of Market Residential 1
                                   Fringe Financial Services RUD
                                   Group Housing Special Use District
                                   Priority Equity Geographies SUD
Planning Code Violations:          Section 145.1(d)(3)(A): Security Gate Deployed During Business Hours
                                   Section 249.5(f): Tobacco Paraphernalia Establishment use Not Permitted

Enforcement Fee:                   $1,725.00 Minimum Fee for Confirmed Violations
Time and Materials:                If the Cost of Reviewing a Confirmed Violation Exceeds the Minimum Fee Above,
                                   Additional Billing for Staff Time and Materials will be Charged.
Administrative Penalty:            Up to $1,000 per Day for Each Violation

Enforcement Planner:               Jia Hong Situ, 628-652-7384, JiaHong.Situ@sfgov.org

The Planning Department has received a complaint and has verified that a Planning Code violation exists on the above referenced property that must be resolved. As the property owner or the business owner, you are a Responsible Party. The purpose of this notice is to inform you about the Planning Code enforcement process so you can take appropriate action to bring this property into compliance with the Planning Code.

中文詢問請電        Para información en Español llamar al      Para sa impormasyon sa Tagalog tumawag sa      628.652.7550

NOTICE OF ENFORCEMENT                                  Record No. 2024-009497ENF
November 27, 2024                                                        335 Jones Street

## PROPERTY INFORMATION

Our records indicate that the subject property is currently authorized as Restaurant and General Grocery uses. The property is identified as a Category A – Historic Resource located within the Listed Uptown Tenderloin Historic District National and California Registers of Historic Districts, and subject to Planning Department preservation review.

## DESCRIPTION OF VIOLATION

The Planning Department finds that the subject property has the following Planning Code violations:

(1) Section 145.1(d)(3)(A)- Storefront security gate was deployed during business hours.
(2) Section 249.5(f)- Any amount of tobacco paraphernalia is a Tobacco Paraphernalia Establishment use which is Not Permitted in the North of Market residential Special Use District.

Pursuant to Planning Code Section 145.1(d)(3)(A), existing security gates for a use established prior to September 06, 2022, may only be deployed when a business is not open to the public and does not exempt the use from any required building permit. As such, the security gates cannot be closed during business hours.

Pursuant to Planning Code Section 102,

> **Tobacco Paraphernalia Establishment use is defined** as "A Retail Sales and Service Use where more than 10% of the square footage of Occupied Floor Area, as defined in Section 102, or more than 10 linear feet of display area projected to the floor, whichever is less, is dedicated to the sale, distribution, delivery, furnishing, or marketing of Tobacco Paraphernalia from one person to another. For purposes of Sections 249.5, 719, 723, and 744 of this Code, however, Tobacco Paraphernalia Establishments shall mean retail uses where any Tobacco Paraphernalia is sold, distributed, delivered, furnished, or marketed from one person to another. **"Tobacco Paraphernalia" means** paraphernalia, devices, or instruments that are designed or manufactured for the smoking, ingesting, inhaling, or otherwise introducing into the body of tobacco, products prepared from tobacco, or controlled substances as defined in California Health and Safety Code Sections 11054, et seq. "Tobacco Paraphernalia" does not include lighters, matches, cigarette holders, any device used to store or preserve tobacco, tobacco, cigarettes, cigarette papers, cigars, or any other preparation of tobacco that is permitted by existing law."

Pursuant to Planning Code Section 249.5, in the North of Market Residential Special Use District, a special definition of "Tobacco Paraphernalia Establishments" applicable to the North of Market Residential Special Use District is set forth in Section 102. **Tobacco Paraphernalia Establishments are not permitted in the North of Market Residential Special Use District.** In the North of Market Residential Special Use District, a legal non-conforming Tobacco Paraphernalia Establishment shall be deemed abandoned after 180 days of non-use.

Failure to comply with any Planning Code provision constitutes a violation of the Planning Code and is subject to an enforcement process, pursuant to Planning Code Section 176.



NOTICE OF ENFORCEMENT                                          Record No. 2024-009497ENF
November 27, 2024                                                335 Jones Street

## PROPERTY HISTORY

| | Date | Document | Description | Result | Notes |
|---|------|----------|-------------|--------|-------|
| 1 | 06/29/2012 | BPA No. 201206293816 | Change of use to general grocery, storefront alterations with outdoor seating on site. | Completed 11/21/2012 | Issued 07/26/2012 |
| 2 | 02/28/2019 | 2019-002508MIS | Retail Sales and Services use dba. EZ Dollar in RC-4 District. No alcohol sales. | Approved 03/14/2019 | |

## TIMELINE OF INVESTIGATION

On October 18, 2024, Planning Complaint No. 2024-009497ENF was accepted.

On October 29, 2024, during a City Attorney Task Force Inspection, Planning Department staff (Jia Hong Situ) conducted a site visit of the space dba. "EZ Discount" at the subject property and found the following:

1. Sale of Tobacco Paraphernalia products beyond the thresholds defined in Planning Code Section 102 and the establishment of a Tobacco Paraphernalia Establishment use, which is not permitted in the North of Market Residential Special Use District.
2. An accordion-style metal security gate at the storefront entrance deployed during business hours. The gate was partially opened and only allowed enough room to enter the entry door.

Three rooms in the rear were locked and access was not given.

On November 20, 2024, during a second City Task Force Inspection, Planning Department staff (Jia Hong Situ) conducted an inspection of the three rooms in the rear. Staff observed:

1. Sale of Tobacco Paraphernalia products and the establishment of a Tobacco Paraphernalia Establishment use, which is not permitted in the North of Market Residential Special Use District.
2. An accordion-style metal security gate at the storefront entrance deployed during business hours. The gate was partially opened and only allowed enough room to enter the entry door.

To date, the Planning Department has not received evidence to demonstrate that the above violation has been abated or a corrective action has been taken to bring the subject property into compliance with the Planning Code.

## COMPLIANCE ACTIONS

### How to Correct the Violation

The Planning Department requires that you immediately proceed to abate the violations by taking the following steps:

1. **Comply with Planning Code Section 249.5** by removing <u>all</u> Tobacco Paraphernalia products and signage. A definition of Tobacco Paraphernalia products is provided above.

2. **Comply with Planning Code Section 145.1(d)(3)(A)** by not deploying the storefront security gate



during business hours. Not deploying the gate means that the gate is <u>fully</u> open.

3. **Provide photographic evidence** of the gate not deployed during business hours and the removal of all Tobacco Paraphernalia products from the store. A site visit may also be required to verify code compliance.

Please visit our website [https://sfplanning.org/](https://sfplanning.org/) for plan submittal guidelines [https://sfplanning.org/resource/plan-submittal-guidelines](https://sfplanning.org/resource/plan-submittal-guidelines), and the code enforcement process [https://sfplanning.org/code-enforcement](https://sfplanning.org/code-enforcement).

## TIMELINE TO RESPOND

The timeline to respond to this Notice of Enforcement is **thirty (30) days** from the date of this notice. The corrective actions shall be taken as early as possible. Failure to respond to this notice by correcting the violation or demonstrating compliance with the Planning Code will result in the issuance of a Notice of Violation by the Zoning Administrator.

Please contact the Enforcement Planner with any questions, to submit evidence of correction, and discuss the corrective steps to abate the violation. Should you need additional time to respond to and/or abate the violation, please discuss this with the Enforcement Planner, who will assist you in developing a reasonable timeline.

## NOTICE OF VIOLATION, ADMINISTRATIVE PENALTIES AND APPEAL RIGHTS

**Please Note: This Notice of Enforcement is NOT a Notice of Violation.**

Once a Notice of Violation is issued and finalized, administrative penalties of up to $1,000 per day along with any applicable additional penalties referenced above for each violation, may be assessed to the Responsible Party for each day beyond the timeline to respond provided in the Notice of Violation, if the violation is not abated.

If the Responsible Party believes that a Notice of Violation to correct a violation of the Planning Code is an abuse of discretion by the Zoning Administrator, the following appeal processes are available:

1) **Zoning Administrator Hearing.** The Responsible Party may request a Zoning Administrator Hearing under Planning Code Section 176 within thirty (30) days from the date of the Notice of Violation by submitting to the Enforcement Planner the Request for Zoning Administrator Hearing Form [Request for Zoning Administrator (ZA) Hearing | SF Planning](#) with supporting evidence to the Planning Department. The request will need to show cause as to why this Notice of Violation has been issued in error and should be rescinded. Provide the emails for all parties interested in attending this hearing. The Zoning Administrator shall render a decision on the Notice of Violation within thirty (30) days of such hearing. If the Responsible Party disagrees with the Zoning Administrator's decision, they may then appeal the Zoning Administrator's written decision to the Board of Appeals within thirty (30) days from the date of the decision.



2) **Board of Appeals.** The Responsible Party or any interested party may waive the right to a Zoning Administrator Hearing and proceed directly to appeal the Notice of Violation within thirty (30) days from the date of the Notice of Violation to the Board of Appeals located at:

49 South Van Ness Avenue, Suite 1475
San Francisco, CA 94103
Phone: (628) 652-1150
Website: Board of Appeals | San Francisco (sf.gov)

If Board of Appeals upholds the Notice of Violation the Board may not reduce the amount of penalty below $200 per day for each day the violation continues unabated.

Penalties are not assessed during the period when the matter is pending either before the Zoning Administrator or before the Board of Appeals. However, if the Responsible Party requests continuance of the appeal without a reasonable cause with the Board of Appeals, the penalties may still be assessed during the continuation period.

## ENFORCEMENT TIME AND MATERIALS FEE

Pursuant to Planning Code Section 350(g)(1), the Planning Department shall charge for "Time and Materials" to recover the cost of correcting the Planning Code violations. **Accordingly, the "Time and Materials" cost associated with the Code Enforcement investigation to date is currently $1,725.00. The Responsible Party is responsible to pay this fee for any confirmed violations.** Additional fees continue to accrue until the violation is abated. The fee is separate from the administrative penalties described above and is not appealable.

### Failure to Pay Penalties and Fees

If the Responsible Party fails to pay the "Administrative Penalties" and "Time and Materials" fee to the Planning Department within thirty (30) days of the issuance of Notice of Penalty and Fee, the Zoning Administrator may take action to collect the "Penalties" and any unpaid "Time and Materials" fee owed to the Department, including:

1) Referral of the matter to the Bureau of Delinquent Revenue (BDR) under Chapter 10, Article V, Section 10.39 of the San Francisco Administrative Code. The BDR may apply a 25% surcharge for their collection services. Please note that such surcharge will be considered part of the cost of correcting the violation, and the Responsible Party will be responsible for such charges.

2) Initiation of lien proceedings under Chapter 10, Article XX, Section 10.230 et seq. of the San Francisco Administrative Code; and

3) Requesting the San Francisco Office of City Attorney to pursue collection of the "Administrative Penalties" and "Time and Materials" imposed against the Responsible Party in a civil action.

### Other Applications Under Consideration



**NOTICE OF ENFORCEMENT**  
**November 27, 2024**

Record No. 2024-009497ENF  
335 Jones Street

The Planning Department requires that any pending violations be resolved prior to the approval and issuance of any separate applications for work proposed on the same property. Therefore, any applications not related to abatement of the violation on the subject property will be placed on hold until a corrective action is taken to abate the violation.

We want to assist you to bring the subject property into full compliance with the Planning Code. If you have any questions on the enforcement and appeal processes, or if you need additional time to correct the violations, please contact the Enforcement Planner noted above and we will assist you in developing a reasonable timeline.

CC:

Hunter W. Sims, Deputy City Attorney, City Attorney's Office, hunter.sims@sfcityatty.org

Kimia Haddadan, Tenderloin Community Equity Manager, Planning Department, kimia.haddadan@sfgov.org

Carl Malchow, Acting Chief Building Inspector, Department of Building Inspection, carl.malchow@sfgov.org

Chris Francis, Building Inspector, Department of Building Inspection, chris.francis@sfgov.org

Jimmy Guaiumi, Acting Senior Building Inspector, Department of Building Inspection, jimmy.guaiumi@sfgov.org

Gilbert Lam, Senior Building Inspector, Department of Building Inspection, gilbert.lam@sfgov.org



EXHIBIT C

DAVID CHIU, State Bar #189542
City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief Deputy City Attorney
WADE CHOW, State Bar #168527
Chief Attorney
Code Enforcement Team
HUNTER W. SIMS III, State Bar #266039
Deputy City Attorney
Fox Plaza
1390 Market Street, Seventh Floor
San Francisco, California 94102-5406
Telephone:    (415) 554-4259
Facsimile:    (415) 437-4644
E-Mail:    hunter.sims@sfcityatty.org

Attorneys for Plaintiffs
CITY AND COUNTY OF SAN FRANCISCO and
PEOPLE OF THE STATE OF CALIFORNIA

ELECTRONICALLY
**F I L E D**
Superior Court of California,
County of San Francisco

**04/10/2025**
**Clerk of the Court**
BY: SAHAR ENAYATI
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

UNLIMITED JURISDICTION

**CGC-25-624266**

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, a Municipal Corporation; and the PEOPLE OF THE STATE OF CALIFORNIA, by and through David Chiu, City Attorney for the City and County of San Francisco,<br><br>        Plaintiffs,<br><br>        vs.<br><br>155 TURK STREET ASSOCIATES L.P., ALEXANDER NOCON, an individual, RUDOLFO NOCON, an individual, ANGELICA NOCON, an individual, TWIN APPLE INC., DBA ED'S MARKET, ADAL SAIF ALTAHAMI, an individual, DOE 1 through DOE 5,<br><br>        Defendants. | Case No.<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND PENALTIES**<br><br>Type of Complaint [42] Other |

/ / /

/ / /

/ / /

1

The CITY AND COUNTY OF SAN FRANCISCO, a municipal corporation, and the PEOPLE OF THE STATE OF CALIFORNIA, by and through San Francisco City Attorney DAVID CHIU (collectively "Plaintiffs"), file their Complaint against Defendants 155 TURK STREET ASSOCIATES L.P., ALEXANDER NOCON, an individual, RUDOLFO NOCON, an individual, ANGELICA NOCON, an individual, TWIN APPLE INC. DBA ED'S MARKET, ADAL SAIF ALTAHAMI, an individual, DOE 1 through DOE 5 (collectively "Defendants").  PLAINTIFFS hereby allege as set forth below:

**INTRODUCTION**

1.      Since 2017, when DEFENDANTS began their business, the residents of the Tenderloin neighborhood have suffered due to the DEFENDANTS' illegal acts and business practices at the property located at 153 Turk Street, San Francisco, California, located on Turk Street mid-block between Taylor and Jones Leavenworth Streets.  DEFENDANTS operate a business at 153 Turk Street that contributes to the criminal activity in the Tenderloin. This action seeks to put an end to that activity.

2.      DEFENDANTS have owned and operated TWIN APPLE INC., doing business as ED'S MARKET, since at least January 2017.  Due to the illegal gambling and the sale of drug paraphernalia and stolen merchandise occurring at the property, ED'S MARKET has attracted criminal and nuisance activity to the surrounding community, necessitating police intervention and adversely affecting the neighborhood and the health, safety, and well-being of those who live and work in the area, as well as the general public.

3.      By allowing illegal gambling to occur at ED'S MARKET, DEFENDANTS have maintained the property as a nuisance in violation of California Penal Code sections 11225-11235 ("Red Light Abatement Law").

4.      By allowing illegal gambling and the sale of drug paraphernalia to occur at ED'S MARKET, DEFENDANTS have maintained the property as a public nuisance in violation of California Civil Code sections 3479-3480.

5.      By operating, and/or allowing the operation of, ED'S MARKET in repeated violation of applicable state and local laws and as a nuisance, DEFENDANTS have also demonstrated a pattern

2

and practice of engaging in unlawful business practices in violation of the Unfair Competition Law ("UCL"), California Business and Professions Code sections 17200-17210.

6.    California's Gambling Control Act ("GCA"), Business and Professions Code sections 19800 *et seq.* was passed in 1997.  While gambling establishments have existed in California for over 100 years, the legal gambling industry prior to 1984 was almost entirely unregulated; California law has since outlawed certain forms of gambling and left other forms free of government oversight or regulation.

7.    With the passage of the GCA, the California Legislature recognized that "[u]nregulated gambling enterprises are inimical to the public health, safety, welfare, and good order.  Accordingly, no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state and by the ordinances of local governmental bodies."  Business and Professions Code section 19801(d).

8.    California has long recognized the adverse impact of gambling on individuals and communities and has consequently restricted legal gambling to the California Lottery, "card rooms," casinos operated by Native American tribes, and race tracks.  State law and many local ordinances make virtually all other forms of gambling expressly illegal and provide local governments both civil and criminal remedies to address the crime and nuisance created by illegal gambling operations.  *See* Penal Code Chapter 10, sections 330-337 *et seq.* and 11225-11235; San Francisco Municipal Police Code sections 325-327.

9.    In order to lawfully operate a business in which drug paraphernalia is offered, sold, or given away, the business must keep and display the drug paraphernalia in a separate room, and the business must exclude minors not accompanied by a parent or legal guardian from entry. *See* Health and Safety Code, Chapter 6, section 11364.5.

**PARTIES AND SUBJECT PROPERTY**

10.    Plaintiff CITY AND COUNTY OF SAN FRANCISCO (the "CITY") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a city and county.  The CITY brings this action under the Red Light Abatement Law, California Civil Code sections 3479, 3480, 3491, 3494, and California Code of Civil Procedure section 731.

3

11.     Plaintiff PEOPLE OF THE STATE OF CALIFORNIA (the "PEOPLE"), by and through David Chiu, City Attorney of the City and County of San Francisco, bring this action pursuant to the Red Light Abatement Law, the Unfair Competition Law, Civil Code Sections 3479, 3480, 3491, 2494, and Code of Civil Procedure Section 731.

12.     Defendant 155 TURK STREET ASSOCIATES, LP owns the property where ED'S MARKET is located, namely 153 Turk Street, San Francisco, California, San Francisco Assessor's Block 0343, Lot 017A ("PROPERTY"). 155 TURK STREET ASSOCIATES, LP is a San Francisco based Limited Partnership.

13.     Defendant ALEXANDER NOCON, an individual, is a Manager or Member of 155 TURK STREET ASSOCIATES, LP and is domiciled in Sunnyvale, California.

14.     Defendant RUDOLFO NOCON, an individual, is a Manager or Member of 155 TURK STREET ASSOCIATES, LP and is domiciled in San Francisco, California.

15.     Defendant ANGELICA NOCON, an individual, is a Manager or Member of 155 TURK STREET ASSOCIATES, LP and is domiciled in Sunnyvale, California.

16.     Defendant ADAL SAIF ALTAHAMI is the Chief Executive Officer of Defendant TWIN APPLE INC. and is the individual who owns, manages and/or operates ED'S MARKET, a commercial business located at 135 Turk Street, in the City and County of San Francisco.  ED'S MARKET is an illegal gambling business, where patrons pay to play slot machines for the chance to win cash payouts.  Actions taken, or omissions made, by TWIN APPLE, INC.'s and ADAL SAIF ALTAHAMI's employees or agents in the course of their employment or agency at ED'S MARKET are considered to be actions or omissions of TWIN APPLE, INC. and ADAL SAIF ALTAHAMI for the purposes of this Complaint. ADAL SAIF ALTAHAMI is domiciled in San Francisco, California.

17.     Defendants DOE ONE through DOE FIVE are sued herein under fictitious names. Plaintiffs do not at this time know the true names or capacities of said defendants, but pray that the same may be alleged herein when ascertained.

/ / /

/ / /

/ / /

Complaint, CASE No.                                                                          n:\codenf\li2025\250846\01830464.docx

**GENERAL ALLEGATIONS**

18.    ED'S MARKET is a commercial business located on the ground floor of 153 Turk Street, San Francisco, California, on a busy commercial street in the Tenderloin district of San Francisco.  ADAL SAIF ALTAHAMI is the Chief Executive Officer of Defendant TWIN APPLE INC. and owns and/or operates ED'S MARKET, which has been in operation since at least October 2024.  ADAL SAIF ALTAHAMI leases the commercial space from 155 TURK STREET ASSOCIATES, LP.

19.    ED'S MARKET has the appearance of a convenience store. However, Defendant ADAL SAIF ALTAHAMI ran a gambling operation in a back room where they offered electronic slot machines.

20.    ED'S MARKET offered a variety of slot machines, including different varieties of "spinning reel" slot machine games. The slot machines accepted cash in exchange for "points" or "credits" used to play the machines. The players won or lost the games depending on chance. The outcome of the games was unpredictable to the patrons. The machines tracked a player's "wins," and winnings were paid in cash by a cashier at ED'S MARKET.

21.    Beginning in February 2025, the San Francisco Police Department ("SFPD") began receiving complaints of gambling at ED'S MARKET.

22.    SFPD conducted an undercover operation at ED'S MARKET on February 16, 2025. The officer entered Ed's Market and purchased a "torch" type lighter and a coconut water from the store clerk. The officer asked the clerk at ED'S MARKET if he could get change for a $20 so he could play the games inside the store. The officer walked into the interior of ED'S MARKET and saw four electronic gambling machines, one of which appeared to be not working. The officer saw a small, back room at the rear of the store that had two additional gambling machines. There were several people playing the machines.

23.    The officer played the only unoccupied machine. The officer put $15 into the machine and lost. During the time the officer played, they saw patrons who were playing on other machines cash out their winnings. The officer then left ED'S MARKET.

Complaint, CASE No.                                                                n:\codenf\li2025\250846\01830464.docx

24.     On March 5, 2025, SFPD members obtained and executed a search warrant at the ED'S MARKET.

25.     Members of the SFPD found significant evidence of criminal activity while executing the search warrant at ED'S MARKET. Officers seized 11 electronic gambling machines and, $3,936 in cash, and hundreds of glass pipes.

26.     ED'S MARKET's gambling operation is illegal under Penal Code section 330b, which makes it unlawful for businesses to operate or possess, and property owners to allow the operation or possession of, slot machines, which it defines as follows:

> [A] machine, apparatus, or device that is adapted, or may readily be converted, for use in a way that, as a result of the insertion of any piece of money or coin or other object, or by any other means, the machine or device is caused to operate or may be operated, and by reason of any element of hazard or chance or of other outcome of operation unpredictable by him or her, the user may receive or become entitled to receive any piece of money, credit, allowance, or thing of value, or additional chance or right to use the slot machine or device, or any check, slug, token, or memorandum, whether of value or otherwise, which may be exchanged for any money, credit, allowance, or thing of value, or which may be given in trade, irrespective of whether it may, apart from any element of hazard or chance or unpredictable outcome of operation, also sell, deliver, or present some merchandise, indication of weight, entertainment, or other thing of value.

27.     ED'S MARKET's gambling operation also violates San Francisco Municipal Police Code section 325, which provides:

> It shall be unlawful for any person, either as owner, lessee, agent, employee, mortgagee or otherwise to operate, keep, maintain, rent, use or conduct, within the City and County of San Francisco, any clock, tape, slot or card machine, or any other machine, contrivance or device upon which money is staked or hazarded upon chance or into which money is paid, deposited, or played, upon chance or upon result of the action of which money or any other article or thing of value is staked, bet, hazarded, won or lost upon chance.

28.     ED'S MARKET sells drug paraphernalia to individuals who DEFENDANTS know will often use narcotics in plain view in front of the store. DEFENDANTS sell straight glass pipes and Brillo pads that are used to ingest base rock cocaine, also known as "crack." In addition, DEFENDANTS sell glass pipes that are specifically designed to smoke methamphetamine. During the

Complaint, CASE No.                                          n:\codenf\li2025\250846\01830464.docx

March 5, 2025 search, officers observed dozens of these pipes offered for sale near the cash register, which is an area accessible to minors.

29.     Since ED'S MARKET has been in existence, criminal and nuisance activity has plagued the area, necessitating police intervention and adversely affecting the surrounding neighborhood.  The neighborhood has experienced a rising number of thefts, assaults, drug-related offenses and arrests of ED'S MARKET customers wanted on outstanding warrants.  DEFENDANTS' maintenance of the ED'S MARKET has interfered with the comfortable enjoyment of life and property in the surrounding community.  Its continued operation is a nuisance that threatens the health and safety of the neighborhood and the well-being of those who live and work in the area, as well as the general public.

## FIRST CAUSE OF ACTION
### FOR VIOLATION OF THE RED LIGHT ABATEMENT ACT BROUGHT BY PLAINTIFFS PEOPLE OF THE STATE OF CALIFORNIA AND THE CITY AND COUNTY OF SAN FRANCISCO AGAINST ALL DEFENDANTS
### (Penal Code Sections 11225 -11235)

26.     Plaintiffs PEOPLE OF THE STATE OF CALIFORNIA and the CITY AND COUNTY OF SAN FRANCISCO hereby incorporate by reference paragraphs 1 through 25 above, as though fully set forth herein.

27.     DEFENDANTS operated, and/or permitted the operation of, an illegal gambling establishment at ED'S MARKET by possessing and/or operating, or permitting the sale of possession and operation of, "machine[s] or device[s]" that "may be operated, and by reason of . . . hazard or chance or of other outcome of operation unpredictable by [the user], the user may receive or become entitled to receive . . .  [an] additional chance or right to use the slot machine or device" or a "token, or memorandum . . . which may be exchanged for any money, credit, allowance, or thing of value." Penal Code section 330b(d).  By possessing and/or operating, and/or permitting the possession and/or operation of, these machines or devices, DEFENDANTS have violated and continue to violate Penal Code section 330b(d) and San Francisco Municipal Police Code sections 325-327.  This illegal gambling operation constitutes a nuisance as a matter of law under Penal Code section 11225.

Complaint, CASE No.                                                    n:\codenf\li2025\250846\01830464.docx

28. Pursuant to Penal Code section 11230, PLAINTIFFS request that the Court order the closure of ED'S MARKET for one year and impose civil penalties of $25,000.00 against each Defendant to prevent DEFENDANTS from continuing to maintain or permit a nuisance at the PROPERTY.

29. Unless said nuisance is abated, the surrounding community and neighborhood, and the residents and citizens of the City and County of San Francisco and the People of California, will suffer irreparable injury and damage, in that said conditions will continue to be dangerous to the life, safety or health of those who live and work near the PROPERTY and the general public.

30. PLAINTIFFS have no adequate remedy at law in that damages alone are insufficient to protect the public from the present injury and harm caused by the conduct described above.

**SECOND CAUSE OF ACTION**

**FOR UNLAWFUL BUSINESS PRACTICES BROUGHT BY PLAINTIFF PEOPLE OF THE STATE OF CALIFORNIA AGAINST ALL DEFENDANTS**

**(California Business and Professions Code Sections 17200-17210)**

31. Plaintiff, the PEOPLE OF THE STATE OF CALIFORNIA, hereby incorporates by reference paragraphs 1 through 30 above, as though fully set forth herein.

32. The PEOPLE bring this cause of action in the public interest in the name of the PEOPLE OF THE STATE OF CALIFORNIA, pursuant to Business and Professions Code sections 17200 through 17210, in order to protect the residents and owners of properties adjoining ED'S MARKET from the unlawful business practices committed by DEFENDANTS in the operation of the ED'S MARKET within the City and County of San Francisco, State of California.

33. The violations of law described herein have been, and are being, carried out wholly or in part within the City and County of San Francisco. The actions of DEFENDANTS are in violation of the laws and public policies of the City and County of San Francisco and the State of California, and are inimical to the rights and interest of the general public.

34. DEFENDANTS are now engaging in and, for a considerable period of time and at all times pertinent to the allegations of this Complaint, have engaged in, unlawful business practices prohibited by California's Unfair Competition Law by managing and operating, and/or allowing the management and operation of, ED'S MARKET in violation of the following laws:

8

1 • Penal Code sections 11225-11235 by allowing illegal gambling to occur at the ED'S
2 MARKET;

3 • Penal Code section 330b by possessing and/or operating, or permitting the possession
4 and/or operation, of slot machines or devices (as defined in Penal Code section 330b(d)) at ED'S
5 MARKET;

6 • San Francisco Municipal Police Code sections 325-327 by operating and/or keeping
7 slot machines or their equivalent at ED'S MARKET.

8 • Health and Safety Code section 11364.5 for unlawfully keeping and selling drug
9 paraphernalia in an area accessible to minors.

10 • Health and Safety Code section 11364.7 by delivering, furnishing, transferring, and
11 possessing with intent to deliver, furnish or transfer drug paraphernalia, knowing or under
12 circumstances where one reasonably should know that it will be used to ingest, inhale or otherwise
13 introduce into the human body a controlled substance.

14 35. DEFENDANTS are now engaging in and, for a considerable period of time and at all
15 times pertinent to the allegations of this Complaint, have engaged in, unfair business practices
16 prohibited by California's Unfair Competition Law, Business and Professions Code sections 17000-
17 17210 by attracting patrons through the offer of illegal gambling and drug paraphernalia. These
18 customers purchase legitimate products when they come to ED'S MARKET to gamble or to buy drug
19 paraphernalia when they otherwise would patronize the businesses of DEFENDANTS' competitors.

20 36. As a direct and proximate result of the foregoing acts and practices, DEFENDANTS
21 have received income, profits, and other benefits, which they would not have received if
22 DEFENDANTS had not engaged in the violations of the Unfair Competition Law described in this
23 Complaint.

24 37. The PEOPLE have no adequate remedy at law in that damages are insufficient to
25 protect the public from the harm caused by the conditions described in this Complaint.

26 38. Unless injunctive relief is granted to enjoin the unlawful business practices of
27 DEFENDANTS, the PEOPLE will suffer irreparable injury and damage.

28

9

39.     By engaging in the unlawful business practices described herein, DEFENDANTS are each subject to civil penalties in the amount of $2,500.00 per violation, pursuant to Business and Professions Code section 17206.

### THIRD CAUSE OF ACTION
### PUBLIC NUISANCE
### (California Civil Code Sections 3479 and 3480, and California Code of Civil Procedure Section 731)

40.     PLAINTIFFS hereby incorporate by reference all of the foregoing paragraphs, as though fully set forth herein.

41.     DEFENDANTS and their employees have sold and offered for sale paraphernalia used to ingest or inhale controlled substances at ED'S MARKET. Such conduct adversely affects public health, contributes to illegal drug activity, and contributes to other criminal activity.

42.     DEFENDANTS and their employees have operated an illegal gambling operation at ED'S MARKET. Such conduct adversely affects public health and contributes to other criminal activity, including violent crimes such as robbery.

43.     As described above, DEFENDANTS are now, and for a considerable period of time, and at all times pertinent to the allegations in this Complaint have been, maintaining the PROPERTY in such a manner as to constitute a continuing public nuisance within the meaning of Civil Code sections 3479 and 3480.  The practices described above are injurious to the health and safety of the residents and the community, are offensive to the senses, and interfere with the comfortable enjoyment of life and property.  The practices described above also affect a considerable number of people and an entire community and neighborhood.

44.     At all times herein mentioned, DEFENDANTS have had notice and knowledge that the PROPERTY constituted a public nuisance because of the multiple calls for service to the PROPERTY by members of the San Francisco Police Department and prior civil investigations into DEFENDANTS' conduct for the same illegal actions described above, but DEFENDANTS have taken inadequate steps to abate the public nuisance.

45.     PLAINTIFFS have no adequate remedy at law in that damages are insufficient to protect the public from the present danger and harm caused by the conditions described herein.

46.     Unless these nuisance conditions are abated, the occupants and neighbors of the subject PROPERTY and the residents of the City and County of San Francisco will suffer irreparable injury and damage because the nuisance conditions will continue to be injurious to the continuous enjoyment of life and the free use of property of the neighbors and the public.

## PRAYER

WHEREFORE, PLAINTIFFS pray that:

**Declaratory Relief**

1.     The PROPERTY be declared a nuisance in violation of Penal Code sections 11225-11235;

2.     DEFENDANTS be declared to have engaged in unlawful business acts and practices in violation of Business and Professions Code sections 17200-17210;

**Injunctive Relief**

3.     The nuisance be preliminarily and permanently abated in accordance with Penal Code sections 11225-11235;

4.     All movable property used in the maintenance of the nuisance at the PROPERTY be removed and sold, pursuant to Penal Code section 11230;

5.     ED'S MARKET be closed for one year, pursuant to Penal Code section 11230;

6.     In the event the Court decides that any vacancy resulting from closure will be harmful to the community, in lieu of closing ED'S MARKET, each Defendant be ordered to pay damages in an amount equal to the fair market rental value of the commercial space occupied by ED'S MARKET for one year, pursuant to Penal Code section 11230;

7.     In the event that the Court does not order ED'S MARKET closed, all DEFENDANTS, their agents, officers, lessees, managers, representatives, employees, and anyone acting on their behalf, and their heirs and assignees be preliminarily and permanently enjoined from operating, conducting, using, occupying, or in any way permitting the use of ED'S MARKET as a nuisance pursuant to Penal Code sections 11225-11235;

/ / /

/ / /

11

8.      DEFENDANTS be enjoined and restrained from occupying or operating, and/or allowing the occupation or operation of, ED'S MARKET while the conditions described in this Complaint exist and until all of the violations at ED'S MARKET have been abated;

9.      DEFENDANTS be ordered to cause the PROPERTY to conform to law, and maintain such structures and all parts thereof in accordance with law;

10.     Pursuant to California Business and Professions Code sections 17203-17204, DEFENDANTS, their agents, officers, lessees, managers, representatives, employees, and anyone acting on their behalf, and their heirs, successors, and assignees be enjoined from operating, conducting, using, occupying, or in any way permitting the use of ED'S MARKET in the unlawful business practices described in this Complaint;

11.     DEFENDANTS, and each of them, inclusive, be enjoined from spending, transferring, encumbering, or removing from California any money received from ED'S MARKET or in payment for the unlawful acts alleged in the Complaint;

**Penalties**

12.     The Court impose civil penalties of $25,000.00 against each Defendant pursuant to Penal Code section 11230;

13.     DEFENDANTS be ordered to each pay a civil penalty of $2,500.00 for each act of unlawful or unfair competition, pursuant to Business and Professions Code section 17206;

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Complaint, CASE No.                                    n:\codenf\li2025\250846\01830464.docx

1    **Fees and Costs**

2        14.    DEFENDANTS be ordered to pay PLAINTIFFS ' reasonable attorney's fees and costs,

3    including the cost of investigation and discovery, pursuant to Civil Code section 3496(b).

4        15.    PLAINTIFFS be awarded their costs incurred herein pursuant to Code of Civil

5    Procedure section 1032; and

6        16.    The Court grant such other and further relief as this Court should find just and proper.

7    Dated:  April 10, 2025

8                                        DAVID CHIU
                                         City Attorney
9                                        YVONNE R. MERÉ
                                         Chief Deputy City Attorney
10                                       WADE CHOW
                                         Chief Attorney
11                                       Code Enforcement Team
                                         HUNTER W. SIMS III
12                                       Deputy City Attorney

13

14                             By:_____
                                         HUNTER W. SIMS III
15
                                         Attorneys for Plaintiffs
16                                       CITY AND COUNTY OF SAN FRANCISCO and
                                         PEOPLE OF THE STATE OF CALIFORNIA
17

18

19

20

21

22

23

24

25

26

27

28

Complaint, CASE No.                                    n:\codenf\li2025\250846\01830464.docx

EXHIBIT D

# CITY ATTORNEY OF SAN FRANCISCO

DAVID CHIU, CITY ATTORNEY

HOME    ABOUT ⌄    OUR WORK ⌄    NEWS    SERVICES ⌄    CAREERS ⌄    OPINIONS    GOOD GOVERNMENT ⌄



**Office of the City Attorney**

City Hall, Room 234
1 Dr. Carlton B. Goodlett Pl.
San Francisco, CA 94102

Hours: M–F, Modified Hours

1390 Market St., Fox Plaza,
7th Floor Reception:
M–F, 8 a.m. – 5 p.m

(415) 554-4700 Phone
(415) 554-6770 TTY
cityattorney@sfcityatty.org

# City Attorney sues Tenderloin drug and gambling dens fronting as small businesses

April 11, 2025

*SFPD investigations revealed multiple Tenderloin stores operated illegal gambling dens, sold drugs, and fueled criminal activity and fencing operations*

SAN FRANCISCO (April 11, 2025) — City Attorney David Chiu announced today that he filed several lawsuits against the property owners and managers of four Tenderloin stores for operating illegal gambling dens and enabling other criminal activity in the neighborhood. The businesses housed substantial illegal gambling operations, facilitated criminal and drug activity in the neighborhood, and, in some cases, illegally sold controlled substances. These property owners and business managers violated a number of state and local laws and California's Unfair Competition Law.

Lawsuits were filed against the property owners and managers of Family Corner Discounts, US Smoke Shop, EZ Dollar Discount Store, and Ed's Market.

## Subscribe

Sign-up here to get news releases by email.

Email (required)

First name (required)

Last name (required)

Organization (optional)

Submit

## Connect

  
  


"It is clear these stores are magnets for substantial illegal activity," said **City Attorney David Chiu**. "Drug dealing, gambling, fencing, selling contraband and illegal tobacco products—these stores are the Wild West. One store went as far as to store meth for sale under a display shelf. I commend SFPD for identifying these problematic stores that endangered the safety and welfare of their Tenderloin neighbors. We are asking the Court to protect the community, hold these owners accountable, and level the playing field for law-abiding small businesses."



*City Attorney David Chiu and Chief Bill Scott speak at a press conference in November 2023.*

"The SFPD will continue to crack down on this illegal activity in our community," said **Chief Bill Scott**. "The City is united in the effort to dismantle drug markets, illegal gambling dens and other criminal activity to ensure our streets and clean and safe. I want to thank City Attorney David Chiu for partnering in this effort and using the tools at his disposal to hold these individuals accountable."

"These illegal drug and gambling dens threaten the safety of the children, families, and seniors in our community who walk by the businesses every day," said **Supervisor Bilal Mahmood**, who represents the Tenderloin. "I commend our City Attorney and his team for taking this issue seriously and working to bring safety back to our neighborhood."

### Family Corner Discounts

The owner of Family Corner Discounts has leased the commercial property at 401 Ellis Street since at least February 2024. In January 2025, a San Francisco Police Department (SFPD) officer saw people crowded around a gambling machine in the store, and saw an individual walk in and show the clerk a container of laundry detergent concealed under his jacket, indicating a possible fencing operation. The following day, undercover officers used the gambling machines at the store and observed five other gambling machines.

Later that month, SFPD executed a search warrant and seized six electronic gambling machines, $4,456 of cash, a payment ledger, foreign tobacco products, merchandise on display for sale with CVS price stickers, and 50.8 grams of methamphetamine located under a display shelf. The store also sold drug paraphernalia, including hundreds of glass pipes commonly used to smoke methamphetamine and crack cocaine, and small plastic baggies used to store narcotics.

### US Smoke Shop

The owner of US Smoke Shop has leased the commercial property at 415 Ellis Street since at least September 2022. In January 2025, after receiving numerous complaints of illegal gambling occurring at the property, undercover SFPD officers entered the store and used the gambling machines. The following week, SFPD executed a search warrant and seized five gambling machines, two pistol magazines, $17,269 in cash, a payment ledger, a digital scale, loose leaf cannabis, pre-rolled cannabis joints, cannabis vape cartridges, and illegal flavored tobacco products.

### EZ Dollar Discount Store

The owner of EZ Dollar Discount Store has leased the commercial property at 335 Jones Street since at least January 2024. In October 2024, a SFPD plainclothes officer

observed six gambling machines and a coin pusher game in the store, but instead of prizes, the machine was filled with quarters and paper currency. Several City departments conducted a task force inspection and issued Notices of Violation (NOV) for work without a permit, the illegal sale of tobacco paraphernalia, and deploying the storefront security gate during business hours. These NOVs remain outstanding.

In January 2025, undercover SFPD officers used the gambling machines at the store. Later that month, SFPD executed a search warrant and seized six gambling machines; $2,181 in cash; a payment ledger; prizes in one machine that consisted of Visa gift cards, a Bluetooth speaker, and a solar charger and watch; and stolen merchandise on display for sale with Walgreens, CVS, Safeway, Big 5, Trader Joe's, Target, and Harbor Freight branding. The store also sold glass pipes, digital scales, and small plastic baggies used to store narcotics.

**Ed's Market**

The owners of Ed's Market have leased the commercial property at 153 Turk Street since at least January 2017. In February 2025, SFPD began receiving complaints about illegal gambling at Ed's Market, and an SFPD officer then conducted an undercover operation. The officer observed four gambling machines, played one of the slot machines, and saw others play and cash out winnings. In March 2025, SFPD executed a search warrant and seized 11 gambling machines, $3,936 in cash, and hundreds of glass pipes and Brillo pads.

Businesses that sell items defined as drug paraphernalia must keep the items in a separate room and ensure that minors do not enter the room without a parent or legal guardian. The drug paraphernalia sold at all markets were in plain view to anyone who entered the stores.

In 1997, California passed the Gambling Control Act, which restricts legal gambling to licensed California Lottery retailers, card rooms, racetracks, and casinos operated by Native American tribes. State and local law make virtually all other forms of gambling expressly illegal, including the operation or possession of gambling slot machines.

Defendants have created a public nuisance and contributed to criminal activity in the Tenderloin. San Francisco's lawsuits allege the Defendants violated multiple state and municipal codes, engaged in unlawful and unfair business practices, and profited from operating businesses or leasing properties used for gambling and other illegal activity. The lawsuits also allege that certain Defendants used their stores as fencing operations and illegally sold cannabis, flavored tobacco, or methamphetamine.

In addition to seeking penalties and injunctive relief to cure the violations at the properties, the City is asking the Court to shut down each business for one year.

The case against Family Corner Discounts and US Smoke Shop is *City and County of San Francisco and the People of the State of California v. 2008 Oh Family Trust, et al.*, San Francisco Superior Court. The case against EZ Dollar Discount Store is *City and County of San Francisco and the People of the State of California v. Ursula Fung, et al.*, San Francisco Superior Court. The case against Ed's Market is *City and County of San Francisco and the People of the State of California v. 155 Turk Street Associates L.P., et al.*, San Francisco Superior Court.

###

📁 CODE ENFORCEMENT, NEWS, PUBLIC SAFETY

‹   City Attorney secures $810,000 from Chinatown SRO owners who profited off of unsafe units

›   City Attorney Chiu sues last mile delivery company for misclassifying drivers

Copyright © 2025 City Attorney of San Francisco • Go to SFGov.org

Exhibit E



**City and County of San Francisco
Department of Public Health**

Daniel Tsai
Director
San Francisco Department of Public Health

Mayor
Daniel Lurie

**SFDPH Pilot Treatment Connections and Safer Use Supplies Distribution Policy**

Safer use supplies are an evidence-based tool for decreasing the health effects of substance use, including preventing overdoses and the transmission of certain infectious diseases such as HIV and hepatitis C. SFDPH authorizes contractors and their subcontractors to distribute safer use supplies to their program participants to reduce infectious disease transmission, prevent overdose, and build rapport with individuals in order to motivate them to enter treatment and health services.

To support the City's commitment to providing care, improving street conditions, and reducing public drug use, all SFDPH contractors and subcontractors that distribute safer use supplies must implement the following:

1. <u>Include proactive counseling and connections to treatment as part of the distribution of safer use supplies.</u>

    - SFDPH will require contractors and their subcontractors to provide counseling to motivate participants to enter treatment in all interactions that include the distribution of safer use supplies. This includes utilizing motivational interviewing and proactively providing connections to treatment.
        - ο Motivational interviewing is a counseling tool that helps participants resolve ambivalence about behavioral change to strengthen their motivation and commitment to behavior change.
    - Programs must ensure that they can rapidly link participants to treatment as soon as a participant is ready. Treatment includes medications for opioid use disorder, contingency management, withdrawal management, residential treatment, physical health treatment, and/or mental health treatment.
        - ο Programs are encouraged to utilize the SFDPH Telehealth Medications for Opioid Use Disorder (MOUD) program to ensure that participants can rapidly link to treatment. The SFDPH Telehealth program can be reached at (888) 246-3333 8am – midnight 7 days per week.
        - ο Programs should reach out to their DPH program manager to receive treatment navigation training for their staff.
    - In addition to connections to treatment, programs must also ensure that all interactions that include the distribution of safer use supplies include overdose and infectious disease prevention and education.
    - By April 16th, 2025, programs are required to submit an updated treatment connections policy and procedure document reflecting these requirements to their DPH program manager.
        - ο The policies and procedures must demonstrate how programs are utilizing proactive counseling to support participants and proactively provide connections to treatment. Programs must either provide proactive counseling and proactive connections to

1                                                                                                  April 2nd, 2025

treatment at every encounter or develop a model where all program participants receive proactive counseling and proactive connections to treatment on a regular basis (i.e. membership model).

o   At a minimum, all programs must offer treatment referrals and connections to treatment at every interaction to the extent practical and receivable by the participant. Programs should also incorporate collateral, such as the SFDPH Treatment Palm Card to facilitate offers of treatment.

o   Motivational interviewing that supports participants in moving along the stages of change towards treatment must be offered on a regular and recurring basis. Programs should identify specific operational steps by which they will accomplish this.

o   Programs must ensure that staff, including peers, are adequately trained to provide this level of service.

2.  <u>Discontinue the distribution of safer use smoking supplies in public spaces.</u>
    - Safer use smoking supplies must only be distributed within a program site, and programs must discontinue the distribution of safer use smoking supplies on sidewalks, streets, or any other public spaces.
        o   Programs in the Tenderloin, SOMA, Mission, and Castro neighborhoods must move public outdoor distribution inside by April 30th, 2025.
        o   Programs in other neighborhoods must move public outdoor distribution inside by May 30th, 2025.
        o   This policy applies to all SFDPH contractors and subcontractors that distribute safer use supplies regardless of where and how they acquire safer use supplies.
        o   Safer use smoking supplies specifically includes pipes, straws, and foil used for the smoking consumption of drugs. Naloxone distribution is not included in this policy.
        o   Neighborhoods are defined as:
            ▪   Programs that are currently providing distribution on sidewalks, streets, or other public spaces must contact their DPH program manager to develop a plan to move distribution indoors. This shift aims to create safer, more effective pathways to treatment by integrating multidisciplinary care and wraparound services. It will also enhance neighborhood safety and protect staff and individuals seeking help.
        o   Programs must also ensure they are not distributing smoking supplies to participants who will then distribute those supplies in public spaces.
    - Programs must anticipate the potential impacts of moving distribution indoors, and following the SFDPH Good Neighbor Policy, programs must actively discourage loitering, excessive noise, and public drug use in the area immediately surrounding the location where safer use supplies are distributed.

3.  <u>Track and report service utilization and connection to treatment data.</u>
    - Contractors distributing safer use supplies must begin collecting and reporting aggregate de-identified program data to SFDPH.
    - This includes:
        o   Referral, connections to treatment, and/or on-site treatment (see data definitions in sample report below).

- ▪ Treatment services include:
  - Contingency management
  - Medications for opioid use disorder (MOUD)
  - Outpatient substance use disorder treatment
  - Outpatient mental health treatment
  - Other counseling
  - Withdrawal management
  - Residential treatment
  - HIV/HCV/STI testing and linkage to treatment
  - Primary care/medical care
  - o Service utilization, including race/ethnicity demographics
- Contractors and subcontractors must submit their data through an online data reporting portal.
- The first report will be due June 30th and include data from May 1- 31, 2025. Data for June, July, August, and September will be reported monthly at the end of the following month.
  - o Report due July 31st for data from June 1st-30th, 2025
  - o Report due August 31st for data from July 1st-31st, 2025
  - o Report due September 31st for data from August 1st-31st, 2025
  - o Report due October 31st for data from September 1st-31st, 2025
- After the first four months of the pilot, data will be reported quarterly and due at the end of the month following the preceding quarter.
  - o Report due January 31st, 2026 for data from October 1st-December 31st, 2025
  - o Report due April 30th, 2026 for data from January 1st-March 31st, 2026
  - o Report due July 31st, 2026 for data from April 1st-June 30th, 2026

4. <u>Services to minors</u>
   - In alignment with California State Health and Safety Code Section 121349, safer use supply services may not be restricted by age. Due to the increased vulnerability of youth, programs must provide more frequent proactive counseling and age-appropriate connections to treatment for people seeking services under the age of 18.

5. <u>Monitoring and Accountability</u>
   - As stated above, programs are required to submit an updated treatment connections policy and procedure document reflecting these requirements to their DPH program manager by April 30th, 2025. DPH program managers will be conducting regular site visits to ensure compliance with the policy.
   - Each unique program should retain a copy of its Updated Treatment Connections Policy and Procedure Document, along with a copy of the subject policy in the program's Administrative Binder (see below).
   - This policy will be added to the FY25-26 Program Declaration of Compliance, as part of the Compliance Checklist of items that must be retained in the program's administrative binder. This will be monitored annually by the Business Office of Contract Compliance (BOCC). Failure to comply with the requirements may result in a Corrective Action Plan (CAP).
   - Finally, SFDPH will closely monitor the implementation of this pilot by tracking overdose rates and new HIV and hepatitis C infections to ensure this approach remains effective and data-driven.

**Sample Data Tracking**

| Metric | Definition | Value |
|---|---|---|
| Referral to Contingency Management | # of safer use supplies distribution encounters where a participant receives a referral to contingency management services per reporting period<br>A referral is defined as providing information to a program participant that has expressed interest in a specific service.<br>Example: Providing the location and hours of a contingency management program to a participant who has expressed interest in stopping the use of stimulants. | X |
| Connections to Contingency Management | # of safer use supplies distribution encounters where a provider connects a client to contingency management services per reporting period<br>A connection to treatment is defined as establishing an initial face-to-face and/or interpersonal connection between a participant and an external service provider.<br>Example: Calling a contingency management program and ensuring they have intake availability for the program participant and letting them know that you are sending a participant to the program. | X |
| On-Site Contingency Management | # of safer use supply distribution encounters where a participant is enrolled in on-site or within program contingency management services per reporting period<br>Example: A program participant expresses interest in contingency management and the provider enrolls that participant in the contingency management program at the same agency | X |

EXHIBIT F

In the Matter of:

JANE ROE, ET AL. vs CITY AND COUNTY OF SAN FRANCISCO

TYLER TERMEER, PHD

November 14, 2025



JANE ROE, ET AL.vs CITY AND COUNTY OF SAN FRANCISCO
TYLER TERMEER, PHD                    11/14/2025

```
 1              UNITED STATES DISTRICT COURT

 2     NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO/OAKLAND

 3                        DIVISION

 4


 5   JANE ROE, an individual; MARY ROE, )
     an individual; SUSAN ROE, an       )    CERTIFIED
 6   individual; JOHN ROE, an           )    TRANSCRIPT
     individual; BARBARA ROE, an        )
 7   individual; PHOENIX HOTEL SF, LLC, )
     a California limited liability     )
 8   company; FUNKY FUN, LLC, a         )
     California limited liability       )
 9   company; and 2930 EL CAMINO, LLC,  )
     a California limited liability     )
10   company,                          )
                                        )
11                  Plaintiffs,         )
                                        )
12   v.                                 )
                                        ) Case No.
13                                      ) 4:24-cv-01562-JST
                                        )
14   CITY AND COUNTY OF SAN FRANCISCO,  )
     a California public entity,        )
15                                      )
                                        )
16                                      )
                                        )
17                  Defendants.         )
     _____)

18

19

20          DEPOSITION OF TYLER TERMEER, PHD

21                  Taken via Zoom

22           Friday, November 14, 2025

23

24   Reported by Jane Gallegos, CSR
     Certificate No. 14676
25
```

```
 1              UNITED STATES DISTRICT COURT

 2     NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO/OAKLAND

 3                        DIVISION

 4

 5   JANE ROE, an individual; MARY ROE, )
     an individual; SUSAN ROE, an       )
 6   individual; JOHN ROE, an           )
     individual; BARBARA ROE, an        )
 7   individual; PHOENIX HOTEL SF, LLC, )
     a California limited liability     )
 8   company; FUNKY FUN, LLC, a         )
     California limited liability       )
 9   company; and 2930 EL CAMINO, LLC,  )
     a California limited liability     )
10   company,                          )
                                        )
11              Plaintiffs,             )
                                        )
12   v.                                 )
                                        ) Case No.
13                                      ) 4:24-cv-01562-JST
                                        )
14   CITY AND COUNTY OF SAN FRANCISCO,  )
     a California public entity,        )
15                                      )
                                        )
16              Defendants.             )
     _____)
17

18

19        On Friday, November 14, 2025, commencing at the hour

20   of 1:59 p.m., via Zoom, before me, Jane Gallegos,

21   Certified Shorthand Reporter in and for the State of

22   California, remotely appeared

23                    TYLER TERMEER, PHD,

24   called by the Plaintiffs, who, being by me first duly

25   sworn, was thereupon examined as a witness in said cause.
```

JANE ROE, ET AL.vs CITY AND COUNTY OF SAN FRANCISCO
TYLER TERMEER, PHD                    11/14/2025                    Page 3

```
 1                   A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:

 3         WALKUP, MELODIA, KELLY & SCHOENBERGER
           A PROFESSIONAL CORPORATION
 4         BY: MATTHEW D. DAVIS , ESQ.
               ASHCON MINOIEFAR, ESQ.
 5         650 California Street
           26th Floor
 6         San Francisco, California 94108
           (415) 981-7210
 7         (Appeared remotely)

 8

 9    FOR THE DEPONENT TYLER TERMEER, PhD, SAN FRANCISCO AIDS
                      FOUNDATION:
10

11         MORRISON & FOERSTER
           BY: JACK LONDON, ESQ.
12             ALEXIS JULIEN, ESQ.
           707 Wilshire Boulevard
13         Suite 6000
           Los Angeles, California 90017
14         (213) 892-5200
           (Appeared remotely)
15

16

17    FOR THE DEFENDANT CITY AND COUNTY OF SAN FRANCISCO:

18         DEPUTY CITY ATTORNEYS
           BY: KAITLYN M. MURPHY, ESQ.
19             SABRINA BERDUX, ESQ.
           City Hall, Room 234
20         1 Drive Carlton B. Goodlett Place
           San Francisco, California 94102
21         (415) 554-6762
           (Appeared remotely)
22

23

24    ALSO PRESENT:
           PHILIP KNOWLES, LEGAL VIDEOGRAPHER
25         (Appeared remotely)
```

JANE ROE, ET AL.vs CITY AND COUNTY OF SAN FRANCISCO
TYLER TERMEER, PHD                11/14/2025                    Page 4

```
 1                      I N D E X

 2   Examination:                                    Page

 3      By Mr. Davis                                    6

 4

 5                  E X H I B I T S (Continued)

 6   Plaintiffs'    Description                       Page

 7   EXHIBIT 1      Video - Glide Location             12

 8   EXHIBIT 2      Video - Van                        14

 9   EXHIBIT 3      Video                              17

10   EXHIBIT 4      Video - Duboce Location            18

11   EXHIBIT 5      California Harm Reduction          27
                    Supplies Presentation
12
     EXHIBIT 6      The Foundation Website             34
13
     EXHIBIT 7      Policy Checklist - Bates-Stamped   41
14                  SFAF001700 - SFAF001707

15   EXHIBIT 10     Spreadsheet - Order Form           66

16

17                  E X H I B I T S
                    Previously Marked
18
     Previously Marked                                Page
19
     EXHIBIT 8                                          36
20
     EXHIBIT 9                                          38
21
     EXHIBIT 10                                         70
22

23

24

25
```

1    a letter dated April 1st, 2025, from the Department of

2    Public Health, Director Tsai.

3              Do you see that?

4        A    Yes.

5        Q    Do you recognize this letter?

6        A    Yes, I do.

7        Q    And is this a letter that also announced the

8    City's new policy?

9        A    Yes.

10       Q    Great.  And if we look at the letter, it says --

11   and I've highlighted -- this is my highlighting in the

12   third paragraph.  It's bolded with my highlight.  It says:

13   "We are sharing with you today that beginning

14   April 30th, 2025, all SFDPH-funded programs that

15   distribute any safer-use supplies must include proactive

16   counseling," parens "e.g. with motivational interviewing,"

17   close parens, "and connections to treatment."

18             Do you see that?

19       A    I do.

20       Q    Is that the City's policy, to your understanding,

21   today?

22       A    My understanding of the City's policy today is

23   that we must include proactive counseling whenever

24   practicable.

25       Q    And has there been any change in the policy to

1  add that qualifier, "whenever practicable"?

2     A    To my knowledge, that is the way that it appears

3  in our -- our policy that was required by Public Health,

4  so they -- each site was asked to draft our own policies

5  that were then approved for implementation.  So I'm

6  unaware personally if the overall policy was changed, but

7  our policy for implementation includes that language.

8     Q    And are you telling us that this -- Foundation's

9  policy includes the language "whenever practicable," and

10  that the City has reviewed and approved that policy?

11     A    That is correct.

12     Q    Who from the City would have reviewed and

13  approved that policy?

14     A    We would have submitted it through our project

15  monitor, Emily Raganold, but I'm unaware of who ultimately

16  would have had approval authority.

17     Q    And are you aware of any document or

18  communication or other -- anything that memorializes the

19  City's approval of The Foundation's policy that has a

20  qualifier "whenever practicable"?

21     A    I'm not aware of an email that -- I'm not

22  personally aware of an email that approves it, although --

23  yeah.  I'm not personally aware of it.  It would have gone

24  to -- it would not have come directly to me.

25        MR. DAVIS:  I promised you at the beginning that

1    A    The Foundation does place orders through the

2    State Clearinghouse for our partners at the Homeless Youth

3    Alliance for safer smoking supplies.  That is separate

4    from our relationship and the syringe access

5    collaborative.  We partner with many agencies in multiple

6    forms; but, yes, we do place an order for the homeless

7    youth alliance through the syringe access -- or sorry --

8    through that -- the State Clearinghouse, separate from the

9    syringe access collaborative.  We do not for Glide.

10   **Q    So if -- to the extent Glide is distributing**

11   **smoking supplies, those supplies are not originating, in**

12   **any way, with The Foundation?**

13   A    To my knowledge, Glide has a separate

14   relationship with the State Clearinghouse.

15   **Q    Okay.  Okay.  And you don't have any knowledge**

16   **about how Glide hands out those smoking supplies?**

17   A    I am unaware of their specific policies.

18   **Q    Glide does receive money from The Foundation with**

19   **respect to the syringe access collaborative?**

20   A    They do receive money in respect to the syringe

21   access collaborative.

22   **Q    Okay.  And do you have any understanding as --**

23   **well, is it your understanding that Glide is obligated to**

24   **follow the same policy, the new City policy, with respect**

25   **to smoking supplies that The Foundation is obligated to**

1  **follow?**

2              MS. MURPHY:  Object to form.

3              THE WITNESS:  It is my understanding that there

4  is one overarching policy of the City, as it relates to

5  safer smoking supply distribution in public spaces for

6  its -- for its City-funded sites, and that we were all

7  asked to develop a protocol and policy for how that would

8  be done.

9  BY MR. DAVIS:

10      **Q      And have you -- first of all, do you have a**

11  **contact at Glide for the syringe access collaborative**

12  **work?**

13      A    I do not personally, but my staff would.

14      **Q      Do you know who the Glide contact is?**

15      A    I do not, currently.  They have recently gone

16  through staff transition, so the contact I did know is no

17  longer there.

18      **Q      Who was the contact that you knew?**

19      A    Michael Discepola.

20      **Q      Now going back to The Foundation's policy, which**

21  **is Exhibit 7 to your deposition, there's some other**

22  **exceptions under the not practical or receivable category.**

23  **One of them is "severe untreated mental health symptoms**

24  **that present as a barrier to communication."**

25          **Can you explain to us what that means?**

JANE ROE, ET AL.vs CITY AND COUNTY OF SAN FRANCISCO
TYLER TERMEER, PHD                     11/14/2025                          Page 48

1        A    Yes.  It's -- if someone were to show up at one

2    of our sites and be determined to be in a state of severe

3    psychosis or untreated mental health, presenting symptoms

4    that they were unable to effectively communicate at the

5    time, but is presenting in a way that we recognize that

6    they are going to use a substance, we would still provide

7    them with access to the safer-use supplies they are

8    requesting.

9        **Q    And so this is -- if someone is -- is truly --**

10   **you know, if they look like they're experiencing a**

11   **psychotic episode, but they want supplies, does this mean**

12   **that they're given the supplies without an offer of**

13   **treatment or referral?**

14       A    I'm not specifically talking solely about a

15   psychotic episode.  I'm -- there are a wide array of

16   mental health symptoms that might present, by which there

17   could be a barrier to communication, to effectively have a

18   thoughtful communication about connection to treatment and

19   care.  People need to be in the right headspace to be

20   ready to have a conversation to be connected to care and

21   treatment, and so we allow our providers to use their own

22   discernment about whether someone is effectively able to

23   communicate in that moment.

24       **Q    Okay.  And I meant to give that as an example,**

25   **not a -- a complete description of a severe, untreated**

1   mental health symptom; but is an example of that type of

2   symptom a psychotic episode that someone appears to be

3   experiencing, who shows up wanting supplies?

4       A    In the case of a psychotic episode, we have

5   relationships with a variety of mental health providers,

6   including law enforcement.  So if it was a true mental

7   health psychotic episode, we would use our best judgment

8   to ensure that someone had access to the care and

9   compassion that they needed in that moment.

10      Q    Understood.

11           But if someone was experiencing or appeared to be

12  experiencing a psychotic episode, and they insisted on

13  obtaining supplies, is it correct that under this policy,

14  they could be given the supplies without any offer of

15  treatment or referral?

16           MS. MURPHY:  Object to form.

17           THE WITNESS:  I think under our policy, our staff

18  are to use their discernment, their best judgment, in a

19  moment on what's best for the -- the client in that

20  moment.

21  BY MR. DAVIS:

22      Q    So the staff -- this policy gives the staff some

23  degree of discretion to decide whether or not someone

24  asking for the supplies, whether there's a need to offer

25  treatment or referrals.  Is that fair?

1  BY MR. DAVIS:

2      Q    And so my question was, do you think that would

3  be harmful for the family to walk -- have to walk by or

4  through a sidewalk that is congested with people who are

5  openly smoking narcotics?

6                  (Simultaneous speakers.)

7                  (Reporter clarification.)

8            MR. LONDEN:  I -- my objection was "asked and

9  answered."

10           I did not instruct the witness not to answer.

11           MS. MURPHY:  Mine was "same objection."

12  BY MR. DAVIS:

13     Q    I'm sorry.

14           Do you have an answer, Doctor?

15     A    I believe I've answered.

16     Q    You can't simply say "yes" to that question, that

17  that might be harmful to families?

18           MR. LONDEN:  Argumentative.

19           You can respond.

20  BY MR. DAVIS:

21     Q    You mentioned the -- the benefits or the --

22  excuse me.  You mentioned concern about the health of

23  people who are -- are struggling with addiction.

24           Can you tell me what you understand to be the

25  benefits of giving somebody who's struggling with

1  addiction smoking supplies?

2      A    Yeah.  I -- I believe that there are people who

3  are using substances, who are going to use substances

4  every day, and that there is a public health benefit to us

5  providing access to supplies that will reduce their harm.

6  So we've learned over time -- for example, in the access

7  to syringe access supplies, that syringe access supplies

8  help reduce the risk of infectious disease, like

9  hepatitis, HIV, and soft tissue infection.

10          And, similarly, in safer smoking supplies, we are

11  trying to reduce the risk of the spread of disease, of

12  people burning their lips, of inhaling other substances

13  that might burn their lungs, et cetera.  So there's a

14  public health benefit of distributing these supplies if

15  people are, in fact, going to use.

16      Q    I'm going to go back to Exhibit 9, to

17  Dr. Philip's deposition.  Give me just a moment here.  See

18  if I'm sharing that.

19          Do you see -- it's a document, and I've got the

20  page.  It's page 3 of 3, some highlight at the top.

21      A    I do.

22      Q    Okay.  Do you see -- do you recognize this is the

23  letter that the -- that you received from the City

24  announcing the new policy?

25      A    I do see that.

1    locations?

2        A    We don't currently offer glass straws.  All of

3    our straws are plastic.

4        Q    Okay.  They could be offered a straw, they could

5    be offered foil?

6        A    They could be offered an array of other safer

7    smoking supplies at a site where that is allowable, which

8    is currently our Bayview site.

9        Q    And is there an age cutoff?

10        A    Like, a lower-end age cutoff?

11        Q    Yeah.

12        A    Is that what you're saying?

13            Correct.  We wouldn't -- I mean, we don't ask for

14    ID if -- we do not -- we do not currently ask for ID.

15        Q    Okay.  And so if someone comes in, and they

16    appear to be ten years old -- would they be able to obtain

17    supplies, as long as they went through the offer of

18    counseling process?

19        A    Our -- our existing -- our existing policy does

20    not account for looking at individual's ID as a part of

21    the process.  It's an anonymous service and, therefore, we

22    don't check IDs, which would include age.  We follow the

23    same protocol, which is for every individual regardless of

24    identity; and so no matter their age, they would show up

25    and go through the same process.

JANE ROE, ET AL. vs CITY AND COUNTY OF SAN FRANCISCO
TYLER TERMEER, PHD                    11/14/2025                    Page 78

```
 1                      CERTIFICATE

 2                          OF

 3              CERTIFIED SHORTHAND REPORTER

 4                  *    *    *    *

 5

 6

 7        The undersigned Certified Shorthand Reporter of the

 8   State of California does hereby certify:

 9        That the foregoing Proceeding was taken before me at

10   the time and place therein set forth.

11        That the testimony and all objections made at the

12   time of the Proceeding were reported verbatim by me and

13   were thereafter transcribed, said transcript being a true

14   and correct copy of the proceedings thereof.

15        In witness whereof, I have subscribed my name, this

16   date:  November 17, 2025.

17

18

19                  Jane Gallegos

20   _____

21        JANE GALLEGOS, CSR No. 14676

22

23

24

25
```

EXHIBIT G

In the Matter of:

JANE ROE, ET AL. vs CITY AND COUNTY OF SAN FRANCISCO

---

SUSAN PHILLIP, M.D. MPH

October 28, 2025

---



1              UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA, SAN

3              FRANCISCO/OAKLAND DIVISION

4

5    JANE ROE, an individual; MARY ROE,
     an individual; SUSAN ROE, an
6    individual; JOHN ROE, an individual;
     BARBARA ROE, an individual;
7    PHOENIX HOTEL SF, LLC, a
     California limited liability company;
8    FUNKY FUN, LLC, a California limited
     liability company; and 2930 EL
9    CAMINO, LLC, a California limited
     liability company,

10            Plaintiffs,          CERTIFIED
                                   TRANSCRIPT
11
     vs.                                    Case No.
12                                          4:24-cv-01562-JST
     CITY AND COUNTY OF SAN FRANCISCO,
13   a California public entity,

14            Defendants.
     _____/

15

16

      VIDEOTAPED DEPOSITION OF SUSAN PHILIP, M.D., MPH

17       REPORTED FROM SAN FRANCISCO, CALIFORNIA

18      DATE:  TUESDAY, OCTOBER 28, 2025

19      TIME:  10:30 A.M. - 3:03 P.M.

20      PAGES: 1 - 188

21

22
     REPORTED BY:
23   TAMARA L. HOUSTON
     CA CSR NO. 7244, RPR, CCRR NO. 140, NY CSR
24   JOB: 4928 1090741

25

1    VIDEOTAPED DEPOSITION OF SUSAN PHILIP, M.D., MPH

2

3            Pursuant to Subpoena and Notice of Taking

4    Deposition, and on Tuesday, October 28, 2025,

5    commencing at the hour of 10:30 a.m., at Walkup,

6    Melodia, Kelly & Schoenberger, 650 California

7    Street, 25th Floor, San Francisco, California,

8    before me, Tamara Houston, California Certified

9    Shorthand Reporter No. 7244, appeared Susan Philip,

10   M.D., MPH, produced as a witness in the

11   above-entitled action, who, having been first duly

12   sworn, was thereupon examined as a witness to said

13   action.

14

15

16

17

18

19

20

21

22

23

24

25

```
1   more recent -- those would be my most recent

2   publications would be on public health implications

3   of COVID.

4        Q.   And these are publications in

5   peer-reviewed journals?

6        A.   Yes, they are.

7        Q.   Can you ballpark for me how many

8   publications you have in peer-reviewed journals?

9        A.   I do not have an exact number.  I estimate

10  it's about three -- three dozen.

11       Q.   Have you published anything in the topic

12  of addiction or addiction medicine?

13       A.   No, I have not.

14       Q.   When you -- when you had a clinical

15  practice up until the pandemic, generally what was

16  your patient base?  Who were you treating?

17       A.   Both a primary care for people living with

18  HIV.

19       Q.   Okay.

20       A.   And also specialty consultation for

21  inpatients at San Francisco General Hospital who had

22  infectious diseases.

23       Q.   And you're an employee of the City?

24       A.   Yes, I am.

25       Q.   How long have you worked for the City?
```

1    ingest fentanyl and methamphetamines.

2         A.    Yes.   I am not aware of any larger amount

3    of those substances in the Tenderloin compared to

4    other areas of the city.

5         Q.    Okay.  And you just have no idea if there

6    is more of that in the Tenderloin compared to, let's

7    say, Pacific Heights?

8              MS. WALD:  Objection to form.

9              THE WITNESS:  My -- where I work is along

10   Civic Center, South of Market, Tenderloin, in those

11   areas where I am working and spend most of my time.

12   And there are issues within those neighborhoods.

13   BY MR. DAVIS:

14        Q.    And -- and discarded paraphernalia, at

15   least in the Tenderloin, we can agree that that

16   would be a potential hazard to the health of the

17   children, wouldn't it?

18              MS. WALD:  Objection to form.  Calls for

19   speculation.  Incomplete hypothetical.  Vague.

20              THE WITNESS:  What I can say is that not

21   just for children, but for adults as well, there is

22   always a concern about discarded materials such as

23   syringes or other smoking supplies, et cetera.

24   BY MR. DAVIS:

25        Q.    Okay.  You submitted a declaration in this

1          MS. WALD:  Objection to the form of the

2     question.

3          THE WITNESS:  So as stated here, our

4     department recognizes that there are benefits that

5     have been outlined by DPH, and we incorporate that

6     into thinking about what the overall policy should

7     be for San Francisco.

8     BY MR. DAVIS:

9          Q.   Okay.  And so my question is:  Is that

10    a -- does your department, the San Francisco

11    Department of Public Health, recognize and

12    acknowledge that there is a health benefit to

13    handing out smoking supplies in the Tenderloin?

14          MS. WALD:  Objection to form.

15    Argumentative.

16          THE WITNESS:  What we recognize is that

17    there can be -- there can be benefits to the health

18    of people who use drugs if they have access to clean

19    smoking supplies.

20    BY MR. DAVIS:

21          Q.   And can you list for me what the possible

22    benefits are of handing out smoking supplies in the

23    Tenderloin?  What are the public health benefits

24    that you can think of?

25          A.   Yes.  Well, there can be injuries

1   associated with cracked or broken pipes or other

2   equipment in using those.  There can also be

3   transmission of communicable diseases through

4   sharing of those materials, including potentially

5   hepatitis and viral infections.

6        Q.   Okay.  Anything else?

7        A.   Those are the primary benefits that I am

8   aware of.

9        Q.   Okay.  So one of the benefits is to

10  prevent someone from getting, I assume -- cutting

11  their lip or something on a cracked or broken

12  fentanyl pipe?

13       A.   Yes.

14       Q.   And is the idea that if you give someone a

15  pipe for free, that pipe is not likely to be damaged

16  and, therefore, they're not going to cut their lip?

17            MS. WALD:  Objection to the form of the

18  question; incomplete hypothetical and misstates

19  testimony.

20            THE WITNESS:  Could you -- could you

21  clarify?

22  BY MR. DAVIS:

23       Q.   Yeah.  I want to make sure I understand

24  the possible public health benefit, and I'm

25  following up on there could be an injury from a

1  cracked or a broken pipe.  And so how does handing

2  out smoking supplies to someone in the Tenderloin

3  prevent that injury?

4        A.   By giving them a new intact pipe or other

5  supplies would avoid that potential for injury from

6  a cracked or broke pipe.

7        Q.   And is the concern that if you didn't give

8  them a new pipe that they might use an old pipe and

9  cut their lip?

10             MS. WALD:  Incomplete hypothetical.

11  Misstates testimony.

12             THE WITNESS:  Yes, that is -- that is

13  possible that that could happen.

14  BY MR. DAVIS:

15        Q.   Okay.  Have you heard of that happening?

16        A.   I have not personally heard of that

17  happening.

18        Q.   Has it come to your attention that that

19  was an injury that was happening with some frequency

20  in San Francisco?  In other words, people --

21  fentanyl users were cutting their lips on pipes?

22        A.   It was not brought to my attention that

23  that was a --

24        Q.   Have you ever heard of it happening even

25  once?

1    A.    I have not heard of that occurring in

2  San Francisco.

3    Q.    Okay.  The other possible public health

4  benefit that you mentioned was, I think, the

5  prevention of -- or trying to stop the transmission

6  of diseases such as hepatitis and other viral

7  diseases.

8         Do I have that right?

9    A.    Correct.

10    Q.    Is there literature saying that that's a

11  possibility that can happen with smoking pipes?

12         MS. WALD:  Objection to the form of the

13  question.  Incomplete hypothetical.

14         THE WITNESS:  My understanding is that --

15  and my understanding in discussions are -- with

16  other public health colleagues and my understanding

17  of the public health literature is that, yes.

18  BY MR. DAVIS:

19    Q.    Okay.  And as the Population Health

20  director for the city and the health officer, did it

21  come to your attention that that's actually been

22  happening?  In other words, that diseases were being

23  spread because people were sharing --I guess people

24  are sharing pipes?  Is that how the disease gets

25  spread?

 1              MS. WALD:  Objection to form.

 2              THE WITNESS:  Yes, the disease could be

 3     spread by people sharing pipes.

 4     BY MR. DAVIS:

 5         Q.   If you hand out a pipe to an addict for

 6     free, is there anything to prevent that addict from

 7     using that pipe and then sharing it with somebody

 8     else?

 9              MS. WALD:  Objection to form.

10              THE WITNESS:  Not to my knowledge.

11     BY MR. DAVIS:

12         Q.   Okay.  Now, in the calendar year 2025,

13     since Dr. Tsai became the director --

14         A.   Daniel Tsai is not a doctor.  He's a -- so

15     his title is just director of --

16         Q.   Director.  Since Mr. Tsai became the

17     director, there have been some changes with respect

18     to the City's policies with respect to the

19     distribution of smoking supplies; is that generally

20     true?

21         A.   That is correct, in April of 2025.

22         Q.   And were those changes to the policies

23     discussed at the executive level?

24         A.   Yes, they were.

25         Q.   And did you participate in those

1    BY MR. DAVIS:

2        Q.    And I'm -- I'm focused on any discussion

3    or statements to the effect that there is a public

4    health benefit to be recognized or achieved by

5    handing out smoking supplies.  And so we've talked

6    about two.  And I'm wondering if there are any

7    others that come to mind.

8        A.    Yes.  The other benefit would be engaging

9    a person who uses drugs via smoking in a

10   conversation with a health worker or a member of a

11   staff of a community-based organization so that they

12   are told about opportunities for treatment and

13   recovery in San Francisco.

14       Q.    So would it be -- if I can summarize it,

15   one benefit is if you coupled the distribution with

16   a conversation about getting the user into treatment

17   or recovery, that could be a benefit?

18       A.    Correct.  That could be a benefit.

19       Q.    Any others come to mind?

20       A.    Well, related to the conversation about

21   treatment, it is also keeping a person engaged with

22   public health entities to continue to assess

23   readiness for core treatment and offer those.

24       Q.    So keeping that addict engaged, if you

25   will, so that perhaps in the future he or she will

1    **opt for recovery treatment?**

2          **A.    Yes.**

3                MS. WALD:  Objection to form.  Vague as to

4    "addict."

5                THE WITNESS:  The term we use is "a person

6    who uses drugs," yes.

7    BY MR. DAVIS:

8          **Q.    Okay.  And you understand that many of**

9    **them, probably the majority, are addicts?**

10                MS. WALD:  Objection to form.  Lacks

11    foundation.

12                THE WITNESS:  I do understand that the

13    substances they are using are addictive substances.

14    BY MR. DAVIS:

15          **Q.    Yeah.  Okay.  Have we covered all of the**

16    **possible public health benefits that were discussed**

17    **in the leadership team with respect to the**

18    **distribution of smoking supplies?  And we're talking**

19    **of the 2005 -- 2025 time period.**

20                MS. WALD:  Objection to form.

21                THE WITNESS:  Those are generally the ones

22    that I recall, yes.

23    BY MR. DAVIS:

24          **Q.    Did anyone talk about possible negative**

25    **effects or consequences of handing out the supplies?**

 1  and off the street?

 2      A.    For this -- for this change in policy that

 3  happened in April --

 4      Q.    Mm-hmm.

 5      A.    So take some time to see those data.  So

 6  the idea is to continue to monitor, as we have been

 7  doing, the uptake and connection of people into --

 8  into treatment.

 9      Q.    And, to your knowledge, have any people

10  been linked to treatment since this new policy went

11  into effect?

12            MS. WALD:  Objection.  Vague.

13            THE WITNESS:  I am not aware of -- of

14  those data.

15  BY MR. DAVIS:

16      Q.    Okay.  You -- did you become aware when

17  the Linkage Center was operating that there was

18  almost no linkage of people with services with

19  respect to that center?

20            MS. WALD:  Objection.  Misstates

21  testimony.  Lacks foundation.  Argumentative.

22  Objection to form.

23            THE WITNESS:  After the Linkage Center was

24  closed at the end of 2022, I did understand that

25  there were very few people who were able to be

 1   personally -- have little involvement in the

 2   distribution of these supplies in terms of you

 3   personally or your division?

 4        A.    My division does not have direct

 5   day-to-day involvement.

 6        Q.    And so that would be something that

 7   Dr. Kunins would know more about?

 8             MS. WALD:   Calls for speculation.

 9   Objection to form.   Lacks foundation.

10             THE WITNESS:   This work is within

11   Dr. Kunins's division.

12   BY MR. DAVIS:

13        Q.    Okay.   And as far as you know, this is a

14   policy that that Director Tsai would agree with; in

15   other words, that if a teenager goes into a

16   City-supported vendor space and asks for smoking

17   supplies, the vendor can give that -- those supplies

18   to the teenager as long as counseling is offered; is

19   that correct?

20             MS. WALD:   Objection to form and

21   incomplete hypothetical.   Asked and answered.

22             THE WITNESS:   My understanding is that

23   that could happen.

24   BY MR. DAVIS:

25        Q.    Okay.

1    BY MR. DAVIS:

2        Q.    Right.   What -- tell me -- I don't need to

3    be a test, but are you saying that there is

4    peer-reviewed literature that is saying -- that says

5    it's a good idea from a public health perspective to

6    hand out smoking materials?

7        A.    The data in the public health literature

8    are much stronger for handing out clean syringes and

9    safer injection supplies, but there are data, again,

10   peer-review data to also support --

11       Q.    Tell me anything you know about that

12   supports -- I'm not talking about syringes.   I'm

13   talking about smoking supplies.   Are you aware of a

14   journal, an article, anything out there that says

15   that this is -- these are the public health

16   benefits?

17       A.    I don't have the specific references.

18       Q.    Okay.

19       A.    But California's position is footnoted and

20   based on some of those data, and it is generally

21   accepted in the public health realm that there

22   are -- that there are benefits and that's why --

23       Q.    Is it generally accepted in the public

24   health realm that the benefits of handing out

25   smoking pipes and things like that outweigh any --

1   discussion; and, again, that was part of the reason

2   for wanting to make sure this was linked to the

3   offer of treatment and making sure that there was

4   good neighbor policies in place.

5   BY MR. DAVIS:

6        **Q.   Was there an acknowledgment that if we**

7   **hand out these supplies, people are likely to use**

8   **these supplies in public spaces?**

9             MS. WALD:  Objection.  Asked and answered.

10            THE WITNESS:  There is an acknowledgment

11  of -- within our discussions that people were

12  already using drugs within the public sphere, and we

13  wanted to do everything we could to decrease that

14  for the health of the community and for the

15  individuals.

16            So continuing the evidence-based approach

17  of giving safer smoking supplies but doing it in a

18  more controlled settings and doing it always coupled

19  with the offer of treatment was the approach that we

20  took earlier this year.

21  BY MR. DAVIS:

22       **Q.   Okay.  And, again, even under the new**

23  **policy, folks in the Department of Public Health**

24  **understand and appreciate that the people who get**

25  **the supplies may use them on the streets and**

1    **sidewalks of the Tenderloin?**

2            MS. WALD:  Objection.  Incomplete

3    hypothetical.  Asked and answered many times.

4            THE WITNESS:  Yes, we understand that that

5    is possible that that can happen.

6            MR. DAVIS:  Okay.  That's all I have.

7    Thank you very much.  Appreciate your time.

8            COURT REPORTER:  Counsel, may I get

9    transcript requests on the record, please.

10           MR. DAVIS:  I probably need an expedited

11   copy.  I don't need it video synced.

12           MS. WALD:  We would like a copy of the

13   transcript.

14           MR. DAVIS:  Thank you.

15           THE VIDEOGRAPHER:  Going off the record.

16   The time is 3:03.

17                   (Whereupon the proceedings concluded

18                    at 3:03 p.m.)

19

20

21

22

23

24

25

```
 1                         )
     STATE OF CALIFORNIA ) ss.
 2                         )

 3

 4          I, Tamara Houston, RPR, CCRR, CSR No. 7244, a

 5   Certified Shorthand Reporter in the State of

 6   California, duly empowered to administer oaths, do

 7   hereby certify:

 8             That, prior to being examined, the witness

 9   named in the foregoing deposition was by me duly sworn

10   to testify to the truth, the whole truth, and nothing

11   but the truth;

12        That said deposition was taken down by me in

13   shorthand at the time and place therein named, and

14   thereafter reduced to typewriting by computer-aided

15   transcription under my direction;

16        That the dismantling, unsealing, or unbinding of

17   the original transcript will render the reporter's

18   certification null and void.

19        I further certify that I am not interested in the

20   event of the action.

21        In witness whereof, I have hereunto subscribed my

22   name.

23        Dated:  30th of October, 2025.

24   _____

     TAMARA L. HOUSTON
25   CSR 7244, RPR, CCRR 140
```

EXHIBIT H

```
 1            UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3   - - - - - - - - - - - - - - - - - - -

 4   JANE ROE, an individual; MARY ROE,    )  CASE NO.

 5   an individual; SUSAN ROE, an          )  4:24-cv-01562-

 6   individual, JOHN ROE, an individual;  )  JST

 7   BARBARA ROE, an individual; PHOENIX   )

 8   HOTEL SF, LLC, a California limited    )

 9   liability company, et al.,            )

10                 Plaintiffs,             )

11   vs.                                   )

12   CITY AND COUNTY OF SAN FRANCISCO, a   )

13   California public entity,             )

14                 Defendant.              )

15   - - - - - - - - - - - - - - - - - - -

16

17        VIDEOTAPED DEPOSITION OF OMAR S. WARD

18              FRIDAY, NOVEMBER 7, 2025

19

20

21         BEHMKE REPORTING AND VIDEO SERVICES, INC.

22           BY:  SUZANNE I. ANDRADE, CSR NO. 10682

23              550 CALIFORNIA STREET, SUITE 820

24              SAN FRANCISCO, CALIFORNIA  94104

25                             (415) 597-5600
```

1

2

3

4

5

6

7

8

9

10          Videotaped deposition of OMAR S. WARD, taken

11   on behalf of Defendant, at 1390 Market Street,

12   7th Floor, San Francisco, California, commencing at

13   10:10 A.M., FRIDAY, NOVEMBER 7, 2025, before Suzanne I.

14   Andrade, Certified Shorthand Reporter No. 10682,

15   pursuant to Notice.

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFFS:
 3        WALKUP, MELODIA, KELLY & SCHOENBERGER
 4        BY:  MATTHEW D. DAVIS, ATTORNEY AT LAW
 5        650 California Street, 26th Floor
 6        San Francisco, California  94108
 7        Telephone:  (415) 981-7210
 8        Email:  mdavis@walkuplawoffice.com
 9
10   FOR DEFENDANT:
11        CITY AND COUNTY OF SAN FRANCISCO
12        OFFICE OF THE CITY ATTORNEY
13        BY:  SABRINA M. BERDUX, DEPUTY CITY ATTORNEY
14        1390 Market Street, 7th Floor
15        San Francisco, California  94102
16        Telephone:  (415) 554-3929
17        Email:  sabrina.m.berdux@sfcityatty.org
18
19   ALSO PRESENT:
20        STEVE PATAPOFF, VIDEO OPERATOR
21
22
23
24
25
```

1    Q.    How long did you speak for?

2    A.    I can't recall how long we spoke for.

3    Q.    Approximately, best estimate?

4    A.    Mm, let me see.  Did we...  About five minutes.

5    Q.    Was it on the phone or in person?

6    A.    Over the phone.

7    Q.    And what did you discuss?  What was said?

8    A.    Make sure the time and date of this, the

9    information about when this is going to be.

10    Q.    Okay.  And besides that conversation yesterday,

11    did you have any discussions with anybody else to

12    prepare for your deposition today?

13    A.    No.

14    Q.    Have you spoken with any of Plaintiffs'

15    attorneys before, besides to prepare for your

16    deposition?

17    A.    No.  I don't know the plaintiffs.

18    Q.    Their attorneys.  So Mr. Davis or anybody from

19    the Walkup law firm.

20    A.    No.

21    Q.    You've never spoken with any of the attorneys

22    in this case for the plaintiffs?

23    A.    I -- I don't know who the plaintiffs are.  So

24    when I spoke to somebody, I don't know if they was for

25    the plaintiffs or who they was for.

1    Q.   You have not?

2    A.   No.

3    Q.   Okay.  You've been -- do you take the videos

4    and -- let me back up.

5        The videos that you post to social media, do

6    you take those with your cell phone?

7    A.   Yes, I take them with a cell phone.

8    Q.   And how long have you been taking those videos?

9    A.   I've been doing videos since 2022.

10   Q.   Do you still have the phones that you took the

11   videos with before you got your new phone in 2024?

12   A.   Yes.

13   Q.   Are they at home?

14   A.   Hmm?

15   Q.   Are they at home?

16   A.   No.  They're with me.

17   Q.   Oh, currently?

18   A.   Mm-hmm.

19   Q.   Yes?

20   A.   Yes.

21   Q.   Okay.  Would that be another phone number that

22   you have been using?

23   A.   It's not no number on the phone.  It's just --

24   I just use it to use the video.

25   Q.   Got it.

```
1     A.   You want me to name everybody?

2     Q.   Yeah.

3     A.   Charles, Robert, Pam, Susan, Michael, James,

4  Joseph, Noah --

5     Q.   Hold on.  Slow down.

6          Charles, Robert, Pam, Joseph --

7     A.   Noah.

8     Q.   Noah.

9     A.   Kimball.

10    Q.   Kimball.

11    A.   Mike Easton.

12    Q.   Mike what?

13    A.   Mike Easton.

14    Q.   Easton?  How do you --

15    A.   Claire --

16    Q.   How do you spell that, Easton?

17    A.   E -- E-a-s-t.

18         Claire Huxtable.  It's -- it's -- I can't name

19  everybody.  It's a lot of names.  I have a lot of

20  videos.  There's a lot of names.  I have a catalog of

21  over 500 videos.

22    Q.   That was my next question, is:  How many videos

23  do you have in your catalog?

24    A.   I have catalog over 500 videos.  And I can't --

25  we would be here for two days naming 500 people.
```

```
 1      Q.    Or even before December 2024?
 2      A.    No.
 3      Q.    Okay.  Do you have a business address, or do
 4  you use, like, your mailing or home address?
 5      A.    Business address.
 6      Q.    What's your business address?
 7      A.    463 Ellis.
 8      Q.    Do you have a storefront?
 9      A.    Yes.
10      Q.    All right.  Please describe for me what is your
11  business.
12      A.    Deli.
13      Q.    Great.
14            So you sell food, sandwiches?
15      A.    Yes.
16      ATTORNEY BERDUX:  Let me mark as Exhibit C a Google
17  image.
18            (Deposition Exhibit C was marked for
19            identification.)
20  BY ATTORNEY BERDUX:
21      Q.    Is that your business on Exhibit -- can you see
22  it on Exhibit C?
23      A.    Mm-hmm.
24      ATTORNEY DAVIS:  Do you have a copy for me?
25      ATTORNEY BERDUX:  I will get you a copy.  I just
```

1   A lot of people has places to go to.

2          You can go out there right now and walk down

3   the street.  You going to see a lot of 18, 17, 19,

4   20-year-olds, 30-year-olds; they got family, and the

5   family want them home.

6          I can show you a lot of e-mails and texts.

7   "Tell my son to call me."  "Tell my daughter to call

8   me."  "Tell my wife to call me."

9          And I make those connections with people so

10  they could -- a lot of people come to my shop so they

11  can check their e-mails.  That's what I do there.  They

12  check their e-mails.  They use the phone.  They call

13  family or send word back out on the street.  "Come talk

14  to your -- come call your mother."  And that's what they

15  do.

16          I was going to show you, but I'll wait.

17          Yeah.  So, technically, this is not homeless

18  crisis out there right now; it's a drug crisis.  No

19  matter how you want to beat around the bush and say

20  homeless, but it's not a homeless crisis; it's a drug

21  crisis.

22          Because if the drugs wasn't there and this

23  person wasn't addicted, they can always go back home.

24  They can always go back home.  Look.

25      Q.   Since you've been in the -- in -- doing these

1  videos in 2022, have you noticed any changes over time
2  in the Tenderloin?
3      A.   No.  It's just -- everything just get shift
4  from street to street, another block and another block.
5      Q.   Have you seen or observed the City's efforts to
6  try to keep the sidewalks clear, move people?
7      A.   Oh, yeah.  I see -- I see the efforts.  They --
8  they -- they do try that.  They do try that, though.
9  But in -- it works to an extent.  It works until
10  somebody complain about it.
11          His -- when -- when this case went to news
12  media and the news media got ahold of it about a month
13  or two ago, they was talking about that people hanging
14  out in front of the hostel that's on the -- four,
15  five -- 600 block of Ellis.  And that hostel learned
16  that their name was mentioned in there.  The next day,
17  they went outside and moved everybody that was hanging
18  out in front, made them go to the -- they told them,
19  "No.  Go -- go across the street."
20          They moved everybody across the street.  As
21  long as they ain't in front of their building no more,
22  they're not worried about it.
23      Q.   Do you see street crews throughout the
24  Tenderloin, like, trying to clean the streets, clean the
25  sidewalks, DPW, stuff like that operating on a daily

```
 1  basis?
 2      A.   Yeah, I see that.
 3      Q.   Do you know what the neighborhood street teams
 4  are?
 5      A.   Mm-hmm.
 6      Q.   Yeah?
 7           Have you seen them out there?
 8      A.   Like the ambassadors, the HOT Team --
 9      Q.   Yeah.  But --
10      A.   -- Field Institute, yeah.
11      Q.   But the City workers too, like the -- when DPW
12  goes out --
13      A.   DPW.
14      Q.   -- with SFPD and --
15      A.   I see them -- I see them every day.
16      Q.   Every day?
17      A.   Every day.
18      Q.   Okay.
19      A.   But they come -- they come right now at
20  9:00 o'clock, do their little sweep, powerwash.  After
21  they drive off, by the time they get to the next block,
22  the people moving right back over there.
23           It's an ongoing thing.  The -- the -- the way
24  to solve that is start telling people, "Hey, you come
25  back and you set up your tent, you're going to get a
```

1    ticket." They not enforcing it.
2            To me, and to be honest with you, I feel as
3    though it's a waste of time and money and effort.
4    Because the City is spending a lot of money to just come
5    out there, powerwash the street, which, don't get me
6    wrong, that's a good thing. They cleaning the streets,
7    don't get me wrong, is good.
8            But just as they drive off, the same exact
9    people that moved away walk back. And they come back
10   two days later and do the same routine again to clean
11   up, powerwash again.
12           Now, if you're going to keep coming back to the
13   same spot doing the same thing every day, every day, at
14   least, after you clean it up, you get these people in
15   front of these people doorways.
16       Q.   You have to get the drugs off the streets?
17       A.   Not necessarily getting the drugs off the
18   streets, but -- because that -- that will never happen,
19   no matter how many time -- no matter what, drugs are
20   always going to be there; I know that. Don't get me
21   wrong. But you got to start somewhere.
22           And I'm not just saying arrest somebody because
23   they use drugs, no, not there. But to be all honest,
24   some people use -- need -- need that. Because once they
25   get in jail and somebody go sit down in jail for a few

1          Have you seen drug use on the streets your
2     entire life living in the city?
3          A.   Not on -- not the way it is now.
4          Q.   Mm-hmm.
5          A.   I mean, I seen people get high outside but not
6     openly as they do it now.  They do it too broadly,
7     openly.
8               They didn't used to do it like that.  I'd say
9     about four to five years ago, about five, six years ago,
10    they wasn't all sitting out there openly doing it the
11    way they do it now.
12         Q.   And there's been drug sales on the street
13    since --
14         A.   Since forever.
15         Q.   Forever.
16         A.   But that wasn't done all openly like they do it
17    now.  It's like they do it so openly now, it's like
18    it's -- it's -- this -- you want to see how openly they
19    do it?
20         Q.   Oh, I've -- yeah.  I've -- I've -- I've got
21    your social media.
22         A.   You've watched my video?
23         Q.   Yeah.
24         A.   Oh, okay.
25         Q.   Any other changes you've observed in the

1  Tenderloin let's say just within the last six months or

2  so?

3      A.    Negative or positive?

4      Q.    Both.

5      A.    The last six months, certain areas is getting

6  cleaner than other areas.  That's a good thing.

7          But like I said, as soon as they clean it, as

8  soon as they clean it, like -- I seen a new captain,

9  like, about two months ago.  They made a statement they

10 was going to start having beat walkers walking along

11 certain streets -- certain streets in the Tenderloin.

12          Like, supposedly -- like, for example, they

13 going to have one walking from Golden Gate all the way

14 up to Ellis or Leavenworth.  That lasted about three

15 weeks, and it's over with.

16          Every time they commit to something, it don't

17 last long.  They don't keep -- it's like us from the

18 street, we call it keep your foot on their necks.  Keep

19 your foot on their neck.  It's like you stand with it.

20 You stand your ground.

21          They don't stand their ground, and they don't

22 keep -- they don't keep what they pushing.  If they keep

23 their feet on their neck, they keep doing what they

24 doing, patrolling and cleaning up, it's going to keep

25 putting the same thing.

1    A.    There was about 80 other people that donated on

2  there too.

3    Q.    And when did you have your heart attack?

4    A.    That was last year.  I think February of last

5  year.

6    Q.    Okay.  Well, I hope you're doing well.

7          Okay.  How well would you say that you know the

8  Tenderloin neighborhood of San Francisco?

9    A.    I know it very well.

10   Q.    How much time do you spend there on a typical

11  day, if there is a typical day?

12   A.    Every day.  That's -- majority of my whole day

13  is -- from the morning until -- I wake up until I go

14  back inside is in the Tenderloin.

15   Q.    And is it correct that you often walk or ride

16  your scooter around the sidewalks and the streets of the

17  neighborhood?

18   A.    Yes.

19   Q.    Do you have any -- you've talked a little bit

20  about what you try to do for people who are dealing with

21  their drug addiction in the neighborhood.  You've talked

22  a little bit about that.

23          Have you encountered people who are

24  experiencing overdoses?

25   A.    Yes.

```
 1   personally observed the distribution of these smoking
 2   supplies.  You know, there's 172 Turk.
 3            Any other locations on Turk Street where you --
 4   you're aware that smoking supplies are being handed out?
 5   And let's just say within the past six months.
 6       A.   Yeah.  There's the place at the Hospitality
 7   House that's right next door to -- I mean, it's -- they
 8   share the same building as the Coalition on
 9   Homelessness.  And they also does it there.  That's,
10   like, the next block up.
11       Q.   And what do you see -- what have you seen
12   happening -- I believe it's 290 Turk Street.
13            But what have you seen happening there?
14       A.   Like recently, like two weeks ago, somebody
15   just overdosed in front of it, directly in front of
16   them.  Because they're allowed to get high there.
17       Q.   Okay.
18       A.   I have that on video too.
19       Q.   Do you -- do you have any information as to
20   whether smoking supplies are being handed out of that
21   location?
22       A.   Yeah, they are, though.  But it's, like -- it's
23   kind of hard for me to get in there to record, because
24   they know who I am and stops me at the door.
25       Q.   You're becoming somewhat notorious?
```

1            I don't have any additional questions, but I'm

2     not concluding the deposition until we can receive and

3     review the document requests, including the videos that

4     you've agreed to provide me pursuant to the notice.

5            Thank you.

6        ATTORNEY DAVIS:  I've got one other question.

7        THE WITNESS:  Sure.

8                        FURTHER EXAMINATION

9     BY ATTORNEY DAVIS:

10       Q.    Have you seen people that you understand to be

11    under the age of 18 collecting safe-smoking -- so-called

12    safe-smoking supplies in the Tenderloin?

13       A.    Yeah.  I got a video of a person.  I asked him

14    how old he was.  I think he said he was 17 or something.

15       Q.    When -- when was that video taken?  I don't

16    need you to pull it up.

17       A.    Earlier this year sometime.

18       Q.    Okay.  Have you seen other instances where

19    people who appeared to be under the age of 18 who were

20    collecting smoking supplies?

21       A.    I can't remember right now.

22            I remember that one kid because I questioned

23    him about his age, and he told me his age.  Because I

24    looked at him and said, "You look young."

25       ATTORNEY DAVIS:  Okay.  That's all I got.  Thanks.

```
 1   STATE OF CALIFORNIA          )
 2                                ) ss.
 3   COUNTY OF SAN MATEO          )
 4           I hereby certify that the witness in the
 5   foregoing deposition, OMAR S. WARD, was by me duly sworn
 6   to testify to the truth, the whole truth and nothing but
 7   the truth, in the within-entitled cause; that said
 8   deposition was taken at the time and place herein named;
 9   that the deposition is a true record of the witness'
10   testimony as reported by me, a duly Certified Shorthand
11   Reporter and disinterested person, and was thereafter
12   transcribed into typewriting by computer.
13           I further certify that I am not interested in
14   the outcome of said action nor connected with, nor
15   related to, any of the parties in said action, nor to
16   their respective counsel.
17           IN WITNESS WHEREOF, I have hereunto set my hand
18   this 12th day of November, 2025.
19   Read and Sign was:  Requested.
20
21
22
23           SUZANNE I. ANDRADE, CSR NO. 10682
24           STATE OF CALIFORNIA
25
```

EXHIBIT I

In the Matter of:

JANE ROE, et al.

vs

CITY AND COUNTY OF SAN FRANCISCO

---

# COMMANDER SCOTT BRIGGS

## October 29, 2025

---



JANE ROE, et al. vs CITY AND COUNTY OF SAN FRANCISCO
COMMANDER SCOTT BRIGGS                    10/29/2025

1              UNITED STATES DISTRICT COURT

2                 NORTHERN OF CALIFORNIA

3              SAN FRANCISCO/OAKLAND DIVISION
   _____
4  JANE ROE, an individual; MARY ROE,   )
   an individual; SUSAN ROE, an         )
5  individual; JOHN ROE, an             )
   individual; BARBARA ROE, an          )
6  individual; PHOENIX HOTEL SF, LLC,   )
   a California limited liability       )   Case No.
7  company; FUNKY FUN, LLC, a           )   4:24-cv-01562-JST
   California limited liability         )
8  company; and 2930 EL CAMINO, LLC,    )
   a California limited liability       )
9  company,                             )
                                        )
10          Plaintiffs,                 )
                                        )
11 v.                                   )
                                        )
12 CITY AND COUNTY OF SAN FRANCISCO,    )
   a California public entity,          )
13                                      )
            Defendants.                 )
14 _____ )

15

16

17      Videotaped Deposition of COMMANDER SCOTT BIGGS

18             San Francisco, California

19            Wednesday, October 29, 2025

20                 CERTIFIED
                  TRANSCRIPT
21

22

23            Reported Stenographically by

24      Michael P. Hensley, RDR, CSR No. 14114

25

```
 1              UNITED STATES DISTRICT COURT

 2                 NORTHERN OF CALIFORNIA

 3              SAN FRANCISCO/OAKLAND DIVISION
      _____
 4   JANE ROE, an individual; MARY ROE,    )
     an individual; SUSAN ROE, an          )
 5   individual; JOHN ROE, an              )
     individual; BARBARA ROE, an           )
 6   individual; PHOENIX HOTEL SF, LLC,    )
     a California limited liability        )   Case No.
 7   company; FUNKY FUN, LLC, a            )   4:24-cv-01562-JST
     California limited liability          )
 8   company; and 2930 EL CAMINO, LLC,     )
     a California limited liability        )
 9   company,                              )
                                           )
10           Plaintiffs,                   )
                                           )
11   v.                                    )
                                           )
12   CITY AND COUNTY OF SAN FRANCISCO,     )
     a California public entity,           )
13                                         )
              Defendants.                  )
14   _____)

15

16       Videotaped Deposition of COMMANDER SCOTT BIGGS,

17   commencing at the hour of 10:07 AM and concluding at the

18   hour of 10:53 AM on Wednesday, October 29, 2025, at the

19   location of 650 California Street, 26th Floor, San

20   Francisco, California 94108, before Michael Hensley,

21   Registered Diplomate Reporter, Certified Shorthand

22   Reporter No. 14114, in and for the State of California.

23

24

25
```

1      A.    Derrick Lew.

2      Q.    How do you spell Deputy Chief Lew's last name?

3      A.    L-e-w.

4      Q.    Who's the acting chief?

5      A.    The interim chief right now is Paul Yep.        10:13:52AM

6      Q.    That's right.

7      A.    Y-e-p.

8      Q.    So you report to Deputy Chief Lew, and I

9   assume Deputy Chief Lew reports to Interim Chief --

10     A.    Correct.                                        10:14:06AM

11     Q.    -- Yep.  Great.

12           And how many reports are there in the police

13  department to you?

14     A.    So I have a -- one captain -- oh, actually,

15  I'm sorry.  I have three captains that report to me.     10:14:15AM

16     Q.    And is one of those captains the captain of

17  the Tenderloin district?

18     A.    That is correct.

19     Q.    Who's the current captain of the district?

20     A.    Matt Sullivan.                                  10:14:28AM

21     Q.    And did he assume that role from Danny

22  Manning?

23     A.    He did.

24     Q.    Just curious, who are the other two captains,

25  and what are their job responsibilities?                 10:14:43AM

1      A.   Sure.

2           Mission station would be Sean Perdomo.

3      Q.   Okay.

4      A.   And then the DMAC current captain is James

5  Aherne.                                                          10:14:55AM

6      Q.   And how do we spell that last name?

7      A.   A-h-e-r-n-e.

8      Q.   Great.  Okay.

9           And -- and -- do you have a physical office or

10 location out of which you work?                                  10:15:07AM

11     A.   I do.

12     Q.   And where is that?

13     A.   At our headquarters on 3rd Street.

14     Q.   Okay.

15     A.   1245 3rd Street.                                        10:15:15AM

16     Q.   The new headquarters?

17     A.   Yeah.  "PHQ" we call it.

18     Q.   Okay.

19          How often would you say you are in the

20 Tenderloin district of San Francisco?                            10:15:22AM

21     A.   Currently?

22     Q.   Yes.

23     A.   Regularly.  I would say routinely on a weekly

24 basis, two times a week.

25     Q.   And when you go there, do you -- do you tend            10:15:34AM

1    do -- I do review any types of -- like, operations --

2        Q.    Okay.

3        A.    -- that are going to be put together that are

4    going to happen within the Tenderloin will come across

5    my desk.                                                   10:16:47AM

6        Q.    Going -- going back to -- to DMAC, does DMAC

7    have geographic boundaries?

8        A.    So originally when DMAC started, the

9    geographic boundary was the Tenderloin.  And then over

10   the course of time, based off of all of the work that we   10:17:01AM

11   have been doing in DMAC -- we deal with a lot of

12   displacement of folks out on the street in the drug

13   market; so it kind of -- the way I -- the way I like to

14   explain it is kind of like an accordion file --

15       Q.    Mm-hmm.                                          10:17:20AM

16       A.    -- where it kind of expands and then it

17   contracts just based off of our operational history and

18   kind of where we're working.  So sometimes in the SoMa,

19   sometimes over into the northern, and then also pushes

20   up little bit into the lower Nob Hill area.                10:17:30AM

21       Q.    Gotcha.

22             So the -- if you will, the epicenter of DMAC

23   is the Tenderloin, but sometimes things ebb and flow in

24   terms of conditions --

25       A.    That is correct.                                 10:17:41AM

```
 1        A.   So over the past two years, the market has
 2   changed in a couple of different ways.
 3             One, from a 24/7 operation; it's really more
 4   of a nighttime operation.  And really, at this point in
 5   time, the drug -- the prolific drug dealing really            10:20:08AM
 6   occurs after 11:00 PM until about 6:00 AM in the
 7   morning.
 8             Primarily, the -- you know, the number one
 9   drug that is sold out on the street is fentanyl, and
10   then close second is methamphetamine, then cocaine, and      10:20:25AM
11   then heroin.
12        Q.   Okay.
13        A.   Or really the -- the -- the real top four.
14        Q.   Gotcha.
15             And -- and I -- and I assume you monitor           10:20:38AM
16   social media with respect to people reporting conditions
17   in the Tenderloin?
18        A.   Occasional, yes.
19        Q.   All over formally-known-as-Twitter/X I -- I
20   see a lot of postings about conditions in the                10:20:53AM
21   Tenderloin.
22        A.   Yes.  Regularly.
23        Q.   Do you know who JJ Smith is?
24        A.   I know his -- I know who he is.
25        Q.   Okay.                                              10:21:00AM
```

```
 1        A.    Yes.  I've seen him in the Tenderloin.

 2        Q.    And you've -- have you seen his postings?

 3        A.    I have.

 4        Q.    Okay.

 5              Okay.  That's -- that's really helpful.      10:21:06AM

 6              In -- in terms of the -- the four predominant

 7   drugs -- fentanyl, meth, cocaine, and heroin -- what --

 8   what are the means of ingestions that the users in the

 9   Tenderloin typically follow?

10        A.    So each one can be different.                10:21:21AM

11        Q.    Okay.

12        A.    But I'll talk a little bit about fentanyl.  So

13   fentanyl is primarily smoked, whether it's smoked in a

14   glass pipe or a piece of tinfoil where they heat up the

15   tinfoil and then they -- they inhale the fumes from the   10:21:37AM

16   smoke that emanates from --

17        Q.    Okay.

18        A.    -- you know, the heating up of the fentanyl.

19        Q.    Okay.

20              How about meth?                               10:21:46AM

21        A.    So meth can be ingested in a couple different

22   ways.  It can be injected, or it can be -- in kind of

23   same manner as fentanyl, can be smoked through the same

24   means.

25        Q.    Cocaine?                                      10:22:03AM
```

1      A.   So cocaine base is usually smoked through a

2   glass pipe.  I've seen people use -- try to use really

3   anything that's kind of metal consistency; so I've seen

4   it smoked out of like a -- a -- like a soda can --

5      Q.   Mm-hmm.                                        10:22:29AM

6      A.   -- or, you know, foil.

7      Q.   Right.

8      A.   So it's -- it's really just heating up the

9   substance where you get the smoke from the substance.

10     Q.   Okay.                                          10:22:36AM

11     A.   And then another means of ingestion of cocaine

12  -- that's cocaine base.

13     Q.   Right.

14     A.   Then cocaine salt is obviously snorted, and

15  also you can inject as well as.                        10:22:45AM

16     Q.   Gotcha.

17          How about heroin?  And obviously there's --

18  people at least used to inject it.  Is that still the --

19     A.   Yeah, you can inject it.  You can also smoke

20  it.                                                    10:22:58AM

21     Q.   Same way to smoke it with a pipe or --

22     A.   Yeah, same ways.

23     Q.   I -- I've seen comments that paraphernalia

24  kits sometimes contain steel wool or Brillo.

25          Is -- is -- is that used for some -- is that   10:23:11AM

1    somehow used to -- in ingesting drugs, based on your

2    experience?

3         A.    Yeah.  So usually Brillo is used to create --

4    I don't want to say this.

5              So, for example, in a meth -- or -- in a meth    10:23:21AM

6    pipe -- in a pipe --

7         Q.    Mm-hmm.

8         A.    -- it's usually something that would be pushed

9    into the pipe to create, like, a blockage --

10        Q.    Mm-hmm.                                          10:23:30AM

11        A.    -- to where -- then the narcotics can be

12   placed on top of that so when they're smoking it they

13   are not sucking in the actual narcotics themselves.

14   It's kind of like -- a barrier, I guess, would be the

15   easiest way --                                             10:23:43AM

16        Q.    And that's --

17        A.    -- to explain it.

18        Q.    I've heard the --

19              (Admonition by the court reporter.)

20   BY ATTORNEY DAVIS:                                         10:23:53AM

21        Q.    I've heard the term "bubbles" used.

22              Do you know what that is?

23        A.    It would be like a bubble -- like a bubble

24   pipe.

25        Q.    Okay.                                           10:24:01AM

1    individual who uses narcotics based off of really strong

2    addiction that they have --

3    BY ATTORNEY DAVIS:

4        Q.    Mm-hmm.

5        A.    -- depending on their drug of choice.                    10:24:57AM

6              These folks tend to congregate and hang out on

7    sidewalks on specific blocks.  When we first -- again,

8    when -- I'll go back.

9              When we first started DMAC, it was really kind

10   of all over the place.  And since we have progressed          10:25:15AM

11   over the last two and a half -- well,

12   two-and-some-change years, you know, based off of all of

13   the efforts from the City, from all the different

14   agencies, we've really kind of been able to break up

15   that large congregation over that large geographical        10:25:33AM

16   area into certain -- "hotspot locations" is what we call

17   it.  These folks tend to, you know -- they tend to

18   congregate in packs, large packs.  They also tend to

19   congregate by themselves or with another person just

20   depending on, I guess, the climate or the given day or      10:25:53AM

21   whatever it may be.

22             You know, these folks do smoke and use

23   narcotics out in public regularly.

24             Current day, you see during the day is a lot

25   better than it once was, you know.  And then at night is    10:26:14AM

 1  really when we start to see a lot of -- a lot -- large

 2  congregations of folks coming back out on the street.

 3      Q.    Okay.

 4            And -- and earlier you -- you used the analogy

 5  of an accordion to describe, if you will, the boundaries    10:26:30AM

 6  of DMAC.  And -- and I don't want to be cruel or

 7  anything, but in -- in terms of dealing with these

 8  congregate -- congregations of drug users, is it a

 9  little bit of whack-a-mole?  In other words, you -- you

10  address them in one area, and they tend to move to         10:26:44AM

11  another and --

12            Has that a problem in the Tenderloin?

13      A.    People talk about whack-a-mole.

14      Q.    Yeah.

15      A.    The way I look at it --                           10:26:56AM

16      Q.    And I don't want to use a cruel term but

17      A.    Yeah.

18            The way I look at it is that, you know, we --

19  we -- we definitely strategically deploy to certain

20  areas --                                                   10:27:03AM

21      Q.    Okay.

22      A.    -- when there are these large hotspot

23  congregations.  Over time, what we've realized is that

24  once -- we can't be everywhere all the time; so we

25  really pick a certain location --                          10:27:16AM

1      A.   It's like an ecosystem.  So what I've learned

2  over the last two years is that drug addiction is an

3  extremely powerful thing.  In order for the folks to buy

4  drugs, they have to steal items from local

5  establishments.                                                          10:32:41AM

6            And then what they end up doing is they bring

7  these items to the street.  And I've witnessed --

8  witnessed this firsthand, that they will sell these

9  items out on the street for a lot lower price points

10  than they would be in a store.  They get cash for these   10:32:57AM

11  items.  There are folks out there that do buy stolen

12  items off of the street.

13      Q.   Mm-hmm.

14      A.   And then the drug user would then take that

15  money and go straight to a drug dealer --                  10:33:10AM

16      Q.   Mm-hmm.

17      A.   -- to buy narcotics.

18            So that's why I talk about this ecosystem.  It

19  all feeds into one another.

20      Q.   Sort of a vicious cycle --                        10:33:20AM

21      A.   That's right.

22            ATTORNEY DAVIS:  -- too?  Got it.

23            Okay.

24            I -- someone forwarded an email to me

25  yesterday which I'm going to share with you.  I'm          10:33:26AM

JANE ROE, et al. vs CITY AND COUNTY OF SAN FRANCISCO
COMMANDER SCOTT BRIGGS                 10/29/2025                                    Page 31

1    wondering if you've seen this.  I think it's an email

2    from yesterday.

3                We'll mark this as Exhibit 1.

4                (Exhibit 1 was marked for identification.)

5    BY ATTORNEY DAVIS:                                        10:33:46AM

6        Q.    Okay.

7                Take a moment to -- to look at this email.

8    You'll see it's got a date of October 28th.  I -- I've

9    redacted some of the forwarding information.

10               Have you seen this?                            10:33:57AM

11       A.    I have.

12       Q.    And how did this come to your attention?

13       A.    Via email.

14       Q.    Okay.

15               And I assume you -- you recognize at least    10:34:03AM

16   some of the -- well, do you know who Kim Fisk --

17   Fink? -- Fisk is?

18       A.    I've never met her, but she works for Golden

19   Gate -- she's associated with Golden Gate Theatre.

20       Q.    Gotcha.                                         10:34:16AM

21               And I -- I -- I'm going to surmise that you

22   know at least some of the recipients of this email?

23       A.    Yeah.  I know some of them, yes.

24       Q.    Okay.

25               And -- and in this email, obviously there's -- 10:34:28AM

1    there's a complaint about conditions around the Golden

2    Gate Theatre, which is in -- within DMAC, I guess?

3         A.    Correct.

4         Q.    Yeah.

5              And -- and you see there -- there's a          10:34:40AM

6    narrative, and then there's some photographs attached.

7         A.    Yes.

8         Q.    Are those photographs sort of fairly

9    representative of conditions that may arise or -- in

10   this area of the Tenderloin on any given night?        10:34:58AM

11             ATTORNEY BERDUX:  Objection.  Lacks

12   foundation.  Calls for speculation.  Overbroad.

13   Compound.

14             Go ahead.

15             THE WITNESS:  Okay.                           10:35:10AM

16             Yes.

17   BY ATTORNEY DAVIS:

18        Q.    Okay.

19        A.    Yes.  They represent --

20        Q.    Yeah.                                        10:35:18AM

21        A.    -- conditions on -- conditions at night.

22        Q.    Yeah.

23             And in terms of the -- the people who -- who

24   gather in this area at night, based on your experience,

25   are they -- they primarily drug users?                 10:35:35AM

JANE ROE, et al. vs CITY AND COUNTY OF SAN FRANCISCO
COMMANDER SCOTT BRIGGS          10/29/2025                          Page 33

```
 1             ATTORNEY BERDUX:  Calls for speculation.
 2    Lacks foundation.  Compound.  Overbroad.
 3             Go ahead.
 4             THE WITNESS:  Drug users; but filtered into
 5    these crowds or hoards or whatever word we would like to    10:35:52AM
 6    use of people, there are drug dealers as well.
 7    BY ATTORNEY DAVIS:
 8        Q.   Gotcha.
 9             Okay.
10             And -- and based on your experience with this     10:36:02AM
11    area and as a commander of DMAC, the -- the -- the drug
12    users, when they are openly using drugs, are they
13    generally smoking those drugs?
14             ATTORNEY BERDUX:  Overbroad.  Compound.  Lacks
15    foundation.  Calls for speculation.                         10:36:21AM
16             Go ahead.
17             THE WITNESS:  That is one means of ingestion
18    of narcotics, by smoking, yes.
19    BY ATTORNEY DAVIS:
20        Q.   And is that -- and maybe you don't -- I hate       10:36:28AM
21    to say this, but based on what you have seen in your
22    experience in the neighborhood, which is pretty
23    extensive, is -- is that the primary means of ingestion?
24             ATTORNEY BERDUX:  Same objections.
25                           ///
```

1    a lawsuit that was filed by the San Francisco City

2    Attorney's Office against the owners and operators of

3    some, if you will, corner stores in the Tenderloin.

4            And I don't know if you're -- you're

5    knowledgeable or not, but the City has brought                    10:39:00AM

6    enforcement actions against some stores in the

7    Tenderloin alleging that those stores cause public

8    nuisances and violate other laws.

9            ATTORNEY BERDUX:  Sorry, what's the question.

10   BY ATTORNEY DAVIS:                                                10:39:12AM

11      Q.   Were you aware of that?  That the City

12   attorney has brought, if you will, code-enforcement

13   actions against some of the stores in the Tenderloin?

14      A.   Yes.

15      Q.   Okay.                                                     10:39:19AM

16            Are -- are you at -- at all -- or -- when I

17   say "you," I mean officers under your chain of

18   command -- involved at all with respect to those

19   enforcement actions?

20      A.   So the San Francisco Police Department's            10:39:31AM

21   responsibility, it -- so we do investigate crimes that

22   occur and that we believe are occurring in different

23   business establishments within the Tenderloin --

24      Q.   Mm-hmm.

25      A.   -- and some.  So we have done numerous           10:39:47AM

JANE ROE, et al. vs CITY AND COUNTY OF SAN FRANCISCO
COMMANDER SCOTT BRIGGS            10/29/2025                    Page 37

1    investigations into different stores in the Tenderloin

2    for illegal gambling, the selling of narcotics, you

3    know, through these investigations.  Once we go in,

4    obviously with search warrants -- that -- you know, the

5    thing -- the items that we're seizing are very          10:40:07AM

6    consistent with drug dealing and drug paraphernalia --

7        Q.   Mm-hmm.

8        A.   -- drug crimes.

9        Q.   Gotcha.

10             And there's some coordination between your     10:40:22AM

11   department and the City Attorney's Office with respect

12   to these code-enforcement actions?

13       A.   Yes.

14       Q.   Okay.

15             If you'd look at the allegations contained     10:40:29AM

16   in -- in this complaint -- I'm not going to have you

17   look at all of them, but if we look at page 2, you know,

18   paragraphs 1 through 4.

19             Do you need some water?

20       A.   No.  I'm good, thanks.                          10:40:46AM

21       Q.   Okay.

22             There -- there's an allegation that the owners

23   and operators of these stores, among other things, sell

24   drug paraphernalia, and that -- that adversely affects

25   the neighborhood and the health and safety of those who  10:40:58AM

1   has adopted certain policies with respect to

2   organizations that receive funding in their distribution

3   of smoking supplies.

4         Are you with me?

5   A.   Yep.                                    10:45:23AM

6   Q.   And that the City policies, among other

7   things, will permit the distribution of those smoking

8   supplies subject to certain conditions, like it be

9   coupled with counseling or it be done indoors or

10  there -- or approved space.                  10:45:34AM

11        Were -- were you generally aware that the City

12  has -- has adopted such policies?

13        ATTORNEY BERDUX:  Objection.  Compound.  Lacks

14  foundation.  Calls for speculation.  Potentially

15  misrepresents prior testimony or evidence in the case.  10:45:44AM

16        Go ahead.

17        THE WITNESS:  I do know that the Department of

18  Public Health has some policies and procedures around

19  that, but I don't know any specifics on it.

20  BY ATTORNEY DAVIS:                           10:45:58AM

21  Q.   Okay.

22        You certainly know where the GLIDE Church is

23  in the Tenderloin?

24  A.   I do.

25  Q.   Were -- were you aware that smoking supplies  10:46:02AM

1    are handed out from the parking lot of the GLIDE Church?

2           When I say "smoking supplies," I'm talking

3    about pipes, steel wool, foil, that type of thing.

4        A.   I have heard that.  I have not physically seen

5    it myself.                                              10:46:18AM

6        Q.   Okay.

7           And -- and has anyone from the City, be it DPH

8    or any other City department, ever consulted with you as

9    to whether or not you think that's a good idea?

10           When I say "that," I mean the distribution of   10:46:30AM

11   smoking supplies in the Tenderloin.

12       A.   I have not, no.

13       Q.   Okay.

14           You've already established that you -- you

15   know former Captain Manning?                            10:46:42AM

16       A.   Yes.

17       Q.   He's -- I -- I understand he's now retired?

18       A.   Yes.

19       Q.   I have --  oops, I'm sorry.

20       A.   I've known him for a very long time.           10:46:51AM

21       Q.   I'm sorry --

22           (Indiscernible cross-talk.)

23   BY ATTORNEY DAVIS:

24       Q.   Seems like a not only good individual, but he

25   was a very good police officer, I assume?               10:46:58AM

JANE ROE, et al. vs CITY AND COUNTY OF SAN FRANCISCO
COMMANDER SCOTT BRIGGS                    10/29/2025                    Page 47

1    BY ATTORNEY DAVIS:

2         Q.   And -- and to your knowledge -- first of all,

3    there's been testimony in this case, I will represent

4    to -- to you, that the City adopted a policy with

5    respect to the distribution of safe smoking supplies          10:50:27AM

6    that, among other things, said that the City could

7    designate authorized distribution sites for those

8    supplies.

9              You with me?

10        A.   Okay.  Yeah.                                         10:50:39AM

11        Q.   Are you aware of any authorized distribution

12   sites in the Tenderloin?

13        A.   I am aware of the policy --

14        Q.   Okay.

15        A.   -- but I don't know specifically where those        10:50:49AM

16   locations would be.

17        Q.   No -- no one from the City has shared that

18   information with you?

19        A.   No.

20        Q.   You -- you've read Captain Manning's                10:50:56AM

21   testimony.

22             What is your view about the handing out of

23   smoking supplies in the Tenderloin?

24             ATTORNEY BERDUX:  Objection.  Overbroad.

25   Compound.  Lacks foundation.  Incomplete hypothetical.        10:51:09AM

1              CERTIFICATE OF SHORTHAND REPORTER

2

3        I, Michael P. Hensley, Registered Diplomate

4    Reporter for the State of California, CSR No. 14114, the

5    officer before whom the foregoing deposition was taken,

6    do hereby certify that the foregoing transcript is a

7    true and correct record of the testimony given; that

8    said testimony was taken by me stenographically and

9    thereafter reduced to typewriting under my direction;

10   that reading and signing was not requested; and that I

11   am neither counsel for, related to, nor employed by any

12   of the parties to this case and have no interest,

13   financial or otherwise, in its outcome.

14

15

16

17        _____

18             Michael P. Hensley, CSR, RDR

19

20

21

22

23

24

25

EXHIBIT J

In the Matter of:

JANE ROE, ET AL.vs CITY AND COUNTY OF SAN FRANCISCO

---

JOSEPH WILSON

November 14, 2025

---



```
 1              UNITED STATES DISTRICT COURT

 2     NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO/OAKLAND

 3                        DIVISION

 4

 5   JANE ROE, an individual; MARY ROE,  )
     an individual; SUSAN ROE, an        )
 6   individual; JOHN ROE, an            )
     individual; BARBARA ROE, an         )
 7   individual; PHOENIX HOTEL SF, LLC,  )
     a California limited liability      )
 8   company; FUNKY FUN, LLC, a          )     CERTIFIED
     California limited liability        )     TRANSCRIPT
 9   company; and 2930 EL CAMINO, LLC,   )
     a California limited liability      )
10   company,                           )
                                         )
11              Plaintiffs,              )
                                         )
12   v.                                  )
                                         )   Case No.
13                                       )   4:24-cv-01562-JST
                                         )
14   CITY AND COUNTY OF SAN FRANCISCO,   )
     a California public entity,         )
15                                       )
                                         )
16                                       )
                                         )
17              Defendants.              )
     _____)

18

19

20            DEPOSITION OF JOSEPH WILSON

21                 Taken via Zoom

22            Friday, November 14, 2025

23

24   Reported by Jane Gallegos, CSR
     Certificate No. 14676

25
```

```
 1                  UNITED STATES DISTRICT COURT

 2      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO/OAKLAND

 3                             DIVISION

 4

 5   JANE ROE, an individual; MARY ROE, )
     an individual; SUSAN ROE, an       )
 6   individual; JOHN ROE, an           )
     individual; BARBARA ROE, an        )
 7   individual; PHOENIX HOTEL SF, LLC, )
     a California limited liability     )
 8   company; FUNKY FUN, LLC, a         )
     California limited liability       )
 9   company; and 2930 EL CAMINO, LLC,  )
     a California limited liability     )
10   company,                           )
                                        )
11              Plaintiffs,             )
                                        )
12   v.                                 )
                                        ) Case No.
13                                      ) 4:24-cv-01562-JST
                                        )
14   CITY AND COUNTY OF SAN FRANCISCO,  )
     a California public entity,        )
15                                      )
                                        )
16              Defendants.             )
     _____)
17

18

19        On Friday, November 14, 2025, commencing at the hour

20   of 10:03 a.m., via Zoom, before me, Jane Gallegos,

21   Certified Shorthand Reporter in and for the State of

22   California, remotely appeared

23                        JOSEPH WILSON,

24   called by the Plaintiffs, who, being by me first duly

25   sworn, was thereupon examined as a witness in said cause.
```

1        A        Joseph Wilson.

2        Q        Mr. Wilson, I think we actually spoke briefly

3     once when you telephoned my office; but, again, my name

4     is -- is Matt Davis, and I'll be taking most of the

5     deposition here today.

6                 Are you the executive director of the Hospitality

7     House in San Francisco?

8        A        Yes.

9        Q        How long have you been the executive director?

10       A        Approximately eight and a half years.

11       Q        How long have you been associated with the

12    Hospitality House?

13       A        Roughly, a 40-year period.

14       Q        Are you one of the founders of that entity?

15       A        No.

16       Q        And is the Hospitality House -- what would you

17    call it?  Is it a nonprofit corporation?  Is it some other

18    type of entity?

19       A        It is a nonprofit organization based in the

20    Tenderloin.

21       Q        Got it.

22                Have you ever given testimony under oath before?

23       A        Yes.

24       Q        How many times, would you say?

25       A        Once or twice.

1          And it's about four blocks south of Market.  Do I

2  have that right?

3      A    That's -- that's right.

4      Q    Somewhere in that ballpark.

5      A    Yes.

6      Q    And what services, programs are offered out of

7  that location?

8      A    We rent out the ground floor commercial space at

9  169 6th Street and 181 6th Street.  Houses are 6th Street

10  Self-Help Center.

11      Q    Now, Hospitality House is -- had a contractual

12  relationship with the City and County of San Francisco for

13  a number of years.  Is that generally correct?

14      A    Yes.

15      Q    What, generally, does the Hospitality House do

16  for the City?

17      A    We just mentioned the multiple programs.  That's

18  generally what we do.

19      Q    Okay.  And you have -- you have mentioned --

20  well, let me -- there are going to be some exhibits to

21  your deposition, and I think I can -- can I drop these in

22  the chat?  Do we have a chat?  Yeah.

23          MR. DAVIS:  I'm going to drop a document in the

24  chat, which we will mark as Exhibit 1.

25          (Exhibit 1 marked for identification.)

1          Are you familiar with that term?

2     A     Yes.

3     Q     What harm reduction services is Hospitality House

4  providing to the City?

5     A     We have a contract with the Harm Reduction

6  Therapy Center, which includes individual and group

7  therapy.  We offer support groups; we offer community

8  engagement activities; we offer one-on-one case

9  management; we offer drop-in space at the multiple

10  locations; and we offer a connection with services such as

11  longer-term housing, access to -- or referrals to

12  behavioral health services, things of that nature.

13     Q     You, yourself, are familiar with the term "harm

14  reduction"?

15     A     Yes.

16     Q     Can you tell us what you understand that term to

17  mean?

18     A     Giving people multiple options in their potential

19  struggles with a variety of issues, including drug use;

20  including abstinence, if that's the option that people

21  choose.  Harm reduction is based on the principle that

22  people have the opportunity to choose which approach works

23  best for them, and that's our approach to offering

24  services.

25     Q     In other words, the people who, maybe, experience

1    this condition should -- they should have some autonomy to

2    make choices, rather than have things, if you will, shoved

3    down their throats?

4        A    Correct.

5        Q    And you, yourself -- are you a proponent of harm

6    reduction?

7        A    Yes.

8        Q    Now, I want to use terminology that doesn't

9    offend anyone and make sense to you.

10           The people that Hospitality House offers harm

11   reduction services to include people who, for lack of a

12   better word, are struggling with drug addiction?

13       A    Yes.

14       Q    Is that a -- a kind and fair way to describe it?

15       A    Some are.  Yes.

16       Q    Okay.  And in terms of the location through which

17   the Hospitality House, through its City contract, offers

18   harm reduction services -- does that include

19   290 Turk Street?

20       A    Yes.

21       Q    And, also, the location on Leavenworth around the

22   corner?

23       A    Yes.

24       Q    In the 6th Street location?

25       A    Yes.

JANE ROE, ET AL.vs CITY AND COUNTY OF SAN FRANCISCO
JOSEPH WILSON                          11/14/2025                          Page 31

```
1    BY MR. DAVIS:
2         Q      Okay.  And she -- you read what she -- she wrote
3    or she stated in her declaration that she personally made
4    some observations at 290 Turk Street?
5         A      Yes.  I have read that.
6         Q      Okay.  And -- and can you say whether that
7    happened?  In other words, has it happened in the past
8    that somebody was handing out smoking supplies at the
9    290 Turk Street location?
10               MS. MURPHY:  Object to form.
11               THE WITNESS:  To my knowledge, no Hospitality
12   House employee at the 290 Turk Street location has handed
13   out safer smoking supplies.
14   BY MR. DAVIS:
15        Q      Got it.  And -- and thank you.  And my question
16   is, has -- has anyone, maybe a non-Hospitality House
17   employee -- has it come to your attention that such
18   supplies have been distributed from that location?
19               MS. MURPHY:  Same objection.
20               THE WITNESS:  Not to my knowledge.
21   BY MR. DAVIS:
22        Q      And did you -- when did you first see Mary Roe's
23   declaration?
24        A      Some weeks ago.
25        Q      Did you, yourself, do any investigation to
```

1  determine whether there's any truth or merit to what she

2  says she has seen out of the 290 Turk Street location?

3       A    No.

4       Q    In other words, did you ever speak to anyone from

5  the Harm Reduction Therapy Center to say, "Hey, have you

6  guys been handing out supplies at one of our locations?"

7       A    No.

8       Q    Do you -- you have any basis to dispute what she

9  says she saw, in terms of the distribution of smoking

10 supplies at the 290 Turk Street location?

11      A    Yes.

12           (Simultaneous speakers.)

13      MS. MURPHY:  Object -- belated object to form.

14 BY MR. DAVIS:

15      Q    Okay.  And tell me the basis why you'd say she's

16 wrong.

17      A    My office is at the 290 Turk Street location.

18 The employees at the 290 Turk Street location are familiar

19 with Hospitality House's policy.  No Hospitality House

20 employee would distribute safer smoking supplies.

21      Q    Got it.

22           And -- and I understand it's -- it sounds like

23 it's a strict policy for Hospitality House employees --

24 can't distribute the smoking supplies.  Is that accurate?

25      A    That's accurate.

1    Q    There are other people who use 290 Turk Street;

2    correct?

3                 (Simultaneous speakers.)

4    BY MR. DAVIS:

5    Q    -- Hospitality House Coalition on Homelessness --

6    there -- there are employees of Harm Reduction Therapy

7    Center; correct?

8    A    Yes.

9    Q    Are there volunteers with other organizations or

10    other people who sometimes use that location?

11    A    Occasionally.

12    Q    Okay.  Do you know -- to your knowledge, have any

13    people from other organizations, be them volunteers,

14    employees, or somehow affiliated with other

15    organizations -- ever handed out smoking supplies out of

16    the 290 Turk Street location?

17                 MS. MURPHY:  Object to form.

18                 THE WITNESS:  To my knowledge, no.

19    BY MR. DAVIS:

20    Q    And is the Hospitality House the master tenant of

21    that location, 290 Turk Street?

22    A    Hospitality House is the owner of Turk Street.

23    Q    And so Hospitality House gets to control what

24    happens at that location?  You're the --

25    A    Yes.

1    BY MR. DAVIS:

2         Q     Have you seen anyone handing out the supplies,

3    for example, from a cart on the sidewalks?

4              MS. MURPHY:  Same objection.

5              THE WITNESS:  No.

6    BY MR. DAVIS:

7         Q     Now I just want to make sure -- I know that you

8    have reviewed Mary Roe's declaration, and you saw what she

9    says she saw happening at 290 Turk Street.  Have you done

10   anything to -- I know you have some knowledge of the

11   location because you work there, but apart from that, have

12   you spoken to anyone?  Have you conducted any

13   investigation to see whether there was any possibility

14   that smoking supplies were being handed out from that

15   location?

16        A     Have I conducted an investigation?  No.

17        Q     Did you speak to anyone from the Harm Reduction

18   Therapy Center to ask them, "Are you handing out smoking

19   supplies?"

20        A     You've asked me that question previously.  No.

21        Q     Okay.  To your knowledge, does the Harm Reduction

22   Therapy Center -- people associated with that

23   organization -- do they hand out smoking supplies

24   anywhere?  If it's not a Hospitality House, perhaps in

25   another location?

 1                    (Recess.)

 2               THE VIDEOGRAPHER:  Back on the record now,

 3     Counsel, at 10:58 a.m.

 4     BY MR. DAVIS:

 5          Q    Welcome back, Mr. Wilson.  I have maybe ten more

 6     minutes, if that.

 7               MR. DAVIS:  I have dropped in the chat and will

 8     mark as Exhibit 5.

 9               (Exhibit 5 marked for identification.)

10     BY MR. DAVIS:

11          Q    It's a document entitled "Revision to Program

12     Budgets," et cetera -- and let me share my screen.

13               And do you recognize this is a -- this is a

14     73-page document, and I'm just showing you the first page;

15     but you at least recognize this first page, sir?

16          A    Yes.

17          Q    And can you tell us what this is?

18          A    This is -- this is a budget revision after the

19     fiscal year '24/'25 had started.

20          Q    Gotcha.

21               And you signed this document, it looks like, on

22     September 17th, 2024?

23          A    Correct.

24          Q    And does this reflect that the compensation that

25     the City provided Hospitality House for its services

1    during this contract period was $8,636,330?

2         A    Well, this is confirming that there's no change

3    to the total compensation.

4         Q    Got it.

5              Is -- and so -- is that how much compensation the

6    City provided the Hospitality House for this contract

7    term?

8         A    Well, it's over a two-year period, and it

9    includes a contingency.  So our total compensation would

10   be less.

11        Q    Okay.  And how much less would the total

12   compensation be?

13        A    I'd have to look at it and talk to our finance

14   manager; but, essentially, the contract budget includes

15   the total budget for the contract and a contingency for

16   whatever -- cost overruns; but, typically, it's -- it

17   certainly can't exceed that amount.

18        Q    Very good.

19             And then I jumped to page 5 of the contract,

20   where it says this -- this term -- "R. Harm Reduction" is

21   the title.  It says:  "The program has a written internal

22   harm reduction policy that includes the guiding principles

23   per Resolution," and then there's a cite to some city

24   resolution.

25             Do you see that?

1      Q     Good guy?

2      A     I know Mark.

3      Q     Okay.  Cares about the Tenderloin?

4      A     I believe he does.

5      Q     Okay.  This is -- this is a -- a document.  It

6  was marked as Exhibit 1.  It's been authenticated by a

7  number of witnesses in this case.  It's a flier that was

8  distributed when the Lincoln Center was in operation.

9            You remember the Lincoln Center?

10     A     Yes.

11     Q     Did -- did Hospitality House have any involvement

12 with the operation of Lincoln Center?

13     A     No.

14     Q     Okay.  In any event, you see on this flier

15 that -- you can see has got the City seal down below it.

16 In the middle it says:  "The following activities are

17 harmful to the whole community and will be lawfully

18 enforced," and then, "unhealthy and unsafe street

19 conditions are" -- first bullet point -- "selling and

20 storing illegal drugs."

21            You know -- do you, as the executive director of

22 the Hospitality House -- would you agree with that

23 statement, that the selling and storing of illegal drugs

24 in the neighborhood contributes to unhealthy and unsafe

25 street conditions?

JANE ROE, ET AL.vs CITY AND COUNTY OF SAN FRANCISCO
JOSEPH WILSON                              11/14/2025                                Page 43

1           MS. MURPHY:  Object to form.

2           THE WITNESS:  I have no opinion about that, one

3    way or the other.

4    BY MR. DAVIS:

5        Q    Okay.  And the same thing with respect to using

6    illegal drugs in the public.  Any -- any opinion whether

7    that contributes to unhealthy and unsafe street conditions

8    in the neighborhood?

9           MS. MURPHY:  Same objection.

10          THE WITNESS:  Same answer.

11   BY MR. DAVIS:

12       Q    Would you agree that people who live in the

13   neighborhood would be better off if there wasn't open drug

14   use on the sidewalks and streets around their homes and

15   businesses?

16          MS. MURPHY:  Object to form.

17          THE WITNESS:  That's a subjective, you know,

18   opinion.  I have no opinion about that.

19   BY MR. DAVIS:

20       Q    Okay.  And you have seen children walking through

21   the neighborhood past open drug use and open drug sales?

22       A    Yes.

23       Q    Any opinion as to whether that might be harmful

24   from the child's perspective?

25          MS. MURPHY:  Object to form.

JANE ROE, ET AL.vs CITY AND COUNTY OF SAN FRANCISCO
JOSEPH WILSON                          11/14/2025                          Page 44

1          THE WITNESS:  In my opinion if -- when children

2     have someone that they know loves them and they're -- they

3     feel protected by the person that's with them, children

4     are in good hands.

5     BY MR. DAVIS:

6          Q     Yeah.  I had a different question.

7               And that is, you've seen children walk by open

8     drug use and open drug sales, and I'm asking if you would

9     agree that that would -- that could be harmful to the

10     child, regardless of who the child may be with.

11               MS. MURPHY:  Object to form.  Asked and answered.

12               MS. DANGA:  Calls for speculation.

13               THE WITNESS:  Same answer.  No real opinion about

14     that.

15               MR. DAVIS:  Okay.  I thank you for your time,

16     Mr. Wilson.  I really appreciate it.  I have no further

17     questions.

18               THE VIDEOGRAPHER:  Do we have any follow-up from

19     counsel?

20               MS. MURPHY:  None from the City.

21               MR. DAVIS:  Thank you, sir.

22               THE VIDEOGRAPHER:  Okay.  And just before we go

23     off the record, we do need orders on the record.  So if

24     you'd like a copy of the video or transcript, please speak

25     up.

JANE ROE, ET AL.vs CITY AND COUNTY OF SAN FRANCISCO
JOSEPH WILSON                          11/14/2025                          Page 49

```
 1                    CERTIFICATE

 2                        OF

 3            CERTIFIED SHORTHAND REPORTER

 4                  *    *    *    *

 5

 6

 7        The undersigned Certified Shorthand Reporter of the

 8   State of California does hereby certify:

 9        That the foregoing Proceeding was taken before me at

10   the time and place therein set forth.

11        That the testimony and all objections made at the

12   time of the Proceeding were reported verbatim by me and

13   were thereafter transcribed, said transcript being a true

14   and correct copy of the proceedings thereof.

15        In witness whereof, I have subscribed my name, this

16   date:  November 17, 2025.

17

18

19          Jane Gallegos

20        _____

21        JANE GALLEGOS, CSR No. 14676

22

23

24

25
```

EXHIBIT K

**Google** Maps          606 Eddy St

EXHIBIT _____ 18 _____
WITNESS _I. Manchester_
CONSISTING OF _____ 3 _____ PAGES
DATE __9-17-25__
BEHMKE REPORTING AND VIDEO SERVICES, INC.

PLTF.
(DEFT.)





Image capture: Nov 2021    © 2025 Google



EXHIBIT L



620 Eddy St



EXHIBIT M

648 Eddy St





## PROOF OF SERVICE

### Jane Roe, et al. v. City and County of San Francisco, et al.
### USDC–Northern California Case No. 4:24-cv-01562-JST

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the county where the mailing took place, My business address is 650 California Street, 26th Floor, City and County of San Francisco, CA 94108-2615.

On the date set forth below, I caused to be served true copies of the following document(s) described as

**DECLARATION OF ASHCON MINOIEFAR IN SUPPORT OF PLAINTIFFS' REPLY, REQUEST FOR JUDICIAL NOTICE AND OBJECTIONS TO EVIDENCE**

to:

Shanin Specter, Esq.
(Admitted Pro Hac Vice)
Alex Van Dyke, Esq.
KLINE & SPECTER, P.C.
1525 Locust Street
Philadelphia, PA 19102

**Co-Counsel for Plaintiffs**

Telephone: (215) 772-1000
shanin.specter@klinespecter.com
alex.vandyke@klinespecter.com
escalanteyleana@uclawsf.edu

David Chiu, Esq., City Attorney
Yvonne R. Meré, Esq., Chief Deputy City Attorney
Wayne Snodgrass, Esq., Deputy City Attorney
Tara M. Steeley, Esq., Deputy City Attorney
John H. George, Esq., Deputy City Attorney
Kaitlyn M. Murphy, Esq., Deputy City Attorney
Abigail Wald, Esq., Deputy City Attorney
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, CA  94102-4682

**Counsel for City and County of San Francisco**

Steeley Direct: (415) 554-4655
George Direct:  (415) 554-4223
Murphy Direct:  (415) 554-6762
Facsimile: (415) 554-4699
Mere Direct:  (415) 554-4700
Mere Facsimile:  (415) 554-4757
tara.steeley@sfcityatty.org
john.george@sfcityatty.org
kaitlyn.murphy@sfcityatty.org
Abigail.Wald@sfcityatty.org
anita.murdock@sfcityatty.org
sophia.garcia@sfcityatty.org
holly.chin@sfcityatty.org
pamela.cheeseborough@sfcityatty.org
Elizabeth.coolbrith@sfcityatty.org

DECLARATION OF ASHCON MINOIEFAR IN SUPPORT OF PLAINTIFFS' REPLY, REQUEST FOR JUDICIAL NOTICE AND OBJECTIONS TO EVIDENCE - CASE NO. 4:24-cv-01562-JST

| | |
|---|---|
| 1 | John K. Dipaolo, Esq.<br>General Counsel |
| 2 | Secretary to the Board of Directors<br>College of the Law, San Francisco |
| 3 | 200 McAllister Street<br>San Francisco, CA 94102 |
| 4 | |
| 5 | |

1  John K. Dipaolo, Esq.
   General Counsel
2  Secretary to the Board of Directors
   College of the Law, San Francisco
3  200 McAllister Street
   San Francisco, CA 94102
4
5

**Counsel for Plaintiff College of the Law, San Francisco**
(related case USDC-Northern California case #4:20-cv-03033-JST)

Telephone: (415) 565-4787
Facsimile: (415) 565-4825
dipaolojohn@uchastings.edu

6  Lauren Hansen, Esq.
   Melissa A. Morris, Esq.
7  Public Interest Law Project
   449 15th Street, Suite 301
8  Oakland, CA 94612-06001
9
10
11

**Counsel for Proposed Intervenors Hospitality House; Coalition on Homelessness; and Faithful Fools**
(related case USDC-Northern California case #4:20-cv-03033-JST)

Office: (510) 891-9794
Fax: (510) 891-9727
lhansen@pilpca.org
mmorris@pilpca.org

12  Lili V. Graham, Esq.
    Disability Rights California
13  350 S. Bixel Street Suite 290
    Los Angeles, CA 90017-1418
14
15
16
17

**Counsel for Proposed Intervenors Hospitality House; Coalition on Homelessness; and Faithful Fools**
(related case USDC-Northern California case #4:20-cv-03033-JST)

Office: (213) 213-8000
Fax: (213) 213-8001
lili.graham@disabilityrightsca.org

18  Michael David Key, Esq.
    Jessica Berger, Esq.
    Bay Area Legal Aid
19  1454 43rd Avenue
    San Francisco, CA 94122
20
21
22

**Counsel for Proposed Intervenors Hospitality House; Coalition on Homelessness; and Faithful Fools**
(related case USDC-Northern California case #4:20-cv-03033-JST)

Office: (415) 982-1300
Fax: (415) 982-4243
mkeys@baylegal.org
jberger@baylegal.org

23  John Thomas H. Do, Esq.
24  ACLU Foundation of Northern
    California
25  39 Drumm Street
    San Francisco, CA 94111
26
27
28

**Counsel for Amicus Curiae (ACLU Foundation of Northern California)**
(related case USDC-Northern California case #4:20-cv-03033-JST)

Office: (415) 621-2943
jdo@aclunc.org

2

1

2          **BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the
document(s) with the Clerk of the Court by using the CM/ECF system.  Participants
3   in the case who are registered CM/ECF users will be served by the CM/ECF system.
Participants in the case who are not registered CM/ECF users will be served by mail
4   or by other means permitted by the court rules.

5          I declare under penalty of perjury under the laws of the United States of
America that the foregoing is true and correct and that I am employed in the office of
6   a member of the bar of this Court at whose direction the service was made.

7          Executed on November 21, 2025, at San Francisco, California.

8

9                                              _____
                                              Kirsten Benzien
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ASHCON MINOIEFAR IN SUPPORT OF PLAINTIFFS' REPLY, REQUEST
FOR JUDICIAL NOTICE AND OBJECTIONS TO EVIDENCE - CASE NO. 4:24-cv-01562-JST