# EXHIBIT 44

to

**DECLARATION OF ABIGAIL WALD IN SUPPORT OF DEFENDANT CITY AND COUNTY OF SAN FRANCISCO'S SUR-REPLY OPPOSING PLAINITFFS' MOTION FOR PRELIMINARY INJUNCTION**

In the Matter of:

JANE ROE, ET AL. vs CITY AND COUNTY OF SAN FRANCISCO

SUSAN PHILLIP, M.D. MPH

October 28, 2025



1    A.   I do understand the benefits that have
2  been outlined by the California Department of Public
3  Health, yes.
4    **Q.   Okay.  The way this declaration is framed,**
5  **this is not saying that these are your views, that**
6  **there are benefits from handing out smoking**
7  **supplies; but is that your view, that there are**
8  **public health benefits in handing out the smoking**
9  **supplies in the Tenderloin?**
10   **A.   There are --**
11        **MS. WALD:  Objection to the form of the**
12 **question.**
13        **THE WITNESS:  There are stronger data for**
14 **the distribution of clean syringes and syringe**
15 **access programs; but there are data, accepted data**
16 **in the public health literature around individual**
17 **health benefits from the use of distribution of**
18 **safer smoking supplies as well, yes.**
19 BY MR. DAVIS:
20   **Q.   And is that something that the**
21 **San Francisco Department of Public Health**
22 **recognizes, that there are public health benefits**
23 **that result from the distribution of smoking**
24 **supplies in the Tenderloin?  Is that something that**
25 **the department -- your department recognizes?**

1                    MS. WALD:  Objection to the form of the
2    question.
3                    THE WITNESS:  So as stated here, our
4    department recognizes that there are benefits that
5    have been outlined by DPH, and we incorporate that
6    into thinking about what the overall policy should
7    be for San Francisco.
8    BY MR. DAVIS:
9         Q.   Okay.  And so my question is:  Is that
10   a -- does your department, the San Francisco
11   Department of Public Health, recognize and
12   acknowledge that there is a health benefit to
13   handing out smoking supplies in the Tenderloin?
14                   MS. WALD:  Objection to form.
15   Argumentative.
16                   THE WITNESS:  What we recognize is that
17   there can be -- there can be benefits to the health
18   of people who use drugs if they have access to clean
19   smoking supplies.
20   BY MR. DAVIS:
21        Q.   And can you list for me what the possible
22   benefits are of handing out smoking supplies in the
23   Tenderloin?  What are the public health benefits
24   that you can think of?
25        A.   Yes.  Well, there can be injuries

1  associated with cracked or broken pipes or other
2  equipment in using those.  There can also be
3  transmission of communicable diseases through
4  sharing of those materials, including potentially
5  hepatitis and viral infections.
6       Q.   Okay.  Anything else?
7       A.   Those are the primary benefits that I am
8  aware of.
9       Q.   Okay.  So one of the benefits is to
10 prevent someone from getting, I assume -- cutting
11 their lip or something on a cracked or broken
12 fentanyl pipe?
13      A.   Yes.
14      Q.   And is the idea that if you give someone a
15 pipe for free, that pipe is not likely to be damaged
16 and, therefore, they're not going to cut their lip?
17           MS. WALD:  Objection to the form of the
18 question; incomplete hypothetical and misstates
19 testimony.
20           THE WITNESS:  Could you -- could you
21 clarify?
22 BY MR. DAVIS:
23      Q.   Yeah.  I want to make sure I understand
24 the possible public health benefit, and I'm
25 following up on there could be an injury from a

1    A.    I have not heard of that occurring in
2    San Francisco.
3    Q.    Okay.  The other possible public health
4    benefit that you mentioned was, I think, the
5    prevention of -- or trying to stop the transmission
6    of diseases such as hepatitis and other viral
7    diseases.
8          Do I have that right?
9    A.    Correct.
10   Q.    Is there literature saying that that's a
11   possibility that can happen with smoking pipes?
12         MS. WALD:  Objection to the form of the
13   question.  Incomplete hypothetical.
14         THE WITNESS:  My understanding is that --
15   and my understanding in discussions are -- with
16   other public health colleagues and my understanding
17   of the public health literature is that, yes.
18   BY MR. DAVIS:
19   Q.    Okay.  And as the Population Health
20   director for the city and the health officer, did it
21   come to your attention that that's actually been
22   happening?  In other words, that diseases were being
23   spread because people were sharing --I guess people
24   are sharing pipes?  Is that how the disease gets
25   spread?

```
 1  BY MR. DAVIS:
 2      Q.   And I'm -- I'm focused on any discussion
 3  or statements to the effect that there is a public
 4  health benefit to be recognized or achieved by
 5  handing out smoking supplies.  And so we've talked
 6  about two.  And I'm wondering if there are any
 7  others that come to mind.
 8      A.   Yes.  The other benefit would be engaging
 9  a person who uses drugs via smoking in a
10  conversation with a health worker or a member of a
11  staff of a community-based organization so that they
12  are told about opportunities for treatment and
13  recovery in San Francisco.
14      Q.   So would it be -- if I can summarize it,
15  one benefit is if you coupled the distribution with
16  a conversation about getting the user into treatment
17  or recovery, that could be a benefit?
18      A.   Correct.  That could be a benefit.
19      Q.   Any others come to mind?
20      A.   Well, related to the conversation about
21  treatment, it is also keeping a person engaged with
22  public health entities to continue to assess
23  readiness for core treatment and offer those.
24      Q.   So keeping that addict engaged, if you
25  will, so that perhaps in the future he or she will
```

1    A.    Yes, that is correct.

2    Q.    And so if she gave testimony on the 21st,
3  that would have been nine days before the new policy
4  took effect; does that sound right to you?

5    A.    That sounds right.

6    Q.    And her testimony was that if a
7  14-year-old came to GLIDE and was cancelled and
8  wanted paraphernalia, that 14-year-old could get the
9  paraphernalia.

10         Is that consistent with your understanding
11  of the City's policy that a 14-year-old could go
12  into an SSP provider in the Tenderloin and ask for
13  drug paraphernalia, smoking supplies, and get it?

14         MS. WALD:  Objection to form.  Misstates
15  testimony.

16         THE WITNESS:  In the 20 years that I have
17  been doing public health in San Francisco, I have
18  never heard of an instance in that regard, so we
19  have not created policies around that that would
20  preclude that.

21  BY MR. DAVIS:

22    Q.    And would that be consistent with the
23  City's new policy for a 14-year-old to go into an
24  SSP provider space and get free drug paraphernalia?

25         MS. WALD:  Objection to form.  Vague as to

```
                        )
STATE OF CALIFORNIA ) ss.
                        )
```

I, Tamara Houston, RPR, CCRR, CSR No. 7244, a Certified Shorthand Reporter in the State of California, duly empowered to administer oaths, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced to typewriting by computer-aided transcription under my direction;

That the dismantling, unsealing, or unbinding of the original transcript will render the reporter's certification null and void.

I further certify that I am not interested in the event of the action.

In witness whereof, I have hereunto subscribed my name.

Dated:   30th of October, 2025.

*(signature: Tamara Houston)*

TAMARA L. HOUSTON
CSR 7244, RPR, CCRR 140