# EXHIBIT 47

## TO
## DECLARATION OF ABIGAIL WALD IN SUPPORT OF DEFENDANT CITY AND COUNTY OF SAN FRANCISCO'S SUR-REPLY OPPOSING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# In the Matter of:

## JANE ROE, ET AL. vs CITY AND COUNTY OF SAN FRANCISCO

## TYLER TERMEER, PHD

## November 14, 2025



1  **Are you the chief executive officer of the**
2  **San Francisco AIDS Foundation?**
3  **A    Yes, I am.**
4       Q    And have you been the CEO since February of 2022?
5       A    Yes, I have.
6  **Q    Very good.**
7  **And as I understand it, you have -- your PhD is**
8  **from Walden University?**
9  **A    That's correct.**
10 **Q    And what was the subject matter of your PhD?**
11 **A    The subject matter of my PhD is in public policy,**
12 **and I focused on the HIV clinician's viewpoint on policy**
13 **and system level barriers to transitioning young people**
14 **born with HIV from pediatrics to adult health care.**
15      Q    Very good.
16           And before becoming the CEO of SF AIDS -- is it
17 okay if I call it "SF AIDS"?
18      A    That -- "The Foundation" would be better.
19      Q    The Foundation -- before you became CEO of The
20 Foundation, were you the CEO of Cascade AIDS Project in
21 Portland?
22      A    That's correct.
23      Q    Okay.  Very good.
24           How many employees does The Foundation have?
25      A    We currently have just under 200 employees.

1  the syringe access program.
2            Is -- is The Foundation in charge of the syringe
3  access program in San Francisco?
4       A    We run a syringe access program for San Francisco
5  AIDS Foundation.  We -- we are not in charge of all
6  syringe -- or syringe access services for San Francisco.
7       Q    Okay.  And does The Foundation have a contract
8  with the City and County of San Francisco with respect to
9  the syringe access program?
10      A    We have a contract specifically to provide
11 syringe access services in San Francisco and a specific
12 contract for a collaborative known as the SAC, the Syringe
13 Access Collaborative, where we have partners, the Homeless
14 Youth Alliance and Glide.
15      Q    Okay.  And -- and so -- first of all, does --
16 does the City and County of San Francisco to provide some
17 compensation to The Foundation for the syringe programs?
18      A    Correct.  We receive compensation from the City
19 and County of San Francisco to provide syringe access.
20      Q    And let's say for the most recent fiscal year,
21 how much money has the City compensated The Foundation
22 for, for its efforts with respect to syringe access?
23      A    Approximately $3.5 million.
24      Q    And you mentioned that there is a syringe access
25 collaborative?

1    A    That is correct.
2    Q    And what is that?
3    A    The syringe access collaborative is a partnership
4  where the lead partner is San Francisco AIDS Foundation.
5  In that collaborative, the Homeless Youth Alliance, or
6  HYA, and Glide are our partners; and together, we work to
7  ensure syringe access throughout several neighborhoods in
8  San Francisco.  So of that $3.5 million, about $500,000 is
9  a pass-through from SFAF to those other organizations; and
10 we help ensure that safer use supplies related to syringe
11 access are available to the community.
12   Q    And you -- and is -- is the pass-through is
13 money -- for example, pass-through, The Foundation, to
14 Glide through that program?
15   A    Pass-through to Glide and Homeless Youth Alliance
16 related to syringe access.
17   Q    And so it is money that comes from the City to
18 The Foundation, and then some of that goes to Glide or
19 Homeless Youth Access?
20   A    Correct.
21   Q    And what neighborhoods are served by this
22 collaborative?
23   A    San Francisco AIDS Foundation provides our
24 service in south of Market; and we provide mobile services
25 in lower Nob Hill, in the Mission, and in the Bayview.

1  Q   Okay.  And then your -- what do you call Glide
2  and the Homeless Youth, HYA -- are they your collaborators
3  or subs, or what do you call them?
4  A   There are collaborative partners.
5  Q   Okay.  And your collaborative -- where does --
6  where does Glide provide these services?
7  A   Glide provides their service out of their
8  physical location in the Tenderloin.
9  Q   And how about Homeless Youth Access?
10 A   I'm -- I've not been to their physical site, so
11 I'm personally not aware of where their --
12 Q   Okay.
13 A   -- site is.
14 Q   Does The Foundation have any type of
15 subcontracting collaborative or other relationship with
16 the San Francisco Drug Users Union?
17 A   We do not.
18 Q   Has it ever had such a relationship since you've
19 been the CEO?
20 A   Not in my tenure as CEO.
21 Q   To your knowledge, has The Foundation previously
22 had some type of contractual, collaborative, or other
23 relationship with the Drug Users Union?
24 A   To my knowledge, the -- to my knowledge, the
25 original -- excuse me -- to my knowledge, the original

1        MS. MURPHY: Object to form.
2        MR. LONDEN: You can answer, if you understand
3    that -- answer.
4        THE WITNESS: Yes.
5    BY MR. DAVIS:
6        Q   And at that site -- sorry, sir.  I thought I
7    heard something.  I guess not.
8            At that site you had mentioned that if the -- the
9    person who comes to that site is interested in getting
10   supplies, they can get supplies at the site?
11       A   That is correct.
12       Q   After they've gone through the process that
13   you've described?
14       A   Correct.  They must first speak to someone about
15   treatment.
16       Q   Great.
17           And what supplies are offered at that site?
18       A   At the Duboce site, only access to our syringe --
19   safer syringe access supplies.
20       Q   How long has that been the case that the access
21   was limited to syringe supplies only?
22       A   The policy for that site changed after
23   April 30th.  So the changes were made prior to that date.
24       Q   Prior to April 30th, were smoking supplies
25   distributed at that site?

1    A    Yes, they were.
2    Q    And as of, let's say, last week or two weeks ago,
3    was that The Foundation's policy that smoking supplies
4    should not be distributed at the Duboce site?
5    A    That is correct.
6    Q    And if smoking supplies are still being
7    distributed at that site, would that be news to you?
8    A    There are not smoking supplies still distributed
9    at that site, to my knowledge.
10   Q    Right.  Because that is prohibited today.  Is
11   that true?
12   A    Under the policy, that is prohibited today.
13   Correct.
14   Q    Okay.  Let me -- your -- your lawyer was kind
15   enough to share some documents before today's deposition.
16   Let me look at a couple of them here.
17        MR. DAVIS:  Okay.  This will be Exhibit 5.
18        (Exhibit 5 marked for identification.)
19        THE VIDEOGRAPHER:  And, Matthew, this is the
20   videographer again.  We usually don't screen share the
21   exhibits, just videos.  Do you want these in the video as
22   well or --
23        MR. DAVIS:  I do.
24        THE VIDEOGRAPHER:  You don't?
25        MR. DAVIS:  I do.

1    THE VIDEOGRAPHER: You do. Okay.
2  BY MR. DAVIS:
3    Q   Okay. I'm going to share what we're marking as
4  Exhibit 5. Can you -- do you see this -- this document,
5  appears to be a PowerPoint or slide presentation?
6    A   Yes, I do.
7    Q   And we'll go through it.
8        But you generally recognize it?
9    A   I do.
10   Q   And can you tell us what this is?
11   A   Yeah. This is a document that describes the
12 various supplies that are available at our site, their
13 function, and their public health benefit.
14   Q   Okay. And so if we -- we -- and this -- the
15 title page or the first slide references, at least the
16 California Department of Public Health.
17       Are these supplies provided by the California
18 Department of Public Health?
19   A   We receive -- yes. We have a separate
20 relationship with a supply from the State of California.
21   Q   And does the Foundation purchase them from the
22 State, or is the State given -- give the supplies to The
23 Foundation, or is it something different?
24   A   We receive a set, like, monetary allocation. So
25 there's not money exchanged, but there's a set amount of

1  money; and then we can purchase supplies up to a set
2  dollar amount.
3      Q    Got you.
4           And if we look at this presentation, these --
5  this shows the supplies that are distributed through the
6  collaborative; is that correct?
7           MR. LONDEN:  Vague.
8           MS. MURPHY:  Object to form.
9  BY MR. DAVIS:
10     Q    You can answer, Doctor, if you understand.
11     A    The -- the collaborative itself is designed to
12 distribute supplies related to syringe access.  These same
13 sites have access to the State Clearinghouse, and may
14 also, under the policy of the current city, decide that if
15 they are allowed, depending on their site and location, to
16 distribute -- distribute safer smoking supplies in the
17 city -- they may decide that they want to get their own
18 allocation of safer smoking supplies and distribute them
19 at those locations.  That would not be through the
20 collaborative; that would be through their own
21 relationship with the State Clearinghouse.
22     Q    Okay.  Well, thank you.  Let's look at -- at
23 page 4 of Exhibit 5, and you see that it lists straws used
24 for snorting or inhaling vapor, and then, also, glass
25 straight pipes used for smoking or vaping drugs.

1  was asked to develop their own set of policies, so I'm
2  unaware of what their individual policies may say.
3       Q    And that is not something -- in other words, we
4  know that there is money passed -- that originates with
5  the City, that gets passed through The Foundation, and it
6  goes to Glide for the syringe access program; but you
7  don't monitor how Glide distributes its safer smoking
8  supplies?
9            MS. MURPHY:  Object to form.
10           MR. DAVIS:  By "you," I mean The Foundation; is
11 that correct?
12           MS. MURPHY:  Same objection.
13           THE WITNESS:  For the syringe access
14 collaborative, we are only working in partnership to
15 ensure that they have access to the financial resources,
16 as I said, through the pass-through; and that they have
17 the access to the supplies they need for syringe access.
18 BY MR. DAVIS:
19      Q    Very good.
20           And then we know that The Foundation obtains
21 supplies from the State's smoking supplies.  I'm leaving
22 syringe supplies out.  I'm talking about the pipes, the
23 straws, the -- the brillo, and things like that.
24           Does The Foundation share or pass any of those
25 supplies on to its collaborative partners?

```
 1      A    The Foundation does place orders through the
 2 State Clearinghouse for our partners at the Homeless Youth
 3 Alliance for safer smoking supplies.  That is separate
 4 from our relationship and the syringe access
 5 collaborative.  We partner with many agencies in multiple
 6 forms; but, yes, we do place an order for the homeless
 7 youth alliance through the syringe access -- or sorry --
 8 through that -- the State Clearinghouse, separate from the
 9 syringe access collaborative.  We do not for Glide.
10      Q    So if -- to the extent Glide is distributing
11 smoking supplies, those supplies are not originating, in
12 any way, with The Foundation?
13      A    To my knowledge, Glide has a separate
14 relationship with the State Clearinghouse.
15      Q    Okay.  Okay.  And you don't have any knowledge
16 about how Glide hands out those smoking supplies?
17      A    I am unaware of their specific policies.
18      Q    Glide does receive money from The Foundation with
19 respect to the syringe access collaborative?
20      A    They do receive money in respect to the syringe
21 access collaborative.
22      Q    Okay.  And do you have any understanding as --
23 well, is it your understanding that Glide is obligated to
24 follow the same policy, the new City policy, with respect
25 to smoking supplies that The Foundation is obligated to
```

```
 1   BY MR. DAVIS:
 2       Q    And so my question was, do you think that would
 3   be harmful for the family to walk -- have to walk by or
 4   through a sidewalk that is congested with people who are
 5   openly smoking narcotics?
 6                (Simultaneous speakers.)
 7                (Reporter clarification.)
 8           MR. LONDEN:  I -- my objection was "asked and
 9   answered."
10           I did not instruct the witness not to answer.
11           MS. MURPHY:  Mine was "same objection."
12   BY MR. DAVIS:
13       Q    I'm sorry.
14           Do you have an answer, Doctor?
15       A    I believe I've answered.
16       Q    You can't simply say "yes" to that question, that
17   that might be harmful to families?
18           MR. LONDEN:  Argumentative.
19           You can respond.
20   BY MR. DAVIS:
21       Q    You mentioned the -- the benefits or the --
22   excuse me.  You mentioned concern about the health of
23   people who are -- are struggling with addiction.
24           Can you tell me what you understand to be the
25   benefits of giving somebody who's struggling with
```

1   addiction smoking supplies?
2       A    Yeah.  I -- I believe that there are people who
3   are using substances, who are going to use substances
4   every day, and that there is a public health benefit to us
5   providing access to supplies that will reduce their harm.
6   So we've learned over time -- for example, in the access
7   to syringe access supplies, that syringe access supplies
8   help reduce the risk of infectious disease, like
9   hepatitis, HIV, and soft tissue infection.
10           And, similarly, in safer smoking supplies, we are
11  trying to reduce the risk of the spread of disease, of
12  people burning their lips, of inhaling other substances
13  that might burn their lungs, et cetera.  So there's a
14  public health benefit of distributing these supplies if
15  people are, in fact, going to use.
16      Q    I'm going to go back to Exhibit 9, to
17  Dr. Philip's deposition.  Give me just a moment here.  See
18  if I'm sharing that.
19           Do you see -- it's a document, and I've got the
20  page.  It's page 3 of 3, some highlight at the top.
21      A    I do.
22      Q    Okay.  Do you see -- do you recognize this is the
23  letter that the -- that you received from the City
24  announcing the new policy?
25      A    I do see that.

1    Q    And do you see that it says -- there's a bullet
2  point that says:  "First, the distribution of safer
3  smoking supplies does not have the same breadth or rigor
4  of evidence-based studies as sterile syringe access."
5         Do you have any reason to disagree or dispute
6  that statement?
7    A    I don't have firsthand knowledge of the amount of
8  evidence-based research to compare one versus the other,
9  in terms of the amount of research; but what I do know
10 from the conversations at this time is that we, as a
11 Foundation, expressed a great deal of concern because we
12 have made such significant progress as a city at getting
13 closer to zero new HIV diagnoses in a city, because we
14 have been able to deter folks from injecting drugs in our
15 city by providing safer smoking supplies.
16        And in the rollout of this new policy, there was
17 significant concern that in the absence of safer smoking
18 supplies, folks may return to injecting something that we
19 are afraid may, in fact, be happening throughout the
20 rollout of this policy.
21   Q    And I don't mean to be flippant or anything.
22        You're not a medical professional?
23   A    I'm not.
24   Q    You're not an academic?
25   A    I --

1  We're trying to be good -- good neighbors under the
2  policy, and we recognize that if folks were to immediately
3  take a supply that we are distributing and then sit down
4  in the immediate area, that there could be a large
5  grouping of folks; and that's what we're trying to avoid.
6  BY MR. DAVIS:
7      Q   How far does someone have to go before staff no
8  longer asks them to move away?
9          MS. MURPHY:  Object to form.
10         THE WITNESS:  There's not a defined proximity.
11 BY MR. DAVIS:
12     Q   And so if they go down -- 25 feet down the
13 sidewalk and use there, can you say whether that would be
14 okay?
15         MS. MURPHY:  Same objection.
16         THE WITNESS:  Again, there's not a defined
17 proximity on exact distance.
18 BY MR. DAVIS:
19     Q   Can we agree that if people get a supply from The
20 Foundation, walk outside, and use it immediately outside
21 the facility, that might adversely affect the neighbors of
22 that community?
23         MS. MURPHY:  Object to form.
24         THE WITNESS:  I think our participants are
25 actually very savvy, and they know that they rely on

1  our -- our sites to get the supplies that they need to use
2  safely, and so they -- many of them choose not to use in
3  close proximity to protect the sites where they receive
4  services that they need.
5  BY MR. DAVIS:
6      Q    And -- I'm sorry.
7           How many of these sites have you actually gone to
8  and monitored?
9      A    I have been to our previous Mission-based site
10 prior to its relocation and to our Bayview site and to our
11 6th Street physical location.
12     Q    Have you ever been to the Duboce site?
13     A    I have not been to our Deboce site.
14     Q    And you haven't been to the Hemlock site?
15     A    I have not been to the Hemlock site.
16     Q    Is -- is the Good Neighbor Policy something that
17 the City required The Foundation to include in this
18 policy?
19     A    I am unaware if it was required as a part of this
20 particular policy, but it is required of us as an
21 organization in the implementation of behavioral health
22 and substance use policies in general and -- yes, in
23 general.
24     Q    Okay.  I'm going to the -- let's see.  It's
25 page 7 of 8 of Exhibit 7, The Foundation's policy, and

1  the day of the week; the specific mobile site; the Column
2  D there -- "UOS" is the unit of service, which is the
3  number of hours the site was open; and then the following
4  columns indicates the type of supply and the individual
5  number of that supply that was provided at that site.
6      Q    Got it.  Okay.
7           MR. DAVIS:  Can you -- (sotto voice.)
8           Okay.  I think we now are sharing Exhibit 10 -- I
9  think we're up to.
10          (Exhibit 10 marked for identification.)
11 BY MR. DAVIS:
12     Q    Do you recognize this spreadsheet?
13     A    This looks like the order form for the State
14 Clearinghouse.
15     Q    And is this the form that The Foundation uses to
16 order, among other things, smoking supplies?
17     A    Yes.
18     Q    And this order form -- what's the time period
19 covered by this?  Is this a recent order, or how would we
20 tell?
21     A    I would suspect by the date in the subject line,
22 where it is titled "Order Form August 2025."
23     Q    Okay.  So this is a -- an order form from -- from
24 August.
25          Does this mean that The Foundation ordered from

```
 1   the State, for example, some glass stems 3/8 of an inch
 2   length?
 3        A    That is correct.
 4        Q    And how many -- how many stem three quarter -- or
 5   3/8 length glass pipes or glass stems were part of this
 6   order?
 7        A    According to this spreadsheet, there would have
 8   been five cases at 1600 stems per case.
 9        Q    So about 8,000 of these stems?
10        A    Correct, according to this spreadsheet.
11        Q    And then the glass bubblers, 5-inch length --
12   looks like you ordered five boxes of -- or five cases with
13   432 in each case?
14        A    That is correct.
15        Q    About 2,000?
16        A    Yeah.
17        Q    And did The Foundation hand out all of these
18   materials in one location -- or tell us what The
19   Foundation did with these materials.
20        A    Yeah.  So this is an order form for the State
21   Clearinghouse.  As I said earlier in the deposition, we
22   order for both ourselves and the Homeless Youth Alliance;
23   and these are distributed at multiple sites.
24        Q    And you don't know what sites the Youth Alliance
25   distributes them at; is that correct?
```

```
 1                      CERTIFICATE

 2                           OF

 3              CERTIFIED SHORTHAND REPORTER

 4                     *    *    *    *

 5

 6

 7         The undersigned Certified Shorthand Reporter of the

 8    State of California does hereby certify:

 9         That the foregoing Proceeding was taken before me at

10    the time and place therein set forth.

11         That the testimony and all objections made at the

12    time of the Proceeding were reported verbatim by me and

13    were thereafter transcribed, said transcript being a true

14    and correct copy of the proceedings thereof.

15         In witness whereof, I have subscribed my name, this

16    date:  November 17, 2025.

17

18

19              *Jane Gallegos*

20         _____
           JANE GALLEGOS, CSR No. 14676
21

22

23

24

25
```